**Nos. 24-50721 & 25-50096**

# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE, L.L.C.,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

## RECORD EXCERPTS FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General

AARON L. NIELSON
Solicitor General

CAMERON FRASER
Assistant Solicitor General
Cameron.Fraser@oag.texas.gov

P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Eric S. Abels
Assistant Attorney General

*Counsel for Defendant-Appellant*

## Table of Contents


1. *CCIA* Docket Sheet (ROA.24-50721.1-6)........................................ Tab 1
2. *CCIA* Preliminary Injunction Order (ROA.24-50721.394-431) ....... Tab 2
3. *CCIA* Notice of Appeal (ROA.24-50721.432-433) .......................... Tab 3
4. *SEAT* Docket Sheet (ROA.25-50096.1-11) ..................................... Tab 4
5. *SEAT* Preliminary Injunction Order (ROA.25-50096.837-873)....... Tab 5
6. *SEAT* Notice of Appeal (ROA.25-50096.874-875) ......................... Tab 6


## Certificate of Service

On April 28, 2025, these record excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Cameron Fraser
Cameron Fraser

# Tab 1: *CCIA* Docket Sheet (ROA. 24-50721.1-6)

INTAPP,ML,STAYED

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:24-cv-00849-RP

Computer & Communications Industry Association et al v. Paxton
Assigned to: Judge Robert Pitman
Related Case: 1:24-cv-00945-RP
Case in other court: Fifth Cicruit, 24-50721
Cause: 42:1983 Civil Rights Act

Date Filed: 07/30/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Computer & Communications Industry Association** represented by

**Joshua Paul Morrow**
Lehotsky Keller Cohn LLP
408 W. 11th Street
Ste 5th Floor
Austin, TX 78701
806-674-0457
Email: josh@lkcfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Keller**
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
512-693-8350
Email: scott@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared B. Magnuson**
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
512-693-8350
Fax: 512-727-4755
Email: jared@lkcfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven P. Lehotsky**
Lehotsky Keller LLP
200 Massachusetts Ave., Nw, Suite 700
Washington, DC 20001
(512) 693-8350
Fax: 202-463-5346
Email: steve@lehotskykeller.com
*ATTORNEY TO BE NOTICED*

**Jeremy Evan Maltz**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
512-693-8350
Email: jeremy@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NetChoice, LLC** represented by

**Joshua Paul Morrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Keller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven P. Lehotsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Evan Maltz**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ken Paxton**
*in his official capacity as Attorney General of Texas* represented by

**Todd A. Dickerson**
Office of the Attorney General of Texas
PO Box 12548-Capitol Station
Austin, TX 78701
512-463-2120
Fax: 512-320-0667
Email: todd.dickerson@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2024 | 1 (p.7) | COMPLAINT *for Declaratory and Injunctive Relief* ( Filing fee $ 405 receipt number ATXWDC-19039982), filed by Computer and Communications Industry Association, NetChoice, LLC. (Attachments: # 1 (p.7) Exhibit 1 - Text of Tex. HB18, # 2 (p.66) Civil Cover Sheet)(Maltz, Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 2 (p.66) | REQUEST FOR ISSUANCE OF SUMMONS by Computer and Communications Industry Association, NetChoice, LLC. (Maltz, |

| | | |
|---|---|---|
| | | Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 3 (p.68) | RULE 7 DISCLOSURE STATEMENT filed by Computer and Communications Industry Association. (Maltz, Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 4 (p.69) | RULE 7 DISCLOSURE STATEMENT filed by NetChoice, LLC. (Maltz, Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 5 (p.70) | MOTION to Appear Pro Hac Vice by Jeremy Evan Maltz *on behalf of Jared B. Magnuson* ( Filing fee $ 100 receipt number ATXWDC-19041540) by on behalf of Computer and Communications Industry Association, NetChoice, LLC. (Attachments: # 1 (p.7) Proposed Order)(Maltz, Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 6 (p.75) | Opposed MOTION for Preliminary Injunction *and, in the alternative, Temporary Restraining Order for Injunctive Relief by September 1, 2024* by Computer and Communications Industry Association, NetChoice, LLC. (Attachments: # 1 (p.7) Exhibit 1 - Text of Texas HB18, # 2 (p.66) Exhibit 2 - Decl. of Matt Schruers (CCIA), # 3 (p.68) Exhibit 3 - Decl. of Carl Szabo (NetChoice), # 4 (p.69) Exhibit 4 - Dec. of Alexandra Veitch (YouTube), # 5 (p.70) Exhibit 5 - Decl. of Gautham Pai (Nextdoor), # 6 (p.75) Exhibit 6 - Decl. of Chris Riley (tech policy.social), # 7 (p.207) Exhibit 7 - Decl. of Stacie Rumenap (Stop Child Predators))(Maltz, Jeremy) (Entered: 07/30/2024) |
| 07/30/2024 | 7 (p.207) | ORDER re 6 (p.75) Opposed MOTION for Preliminary Injunction *and, in the alternative, Temporary Restraining Order for Injunctive Relief by September 1, 2024* filed by Computer & Communications Industry Association, NetChoice, LLC, (**Telephone Conference set for 7/31/2024 10:45 AM before Judge Robert Pitman,**. Signed by Judge Robert Pitman. (jg3) (Entered: 07/30/2024) |
| 07/30/2024 | 8 (p.208) | NOTICE of Attorney Appearance by Todd A. Dickerson on behalf of Ken Paxton. Attorney Todd A. Dickerson added to party Ken Paxton(pty:dft) (Dickerson, Todd) (Entered: 07/30/2024) |
| 07/30/2024 | | Case assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (cr5) (Entered: 07/31/2024) |
| 07/30/2024 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Lane. (cr5) (Entered: 07/31/2024) |
| 07/31/2024 | 9 (p.210) | Summons Issued as to Ken Paxton. (cr5) (Entered: 07/31/2024) |
| 07/31/2024 | 10 | Minute Entry for proceedings held before Judge Robert Pitman: Telephone Conference held on 7/31/2024 (Minute entry documents are not available electronically.). (Court Reporter Lily Reznik.)(cc3) (Entered: 07/31/2024) |
| 07/31/2024 | 11 (p.212) | |

| | | |
|---|---|---|
| | | ORDER GRANTING 5 (p.70) Motion to Appear Pro Hac Vice as to JARED B. MAGNUSON. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (cc3) (Entered: 07/31/2024) |
| 08/02/2024 | 12 (p.213) | ADVISORY TO THE COURT by Ken Paxton . (Dickerson, Todd) (Entered: 08/02/2024) |
| 08/02/2024 | 13 (p.215) | NOTICE *of Plaintiffs' Proposed Schedule* by Computer & Communications Industry Association, NetChoice, LLC re 10 Telephone Conference (Maltz, Jeremy) (Entered: 08/02/2024) |
| 08/02/2024 | 14 (p.220) | SUMMONS Returned Executed by Computer & Communications Industry Association, NetChoice, LLC. Ken Paxton served on 7/31/2024, answer due 8/21/2024. (Maltz, Jeremy) (Entered: 08/02/2024) |
| 08/02/2024 | 15 (p.221) | ORDER for Defendant Ken Paxton respond to 6 (p.75) Motion for Preliminary Injunction on or before 8/20/2024. Signed by Judge Robert Pitman. (cc3) (Entered: 08/05/2024) |
| 08/16/2024 | 16 (p.222) | Unopposed MOTION for Leave to Exceed Page Limitation by Ken Paxton. (Attachments: # 1 (p.7) Proposed Order Granting Defendant's Unopposed Motion for Leave to Exceed Page Limits, # 2 (p.66) Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction, # 3 (p.68) Proposed Order Regarding Preliminary Injunction)(Dickerson, Todd) (Entered: 08/16/2024) |
| 08/19/2024 | | Text Order GRANTING 16 (p.222) Unopposed Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file Defendant's response and proposed order, (Dkts. 16-2 and 16-3). (This is a text-only entry generated by the court. There is no document associated with this entry.) (jllc) (Entered: 08/19/2024) |
| 08/19/2024 | 17 (p.272) | ORDER, IT IS ORDERED that the parties shall file a notice, individually or jointly, before 10:30 a.m., August 20, 2024, as to whether they request a hearing on Plaintiffs' motion for a preliminary injunction or are willing to proceed solely on the papers. Signed by Judge Robert Pitman. (pg) (Entered: 08/19/2024) |
| 08/19/2024 | 18 (p.273) | Defendant's Response in Opposition to Motion, filed by Ken Paxton, re 6 (p.75) Opposed MOTION for Preliminary Injunction *and, in the alternative, Temporary Restraining Order for Injunctive Relief by September 1, 2024* filed by Plaintiff Computer & Communications Industry Association, Plaintiff NetChoice, LLC (Attachments: # 1 (p.7) Proposed Order)(cnr) (Entered: 08/19/2024) |
| 08/19/2024 | 19 (p.320) | NOTICE *by both parties regarding hearing on pending motion* by Computer & Communications Industry Association, NetChoice, LLC re 17 (p.272) Order, (Maltz, Jeremy) (Entered: 08/19/2024) |
| 08/20/2024 | 20 (p.323) | |

| | | |
|---|---|---|
| | | MOTION to Appear Pro Hac Vice by Jeremy Evan Maltz *for Steven P. Lehotsky* ( Filing fee $ 100 receipt number ATXWDC-19124586) by on behalf of Computer & Communications Industry Association, NetChoice, LLC. (Attachments: # 1 (p.7) Proposed Order)(Maltz, Jeremy) (Entered: 08/20/2024) |
| 08/20/2024 | 21 (p.328) | ORDER GRANTING 20 (p.323) Motion to Appear Pro Hac Vice as to STEVEN P. LOHOTSKY. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (cc3) (Entered: 08/20/2024) |
| 08/23/2024 | 22 (p.329) | Unopposed MOTION for Leave to Exceed Page Limitation *for Reply in Support of Motion for Preliminary Injunction* by Computer & Communications Industry Association, NetChoice, LLC. (Attachments: # 1 (p.7) Proposed Order, # 2 (p.66) Exhibit Ex. 1 - Plaintiffs' Reply Brief)(Maltz, Jeremy) (Entered: 08/23/2024) |
| 08/23/2024 | | Text Order GRANTING 22 (p.329) Unopposed Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file Plaintiffs' reply brief, (Dkt. 22-2). (This is a text-only entry generated by the court. There is no document associated with this entry.) (jllc) (Entered: 08/23/2024) |
| 08/23/2024 | 23 (p.360) | Opposed MOTION for Leave to File Defendant's Surreply to Plaintiffs' Motion for Preliminary Injunction by Ken Paxton. (Attachments: # 1 (p.7) Proposed Order, # 2 (p.66) Defendant's Surreply to Plaintiffs' Motion for Preliminary Injunction)(Dickerson, Todd) (Entered: 08/23/2024) |
| 08/23/2024 | 24 (p.366) | REPLY in Support, filed by Computer & Communications Industry Association and NetChoice, LLC, re 6 (p.75) Opposed MOTION for Preliminary Injunction *and, in the alternative, Temporary Restraining Order for Injunctive Relief by September 1, 2024* (cc3) (Entered: 08/26/2024) |
| 08/30/2024 | 25 (p.394) | ORDER GRANTING IN PART 6 (p.75) Motion for Preliminary Injunction; and DENYING 23 (p.360) Motion for Leave to File a Surreply. Signed by Judge Robert Pitman. (cc3) (Entered: 08/30/2024) |
| 09/05/2024 | 26 (p.432) | Appeal of Order entered by District Judge 25 (p.394) by Ken Paxton. ( Filing fee $ 605 receipt number ATXWDC-19188624) (Dickerson, Todd) (Entered: 09/05/2024) |
| 09/05/2024 | | NOTICE OF INTERLOCUTORY APPEAL as to 25 (p.394) Order on Motion for Preliminary Injunction, Order on Motion for Leave to File by Ken Paxton. Filing fee $ 605, receipt number ATXWDC-19188624. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (cc3) |

| | | |
|---|---|---|
| | | (Entered: 09/06/2024) |
| 09/06/2024 | 27 (p.434) | Unopposed MOTION to Stay Case *Pending Appeal* by Ken Paxton. (Attachments: # 1 (p.7) Proposed Order)(Dickerson, Todd) (Entered: 09/06/2024) |
| 09/12/2024 | 28 (p.437) | TRANSCRIPT REQUEST by Ken Paxton for dates of n/a. Proceedings Transcribed: n/a. Court Reporter: n/a.. (Dickerson, Todd) (Entered: 09/12/2024) |
| 09/13/2024 | | Text Order GRANTING 27 (p.434) Motion to Stay Case entered by Judge Robert Pitman. In light of the lack of opposition, the motion is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (qtlc) (Entered: 09/13/2024) |
| 09/13/2024 | | Case Stayed pending the resolution of the 26 (p.432) Appeal filed at the Fifth Circuit Court of Appeals. (cnr) (Entered: 09/13/2024) |

# TAB 2: *CCIA* PRELIMINARY INJUNCTION ORDER (ROA. 24-50721.394-431)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, LLC, | § | |
| Plaintiffs, | § | |
| v. | § | 1:24-CV-849-RP |
| KEN PAXTON, *in his official capacity as Attorney General of Texas*, | § | |
| Defendant. | § | |

**<u>ORDER</u>**

Before the Court is Plaintiffs Computer & Communications Industry Association ("CCIA") and NetChoice, LLC's ("NetChoice") (collectively, "Plaintiffs") Motion for a Preliminary Injunction. (Dkt. 6). Defendant Ken Paxton, in his official capacity as Attorney General of Texas, ("Paxton") filed a response, (Dkt. 18), and Plaintiffs filed a reply, (Dkt. 24). Having considered the record, the parties' briefing, and the relevant law, the Court will grant in part and deny in part the motion for a preliminary injunction.

## I. BACKGROUND

This case concerns Texas House Bill 18 ("HB 18" or "the Act"), a law that regulates social media websites. Tex. Bus. & Com. Code §§ 509.001, et seq.[1] The Court will begin by describing the parties, then HB 18, and then the procedural posture of the case.

### A. The Parties

Plaintiff CCIA is a nonprofit organization that "promote[s] open markets, open systems, and open networks." (Compl., Dkt. 1, at 4). Its members include major technology and social media

[1] All cites are to HB 18, rather than to the Texas Business and Commerce Code.

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 2 of 35

companies such as Google (including YouTube), Meta (including Facebook, Instagram, and Threads), and X (formerly Twitter). (*Id.* at 4). Plaintiff NetChoice is a nonprofit trade association that comprises these members as well as the companies that own Nextdoor, Snapchat, and Pinterest. (*Id.*).

Paxton is the sole Defendant in this suit. He is the Attorney General of Texas, sued in his official capacity. (*Id.* at 5). Paxton and the Consumer Protection Division of the Attorney General's Office have enforcement authority under HB 18. *See* HB 18 § 509.151 ("A violation of this chapter is a deceptive act or practice actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office.").[2]

**B. HB 18**

1. Coverage

HB 18 regulates "digital service provider[s]" ("DSPs") that "allow[] users to socially interact with other users." HB 18 §§ 509.001(2), 509.002(a)(2). This definition includes standard social media platforms such as Facebook and Instagram as well as other "social" websites such as YouTube and Reddit. HB 18 defines DSPs as any "website," "application," "program," or software that collects or processes personal identifying information ("PII") and:

> (1) "determines" both the "means" and the "purpose of collecting and processing the [PII] of users," HB 18 § 509.001(1)-(2);
> (2) "connects users in a manner that allows users to socially interact with other users on the digital service," *id.* § 509.002(a)(1);
> (3) "allows a user to create a public or semi-public profile for purposes of signing into and using the digital service," *id.* § 509.002(a)(2); and
> (4) "allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (A) a message board; (B) a chat room; or (C) a landing page, video channel, or main feed that presents to a user content created and posted by other users," *id.* § 509.002(a)(3).

[2] HB 18 also creates a separate private right of action. HB 18 § 509.152.

Examples of covered DSPs include a "message board," a "chat room," and "a landing page, video channel, or main feed." *Id.* § 509.002(a)(3). Exceptions to the law include: state and local government websites, financial institutions, medical websites, small businesses, institutions of higher education, employee management software, school education software, and email services that only provide "social" functions that are "incidental" to their main service. *Id.* § 509.002(b). Notably, the law also exempts DSPs that "primarily" feature "news, sports, commerce, or content primarily generated by the [website]" but "allows chat, comment, or other interactive functionality that is incidental to the digital service." *Id.*

2. Requirements

a. Age Registration and Parental Disputes

With the stated purpose of protecting minors, HB 18 imposes age registration and verification requirements on users. Under HB 18, covered DSPs must make users "register" their age before those users can create an account. *Id.* § 509.051(a) (covered DSPs "may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the website."). A user cannot change their registered age "unless the alteration process involves a commercially reasonable review process." *Id.* § 509.051(c).

HB 18 also allows parents to dispute the registered age of their child by notifying "a [DSP] that the minor is younger than 18 years of age" or successfully disput[ing] the registered age of the minor . . . ." *Id.* § 509.051(d)(2).[3] If a parent disputes the age of their child, the DSP must treat the user as a known minor. *Id.* § 509.051(e). To ensure parenthood, HB 18 requires DSPs to "verify, using a commercially reasonable method and for each person seeking to perform an action on a

[3] The statute also allows parents to dispute the age of a minor if the parent "performs another function of a parent of guardian under this chapter." HB 18 § 509.051(d)(2)(C). It is not entirely clear what this language refers to.

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 4 of 25

digital service as a minor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." *Id.* § 509.101(a).

b. "Monitoring-and-Filtering" Requirements

If a known minor logs into a covered website, HB 18 imposes several new requirements on the DSPs. Chief among these are the requirements set forth in Section 509.053, which the Court refers to as the "monitoring-and-filtering" requirements. As this label suggests, these requirements make DSPs monitor certain categories of content and filter them from being on display for known minors. Specifically, HB 18 requires covered DSPs to "develop and implement a strategy to prevent [a] known minor's exposure to" defined categories of prohibited speech. *Id.* § 509.053(a). HB 18 prohibits content "that promotes, glorifies, or facilitates" the following categories:

(A) "suicide, self-harm, or eating disorders";
(B) "substance abuse";
(C) "stalking, bullying, or harassment";
(D) "grooming, trafficking, child pornography, or other sexual exploitation or abuse"; and
(E) material that qualifies as obscenity for minors under Texas Penal Code § 43.24.

*Id.*

Strategies to prevent minors' exposure to these harmful categories "must include":

(A) creating and maintaining a comprehensive list of harmful material or other content described [above] to block from display to a known minor;
(B) using filtering technology and other protocols to enforce the blocking of material or content on the list [above];
(C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described [above];
(D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;
(E) performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;
(F) making available to users a comprehensive description of the categories of harmful material or other content described [above] that will be filtered; and

> (G) except as provided by Section 509.058, making available the digital service provider's algorithm code to independent security researchers.

*Id.* § 509.053(b)(1).[4]

c. Additional Requirements

In addition to the "monitoring-and-filtering" requirements, HB 18 imposes regulations on how DSPs can treat the data of known minors. First, the law imposes limits on what kind of data a DSP may collect. Covered DSPs must "limit collection of the known minor's [PII]to information reasonably necessary to provide the digital service" and "limit use of the [PII] to the purpose for which the information was collected . . . ." HB 18 § 509.052(1). In addition, a covered DSP may not: (A) allow the known minor to make purchases or engage in other financial transactions through the digital service; (B) share, disclose, or sell the known minor's PII; (C) use the digital service to collect the known minor's precise geolocation data; or (D) use the digital service to display targeted advertising to the known minor. *Id.* § 509.052(2).

Second, HB 18 requires DSPs to create and provide parental tools for digital services. *Id.* § 509.054. Parents must be able to "control the known minor's privacy and account settings," alter data collection and financial transaction settings for the minor, and "monitor and limit the amount of time the . . . known minor spends" using the DSP. *Id.* § 509.054(b).

Third, HB 18 requires DSPs to "make a commercially reasonable effort to prevent advertisers on the digital service provider's [website] from targeting a known minor" with content

---

[4] In addition to the above mandatory strategies, HB 18 allows DSPs to use other strategies, including:

> (A) creating engaging a third party to rigorously review the digital service provider's content filtering technology;
> (B) participating in industry-specific partnerships to share best practices in preventing access to harmful material or other content described [above]; or
> (C) conducting periodic independent audits to ensure:
> > i. continued compliance with the digital service provider's strategy; and
> > ii. efficacy of filtering technology and protocols used by the digital service provider.

HB 18 § 509.053(b)(2).

that "facilitates, promotes, or offer[s] a product, service, or activity that is unlawful for a minor in this state to use or engage in." *Id.* § 509.055.

Fourth, DSPs that publish content, more than one-third of which is obscene for minors under Texas law, "must use a commercially reasonable age verification method to verify that" the user seeking to access the information is 18 or older. *Id.* § 509.057. Plaintiffs do not challenge this provision.

Fifth, HB 18 requires covered DSPs that "use[] algorithms to automate the suggestion, promotion, or ranking of information to known minors" to "disclose . . . in a clear and accessible manner, an overview of": (1) "the manner in which the digital service uses algorithms to provide information or content"; (2) "the manner in which algorithms promote, rank, or filter information or content"; and (3) "the [PII] used as inputs to provide information or content." *Id.* § 509.056(2). DSPs that "use[] algorithms to automate the suggestion, promotion, or ranking of information" must "make a commercially reasonable effort to ensure that the algorithm does not interfere with the [DSP's] duties." *Id.* § 509.056(1).[5]

**C. Procedural History**

Plaintiffs filed suit on July 30, 2024, and filed a motion for a preliminary injunction concurrently with their complaint. (Compl., Dkt. 1; Mot. Prelim. Inj., Dkt. 6). Paxton filed a response, (Dkt. 18), and Plaintiffs filed a reply, (Dkt. 24).[6]

Plaintiffs allege that HB 18 violates the First Amendment because it is a content-based law that does not survive strict scrutiny. (Compl., Dkt. 1, at 21–25). Their preliminary

---

[5] HB 18 contains various other provisions related to the practical enforcement of the law, such as clarifying that PII may be shared to comply with legal investigations, HB 18 § 509.059(1); that DSPs need not disclose trade secrets, *id.* § 509.058; and that the Department of Family and Protective Services may designate its staff as a minor's caregiver, if a minor is in the agency's conservatorship. *Id.* § 509.104.

[6] The parties filed a joint notice that the motion can be decided solely on the papers without a hearing. (Dkt. 19).

injunction argues both that the coverage provision and thereby the law as a whole is content-based, and it argues that the monitoring-and-filtering requirements are independently content-based. (Mot. Prelim. Inj., Dkt. 6, at 14–24). Plaintiffs also argue that the law is void for vagueness, (Compl., Dkt. 1, at 25–26, 32–34), imposes unconstitutional prior restraints, (*id.* at 26–32), and is preempted under Section 230 of the Communications Decency Act ("Section 230"). (*Id.* at 34–35). Plaintiffs seek a preliminary injunction of the law, requesting that the Court enjoin Paxton from enforcing HB 18 in full. (Mot. Prelim. Inj., Dkt. 6, at 20).

Paxton filed a response in opposition to the motion. (Dkt. 18). Paxton argues that Plaintiffs' claim is barred by sovereign immunity and that Plaintiffs lack standing to bring suit. (*Id.* at 18–23). Paxton also claims that HB 18 should not be classified as a whole and that its disparate provisions, many of which are not content based, should survive First Amendment scrutiny, to the extent the First Amendment applies at all. (*Id.* at 23–30). Paxton further argues that HB 18 does not violate the First Amendment, is subject to limiting constructions, is not unconstitutionally vague, and is not preempted under Section 230. (*Id.* at 30–44). Finally, Paxton notes four "issues" with Plaintiffs' motion: (1) the law is severable; (2) the law is not a prior restraint; (3) age verification is not challenged in Plaintiffs' motion; and (4) Plaintiffs improperly delayed bringing suit. (*Id.* at 44–45). Plaintiffs filed a reply, (Dkt. 24), and Paxton filed an opposed motion for leave to file a surreply. (Dkt. 23).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

**III. DISCUSSION**

As Paxton notes, Plaintiffs' motion turns on the likelihood of success on the merits. (Resp., Dkt. 18, at 45 ("The remaining preliminary injunction factors will not meaningfully impact this case.")). The Court will begin its likelihood of success analysis with the jurisdictional issues: whether Paxton is entitled to sovereign immunity and Plaintiffs' standing to bring suit. Finding that *Ex parte Young* applies and Plaintiffs have standing, the Court will then turn to the merits of Plaintiffs' motion.

**A. Sovereign Immunity**

The Eleventh Amendment deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). However, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations under the *Ex parte Young* exception. 209 U.S. 123, 159–60 (1908). For the exception to apply, "the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (quoting *Young*, 209 U.S. at 157).

The Fifth Circuit's test for a defendant with "some connection" to enforcement looks to three factors: (1) the particular duty to enforce the challenged law; (2) a demonstrated willingness of enforcement; and (3) enforcement authority that amounts to "compulsion" or "constraint." *Mi*

Case 1:24-cv-00849-RP   Document 25   Filed 08/30/24   Page 20 of 105

*Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024). Plaintiffs argue that all three elements are met because the Texas Attorney General's Office enforces HB 18, has shown a willingness to enforce the law, and the enforcement power constitutes compulsion and constraint. (*See* Mot. Prelim. Inj., Dkt. 6). Paxton focuses his briefing on the particular duty to enforce and demonstrated willingness to enforce. (*See* Resp., Dkt. 18).

As to his "particular duty," Paxton suggests there is a distinction between a "particular duty to enforce the statute" and a mere "[d]iscretionary authority to act[.]" (*Id.* at 18 (citing *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022); *Mi Familia Vota*, 105 F.4th at 327)). Because HB 18 authorizes the Attorney General to enforce the law—but does not *require* enforcement against all known violations—Paxton argues that his authority does not exceed the discretionary authority to act.

Paxton conflates two different elements of the *Ex parte Young* test. Whether the defendant has the "particular duty" to enforce the challenged law is different than whether there is a "demonstrated willingness" of enforcement. *See Mi Familia Vota*, 105 F.4th at 325. To demonstrate a "particular duty," *Ex parte Young* requires neither a history of enforcement nor a statutory requirement of enforcement. *City of Austin*, 943 F.3d at 1001; *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020). Under HB 18, Paxton has the "particular duty" to enforce the law because a "violation [is] actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office." HB 18 § 509.151.[7] Whether that enforcement is mandatory or discretionary speaks to a "demonstrated willingness" to enforce the statute—not whether Paxton has the "particular duty" of its enforcement. *See Natl. Press Photographers Assn. v. McCraw*, 90 F.4th

[7] HB 18 also creates a private right of action for equitable relief, but Paxton is the sole governmental agent authorized to bring suit. HB 18 § 509.151–52.

Case 1:24-cv-00849-RP    Document 25    Filed 08/30/24    Page 21 of 35

770, 786 (5th Cir. 2024) (finding state agency heads with discretionary enforcement power had a particular duty to enforce and noting that "[a]s heads of Texas law-enforcement agencies, [defendants] have more than just the general duty to see that the state's laws are implemented—they are *directly* responsible for enforcing Texas's criminal laws").

As to the "demonstrated willingness," there need be only a "scintilla of enforcement by the relevant state official" for *Ex parte Young* to apply. *City of Austin*, 943 F.3d at 1002 (quotations omitted). Imminent enforcement or actual threats thereof are "not required." *Air Evac*, 851 F.3d at 519. Paxton suggests that he "must have *taken some step* to enforce HB 18" in order to be a proper *Ex parte Young* defendant. (Resp., Dkt. 18, at 18 (quoting *Mi Familia Vota*, 105 F.4th at 329)). But Plaintiffs bring a pre-enforcement challenge for a law that has not yet taken effect. Evidence of actual enforcement is therefore impossible and is not required. *See Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023). All Plaintiffs must show is "'some scintilla' of affirmative action by the state official . . . ." *Id.* (citing *Tex. Democratic Party*, 961 F.3d at 401).

That "scintilla" is met. Critically, Paxton has not disavowed enforcement. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty . . . . Appellees are thus not without some reason in fearing prosecution for violation of the ban . . . ."). In the First Amendment context, this is enough. *See Nat'l Press*, 90 F.4th at 782 ("Unlike in other constitutional contexts, in the speech context, we may assume a substantial threat of future enforcement absent compelling contrary evidence.") (internal citation and quotation omitted).

Beyond his refusal to disavow, Paxton's response to the preliminary injunction motion makes clear that he *does* intend to enforce the law. Paxton's motion repeatedly emphasizes that he

believes social media is severely harming children. Paxton's introduction says, "[Plaintiffs] appear to think the Constitution leaves Texas powerless to defend its children . . . against the obvious dangers linked to social media use. They are wrong." (Resp., Dkt. 18, at 11). Paxton compares social media sites to "a slot machine, . . . giv[ing] users dopamine hits every so often . . . to keep them hooked just a little longer." (*Id.* at 13). Paxton's motion states that "[s]ocial media is hurting our children at an alarming and growing rate." (*Id.* at 16). These statements are, at the very least, a "scintilla" of willingness to enforce. Any reasonable reader of these statements would consider them to indicate an intent to enforce. Paxton's refusal to disavow enforcement, combined with his strident criticism of the impacts of social media on children, shows a "scintilla" of willingness to enforce HB 18.

Paxton instead argues that a recent Fifth Circuit case—*Mi Familia Vota*—upended Supreme Court precedent on pre-enforcement challenges by requiring a mandatory (rather than discretionary) enforcement provision. (Resp., Dkt. 18, at 18 (citing *Mi Familia Vota*, 105 F.4th at 327)). In *Mi Familia Vota*, a group of plaintiffs challenged Texas's general election laws by suing, (among others), the Harris County District Attorney Kim Ogg. *Id.* at 317. Because Ogg had only the general duty to enforce the laws of the state, the Fifth Circuit found that the "[d]iscretionary authority to act, on its own, is insufficient to give rise to a particular duty to act," which was "derived from the Texas constitution . . . and from the Texas Code of Criminal Procedure." *Id.* at 327–28. The court also noted that Ogg "never enforced the challenged provisions in the past" and that Plaintiffs had not shown any "action taken by Ogg to show a demonstrated willingness to enforce." *Id.* at 330. Indeed, Ogg stipulated that she would *not* enforce the law during the pendency of the suit. *Id.*

*Mi Familia Vota* is readily distinguishable in at least three material ways. First, as just discussed, Paxton has shown a willingness to enforce. By describing at length the ways in which social media is harming children and how the law represents a substantial and compelling state interest, Paxton has shown a "scintilla" of willingness to enforce. Second, whereas Ogg stipulated

that she would not enforce the law during the pendency of suit, Paxton has not done so here. Third, unlike Ogg's enforcement power in *Mi Familia Vota*, Paxton's authority to enforce HB 18 is not derived from the general constitutional duties of the Texas Attorney General. Instead, his enforcement authority is designed from the statute itself, vesting him with the "sole[]" power to take "enforcement action" under the law. HB 18 § 509.151.

Paxton' final argument suggests that *Ex parte Young* does not apply because the "consumer protection division of the attorney general's office" is vested with the authority to bring suits, rather than Paxton himself. (Resp., Dkt. 18, at 18). *Ex parte Young* requires only "some connection" to enforcement. *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022). "Where a state actor *or agency* is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the] *Young* analysis ends." *City of Austin*, 943 F.3d at 998 (emphasis added). Paxton, as Attorney General, is in charge of the Consumer Protection Division of the Attorney General's Office. He "enforces the law" through its subdivisions, including the Consumer Protection Division. *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024). Paxton does not deny that he has ultimate control over the management of divisions in his office and the prosecution of cases brought by those divisions. That authority establishes "some connection" to the law. Because Paxton has the particular duty to enforce HB 18 and a demonstrated willingness to do so, he is a proper defendant under *Ex parte Young*. Accordingly, Plaintiffs' suit is not barred by sovereign immunity.

**B. Standing**

Next, the Court addresses Plaintiffs' standing to bring suit. Paxton raises several arguments on this point: (1) Plaintiffs lack pre-enforcement standing, especially on provisions that regulate activities Plaintiffs do not engage in; (2) Plaintiffs have no associational standing for their facial challenges; (3) Plaintiffs lack associational standing for their as-applied challenges; (4) Plaintiffs' as-

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 13 of 26

applied challenge is not ripe; and (5) Plaintiffs lack standing to assert third-party rights of their users. (Resp., Dkt. 18, at 19–23).

1. Pre-Enforcement Standing

"In a pre-enforcement challenge, Plaintiffs can establish an injury in fact if they show that '(1) they have an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial.'" *Book People*, 91 F.4th at 335 (quoting *Speech First*, 979 F.3d at 330). Paxton does not dispute these second and third prongs. (Resp., Dkt. 18, at 19). Instead, Paxton argues that Plaintiffs (and their members) lack standing to challenge many provisions of HB 18 because they do not engage in all activities regulated by the law, such as collecting a user's precise geolocation data and selling a minor's PII. (*Id.*).

Paxton correctly notes that "Plaintiffs must show an intent to engage in the conduct being regulated for *each* claim they press." (*Id.* (emphasis in original) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014))). But Plaintiffs state in their complaint that "HB 18 mandates that covered websites adopt many costly requirements" and that the "haphazard" regulations likely "burden[] speech dissemination." (Compl., Dkt. 1, at 3). Those regulations plausibly target at least some of Plaintiffs' members, and, at any rate, the Court does not enjoin HB 18's enforcement as to these other provisions. *See infra*, Section III.C.2.A.

2. Associational Standing

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assn. of Am. Physicians & Surgeons,*

*Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs meet these three criteria. Beginning with the second prong, which is effectively uncontested, Plaintiffs seek to protect an interest germane to their organizational purposes. Both Plaintiffs are trade associations that aim to promote online commerce, speech, and accessibility for internet services. (Compl., Dkt. 1, at 4–5). HB 18 potentially interferes with that mission, regulating how minors can access their online platforms.

Paxton appears to focus his arguments on the first prong: whether Plaintiffs' members would have standing to sue in their own right. (*See* Resp., Dkt, 18, at 19). Here, Paxton relies heavily on the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). In *Moody*, the Supreme Court dealt with separate challenges to new Texas and Florida social media laws that regulated online platforms' ability to engage in content moderation. *Id.* at 2393. Rather than definitively rule on the constitutionality of the laws, the Supreme Court vacated the circuit court decisions, finding that the lower courts had failed to conduct proper facial analyses of the laws at issue. *Id.* at 2397, 2409. While *Moody* certainly cautions lower courts to treat facial challenges carefully, *Moody* is not a case about standing. The majority opinion does not contain a single mention of "standing," much less third-party or associational standing. *See id.* Put simply, *Moody* did not alter the standing analysis for associations, only the proper scope of relief for when those associations challenge laws under the First Amendment.

*Moody* aside, there is little question that Plaintiffs' members would have standing to sue in their own right. Many of the members are social media companies and digital service providers who are regulated by HB 18; including Meta (Facebook and Instagram); Google (YouTube); Snap, Inc. (Snapchat); Nextdoor; Pinterest; and X. As objects of the regulation, those members would have standing to sue. *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) ("If, in a suit 'challenging the

legality of government action,' 'the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)).

Finally, turning to the third prong of associational standing, Plaintiffs' members do not need to participate in this suit. The inquiry regarding the participation of members does not derive from Article III but is "solely prudential." *Assn. of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550. The inquiry focuses importantly on "matters of administrative convenience and efficiency" and is assessed by "examining both the relief requested and the claims asserted." *Id.* at 551. Paxton argues that Plaintiffs' "facial claims require the participation of individual members," again suggesting that *Moody* impliedly changed this test. (Resp., Dkt. 18, at 12 ("*Moody* requires a member-specific analysis for facial claims in this context. Plaintiffs' members will need to participate in this lawsuit to resolve these facial claims, which means Plaintiffs lack standing to sue in their associational capacity.")). To repeat, *Moody*'s majority opinion does not mention standing or the requirement of individual participation. 144 S. Ct. at 2394. *Moody* does show that facial challenges may sometimes require individualized or detailed inquiries into members' activities, but that does not automatically necessitate those members' participation as parties in the suit.[8] Other mechanisms such as detailed briefing and discovery will likely provide sufficient information to make individualized inquiries where needed.

With the exact same Plaintiffs as in *Moody*, there is no prudential reason why Plaintiffs' members must participate in this suit. The preliminary injunction motion does not involve heavily contested issues of fact. This is especially true for the "monitoring-and-filtering" requirements,

[8] If a trade association brings suit but cannot show in sufficient detail that a law is unconstitutional in the substantial majority of its applications, then it will not obtain a facial injunction. That is to say, the problem identified by *Moody* can be remedied by denying facial challenges on the merits, not dismissing the entire suit for lack of standing.

whose constitutionality does not seriously turn on Plaintiffs' members' particular activities. As is the case here, the parties' briefing and discovery will likely provide sufficient information to make individualized inquiries where needed. Finally, courts regularly allow membership organizations and trade associations to bring suit on behalf of their members when they seek to enjoin enforcement of a statute or regulation, rather than damages. *See United Food and Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 553–54 (1996). Even acknowledging the "variegated" nature of the internet, individual participation is not required.

3. Association Standing for As-Applied Challenges

Paxton next suggests that Plaintiffs cannot bring an as-applied challenge on behalf of their members because an as-applied challenge would still require the participation of individual members. (Resp., Dkt. 18, at 20). Again, the member participation requirement is purely "prudential" and is not fatal to Plaintiffs' standing. *See Assn. of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550. Unlike the laws at issue in *Moody*, HB 18 imposes relatively uniform requirements on all Plaintiffs' covered members. For example, if HB 18 is problematic because it requires DSPs to filter broad swaths of covered content, that problem applies equally across DSPs. *See infra*, Section III.C.1. The law's overbroad tailoring does not vary between covered DSPs. The same is true for vagueness—there is no reason to believe one social media company is better suited than another to understand HB 18's vague terms.

4. Ripeness for As-Applied Challenges

As to ripeness, Paxton suggests that "a party cannot challenge a statute as-applied unless the statute has been applied to him." (Resp., Dkt. 18, at 21 (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006))). But in the First Amendment context, a party does "not need to break the law and thereby expose [themselves] to liability" in order to challenge a regulation. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023). The general test for

ripeness, which the Fifth Circuit has used in the as-applied context, *see id.*, examines only "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Book People*, 91 F.4th at 333. That test is met. Legal issues predominate this challenge and are ready for judicial review, while withholding that review would impose irreparable harm on Plaintiffs' members. *See infra*, Section III.F.

5. Third-Party Standing

Last, Paxton argues that Plaintiffs lack the ability to assert the First Amendment rights of the users of social media DSPs. (Resp., Dkt. 18, at 21–22). As to the provisions which cover users' ability to post and view speech, Plaintiffs have third-party standing. *Am. Booksellers*, 484 U.S. at 392 (1988) ("[I]n the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.") (cleaned up). It is less clear that Plaintiffs have standing to assert the rights of users related to the other provisions, such as collection of geolocation data. Those provisions do not seem to regulate a user's access to speech, so it is unclear that the *American Booksellers* presumption would apply. Instead, Plaintiffs' standing for those provisions seems to be based on arguments that the law is facially overbroad and would burden the ability to host protected speech. (*See* Compl., Dkt. 1, at 2–3). Assuming those provisions do burden the ability to display protected speech, then third-party standing is unnecessary because social media DSPs have standing to sue in their own right.

**C. First Amendment Analysis**

Having found that Plaintiffs have standing to bring suit, the Cout turns its analysis to the merits of the case. "[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,' and 'the Fourteenth Amendment makes the First

Amendment's Free Speech Clause applicable against the States.'" *NetChoice, LLC v. Fitch*, No. 1:24-CV-170-HSO-BWR, 2024 WL 3276409, at *7 (S.D. Miss. July 1, 2024) (*quoting Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019)). The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). First Amendment protection extends to social media, which "allows users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

### 1. Strict Scrutiny Applies

The threshold question is what level of scrutiny applies to HB 18's regulations. *See Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 637 (1994). In their motion, Plaintiffs treat HB 18 as a whole, arguing that the law's "central coverage definition of 'digital service provider' is" a content- and speaker-based regulation. (Mot. Prelim. Inj., Dkt. 6, at 14). In response, Paxton suggests that it is a mistake to treat HB 18 as one indivisible law, subject to the same standard of scrutiny across the board. (Resp., Dkt. 18, at 23). Instead, Paxton argues that the Court must treat each subsection separately, conducting a "provision-by-provision" analysis rather than a "one-size-fits-all" approach. (*Id.* at 24).

The Court agrees with Plaintiffs that HB 18's threshold coverage definition is a content-based regulation. HB 18 § 509.002(a)(1). HB 18 regulates [DSPs] that specifically host or broadcast "social" speech, thereby subjecting "social" content to heightened regulation. *Id.* HB 18 § 509.002(a)(1). Non-social interactions, such as professional interactions, are not covered, while social interactions are. That is clear in HB 18's content-based exceptions. DSPs that provide "content primarily generated or selected by the" provider or primarily "functions to provide a user with access

to news, sports, [or] commerce" are exempted. HB 18 § 509.002(b)(10)(A). This "singles out specific subject matter for differential treatment," by using the "function or purpose" of speech as a stand-in for its content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64, 169 (2015). HB 18 is therefore a content- and speaker-based regulation, targeting DSPs whose primary function is to share and broadcast social speech. "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170. When the government favors some speakers over others for their content, the law must be subject to strict scrutiny. *Barr v. Am. Assn. of Political Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (controlling plurality op.); *Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."). The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation.

In response, Paxton suggests that these arguments are foreclosed by the Fifth Circuit. (Resp., Dkt. 18, at 24 (citing *NetChoice, LLC v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) ("*NetChoice I*"), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024))). In *NetChoice I*, the Fifth Circuit rejected a similar argument brought by Plaintiffs by holding that regulations targeting social media did "not render [the law at issue] content-based because the excluded websites are fundamentally dissimilar mediums." *NetChoice I*, 49 F.4th at 480.

That ruling is no longer binding because the Supreme Court vacated *NetChoice I*, "void[ing] each of the judgment's holdings." *Doe v. McKesson*, 71 F.4th 278, 286 (5th Cir. 2023); *see also Moody*, 144 S. Ct. at 2409 (vacating judgment). Paxton suggests that *Moody* "effectively confirmed, or at least did not disturb, the Fifth Circuit's analysis on this point." But the Supreme Court "disturbed" the analysis when it vacated the opinion. Paxton suggests that the Supreme Court's own opinion "also rebuffed" Plaintiffs theory—but it is not clear how. (*See* Resp., Dkt. 18, at 24). To the contrary, the

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 20 of 28

Supreme Court expressly stated that "there has been enough litigation already to know that the Fifth Circuit, if it had stayed the course, would get wrong at least one significant input . . . . " *Moody*, 144 S. Ct. at 2349. While the Supreme Court did not determine "whether to apply strict or intermediate scrutiny[,]" that was only because "Texas's law [did] not pass" either intermediate or strict scrutiny, at least applied to key respects of the law. *Id.* at 2407.

Cutting against the Fifth Circuit's analysis in *NetChoice I*, the Supreme Court noted that "presenting a curated and edited compilation of [third-party] speech is itself protected." *Id.* at 2409 (internal citations omitted). It noted that "editorial judgments influencing the content of [Facebook's News Feed and YouTube's homepage] are, contrary to the Fifth Circuit's view, protected expressive activity." *Id.* If the discretion to favor social content over other messages is protected editorial judgment, then laws like HB 18 are not just targeting "fundamentally dissimilar mediums." Those laws are targeting DSPs based on those protected editorial judgments. So, at the very least, *Moody* calls into serious question *NetChoice I*'s discussion of "content-based" laws.

The district court's reasoning in *NetChoice, LLC v. Yost* is instructive. No. 2:24-CV-00047, 2024 WL 555904, at *8–11 (S.D. Ohio Feb. 12, 2024). There, a district court dealt with a highly similar Ohio law that targeted DSPs hosting "social" speech and excluded sites focused on news and product reviews. *Id.* at *8. The district court grappled with whether the "social" distinction was "content-based" or merely regulated the "manner in which" companies "transmit" the content. *Id.* at *9 (quoting *Turner Broad. Sys.*, 512 U.S. at 637).[9] Although emphasizing that "[i]t is a close call[,]" the court ultimately found that social media DSPs "are not 'mere conduits'" but 'curate both users and

[9] *But see Reed*, 576 U.S. at 163 ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.").

content to convey a message about the type of community the platform seeks to foster.'" *Id.* at *11 (quoting *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1107 (W.D. Tex. 2021)).[10]

In an even more similar case, a Mississippi district court found a nearly identical law (H.B. 1126) to be content- and speaker-based:

> In essence, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material that is disseminated, whether it is "social interaction," as opposed to "news, sports, commerce, [or] online video games[.]" [HB 1126] can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports), or based on a more subtle content-based restriction defining regulated speech by its function or purpose (i.e., providing news and sports). Either way, [b]oth are distinctions drawn based on the message a speaker conveys.

*Fitch*, 2024 WL 3276409, at *9 (quoting HB 1126) (cleaned up).

Like the district courts in *Yost* and *Fitch*, this Court finds that HB 18 discriminates based on the type of content provided on a medium, not just the type of medium. A DSP that allows users to socially interact with other users but "primarily functions to provide" access to news or commerce is unregulated. An identical DSP, with the exact same medium of communication and method of social interaction, but "primarily functions to provide" updates on what a user's friends and family are doing (e.g., through Instagram posts and stories), *is* regulated. If there is a difference between the regulated DSP and unregulated DSP, it is the content of the speech on the site, not the medium through which that speech is presented. When a site chooses not to primarily offer news but instead focus on social engagement, it changes from an uncovered to covered platform. But the type of medium has not changed, only the content primarily expressed on the platform.

---

[10] In *NetChoice I*, the Fifth Circuit ruled that these editorial decisions fall outside the First Amendment, which in turn allowed the court to consider social media platforms "mere conduits." *NetChoice I*, 49 F.4th at 480. But in reversing *NetChoice I* on the First Amendment value of editorial judgments, *Moody* undercut the premise that had allowed the Fifth Circuit to consider social media regulations content neutral. *Moody*, 144 S. Ct. at 2399.

In sum, strict scrutiny applies to HB 18's provisions because the law regulates DSPs based on the content of their speech and the identity of the speaker. Paxton must therefore prove that HB 18 is "the least restrictive means of achieving a compelling state interest." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citation omitted).

2. HB 18 and Strict Scrutiny

In his response, Paxton does not mount a defense on whether HB 18 passes strict scrutiny as a whole. (*See* Resp., Dkt. 18, at 25–28). Instead, Paxton goes "provision-by-provision," arguing that some restrictions pass scrutiny and that even if others fail First Amendment scrutiny, they can be severed and do not mean the entire law is unconstitutional.

Here, the Court agrees with Paxton. Even if HB 18 is a content-based regulation, it does not follow as a matter of course that the law is facially invalid. In the First Amendment context, facial challenges can only succeed if litigants show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). So a law regulating First Amendment activity may only be struck down in its entirety if its "unconstitutional applications substantially outweigh its constitutional ones." *Moody,* 144 S. Ct. at 2397.

*Moody*, including the majority opinion and all four concurrences, emphasized that courts should not treat facial challenges lightly, even in the First Amendment context. It clarified that courts should "address the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications." *Id.* at 2397–98. That analysis requires a two-step process. First, courts must "assess the state law's scope" and ask, "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* at 2398. Second, a court must "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* Only after

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 23 of 35

making these inquiries can a court determine if a law's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 2397.

It is a mistake to treat HB 18 as a whole and assume that because the law draws a threshold content-based distinction, it fails entirely under strict scrutiny. Per *Moody*, the Court must instead go through each provision and examine its respective permissibility under the First Amendment.

a. The Data Privacy, Parental Control, and Disclosure Provisions

The Court first "assess[es] the state law's scope." *Moody*, 144 S. Ct. at 2398. While Plaintiffs focus their challenge on the monitoring-and-filtering requirements, HB 18 imposes various other requirements. (*See* Mot. Prelim. Inj., Dkt. 6). These other provisions, while subject to strict scrutiny, are largely unrelated to First Amendment expression. Section 509.052 prohibits covered DSPs from collecting unnecessary amounts of known minors' PII or geolocation data, allowing minors to make financial transactions through the DSP, sharing minors' PII, and targeting advertising to minors. HB 18 § 509.052. Another section requires covered DSPs to allow parents to control a minor's privacy settings and limit the amount of time a minor spends on the DSP. *Id.* § 509.054. Covered DSPs must also disclose an overview of their algorithms for providing content; promoting, ranking, and filtering content; and the PII used to provide content. *Id.* § 509.056.

*Moody*'s next step is to "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." 144 S. Ct. at 2398. However, in their briefing, Plaintiffs do not clearly do so. It is Plaintiffs' burden to show that the law is unconstitutional in these respects. Indeed, for a preliminary injunction, Plaintiffs must make a "clear showing" that they are entitled to the relief they seek. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)). That clear showing requires more than the law as whole to be "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

It remains possible that each provision will fail under strict scrutiny. But that is not a given. And it is not certain to be the case under HB 18, where many provisions seem to regulate conduct and only incidentally burden speech (if at all). *See Moody*, 144 S. Ct. at 2402 n.4. Plaintiffs do not show how Section 509.052 places any burden on speech by prohibiting the collection of PII and geolocation data. This is primarily a regulation of conduct, so it is not clear that the law restricts or even burdens speech. Similarly, it is not clear that a law requiring parents to be allowed to access and change their children's privacy settings implicates First Amendment concerns. Overall, these provisions likely primarily regulate conduct, and while the Court can conceive of ways in which they do burden speech (e.g., reducing the hours a child may spend consuming speech on social media), that point is not sufficiently developed at this stage.

In sum, Plaintiffs fail to make a "clear showing" that these provisions are unconstitutional. Those provisions, then, do not need to be enjoined, because it is not clear that, taken as a whole, "a substantial number of [those provisions'] applications are unconstitutional . . . ." *Ams. for Prosperity Found.*, 594 U.S. at 615.[11]

b. The Monitoring-and-Filtering Requirements

While the preceding sections of HB 18 may be constitutional, the same cannot be said for the monitoring-and-filtering requirements. These requirements force providers to develop strategies to "prevent [a] known minor's exposure to harmful material and other content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB 18 § 509.053. Irrespective of whether HB 18 as a whole is content-based, there can be little dispute that this provision is. The monitoring-and-filtering requirements explicitly identify

[11] In addition, as Paxton notes, the remaining provisions are potentially severable, as the law does not necessarily operate as an indivisible whole.

discrete categories of speech and single them out to be filtered and blocked. That is as content based as it gets.

It is far from clear that Texas has a compelling interest in preventing minors' access to every single category of information listed above. Some interests are obvious—no reasonable person could dispute that the state has a compelling interest in preventing minors from accessing information that facilitates child pornography or sexual abuse. *See Sable Commc'ns of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."). On the other end, many interests are not compelling, such as regulating content that might advocate for the deregulation of drugs (potentially "promoting" "substance abuse") or defending the morality of physician-assisted suicide (likely "promoting" "suicide"). *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794–95 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (internal citation omitted). The Supreme Court has repeatedly emphasized that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–13 (1975). Much of the regulated topics are simply too vague to even tell if it is compelling. Terms like "promoting," "glorifying," "substance abuse," "harassment," and "grooming" are undefined, despite their potential wide breadth and politically charged nature. While these regulations may have some compelling applications, the categories are so exceedingly overbroad that such a showing is unlikely.

Even accepting that Texas has a compelling interest in blocking select categories under HB 18, the law is not narrowly tailored. HB 18 requires DSPs to implement strategies that include: listing harmful material, using filtering technology, using hash-sharing technology to identify

recurring material, creating a database of keywords used for filter evasion, performing human-monitoring reviews to ensure the filtering technology works, publishing descriptions of the filtered content, and making the code available to independent researchers. HB 18 § 509.053(b)(1). This broad, multi-faceted approach fails for two reasons: it does not employ the least restrictive means, and it is not narrowly tailored.

As in *Fitch*, Paxton "has not shown that the alternative suggested by [Plaintiffs], a regime of providing parents additional information or mechanisms needed to engage in active supervision over children's internet access would be insufficient to secure the State's objective of protecting children." 2024 WL 3276409, at *12. By contrast, Plaintiffs have demonstrated that many DSPs do implement content-moderation policies to ensure that minors cannot access harmful content. (Mot. Prelim. Inj., Dkt. 6, at 22). And Paxton has not shown that methods such as "hash-sharing technology" and publishing depictions of filtered content are necessary to prevent harm to minors. In short, HB 18 does not employ "the least restrictive means" to stop minors from accessing harmful material. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

HB 18 also employs overbroad terminology. Again, the monitoring-and-filtering requirements impose sweeping *ex-ante* speech restrictions, akin to prior restraints,[12] but does little more than vaguely gesture at what speech must be restrained. For example, what does it mean for content to "promote" "grooming?" The law is not clear. So, by requiring filtering as a matter of law

[12] Separate from their other arguments, Plaintiffs argue that the monitoring-and-filtering provisions are unconstitutional because they impose a prior restraint. (Mot. Prelim. Inj., Dkt. 6, at 18). Paxton responds that prior restraints must typically come from "administrative and judicial orders," so HB 18 does not qualify. (Resp., Dkt. 18, at 44). Finding the provisions invalid under strict scrutiny (as well as vague and preempted), the Court does not decide the issue. There can be little question, though, that the monitoring-and-filtering provisions require DSPs to affirmatively seek out and block certain categories of speech, raising the same overbreadth concerns as with prior restraints. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

with only vague reference to what must be filtered, HB 18 will likely filter out far more material than needed to achieve Texas's goal.

More problematically, the law is underinclusive. A law that "is wildly underinclusive when judged against its asserted justification . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802. Websites that "primarily" produce their own content are exempted, even if they host the same explicitly harmful content such as "promoting" "eating disorders" or "facilitating" "self-harm." The most serious problem with HB 18's under-inclusivity is it threatens to censor social discussions of controversial topics. "[S]ocial media in particular" operates as one of "most important places . . . for the exchange of views . . . ." *Packingham*, 582 U.S. at 104. But HB 18 specifically cuts teenagers off from this critical "democratic forum[] of the Internet" even though the same harmful content is available elsewhere. *Reno v. ACLU*, 521 U.S. 844, 868 (1997). A teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads. In its attempt to block children from accessing harmful content, Texas also prohibits minors from participating in the democratic exchange of views online. Even accepting that Texas only wishes to prohibit the most harmful pieces of content, a state cannot pick and choose which categories of protected speech it wishes to block teenagers from discussing online. *Brown*, 564 U.S. at 794–95.

Of course, *Moody*'s instruction on facial challenges still applies: the Court must analyze what each provision of the monitoring-and-filtering requirements does and individually assess those provisions' constitutionality. Here, however, the strict scrutiny test parallels the facial challenge framework. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) ("[T]he validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *NetChoice, LLC v. Bonta*, No. 23-2969, 2024 WL 3838423, at *8 (9th Cir. Aug. 16, 2024) (slip op.) (affirming

Case 1:24-cv-00849-RP Document 45 Filed 08/30/24 Page 28 of 38

facial challenge where strict scrutiny regulation "raises the same First Amendment issues" "in every application to a covered business"); *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010) (noting that overbroad law was facially invalid).

The monitoring-and-filtering provisions are more restrictive and less tailored than they need to be at the outset. The provisions' facial under-inclusivity cannot be cured by identifying examples of HB 18's constitutional applications—the point is that HB 18 does *not* regulate the same harmful content elsewhere. The lack of narrow tailoring and use of overly restrictive means apply to all speech regulated under the provision and "raises the same First Amendment issues." *NetChoice, LLC v. Bonta*, 2024 WL 3838423, at *8. Nor are the monitoring-and-filtering requirements like the laws at issue in *Moody*, where some provisions might restrict protected speech and others do not. 144 S. Ct. at 2398. Instead, the monitoring-and-filtering requirements exclusively target speech, only a small portion of which falls outside First Amendment coverage.[13] Because the monitoring-and-filtering requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face.[14]

**D. Vagueness**

In the alternative to their First Amendment challenge, Plaintiffs argue that HB 18's definition for covered DSPs and its monitoring-and-filtering requirements are void for vagueness. (Mot. Prelim. Inj., Dkt. 6, at 24–25). As a reminder, HB 18 covers DSPs that "allow[] users to *socially* interact with other users" but exempts DSPs that "*primarily* function[] to provider a user with access

---

[13] For example, child pornography generally does not receive First Amendment protection. *See New York v. Ferber*, 458 U.S. 747, 765 (1982). But the large majority of the proscribed content, such as speech promoting eating disorders, harassment, and bullying, is covered speech, even if highly distasteful. A state may not "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794.

[14] The preliminary injunction shall also apply to Section 509.056(1), which requires DSPs to "make a commercially reasonable effort to ensure that [their] algorithm does not interfere with the digital service provider's duties under" the monitoring-and-filtering requirements.

to news, sports, commerce, or content *primarily* generated or selected by the DSP . . . ." HB 18 §§ 509.002(a), (b)(10)(A). Plaintiffs take issue with the terms "socially interact" and "primarily functions" as they define covered DSPs. (*Id.* at 17).[15] And as to the monitoring-and-filtering requirements, Plaintiffs take issue with the terms "promotes," "glorifies," and "facilitates," as well as the categories of proscribed topics. (*Id.* at 24–25).

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied* 144 S. Ct. 348 (2023). "A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. However, if "the law interferes with the right of free speech or association, a more stringent vagueness test should apply." *Id.* at 499.

[15] Plaintiffs also argue that the law is vague because it exempts services that only have "incidental" social functions but does not define "incidental." (Mot. Prelim. Inj., Dkt. 6, at 17). Plaintiffs do not allege, however, that any members are genuinely on the threshold where this ambiguity might come into effect. And such terminology has been upheld by a previous Supreme Court decision. *McGowan v. State of Md.*, 366 U.S. 420, 428–29 (1961).

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 30 of 55

1. The Covered Entity Definitions

Starting with the covered entity definitions, the Court is not convinced that the terms are so vague as to render the entire law unconstitutional. Plaintiffs note that "it is unclear what test one uses to determine how a digital service 'primarily' functions." (Mot. Prelim. Inj., Dkt. 6, at 17 (citing *Fitch*, 2024 WL 3276409, at *15)). That argument is a stretch. "Primary" has a fairly ascertainable meaning: "for the most part" or "in the first place." *Primarily*, Webster's New World Dictionary (4th ed. 2013). When HB 18 exempts DSPs that "primarily function[] to provide a user with access to news, sports, commerce," it likely targets DSPs whose main function is one of those categories. Turning to the word "socially," the Court also finds it is sufficiently definite to survive a preliminary injunction motion. The term is cabined within the definition of a DSP that "connects users in a manner that allows users to *socially* interact with other users on the digital service[.]" HB 18 § 509.002(1). Other regulations include allowing a user to create a public or semi-public profile or post content viewed by others. *Id.* §§ 509.002(2)–(3). Given the ample context surrounding the type of DSP covered, the term "socially interact" is capable of a limited common-sense meaning. *See United States v. Comer*, 5 F.4th 535, 542 (4th Cir. 2021) (denying vagueness challenge to law that targeted social networking).

Tellingly, there seems to be little (or no) actual confusion about whether Plaintiffs' members are covered under these allegedly vague terms. Facebook, Snapchat, X, and YouTube all appear to readily meet the statute's definition because they "primarily" offer "social interactions." It remains possible that the laws are vague, and some providers, especially smaller DSPs, do not know whether they are covered. But such challenges would be more appropriate on an as-applied basis or after a genuine showing that a party does not know whether the law applies to them. *See United States v. Wurzbach*, 280 U.S. 396, (1930) ("[I]f there is any difficulty, which we are far from intimating, it will be time enough to consider it when raised by someone whom it concerns.") (Holmes, J.). As it is,

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 31 of 38

the covered entity definition "is not unconstitutionally vague" solely because it "engender[s] some limited amount of confusion . . . ." *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 123 (5th Cir. 1991).

2. The Monitoring-and-Filtering Provisions

The same cannot be said for the terminology used in HB 18's monitoring-and-filtering provisions. Again, those provisions require social media DSPs to track, filter, and block material that "promotes," "glorifies," or "facilitates" "suicide, self-harm,[] eating disorders[,] substance abuse[,] stalking, bullying, [] harassment[,] grooming, trafficking, child pornography,[] other sexual exploitation or abuse" and material that is sexually explicit for minors. HB 18 § 509.053. Those provisions are vague because both the verbs (promotes, glorifies, and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined. Especially when put together, the provisions are unconstitutionally vague.

Begin with the verbs: promote, glorify, and facilitate. One of those words—"promote"—has already been held to be vague when regulating First Amendment activity. In *Baggett v. Bullitt*, 377 U.S. 360, 371–72 (1964), the Supreme Court dealt with a regulation that imposed a loyalty oath for teachers to swear that they will "*promote* respect for the flag and the institutions of the United States." (emphasis added). The Supreme Court found that the term "promote" was "very wide indeed" and failed to "provide[] an ascertainable standard of conduct." *Id.* In response, Paxton suggests that *Baggett* dealt with a "'wildly different situation' than this one." (Resp., Dkt. 18, at 38). But, if anything, the vagueness is more problematic under HB 18, because the law requires social media DSPs to guess which broad categories of speech, likely constituting billions of posts, must be filtered from view. So the wide-ranging meanings of "promote" will result in wide-ranging censorship of speech.

The problem is even more acute with the term "glorifying." The word encompasses so wide an ambit that people "of common intelligence" can do no more than guess at its application. *McClelland*, 63 F.4th at 1013. To "glorify" potentially includes any content that favorably depicts a prohibited topic, leaving no clear answer on what content must be filtered. Do liquor and beer advertisements "glorify" "substance abuse?" Does *Othello* "glorify" "suicide?" Given the substantial liability companies face for failing to comply (to say nothing of the private rights of action), it is reasonable to expect that companies will adopt broad definitions that do encompass such plainly protected speech.

In sum, HB 18 imposes requirements for entire categories of speech to be blocked. If those *ex-ante* restrictions are to be imposed, they cannot arguably cover such broad categories of protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).[16]

Paxton suggests that these terms, especially "facilitate," can be limited to speech that helps bring about an unlawful act, is intended to induce illegal activities, or provides assistance to a wrongdoer. (Resp., Dkt. 18, at 23–24 (quoting *Williams*, 553 U.S. at 290, then quoting *United States v. Hansen*, 599 U.S. 762, 770–73 (2023))). In other words, Paxton suggests that the terms can be limited to "speech integral to unlawful conduct." *Id.* But if the state had intended to proscribe only speech "integral to unlawful conduct," it could have explicitly stated so. Instead, the state used three terms: "promote, glorify, and facilitate," giving a broader context than criminal assistance. "Glorify" and

[16] Paxton contends that the monitoring-and-filtering provisions are not vague to Plaintiffs because they come "directly from their own content-moderation policies." (Resp., Dkt. 18, at 12 (emphasis omitted)). But a self-policed rule does not suffer the same vagueness problems as a state-backed proscription. Facebook may know their internal definition of "glorify" but the company cannot be assured that Paxton or Texas courts will abide by the same definition.

Case 1:24-cv-00849-RP Document 25 Filed 08/30/24 Page 33 of 39

"promote" taint the understanding of "facilitate" beyond direct criminal advocacy. And there are good reasons to believe the state deliberately sought a broader definition, because HB 18 also proscribes speech related to *lawful* conduct, such as having an eating disorder. Paxton's own introduction shows that many of social media's most deleterious effects comes from the incessant, favorable depiction of certain content, rather than its direct advocacy. (*See* Resp., Dkt. 18, at 13–16). As a result, HB 18 is not "readily susceptible" to the "narrowing construction" that Paxton suggests. *Am. Booksellers*, 484 U.S. at 397 ("[T]he statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements.") (internal quotation omitted).

The final issue for HB 18 is that the law fails to define key categories of prohibited topics, including "grooming," "harassment," and "substance abuse." At what point, for example, does alcohol use become "substance abuse?" When does an extreme diet cross the line into an "eating disorder?" What defines "grooming" and "harassment?" Under these indefinite meanings, it is easy to see how an attorney general could arbitrarily discriminate in his enforcement of the law. *See Smith v. Goguen*, 415 U.S. 566, 575 ("Statutory language of such a standardless sweep allows [] prosecutors[] and juries to pursue their personal predilections."). These fears are not too distant—pro-LGBTQ content might be especially targeted for "grooming." *See Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *2 (W.D. Tex. Mar. 30, 2023) (finding that several books supporting pro-LGBTQ views were removed from library shelves for allegedly promoting "grooming"), *aff'd as modified*, 103 F.4th 1140 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 106 F.4th 426 (5th Cir. 2024). Content related to marijuana use might be prosecuted as "glorifying" "substance abuse," even if cigarette and alcohol use is not. This vast indefinite scope of enforcement would "effectively grant[] [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 465 n.15 (1987). Such a sweeping grant of censorial power cannot pass First Amendment scrutiny.

### E. Section 230 Preemption

Finally, Plaintiffs seek a preliminary injunction against the "monitoring-and-filtering" requirements by arguing that they are preempted by Section 230. Section 230 states that "[n]o interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1). Under Section 230, Congress provided all DSPs "broad immunity" for "all claims stemming from their publication of information created by third parties." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024) (cleaned up), *cert. granted* 2024 WL 3259690 (Mem.) (U.S. July 2, 2024). That includes purported "failure[s] to implement basic safety measures to protect minors." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418–19 (5th Cir. 2008). By preempting "inconsistent" laws, 47 U.S.C. § 230(e)(3), Congress barred regulation of websites' "decisions relating to the monitoring, screening, and deletion of content[.]" *Id.* at 420 (citation omitted).

HB 18 requires DSPs to "implement a strategy to prevent [a] known minor's exposure to" certain third-party content. HB 18 § 509.053(a). That requirement impermissibly forces covered DSPs to "address certain harmful content" on their services. *MySpace*, 528 F.3d at 420 (quoting *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)). Similarly, HB 18 requires DSPs to monitor and filter certain categories of content. HB 18 § 509.053. But Section 230 "specifically proscribes liability" for "decisions relating to the monitoring, screening, and deletion of content." *Id.*; *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017) ("Thus 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.'" (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2009)). "[T]hat is the point of Section 230: to immunize [websites] for harm caused by unremoved speech." *Free Speech Coal.*, 95 F.4th at 284–85.

Paxton, in response, relies on the Fifth Circuit's recent decision in *Free Speech Coalition*. (Resp., Dkt. 18, at 43 (citing *Free Speech Coal.* 95 F4th at 284)). In that case, a group of websites hosting adult videos sued to enjoin a Texas law, HB 1181, that required the websites to implement age verification measures to screen out minors. *Id.* at 267. The Fifth Circuit determined that HB 1181 was "not reliant on the harm done by third-party content" because the law "impose[d] liability purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody." *Id.* at 298. Here, Paxton draws a similar analogy, arguing that HB 18 imposes liability only for failing to comply with the statute, not for hosting content.

HB 18's monitoring and filtering requirements, unlike HB 1181, *do* impose liability based on the type of content that a website hosts. A website only filters out content that falls into certain categories of prohibited speech (e.g., "glorifying" an "eating disorder" and "promoting" "substance abuse"). The monitoring-and-filtering requirements necessarily derive their liability from the type of content a site displays. HB 18 § 509.151–152.

Imagine that Texas passed a law stating, "Social media websites must remove defamatory content." Under Paxton's broad reading of *Free Speech Coalition*, the law would not be preempted because liability attaches based on whether a website complies with the law, not based on its content. That reasoning would altogether nullify Section 230 by having the same effect as directly imposing liability on the website for hosting third-party content. Section 230 provides "broad immunity" for providers for "all claims *stemming from* their publication of information created by third parties." *MySpace*, 528 F.3d at 418 (emphasis added). Liability under HB 18 *stems from* the content it hosts, even if liability directly attaches based on compliance with the law. Accordingly, the Court finds that Section 230 preempts HB 18's monitoring and filtering requirements.

**F. Remaining Preliminary Injunction Factors**

Paxton does not seriously contest the remining preliminary injunction factors. (Resp., Dkt. 18, at 45). He notes that Plaintiffs waited more than a year to bring suit, cutting against their argument for irreparable harm. (*Id.*). Lengthy delays in filing suit do count against irreparable harm, especially in the context of a temporary restraining order ("TRO"). *See Luckenbach Texas, Inc. v. Skloss*, No. 1:21-CV-871-RP, 2022 WL 5568437, at *4–5 (W.D. Tex. July 8, 2022); *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017). That doctrine is less applicable here, where the law created a 14-month gap between enactment and taking effect. While the Court would have appreciated more time to decide these complex issues, Plaintiffs' delay does not automatically negate a finding of irreparable harm.

Setting aside their delay, Plaintiffs make a clear showing that they will suffer irreparable injury in the absence of an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). HB 18 will also impose nonrecoverable compliance costs, adding to Plaintiffs' irreparable harm. *Rest. L. Ctr. v. U.S. Dept. of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("Under our precedent, the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."); *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) (noting that sovereign immunity would bar the recovery of compliance costs). Declarations submitted by Plaintiffs highlight that many DSPs will be forced to substantially revamp their existing filtering software or develop it anew. (Mot. Prelim. Inj., Dkt. 6, at 27 (citing declarations)). Those compliance costs are greater because, as the Court has noted, Plaintiffs' members have no guidance on how to determine if content falls under HB 18's broad regulations. (Veitch Decl., Dkt. 6-4, at 19 (noting that HB 18 "will require alterations to YouTube's content moderation—not because YouTube's content moderation is currently

deficient, but because of uncertainty of how the Texas Attorney General will interpret the Act.”)). For small DSPs that do not qualify as exempt small businesses, the content filtering requirements will be “prohibitive for a sole proprietor . . . to implement” leading to the DSPs potentially “shutting down [] rather than shoulder the[] compliance costs or run the risk of potential liability.” (Riley Decl., Dkt. 6-6, at 5–6). In sum, Plaintiffs have shown irreparable harm.

The balance of equities and public interest follow likelihood of success. These last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). “[I]njunctions protecting First Amendment freedoms are always in the public interest.” *Texans for Free Enter. v. Texas Ethics Comm’n*, 732 F.3d 535, 539 (5th Cir. 2013). Because the Court has found that Plaintiffs have shown a substantial likelihood of success on the merits of their First Amendment claims, the Court finds that an injunction is in the public interest. *See id.; see also, e.g., Book People, Inc.*, 91 F.4th at 341 (“Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won’t be injured by an injunction of a statute that likely violates the First Amendment.”).

## IV. CONCLUSION

Plaintiffs have shown that HB 18 is a content-based statute and is therefore subject to strict scrutiny. As to the monitoring-and-filtering requirements, HB 18 § 509.053, Plaintiffs have carried their burden in showing that the law’s restrictions on speech fail strict scrutiny, are unconstitutionally vague, and are preempted by Section 230. Because Plaintiffs also show that the remaining equitable factors weigh in their favor, the Court preliminarily enjoins Paxton from enforcing the monitoring-and-filtering provisions.

However, Plaintiffs do not show that the remaining provisions of HB 18 unconstitutionally regulate a meaningful amount of constitutionally protected speech or otherwise fail strict scrutiny.

Accordingly, the preliminary injunction is limited only to HB 18's monitoring-and-filtering requirements, HB 18 §§ 509.053, 509.056(1).[17]

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, (Dkt. 6), is **GRANTED IN PART** as set forth in this order. Plaintiffs' request in the alternative for a temporary restraining order is **DISMISSED AS MOOT**. Paxton's Motion for Leave to File a Surreply, (Dkt. 23), is **DENIED**.

**IT IS FURTHER ORDERED** that Paxton, his agents, employees, and persons working under his direction or control are **PRELIMINARILY ENJOINED** from enforcing the "monitoring-and-filtering" requirements, HB 18 §§ 509.053, 509.056(1), against Plaintiffs and their members pending a final judgment in this case or other modification of this order.

**SIGNED** on August 30, 2024.



ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

[17] Plaintiffs are not required to post a security bond. *See Fitch*, 2024 WL 3276409, at *17.

# TAB 3: *CCIA* NOTICE OF APPEAL (ROA. 24-50721.432-433)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, and NETCHOICE, LLC., Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 1:24-cv-849-RP** |
| **KEN PAXTON, in his official capacity as Attorney General of Texas, Defendant.** | § | |

**DEFENDANT'S NOTICE OF APPEAL**

Pursuant to Rules 3(a)(1) and 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Defendant Ken Paxton, in his official capacity as Attorney General for the State of Texas ("Defendant"), files this Notice of Appeal to the United States Court of Appeals for the Fifth Circuit from the Order entered on August 30, 2024.[1] This Order granted in part and denied in part Plaintiffs' Motion for a Preliminary Injunction. Defendant moved the Court to deny Plaintiffs' Motion for a Preliminary Injunction.[2] The order granting the preliminary injunction in part is immediately appealable under 28 U.S.C. § 1292(a)(1). This notice divests this Court of jurisdiction during the pendency of the appeal because Defendant asserted threshold jurisdictional challenges against all claims brought by Plaintiffs in this lawsuit.[3] Based on the cited Fifth Circuit precedent, proceedings in this Court are suspended pending resolution of the appeal.

[1] ECF 25.
[2] ECF 18.
[3] *See* ECF 18; *Whole Woman's Health v. Jackson*, 13 F.4th 434, 444 (5th Cir. 2021) ("[T]he notice appealing the order 'divest[s] the district court of its control over those aspects of the case involved in the appeal.'") (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)); *see also Wooten v. Roach*, 964 F.3d 395, 412 (5th Cir. 2020); *Williams v. Brooks*, 996 F.2d 728, 729–30 (5th Cir. 1993).

Dated: September 5, 2024

Respectfully submitted,

**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**BRENT WEBSTER**
FIRST ASSISTANT ATTORNEY GENERAL

**RALPH MOLINA**
DEPUTY FIRST ASSISTANT ATTORNEY GENERAL

**JAMES LLOYD**
DEPUTY ATTORNEY GENERAL FOR CIVIL LITIGATION

**KIMBERLY GDULA**
CHIEF - GENERAL LITIGATION DIVISION

*/s/Todd Dickerson*
**TODD DICKERSON**
Attorney-in-charge
Assistant Attorney General
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

***Counsel for Defendant***

## CERTIFICATE OF SERVICE

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on September 5, 2024, using the Federal Court CM/ECF system.

*/s/ Todd Dickerson*

# TAB 4: *SEAT* DOCKET SHEET (ROA.25-50096.1-11)

INTAPP,MINOR,ML,STAYED

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:24-cv-00945-RP

Students Engaged in Advancing Texas et al v. Paxton
Assigned to: Judge Robert Pitman
Related Case: 1:24-cv-00849-RP
Case in other court: USCA 5th, 25-50096
Cause: 42:1983 Civil Rights Act

Date Filed: 08/16/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Students Engaged in Advancing Texas** represented by

**Adam Sieff**
Davis Wright Tremaine LLP
350 S. Grand Avenue
Ste 27th Floor
Los Angeles, CA 90071
213-633-6800
Email: adamsieff@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ambika Kumar**
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206-757-8030
Email: ambikakumar@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caesar D. Kalinowski**
Davis Wright Tremaine LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104-1610
206-622-3150
Email: caesarkalinowski@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chelsea T. Kelly**
Davis Wright Tremaine LLP
1301 K Street Nw, Suite 500 East
Washington, DC 20005
212-489-8230
Email: chelseakelly@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Gossett**
Davis Wright Tremaine LLP
1301 K Street Nw, Suite 500 East
Washington, DC 20005
202-262-4156
Email: davidgossett@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David W. Rubin**
The Foundation for Individual Rights and Expression
700 Pennsylvania Ave SE, Ste 340
Washington, DC 20003
215-717-3473
Email: david.rubin@thefire.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marietta Catsambas**
Davis Wright Tremaine LLP
1301 K St NW
Suite 500
Washington, DC 20005
202-973-4246
Email: mariettacatsambas@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Corn-Revere**
Foundation for Individual Rights and Expressions
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
215-717-3473
Email: bob.corn-revere@thefire.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JT Morris**
Foundation for Individual Rights and Expression
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
215-717-3473
Email: jt.morris@thefire.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.F.**
*other*

represented by **Adam Sieff**
(See above for address)

by and through next friend, Vanessa Fernandez

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ambika Kumar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caesar D. Kalinowski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chelsea T. Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Gossett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David W. Rubin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marietta Catsambas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Corn-Revere**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JT Morris**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ampersand Group LLC** represented by **Adam Sieff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ambika Kumar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caesar D. Kalinowski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chelsea T. Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Gossett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David W. Rubin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marietta Catsambas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Corn-Revere**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JT Morris**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brandon Closson** represented by **Adam Sieff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ambika Kumar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caesar D. Kalinowski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chelsea T. Kelly**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**David Gossett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David W. Rubin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marietta Catsambas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Corn-Revere**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JT Morris**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ken Paxton**
*in his official capacity as the Texas Attorney General*

represented by **Todd A. Dickerson**
Office of the Attorney General of Texas
PO Box 12548-Capitol Station
Austin, TX 78701
512-463-2120
Fax: 512-320-0667
Email: todd.dickerson@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/16/2024 | 1 (p.12) | COMPLAINT *For Declaratory and Injunctive Relief* ( Filing fee $ 405 receipt number ATXWDC-19114997), filed by Students Engaged in Advancing Texas, Ampersand Group LLC, M.F., Brandon Closson. (Attachments: # 1 (p.12) Exhibit 1 - Texas House Bill 18, # 2 (p.78) Civil Cover Sheet, # 3 (p.80) Summons)(Morris, JT) (Entered: 08/16/2024) |
| 08/16/2024 | 2 (p.78) | REQUEST FOR ISSUANCE OF SUMMONS by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/16/2024) |

| | | |
|---|---|---|
| 08/16/2024 | 3 (p.80) | RULE 7 DISCLOSURE STATEMENT filed by Ampersand Group LLC. (Morris, JT) (Entered: 08/16/2024) |
| 08/16/2024 | 4 (p.82) | RULE 7 DISCLOSURE STATEMENT filed by Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/16/2024) |
| 08/16/2024 | | Case assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (kp) (Entered: 08/19/2024) |
| 08/16/2024 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Mark Lane. (kp) (Entered: 08/19/2024) |
| 08/19/2024 | 5 (p.84) | Summons Issued as to Ken Paxton. (kp) (Entered: 08/19/2024) |
| 08/19/2024 | 6 (p.86) | MOTION to Appear Pro Hac Vice by JT Morris ( Filing fee $ 100 receipt number ATXWDC-19121431) by Adam Sieff on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/19/2024) |
| 08/19/2024 | 7 (p.92) | MOTION to Appear Pro Hac Vice by JT Morris ( Filing fee $ 100 receipt number ATXWDC-19121433) by Caesar Kalinowski on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/19/2024) |
| 08/19/2024 | 8 (p.98) | MOTION to Appear Pro Hac Vice by JT Morris ( Filing fee $ 100 receipt number ATXWDC-19121434) by David Gossett on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/19/2024) |
| 08/20/2024 | 9 (p.104) | MOTION to Appear Pro Hac Vice by JT Morris *(for Ambika Kumar)* ( Filing fee $ 100 receipt number ATXWDC-19123650) by on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/20/2024) |
| 08/20/2024 | 10 (p.111) | MOTION to Appear Pro Hac Vice by JT Morris *(for Chelsea T. Kelly)* ( Filing fee $ 100 receipt number ATXWDC-19123674) by on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/20/2024) |
| 08/20/2024 | 11 (p.117) | MOTION to Appear Pro Hac Vice by JT Morris *(for Marietta Catsambas)* ( Filing fee $ 100 receipt number ATXWDC-19124265) by on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/20/2024) |
| 08/20/2024 | 12 (p.123) | ORDER GRANTING 6 (p.86) Motion to Appear Pro Hac Vice as to Adam Sieff. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/20/2024) |

| | | |
|---|---|---|
| 08/20/2024 | 13 (p.124) | ORDER GRANTING 7 (p.92) Motion to Appear Pro Hac Vice as to Caesar Kalinowski. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/20/2024) |
| 08/20/2024 | 14 (p.125) | ORDER GRANTING 8 (p.98) Motion to Appear Pro Hac Vice as to David Gossett. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/20/2024) |
| 08/21/2024 | 15 (p.126) | SUMMONS Returned Executed by Students Engaged in Advancing Texas, Ampersand Group LLC, M.F., Brandon Closson. Ken Paxton served on 8/20/2024, answer due 9/10/2024. (Sieff, Adam) (Entered: 08/21/2024) |
| 08/21/2024 | 16 (p.128) | NOTICE of Attorney Appearance by Todd A. Dickerson on behalf of Ken Paxton. Attorney Todd A. Dickerson added to party Ken Paxton(pty:dft) (Dickerson, Todd) (Entered: 08/21/2024) |
| 08/23/2024 | 17 (p.130) | MOTION for Preliminary Injunction by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Sieff, Adam) (Entered: 08/23/2024) |
| 08/23/2024 | 18 (p.159) | AFFIDAVIT in Support of 17 (p.130) MOTION for Preliminary Injunction *(Declaration of Jaryn Holbrook Janeway)* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Sieff, Adam) (Entered: 08/23/2024) |
| 08/23/2024 | 19 (p.164) | AFFIDAVIT in Support of 17 (p.130) MOTION for Preliminary Injunction *(Declaration of Brandon Closson)* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Sieff, Adam) (Entered: 08/23/2024) |
| 08/23/2024 | 20 (p.171) | AFFIDAVIT in Support of 17 (p.130) MOTION for Preliminary Injunction *(Declaration of M.F.)* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Sieff, Adam) (Entered: 08/23/2024) |
| 08/23/2024 | 21 (p.177) | AFFIDAVIT in Support of 17 (p.130) MOTION for Preliminary Injunction *(Declaration of Cameron Samuels)* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Sieff, Adam) (Entered: 08/23/2024) |
| 08/23/2024 | 22 (p.183) | AFFIDAVIT in Support of 17 (p.130) MOTION for Preliminary Injunction *(Declaration of Adam S. Sieff)* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Attachments: # 1 (p.12) Exhibit 1 - Press Release, Samsung Mobile Press, # 2 (p.78) Exhibit 2 - Am. Psych. Ass'N, Health Advisory, # 3 (p.80) Exhibit 3 - Article by A. Lenhart, # 4 (p.82) Exhibit 4 - Article by E. Vogels & R. Gelles-Watnick, # 5 (p.84) Exhibit 5 - Article by |

| | | |
|---|---|---|
| | | K. Hampton, # 6 (p.86) Exhibit 6 - Article by S. Coyne, et al., # 7 (p.92) Exhibit 7 - Article by V. Rideout, et al., # 8 (p.98) Exhibit 8 - Article by C. Hollis, et al., # 9 (p.104) Exhibit 9 - U.S. Dept. of Health & Human Services, # 10 (p.111) Exhibit 10 - Article by J. Hamilton, et al., # 11 (p.117) Exhibit 11 - website page Aura, Protection for Kids, # 12 (p.123) Exhibit 12 - website page Family Keeper, # 13 (p.124) Exhibit 13 - website page Bark, Parental controls, # 14 (p.125) Exhibit 14 - website page Bright Canary, # 15 (p.126) Exhibit 15 - website page Apple, Use Screen Time, # 16 (p.128) Exhibit 16 - website page Google, Manage your child's screen time, # 17 (p.130) Exhibit 17 - Staff Memorandum, dated May 3, 2024, # 18 (p.159) Exhibit 18 - Article by T. Barkley, # 19 (p.164) Exhibit 19 - C.S.H.B. 18 bill analysis, # 20 (p.171) Exhibit 20 - article by C. Odgers, # 21 (p.177) Exhibit 21 - Article by C. Odgers and M. Jensen, # 22 (p.183) Exhibit 22 - Article by M. Vuorre and A. Przybylski, # 23 (p.546) Exhibit 23 - Article by C. Odgers, # 24 (p.551) Exhibit 24 - NetChoice Veto Request for Texas HB 18)(Sieff, Adam) (Entered: 08/23/2024) |
| 08/26/2024 | 23 (p.546) | Opposed MOTION to Stay Case by Ken Paxton. (Attachments: # 1 (p.12) Proposed Order)(Dickerson, Todd) (Entered: 08/26/2024) |
| 08/26/2024 | | Notice of Correction: re 22 (p.183) Affidavit in Support, 19 (p.164) Affidavit in Support, 20 (p.171) Affidavit in Support, 21 (p.177) Affidavit in Support, 18 (p.159) Affidavit in Support. **PLEASE NOTE: Your Affidavit is deficient as it is not in proper pleading format pursuant to FRCP 11 (no signature block of admitted attorney). No further action is required at this time. Please note this for future reference. (dm) (Entered: 08/26/2024) |
| 08/26/2024 | 24 (p.551) | ORDER GRANTING 9 (p.104) Motion to Appear Pro Hac Vice as to Ambika Kumar. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/26/2024) |
| 08/26/2024 | 25 (p.552) | ORDER GRANTING 10 (p.111) Motion to Appear Pro Hac Vice as to Chelsea T. Kelly. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/26/2024) |
| 08/26/2024 | 27 (p.559) | ORDER GRANTING 11 (p.117) Motion to Appear Pro Hac Vice as to Marietta Catsambas. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 08/27/2024) |
| 08/27/2024 | 26 (p.553) | |

| | | |
|---|---|---|
| | | Response in Opposition to Motion, filed by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas, re 23 (p.546) Opposed MOTION to Stay Case filed by Defendant Ken Paxton (Sieff, Adam) (Entered: 08/27/2024) |
| 08/28/2024 | 28 (p.560) | RESPONSE in Support, filed by Ken Paxton, re 23 (p.546) Opposed MOTION to Stay Case filed by Defendant Ken Paxton (Dickerson, Todd) (Entered: 08/28/2024) |
| 08/29/2024 | 29 (p.564) | MOTION to Appear Pro Hac Vice by JT Morris *by Robert Corn-Revere* ( Filing fee $ 100 receipt number ATXWDC-19165164) by on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/29/2024) |
| 08/29/2024 | 30 (p.570) | MOTION to Appear Pro Hac Vice by JT Morris *by David Rubin* ( Filing fee $ 100 receipt number ATXWDC-19165195) by on behalf of Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Morris, JT) (Entered: 08/29/2024) |
| 09/03/2024 | 31 (p.575) | ORDER GRANTING IN PART AND DENYING IN PART AS MOOT 23 (p.546) Motion to Stay Case. Signed by Judge Robert Pitman. (dm) (Entered: 09/03/2024) |
| 09/04/2024 | 32 (p.577) | ORDER GRANTING 29 (p.564) Motion to Appear Pro Hac Vice as to Robert Corn-Revere. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 09/04/2024) |
| 09/04/2024 | 33 (p.578) | ORDER GRANTING 30 (p.570) Motion to Appear Pro Hac Vice as to David Rubin. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (dm) (Entered: 09/04/2024) |
| 09/11/2024 | 34 (p.579) | Unopposed MOTION for Leave to Exceed Page Limitation by Ken Paxton. (Attachments: # 1 (p.12) Proposed Order Regarding Motion for Leave, # 2 (p.78) Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction, # 3 (p.80) Proposed Order Regarding Preliminary Injunction)(Dickerson, Todd) (Entered: 09/11/2024) |
| 09/12/2024 | | Text Order GRANTING 34 (p.579) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file Defendants' response to Plaintiffs' motion for preliminary injunction, (Dkt. 34-2). (This is a text-only entry generated by the court. There is no document associated with this entry.) (tclc) (Entered: 09/12/2024) |
| 09/12/2024 | 35 (p.631) | Response in Opposition to Motion, filed by Ken Paxton, re 17 (p.130) MOTION for Preliminary Injunction filed by Plaintiff Brandon Closson, Plaintiff Students Engaged in Advancing Texas, Plaintiff |

| | | |
|---|---|---|
| | | Ampersand Group LLC, Plaintiff M.F. (dm) (Entered: 09/13/2024) |
| 09/20/2024 | 36 (p.680) | Unopposed MOTION for Leave to Exceed Page Limitation *for Reply Brief* by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas. (Attachments: # 1 (p.12) Proposed Order, # 2 (p.78) Exhibit Plaintiffs' Reply In Support of Motion for Preliminary Injunction, # 3 (p.80) Exhibit Declaration of Christopher Ferguson in Support of Plaintiffs' Reply In Support of Motion for Preliminary Injunction)(Sieff, Adam) (Entered: 09/20/2024) |
| 09/23/2024 | | Text Order GRANTING 36 (p.680) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file Plaintiff's reply in support of their motion for preliminary injunction, (Dkt. 36-2), and accompanying exhibit, (Dkt. 36-3). (This is a text-only entry generated by the court. There is no document associated with this entry.) (tclc) (Entered: 09/23/2024) |
| 09/23/2024 | 37 (p.739) | REPLY to Response to Motion, filed by Ampersand Group LLC, Brandon Closson, M.F., Students Engaged in Advancing Texas, re 17 (p.130) MOTION for Preliminary Injunction filed by Plaintiff Brandon Closson, Plaintiff Students Engaged in Advancing Texas, Plaintiff Ampersand Group LLC, Plaintiff M.F. (dm) (Entered: 09/23/2024) |
| 10/07/2024 | 38 (p.794) | NOTICE *OF SUPPLEMENTAL AUTHORITY* by Ampersand Group LLC, Brandon Closson, Students Engaged in Advancing Texas re 17 (p.130) MOTION for Preliminary Injunction (Sieff, Adam) (Entered: 10/07/2024) |
| 10/24/2024 | 39 (p.813) | NOTICE *OF SUPPLEMENTAL AUTHORITY* by Ampersand Group LLC, Brandon Closson, Students Engaged in Advancing Texas re 17 (p.130) MOTION for Preliminary Injunction (Sieff, Adam) (Entered: 10/24/2024) |
| 12/16/2024 | 40 (p.831) | SUPPLEMENT to 17 (p.130) MOTION for Preliminary Injunction - *Declaration by SEAT ISO Motion* by Students Engaged in Advancing Texas. (Kelly, Chelsea) (Entered: 12/16/2024) |
| 12/16/2024 | 41 (p.834) | SUPPLEMENT to 17 (p.130) MOTION for Preliminary Injunction - *Declaration by Ampersand ISO of Motion* by Ampersand Group LLC. (Kelly, Chelsea) (Entered: 12/16/2024) |
| 02/07/2025 | 42 (p.837) | ORDER GRANTING IN PART AND DENYING IN PART Plaintiffs' 17 (p.130) Motion for Preliminary Injunction. Signed by Judge Robert Pitman. (cnr) (Entered: 02/07/2025) |
| 02/07/2025 | 43 (p.874) | Appeal of Order entered by District Judge 42 (p.837) by Ken Paxton. ( Filing fee $ 605 receipt number ATXWDC-19766914) (Dickerson, Todd) (Entered: 02/07/2025) |
| 02/07/2025 | | NOTICE OF INTERLOCUTORY APPEAL as to 42 (p.837) Order on Motion for Preliminary Injunction by Ken Paxton. Filing fee $ 605, receipt number ATXWDC-19766914. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. |

| | | |
|---|---|---|
| | | This form is available in the Clerk's Office or by clicking the hyperlink above. (klw) (Entered: 02/10/2025) |
| 02/12/2025 | 44 (p.876) | TRANSCRIPT REQUEST by Ken Paxton for dates of No Hearings. Proceedings Transcribed: N/A. Court Reporter: n/a.. (Dickerson, Todd) (Entered: 02/12/2025) |
| 02/12/2025 | 45 (p.878) | Unopposed MOTION to Stay Case *Pending Appeal* by Ken Paxton. (Attachments: # 1 (p.12) Proposed Order)(Dickerson, Todd) (Entered: 02/12/2025) |
| 02/21/2025 | | Text Order GRANTING 45 (p.878) Motion to Stay Case entered by Judge Robert Pitman. In light of the lack of opposition, IT IS ORDERED that this case is STAYED pending resolution of the interlocutory appeal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (tclc) (Entered: 02/21/2025) |

# TAB 5: *SEAT* PRELIMINARY INJUNCTION ORDER (ROA.25-50096.837-873)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, et al., | § | |
| Plaintiffs, | § | |
| v. | § | 1:24-CV-945-RP |
| KEN PAXTON, *in his official capacity as the Texas Attorney General*, | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Plaintiffs Ampersand Group LLC, Brandon Closson, M.F., and Students Engaged in Advancing Texas's (collectively "Plaintiffs") motion for a preliminary injunction, (Dkt. 17). Defendant Ken Paxton, ("Paxton"), in his official capacity as the Texas Attorney General, filed a response, (Dkt. 35), to which Plaintiffs replied, (Dkt. 37). Having considered the briefing, the evidence, and the relevant law, the Court will grant the motion as to Tex. Bus. & Com. Code §§ 509.052(2)(D), 509.053, 509.055, 509.056(1), and 509.057, and deny it in all other respects.

**I. BACKGROUND**

This case concerns Texas House Bill 18, a law that regulates social media websites ("HB 18" or "the Act"). Tex. Bus. & Com. Code §§ 509.001, et seq. The law took effect on September 1, 2024. Before it took effect, the Court enjoined certain aspects of the law in another matter before it, *Computer & Communications Industry Association v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024). The Court begins by describing the parties, then the Act, and then the procedural posture of the case.

A. The Parties

Plaintiffs are Texas-based minors, adults who post content on social media geared toward minors, and organizations whose members include minors, who allege that the Act chills their speech. (Mot. Prelim. Inj., Dkt. 17, at 8–9). Plaintiff Students Engaged in Advancing Texas ("SEAT") "represents a coalition of Texas students, from middle-school to college, who seek to increase youth visibility and participation in policymaking, including via social media." (*Id.* at 8). Plaintiff M.F. is "a 16-year-old high school student who uses social media to learn about current events and opportunities, follow the news, discover music, and conduct research for his debate team and other school activities." (*Id.* at 8–9). Plaintiff The Ampersand Group ("Ampersand") is an advertising agency in Austin, Texas which "publishes social-good and public service advertisements on YouTube, Instagram, Facebook, and gaming platforms." (*Id.* at 9). Plaintiff Brandon Closson ("Closson") is an adult resident of Texas who uses his social networks to share content about mental health and bipolar disorder, including to minors. (Compl., Dkt. 1, at 5).

Paxton is the sole Defendant in this suit. He is the Attorney General of Texas, sued in his official capacity. (Compl., Dkt 1, at 5). Paxton and the Consumer Protection Division of the Attorney General's Office have authority to enforce HB 18. *See* § 509.151 ("A violation of this chapter is a deceptive act or practice actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office.").[1]

B. HB 18

1. Coverage

The Court described the scope of coverage of HB 18 in its order granting a preliminary injunction against the Act in *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *1, and briefly

[1] The law also creates a separate private right of action. § 509.152.

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 3 of 27

reiterates that background here. HB 18 regulates "digital service provider[s]" ("DSPs") that "allow[] users to socially interact with other users," "allow[] a user to create a public or semi-public profile," and "allow[] a user to create or post content." HB 18 §§ 509.001(2), 509.002(a). This definition includes standard social media platforms such as Facebook and Instagram as well as other "social" websites such as YouTube and Reddit. HB 18 defines DSPs as any "website," "application," "program," or software that "collects or processes personal identifying information" ("PII") "with Internet connectivity," § 509.001 (1), and:

> (1) "determines" both the "means" and the "purpose of collecting and processing the [PII] of users," HB 18 § 509.001(2)(B)−(C);
> (2) "connects users in a manner that allows users to socially interact with other users on the digital service," *id.* § 509.002(a)(1);
> (3) "allows a user to create a public or semi-public profile for purposes of signing into and using the digital service," *id.* § 509.002(a)(2); and
> (4) "allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (A) a message board; (B) a chat room; or (C) a landing page, video channel, or main feed that presents to a user content created and posted by other users," *id.* § 509.002(a)(3).[2]

Exceptions to the law include: state and local government websites, financial institutions, medical websites, small businesses, institutions of higher education, employee management software, school education software, and email services that only provide "social" functions "incidental" to their main service. *Id.* § 509.002(b). Notably, the law also exempts DSPs that "primarily function[] to provide a user with access to news, sports, commerce, or content primarily generated or selected by the [DSP]" and "allow[] chat, comment, or other interactive functionality that is incidental to the digital service." *Id.*

[2] Section 509.057 is not limited to social platforms but otherwise retains the same exceptions. *Id.* § 509.002(a-b).

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 4 of 57

2. Requirements

(a) Age Registration and Parental Disputes

With the stated purpose of protecting minors, HB 18 imposes age registration and verification requirements on users. Under HB 18, covered DSPs must make users "register" their age before those users can create an account. *Id.* § 509.051(a) (covered DSPs "may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the [DSP]."). A user cannot change their registered age "unless the alteration process involves a commercially reasonable review process." *Id.* § 509.051(c).

HB 18 also allows parents to dispute the registered age of their child by "notif[ying] a [DSP] that the minor is younger than 18 years of age" or "successfully disput[ing] the registered age of the minor . . . ." *Id.* § 509.051(d)(2).[3] If a parent disputes the age of their child, the DSP "shall treat the user as a known minor." *Id.* § 509.051(e). To ensure parenthood, HB 18 requires DSPs to "verify, using a commercially reasonable method and for each person seeking to perform an action on a digital service as a minor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." *Id.* § 509.101(a). When a known minor logs into a covered DSP, HB 18 imposes several new requirements, with the relevant requirements to this case set forth in more detail below.

(b) "Monitoring-and-Filtering" Requirements

Plaintiffs challenge Sections 509.053 and 509.056(1) of HB 18, which the Court refers to as the "monitoring-and-filtering" requirements. The Court has previously enjoined the monitoring-

[3] The statute also allows parents to dispute the age of a minor if the parent "performs another function of a parent or guardian under this chapter." HB 18 § 509.051(d)(2)(C).

Case: 24-50721 Document: 42 Filed 02/07/25

and-filtering requirements with respect to a group of Plaintiff trade associations. *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *21.

As this label suggests, these requirements make DSPs monitor certain categories of content and filter them from being on display to known minors. Specifically, HB 18 requires covered DSPs to "develop and implement a strategy to prevent [a] known minor's exposure to" defined categories of prohibited speech. *Id.* § 509.053(a). HB 18 prohibits content "that promotes, glorifies, or facilitates" the following:

> (A) "suicide, self-harm, or eating disorders";
> (B) "substance abuse";
> (C) "stalking, bullying, or harassment";
> (D) "grooming, trafficking, child pornography, or other sexual exploitation or abuse."

*Id.*

Strategies to prevent minors' exposure to these harmful categories "must include":

> (A) creating and maintaining a comprehensive list of harmful material or other content described [above] to block from display to a known minor;
> (B) using filtering technology and other protocols to enforce the blocking of material or content on the list [above];
> (C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described [above];
> (D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;
> (E) performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;
> (F) making available to users a comprehensive description of the categories of harmful material or other content described [above] that will be filtered; and
> (G) except as provided by Section 509.058, making available the digital service provider's algorithm code to independent security researchers.

*Id.* § 509.053(b)(1).[4] So too, Section 509.056 requires that DSPs "that use[] algorithms to automate the suggestion promotion, or ranking of information to known minors" "shall . . . make a

[4] In addition to the above mandatory strategies, HB 18 allows DSPs to use other strategies, including:

commercially reasonable effort to ensure that the algorithm does not interfere with the [DSP]'s duties under" the above. *Id.* § 509.056(1).

(c) Targeted Advertising Requirements

In addition to the monitoring-and-filtering requirements, HB 18 Sections 509.052 and 509.055 impose regulations on how DSPs can display advertisements to known minors. The Plaintiffs challenge Sections 509.052(2)(D) and 509.055, which this Court calls the "targeted advertising requirements."

In the relevant section of the Act, first, the law imposes limits on what kind of data a DSP may collect. Covered DSPs must "limit collection of the known minor's [PII] to information reasonably necessary to provide the digital service" and "limit use of the [PII] to the purpose for which the information was collected . . . ." HB 18 § 509.052(1). In addition, a covered DSP may not: "(A) allow the known minor to make purchases or engage in other financial transactions through the digital service; (B) share, disclose, or sell the known minor's [PII]; (C) use the digital service to collect the known minor's precise geolocation data; or (D) use the digital service to display targeted advertising to the known minor." *Id.* § 509.052(2). Out of this section, Plaintiffs challenge only the last provision—§ 509.052(2)(D)'s restriction on using the DSP to display "targeted advertising" to a minor. In another section Plaintiffs challenge, HB 18 requires DSPs to "make a commercially reasonable effort to prevent advertisers on the digital service provider's [website] from targeting a

(A) engaging a third party to rigorously review the digital service provider's content filtering technology;
(B) participating in industry-specific partnerships to share best practices in preventing access to harmful material or other content described [above]; or
(C) conducting periodic independent audits to ensure:
    i. continued compliance with the digital service provider's strategy; and
    ii. efficacy of filtering technology and protocols used by the digital service provider.

HB 18 § 509.053(b)(2).

Case 1:24-cv-00945-RP    Document 42    Filed 02/07/25    Page 7 of 57

known minor with advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor in this state to use or engage in." *Id.* § 509.055.

(d) Content Monitoring and Age-Verification Requirements

Plaintiffs additionally challenge HB 18's provision that requires DSPs to track their overall published material and restrict harmful or obscene material from known minor viewers, which the Court will call the "content monitoring and age-verification requirement." *Id.* § 509.057. This provision provides that "[a] digital service provider . . . that knowingly publishes or distributes material, more than one-third of which is harmful material or obscene as defined by Section 43.21, Penal Code, must use a commercially reasonable age verification method to verify that" any user seeking to access the information is 18 or older. *Id.* § 509.057.

"Obscene" as defined in the Texas Penal Code means material or a performance that:

> (A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;
> (B) depicts or describes: (i) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or (ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and
> (C) taken as a whole, lacks serious literary, artistic, political, and scientific value.

Tex. Penal Code Ann. § 43.21. "Harmful" is not defined in the statute.

(e) Other Requirements

HB 18 has other requirements, that Plaintiffs do not seek to enjoin, which this Court briefly summarizes by way of background. HB 18 requires DSPs to create and provide parental tools to "supervise . . . [a] known minor's use" of the DSP. *Id.* § 509.054(a). Parents must be able to "control the known minor's privacy and account settings," alter data collection and financial transaction

Case: 25-50096 Document: 42 Page: 73 Date Filed: 04/28/2025

settings for the minor, and "monitor and limit the amount of time the . . . known minor spends" using the DSP. *Id.* § 509.054(b).

Also, HB 18 requires covered DSPs that "use[] algorithms to automate the suggestion, promotion, or ranking of information to known minors" to "disclose . . . in a clear and accessible manner, an overview of": (1) "the manner in which the digital service uses algorithms to provide information or content"; (2) "the manner in which algorithms promote, rank, or filter information or content"; and (3) "the [PII] used as inputs to provide information or content." *Id.* § 509.056(2). HB 18 contains various other provisions related to the practical enforcement of the law, such as clarifying that DSPs may share known minors' PII to comply with legal investigations, HB 18 § 509.059(1−2); that DSPs need not disclose trade secrets, *id.* § 509.058; and that the Department of Family and Protective Services may designate its staff as a minor's caregiver, if a minor is in the agency's conservatorship, *id.* § 509.104.

C. Procedural History

Plaintiffs filed suit on August 16, 2024, and filed a motion for a preliminary injunction on August 23, 2024. (Compl., Dkt. 1; Mot. Prelim. Inj., Dkt. 17). Plaintiffs argue that HB 18 §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 violate the First Amendment because they are content-based laws that do not survive strict or intermediate scrutiny; because they are unconstitutional prior restraints of speech; and because they are facially overbroad, (Compl., Dkt. 1, at 28−35). They also challenge HB 18 §§ 509.002(a)(1), 509.002(a)(2), 509.002(b)(10)(B), 509.053(a), 509.052(2)(D), 509.055, 509.057(a), and 509.101 as unconstitutionally void for vagueness. (*Id.* at 36). Their preliminary injunction motion addresses the monitoring-and-filtering, targeted advertising, and the content monitoring and age-verification requirements. (Mot. Prelim. Inj., Dkt. 17, at 8–27). Plaintiffs seek a preliminary injunction: more specifically, they "request an order enjoining Tex. Bus. & Com. Code §§ 509.001–002, 509.051, 509.052(2)(D),

509.053, 509.055, 509.056(1), 509.057, and 509.101–103 on their face." (Mot. Prelim. Inj., Dkt. 17, at 27).

Paxton filed a response in opposition to the motion. (Dkt. 35). Paxton argues that Plaintiffs lack standing, that strict scrutiny does not apply to the analysis of HB 18, and that Texas has an interest in HB 18 sufficient to satisfy this Court's review under the First Amendment. (*Id.* at 20–42). Paxton also argues that HB 18 is subject to limiting constructions and is not unconstitutionally vague, and that it cannot be called a prior restraint. (*Id.* at 42–46). Plaintiffs filed a reply, (Dkt. 37), two notices of supplemental authority, (Dkts. 38, 39), and two supplements to the motion for preliminary injunction in the form of supplemental Plaintiff declarations, (Dkts. 40, 41).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *See Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050–52 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

As Paxton notes, Plaintiffs' motion turns on the likelihood of success on the merits. (Resp., Dkt. 35, at 47 ("The remaining preliminary injunction factors will not meaningfully impact this case.")). The Court will begin its likelihood of success analysis with the jurisdictional issue of

Plaintiffs' standing to bring suit. Finding that Plaintiffs have standing, the Court will then turn to the merits of Plaintiffs' motion.[5]

A. Standing

First, the Court addresses Plaintiffs' standing to bring suit. Standing requires a plaintiff to show they have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024). Paxton raises several arguments on this point: He argues that Plaintiffs lack a concrete injury; that Plaintiffs did not make a showing that HB 18 injures them as users, who are not directly regulated, as opposed to injuring the DSPs, as third parties which are actually regulated; that SEAT lacks associational standing; and that Plaintiffs' injuries are not ripe. (Resp., Dkt. 35, at 20–28). The Court will address each argument in turn.

For the following reasons, the Court finds that Plaintiffs have standing and agrees with Plaintiffs that First Amendment standing doctrine allows for third parties not directly regulated by a law, but whose speech is prevented or chilled by it, to assert claims for relief. Moreover, due to the penalties and enforcement provisions of HB 18, the Court finds that HB 18 produces a "determinative or coercive effect" on providers, which results in preventing speech and produces Plaintiffs' injuries, as is required to show standing. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (injury may be "produced by determinative or coercive effect upon the action of someone else"). In other words, Plaintiffs have demonstrated that a third party, the DSPs, "will likely react in predictable ways" to the three sets of requirements which include preventing them from viewing or posting

[5] The Court addressed sovereign immunity in its *Computer & Comm'ns Indus. Ass'n* preliminary injunction order and found that Paxton has the authority and demonstrated willingness to enforce HB 18, establishing sufficient connection to the law to render him a proper defendant for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). 2024 WL 4051786, at *5–*7. Paxton did not raise the defense of sovereign immunity in this suit, so the Court does not further address it here.

certain types of content, and this confers Plaintiffs with standing to challenge the requirements. *Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 543 (5th Cir. 2022).

1. <u>Plaintiff internet users have a cognizable First Amendment injury</u>

First, Plaintiffs are users of the Internet—minors and those that engage with them—with specific, demonstrated interests in sharing and engaging with the types of content that HB 18 prohibits DSPs from showing to known minors. This demonstrates an injury-in-fact. In a pre-enforcement challenge, Plaintiffs can establish an injury in fact if they show that "(1) they have an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Book People*, 91 F.4th at 335 (quoting *Speech First, Incorporated v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (internal quotation marks omitted).

As an initial matter, Plaintiffs have made this showing as to each group of challenged restrictions. As to the filter-and-monitoring requirements, Plaintiff SEAT's previous and planned educational Instagram posts concern bullying, sexual assault, and suicide. (Samuels Decl., Dkt. 21, at 2–5). Plaintiffs reasonably understand HB 18 to require social media to prohibit those posts. (*Id.*). Similarly, Plaintiff Closson fears that HB 18 will lead social media companies to prevent him from posting about bipolar disorder, eating disorders, substance abuse, and his identity as a member of the LGBTQ+ community, as he has in the past. (Closson Decl., Dkt. 21, at 1–7). As another example, Plaintiff M.F. notes that he arguably will not be able to listen to music like The Fray's song "How to Save a Life" or R.E.M's song "Everybody Hurts" on covered sites because of their references to suicide. (M.F. Decl., Dkt. 20, at 3).

As to the targeted advertising requirements, Plaintiff Ampersand wishes to share posts that help teens better understand topics like sex trafficking and substance abuse, and they have done so in the past. (Janeway Decl., Dkt. 18, at 2–5). Plaintiff Ampersand reasonably believes that the

targeted advertising requirements will restrict digital services providers from allowing such advertising to minors in the future, and moreover, HB 18 will prevent them from distributing planned advertisement campaigns to minors via social media on other topics like vaccines, public health, and census participation. (*Id.*). Plaintiff M.F. testifies that he wants to receive advertisements and that he regularly learns about topics ranging from politics, to local events, to clothing available for purchase, via targeted advertisements. (M.F. Decl., Dkt. 20, at 5).

As to the content monitoring and age-verification requirements, Plaintiffs allege the requirements will prevent them from viewing posts deemed harmful or obscene (for example, content related to sexuality). (*E.g.*, Janeway Decl., Dkt. 18, at 5). And Plaintiff Internet users may be unwilling to submit the personal details required for age verification, which itself creates standing by preventing potential users from accessing the DSP. (*E.g.*, Closson Decl., Dkt. 21, at 6); *cf. Free Speech Coal. v. Knudsen*, No. CV 24-67-M-DWM, 2024 WL 4542260, at *8 (D. Mont. Oct. 22, 2024) (requirement to provide PII to seek to access adult content sufficed to allege standing).

In the ways described above, Plaintiffs have demonstrated that they have an intention to engage in a course of conduct—speaking on social media—affected with their First Amendment interests, and that their intended future conduct—posting or viewing advertisements on any topic and content related to certain topics—is arguably proscribed by the policy in question. *Book People*, 91 F.4th at 335. This type of "chilled speech or self-censorship" "is an injury sufficient to confer standing." *Barilla v. City of Houston, Tex.*, 13 F.4th 427, 431 (5th Cir. 2021) (collecting cases); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (same).

To the third prong of the injury-in-fact test, there exists a threat of enforcement. *Book People*, 91 F.4th at 335. HB 18 includes enforcement provisions. *See* § 509.151 ("A violation of this chapter is a deceptive act or practice actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office."); § 509.151 (creating private right of action).

Paxton has begun enforcing the Act. Compl., *Texas v. TikTok Ltd.*, No. 24-CV-1763 (56th Dist. Ct., Galveston Cnty., Tex. Oct. 3, 2024) (Dkt. 39, at 15) (Paxton asserting complaint against TikTok for violating the Act, including "Sections 509.052, 509.101, and 509.054."). And, as this Court already found, all indications suggest, in this case as well as *Computer & Comm'ns Indus. Ass'n*, that Paxton wishes to continue enforcing HB 18. Paxton has repeatedly emphasized, including in this case, (Resp., Dkt. 35, at 14–17), that he believes social media is severely harming children. *See also Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *6 (finding same).

2. Plaintiffs' injury is fairly traceable to government action and redressable by a judicial order

The injury-in-fact Plaintiffs attest to is also fairly traceable to government action, and redressable by a judicial order enjoining sections of HB 18. Traceability requires that Plaintiffs show "a causal connection between the injury and the conduct complained of." *Book People*, 91 F.4th at 332 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiffs demonstrate that HB 18 requires DSPs to make certain changes to their policies; this is a causal connection to their injuries-in-fact described above. And redressability requires Plaintiffs show "a favorable decision will relieve a discrete injury" and that it is "likely" to redress the injury. *Id.* (internal quotation marks and citations omitted). The redressability prong is obviously met here—if HB 18's enforcement is enjoined in relevant part, DSPs have no reason to make the policy changes it requires.

3. Plaintiffs may assert a challenge as a third party not directly regulated by HB 18

That HB 18 regulates DSPs—and not Plaintiffs directly—does not negate Plaintiffs' injury-in-fact, nor the traceability or redressability of that injury, as Paxton argues.[6] Each of the three

[6] Indeed, Paxton suggested when opposing the motion for preliminary injunction in *Computer & Communications Industry Association*, Case No. 1:24-cv-849-RP, the opposite: that the internet providers could not sue on First Amendment grounds because they are not the users who experience the chilled speech. (Resp., Dkt. 18, at 22 ("[I]ndividual plaintiffs routinely sue on First Amendment grounds to challenge acts that allegedly restrict their use of or access to social media. Nothing prevents [digital services providers plaintiffs'] users from doing the same.").

provisions of HB 18 described above have a "determinative or coercive effect" of the Act on DSPs, and Plaintiffs' injuries result. *Book People*, 91 F.4th at 331. More specifically, HB 18 has enforcement provisions that will predictably prevent DSPs from allowing Plaintiffs to share or view certain content because of the risk that Paxton or a private actor will enforce HB 18 against them.

And Plaintiffs may challenge the regulation of intermediaries (the DSPs) who control their access to the chilled speech, consistent with longstanding First Amendment principles. Plaintiffs' standing is analogous to that in *Bantam Books, Inc. v. Sullivan*, where book publishers had standing to challenge state regulations on bookstores, despite the state not intending to enforce the law as to the publishers themselves. 372 U.S. 58, 64 n.6 (1963). The Fifth Circuit also recently upheld standing when a bookseller brought a challenge to a law restricting school districts' book purchases: the injury "depend[ed] upon the decision of an independent third party," the school district, but booksellers had standing because "the school districts' purchasing decisions" were "coerced by the State" and school districts would "react in predictable ways" that resulted in injury to booksellers. *Book People*, 91 F. 4th 318, at 329–33.[7] The same principle applies here: HB 18 confers standing on Plaintiffs whose speech and listening will be chilled because of DSPs' predictable reactions to the law.[8]

---

[7] As another analogy, courts have also found that news agencies can assert challenges to orders that restrict their information or access to proceedings, even when they are not "restrained directly" by a given order. *See Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926–27 (5th Cir. 1996) (collecting cases).

[8] This case is distinct from *Murthy v. Missouri*, which Paxton describes as having rejected a "right to listen" theory for social media users asserting a First Amendment injury. 603 U.S. 43 (2024); (Resp., Dkt. 35, at 23). In *Murthy*, the Supreme Court found that nothing demonstrated the government had coerced any content moderation policies on the relevant social media platforms; the plaintiffs, rather, based their standing on the fact that federal government officials, as part of an overall focus on COVID-19-related misinformation, had spoken with and met with social media companies about the topic. 603 U.S. at 51–54. The Court concluded that Plaintiffs made no showing of any specific "government-coerced" social media moderation decisions, as opposed to decisions made by the platforms in their own independent judgment. *Id.* at 61. Here, government coercion exists because HB 18 has directly banned certain types of speech among minors on social media, as described above. As in other First Amendment cases, such as *BookPeople*, this Court can logically deduce that the threat of penalties on covered entities would result in changes to their practices. 91 F.4th at 330.

As to the Fourteenth Amendment vagueness challenges, Plaintiffs have standing for the same reasons: the unconstitutional vagueness of the relevant provisions, combined with their coercive effect on DSPs, will predictably result in the DSPs preventing their speech on social media. Plaintiffs have standing as speakers and listeners to challenge an unconstitutionally vague regulation of intermediaries. *See Bantam Books*, 372 U.S. at 64 n.6, 71.

4. <u>SEAT may assert its members' First Amendment rights</u>

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n. of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343, (1977)); *see also Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *8.

SEAT meets these requirements. To the first prong, for the same reasons that individual minor Plaintiffs have standing, SEAT's members (who are middle-school to college-aged youths participating in advocacy and civic engagement) would have standing to sue. SEAT asserts that its members receive information via its advertisement campaigns and view its posts about proscribed topics such as the decriminalization of currently illegal activities, sex education, and mental health conditions. (Samuels Decl., Dkt. 21, at 3, 5). HB 18 would likely prevent them from viewing those forms of content on social media.

Paxton does not contest the second or third prongs of associational standing. To the second prong, the Court finds that SEAT's interest in posting content and advertisements on social media is germane to its mission of mobilizing students in Texas. (Compl., Dkt. 1, at 4). And, to the third prong, SEAT's members do not need to participate in this suit. That inquiry does not derive from Article III but is "solely prudential." *Ass'n. of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550. There

is no prudential reason why SEAT's members need participate; there are not heavily contested fact issues that would benefit from SEAT's members participating, for example. And member participation "is not normally necessary" in actions for injunctive relief. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citation omitted). As such, SEAT has met its burden at the preliminary injunction stage to show associational standing to challenge the three provisions of HB 18.[9]

B. Ripeness

The general test for ripeness examines "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Book People*, 91 F.4th at 333. That test is met. Legal issues predominate this challenge and are ready for judicial review, while withholding that review would impose irreparable harm on Plaintiffs and Plaintiffs' members. *See also Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *9 (finding same).

C. First Amendment Analysis

Having found that Plaintiffs have standing to bring suit, the Court turns its analysis to the merits of the case. "[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,' and 'the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States.'" *NetChoice, LLC v. Fitch*, No. 1:24-CV-170-HSO-BWR, 2024 WL 3276409, at *7 (S.D. Miss. July 1, 2024) (*quoting Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019)). The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). First Amendment protection extends to social media, which "allows users to gain access to information and communicate with one another about it on any

[9] SEAT does not assert a theory of organizational standing in its motion or reply, so the Court does not address Paxton's arguments as to organizational standing. (Dkt. 35, at 18).

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 17 of 37

subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

1. Level of Scrutiny

The threshold question is what level of scrutiny applies to HB 18's regulations. *See Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 637 (1994). The Court has previously found that HB 18's threshold coverage definition is a content-based regulation, such that strict scrutiny applies to all regulations in HB 18. *Computer & Comm'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *10 (interpreting HB 18 § 509.002(a)(1)). The Court will briefly reiterate its reasoning here. HB 18 regulates [DSPs] that specifically host or broadcast "social" speech, thereby subjecting "social" content to heightened regulation. HB 18 § 509.002(a)(1). Non-social interactions, such as professional interactions, are not covered, while social interactions are. That is clear in HB 18's content-based exceptions. DSPs that provide "content primarily generated or selected by the" provider or primarily "functions to provide a user with access to news, sports, [or] commerce" are exempted. HB 18 § 509.002(b)(10)(A). This "singles out specific subject matter for differential treatment," by using the "function or purpose" of speech as a stand-in for its content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64, 169 (2015). HB 18 is therefore a content- and speaker-based regulation, targeting DSPs whose primary function is to share and broadcast social speech. "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170. When the government favors some speakers over others for their content, the law must be subject to strict scrutiny. *Barr v. Am. Assn. of Political Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (controlling plurality op.); *Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech because of the topic

discussed or the idea or message expressed."). The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation.

In response, Paxton suggests that these arguments are foreclosed by the Fifth Circuit. (Resp., Dkt. 35, at 28 (citing *NetChoice, LLC v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) ("*NetChoice I*"), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)). In *NetChoice I*, the Fifth Circuit rejected a similar argument brought by Plaintiffs by holding that regulations targeting social media did "not render [the law at issue] content-based because the excluded websites are fundamentally dissimilar mediums." *NetChoice I*, 49 F.4th at 480.

But Paxton fails to recognize that the *NetChoice I* decision does not control the analysis, as the Court held in *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *10. The Court will again reiterate its analysis on this point: The *NetChoice I* ruling is no longer binding because the Supreme Court vacated *NetChoice I*, "void[ing] each of the judgment's holdings." *Doe v. McKesson*, 71 F.4th 278, 286 (5th Cir. 2023); *see also Moody*, 603 U.S. at 745 (vacating judgment). Paxton suggests that *Moody* "effectively confirmed, or at least did not disturb, the Fifth Circuit's analysis" on this point. (Resp. Dkt. 35, at 29). But the Supreme Court "disturbed" the analysis when it vacated the opinion. Paxton suggests that the Supreme Court's own opinion "also rebuffed" Plaintiffs theory—but it is not clear how. (*See id.*). To the contrary, the Supreme Court expressly stated that "there has been enough litigation already to know that the Fifth Circuit, if it had stayed the course, would get wrong at least one significant input . . . ." *Moody*, 603 U.S. at 744. While the Supreme Court did not determine "whether to apply strict or intermediate scrutiny[,]" that was only because "Texas's law [did] not pass" either intermediate or strict scrutiny, at least applied to key respects of the law. *Id.* at 740.

Cutting against the Fifth Circuit's analysis in *NetChoice I*, the Supreme Court noted that "presenting a curated and edited compilation of [third-party] speech is itself protected." *Id.* at 744. (internal citations omitted). It noted that "editorial judgments influencing the content of

[Facebook's News Feed and YouTube's homepage] are, contrary to the Fifth Circuit's view, protected expressive activity." *Id.* If the discretion to favor social content over other messages is protected editorial judgment, then laws like HB 18 are not just targeting "fundamentally dissimilar mediums." Those laws are targeting DSPs based on those protected editorial judgments. So, at the very least, *Moody* calls into serious question *NetChoice I*'s discussion of "content-based" laws.

The district court's reasoning in *NetChoice, LLC v. Yost* is instructive. No. 2:24-CV-00047, 2024 WL 555904, at *8–11 (S.D. Ohio Feb. 12, 2024). There, a district court dealt with a highly similar Ohio law that targeted DSPs hosting "social" speech and excluded sites focused on news and product reviews. *Id.* at *8. The district court grappled with whether the "social" distinction was "content-based" (as would require strict scrutiny) or merely regulated the "manner in which" companies "transmit" the content (which would trigger intermediate scrutiny). *Id.* at *9 (quoting *Turner Broad. Sys.*, 512 U.S. at 645).[10] Although emphasizing that "[i]t is a close call[,]" the court ultimately found that social media DSPs "are not 'mere conduits'" but 'curate both users and content to convey a message about the type of community the platform seeks to foster.'" *Id.* at *11 (quoting *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1107 (W.D. Tex. 2021)).[11]

In an even more similar case, a Mississippi district court found a nearly identical law (H.B. 1126) to be content- and speaker-based:

> In essence, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material that is disseminated, whether it is "social interaction," as opposed to "news, sports,

[10] *But see Reed*, 576 U.S. at 163–64 ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.").

[11] In *NetChoice I*, the Fifth Circuit ruled that these editorial decisions fall outside the First Amendment, which in turn allowed the court to consider social media platforms "mere conduits." *NetChoice I*, 49 F.4th at 480. But in reversing *NetChoice I* on the First Amendment value of editorial judgments, *Moody* undercut the premise that had allowed the Fifth Circuit to consider social media regulations content neutral. *Moody*, 603 U.S. 727 ("The Fifth Circuit was wrong in concluding that Texas's restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression.").

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 20 of 37

> commerce, [or] online video games[.]" [HB 1126] can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports), or based on a more subtle content-based restriction defining regulated speech by its function or purpose (i.e., providing news and sports). Either way, [b]oth are distinctions drawn based on the message a speaker conveys.

*Fitch*, 2024 WL 3276409, at *9 (quoting HB 1126) (cleaned up). Most recently, a Montana district court found a statute nearly identical to the content monitoring and age-verification requirements to be subject to strict scrutiny because it requires assessing the content of a website to determine whether it is harmful to minors; the analogous requirements do the same here and are subject to strict scrutiny for the same reason. *Free Speech Coal.*, 2024 WL 4542260, at *5–*7.

Like the district courts in *Yost*, *Fitch*, and *Free Speech Coalition*, this Court finds that HB 18 discriminates based on the type of content provided on a medium, not just the type of medium. A DSP that allows users to socially interact with other users but "primarily functions to provide" access to news or commerce is unregulated. An identical DSP, with the exact same medium of communication and method of social interaction, but which "primarily functions to provide" updates on what a user's friends and family are doing (e.g., through Instagram posts and stories), *is* regulated. If there is a difference between the regulated DSP and unregulated DSP, it is the content of the speech on the site, not the medium through which that speech is presented. When a site chooses not to primarily offer news but instead focus on social engagement, it changes from an uncovered to covered platform. But the type of medium has not changed, only the content primarily expressed on the platform. In sum, strict scrutiny applies to HB 18's provisions because the law regulates DSPs based on the content of their speech and the identity of the speaker.

One additional point. Paxton argues that the targeted advertising requirements constitute a regulation on commercial speech, such that strict scrutiny does not apply. (Resp., Dkt. 35, at 31). The Court disagrees. The word "advertisement" in the statute could apply to any number of forms of speech that does not propose a commercial transaction. *Serafine v. Branaman*, 810 F.3d 354, 365

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 21 of 37

(5th Cir. 2016) ("Commercial speech is speech 'that *proposes* a commercial transaction.'") (quoting *Northern Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, (1989)). Paxton proposes that "[t]he better interpretation is that this statute restricts paid advertising," (Dkt. 35, at 30), but the word "paid" is not in the statute, and this Court cannot "rewrite a . . . law to conform it to constitutional requirements." *Serafine*, 810 F.3d at 369 (citation omitted). If the legislature intended to cover only advertisement proposing a commercial transaction, or "paid announcements," (Dkt. 35, at 21), as Paxton suggests, it could have easily added clarifying language saying as much.[12] "The best course, as always, is to stick with the ordinary meaning of the text that actually applies." *Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 817 (2024). The targeted advertising requirements are not commercial speech; strict scrutiny applies to them equally.

2. HB 18 and Strict Scrutiny

Because strict scrutiny applies, Paxton must therefore prove that HB 18 is "the least restrictive means of achieving a compelling state interest." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citation omitted). As the next step in the analysis, this Court must also determine whether the law is facially invalid. Even if HB 18 is a content-based regulation, it does not follow as a matter of course that the law is facially invalid. In the First Amendment context, facial challenges can only succeed if litigants show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). So, a law regulating First Amendment activity may only be struck down in its

[12] Paxton's proposed revision of the statute to cover only "paid" advertising, (Dkt. 35, at 20–21), also ignores the fact that "commercial speech" is not the same thing as "speech for profit," and "indeed, some of our most valued forms of fully protected speech are uttered for a profit." *Serafine*, 810 F.3d 354, at 365. As a result, even if the statute only covered "paid" advertising, strict scrutiny would still apply.

entirety if its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

*Moody*, including the majority opinion and all four concurrences, emphasized that courts should not treat facial challenges lightly, even in the First Amendment context. It clarified that courts should "address the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications." *Id.* That analysis requires a two-step process. First, courts must "assess the state laws' scope" and ask, "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* Second, a court must "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725. Only after making these inquiries can a court determine if a law's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724.

(a) <u>The Monitoring-and-Filtering Requirements</u>

This Court already held that the monitoring-and-filtering requirements likely violate the Constitution. The Court again reiterates its analysis here. These requirements force providers to develop strategies to "prevent [a] known minor's exposure to harmful material and other content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB 18 § 509.053. Irrespective of whether HB 18 as a whole is content-based, there can be little dispute that this provision is. The monitoring-and-filtering requirements explicitly identify discrete categories of speech and single them out to be filtered and blocked. That is as content based as it gets.

It is far from clear that Texas has a compelling interest in preventing minors' access to every single category of information listed above. Some interests are obvious—no reasonable person could dispute that the state has a compelling interest in preventing minors from accessing

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 23 of 37

information that facilitates child pornography or sexual abuse. *See Sable Commc'ns of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."). On the other end, many interests are not compelling, such as regulating content that might advocate for the deregulation of drugs (potentially "promoting" "substance abuse") or defending the morality of physician-assisted suicide (likely "promoting" "suicide"). *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (internal citation omitted). The Supreme Court has repeatedly emphasized that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975). Many of the regulated topics are simply too vague to even tell if they are compelling. Terms like "promoting," "glorifying," "substance abuse," "harassment," and "grooming" are undefined, despite their potential wide breadth and politically charged nature. While these regulations may have some compelling applications, the categories are so exceedingly overbroad that such a showing is unlikely.

Even accepting that Texas has a compelling interest in blocking select categories under HB 18, the law is not narrowly tailored. HB 18 requires DSPs to implement strategies that include: listing harmful material, using filtering technology, using hash-sharing technology to identify recurring material, creating a database of keywords used for filter evasion, performing human-monitoring reviews to ensure the filtering technology works, publishing descriptions of the filtered content, and making the code available to independent researchers. HB 18 § 509.053(b)(1). This broad, multi-faceted approach fails for two reasons: it does not employ the least restrictive means, and it is not narrowly tailored.

As in *Fitch*, Paxton "has not shown that the alternative suggested by [Plaintiffs], a regime of providing parents additional information or mechanisms needed to engage in active supervision over children's internet access would be insufficient to secure the State's objective of protecting children." 2024 WL 3276409, at *12. And Paxton has not shown that methods such as "hash-sharing technology" and publishing depictions of filtered content are necessary to prevent harm to minors. In short, HB 18 does not employ "the least restrictive means" to stop minors from accessing harmful material. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

HB 18 also employs overbroad terminology. Again, the monitoring-and-filtering requirements impose sweeping *ex-ante* speech restrictions, akin to prior restraints, but does little more than vaguely gesture at what speech must be restrained. For example, what does it mean for content to "promote" "grooming?" The law is not clear. So, by requiring filtering as a matter of law with only vague reference to what must be filtered, HB 18 will likely filter out far more material than needed to achieve Texas's goal.

More problematically, the law is underinclusive. That a law "is wildly underinclusive when judged against its asserted justification . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802. Websites that "primarily" produce their own content are exempted, even if they host the same explicitly harmful content such as "promoting" "eating disorders" or "facilitating" "self-harm." The most serious problem with HB 18's under-inclusivity is it threatens to censor social discussions of controversial topics. "[S]ocial media in particular" operates as one of "most important places . . . for the exchange of views . . . ." *Packingham*, 582 U.S. at 104. But HB 18 specifically cuts teenagers off from this critical "democratic forum[] of the Internet" even though the same harmful content is available elsewhere. *Reno v. ACLU*, 521 U.S. 844, 868 (1997). A teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads. In its attempt to

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 25 of 37

block children from accessing harmful content, Texas also prohibits minors from participating in the democratic exchange of views online. Even accepting that Texas only wishes to prohibit the most harmful pieces of content, a state cannot pick and choose which categories of protected speech it wishes to block teenagers from discussing online. *Brown*, 564 U.S. at 794–95.

Of course, *Moody*'s instruction on facial challenges still applies: the Court must analyze what each provision of the monitoring-and-filtering requirements does and individually assess those provisions' constitutionality. Here, however, the strict scrutiny test parallels the facial challenge framework. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) ("[T]he validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *NetChoice, LLC v. Bonta*, No. 23-2969, 2024 WL 3838423, at *8 (9th Cir. Aug. 16, 2024) (slip op.) (affirming facial challenge where strict scrutiny regulation "raises the same First Amendment issues" "in every application to a covered business"); *Stevens*, 559 U.S. at 473 n.3 (noting that overbroad law was facially invalid).

The monitoring-and-filtering provisions are more restrictive and less tailored than they need to be at the outset. The provisions' facial under-inclusivity also cannot be cured by identifying examples of HB 18's constitutional applications—the point is that HB 18 does *not* regulate the same harmful content elsewhere. The lack of narrow tailoring and use of overly restrictive means apply to all speech regulated under the provision and "raises the same First Amendment issues." *Bonta*, 2024 WL 3838423, at *8. Nor are the monitoring-and-filtering requirements like the laws at issue in *Moody*, where some provisions might restrict protected speech and others do not. 603 U.S. 725–26. Instead, the monitoring-and-filtering requirements exclusively target speech, only a small portion of which

falls outside First Amendment coverage.[13] Because the monitoring-and-filtering requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face.[14]

(b) Targeted Advertising Requirements

Turning to the targeted advertising requirements, the Court finds them likely to fail strict scrutiny for similar reasons. First, Paxton specified no compelling state interest. As with the monitoring-and-filtering requirements, there may exist a compelling state interest in promoting teen mental health by limiting teens' exposure to certain advertising, but nowhere does the Court see a specific interest articulated for removing teens' access to targeted advertising of all kinds, much less a compelling one, as is required. *NIFLA*, 585 U.S. at 766. Paxton devotes some briefing to the general harms of social media, citing that teens use it too constantly, that exposure to some types of content may promote suicidality or eating disorders, and that "malicious actors" "target children and adolescents" on social media. (Dkt. 35, at 14–17). The issue, again, is that these purported state interests could, under Paxton's argument, justify restricting any social media for teenagers; why prevent targeted advertising on the covered DSPs toward them, in particular? To that question, Paxton offers no answer. For lacking a compelling state interest alone, the provision fails strict scrutiny. *NIFLA*, 585 U.S. at 766.

So, too, the targeted advertising requirements lack the required narrow tailoring. *Playboy Ent. Grp.*, 529 U.S. at 813. The targeted advertising requirements do nothing to distinguish between potentially harmful advertising and advertising that is not harmful, or that could be beneficial, to

---

13 For example, child pornography generally does not receive First Amendment protection. *See New York v. Ferber*, 458 U.S. 747, 765 (1982). But the large majority of the proscribed content, such as speech promoting eating disorders, harassment, and bullying, is covered speech, even if highly distasteful. A state may not "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794.

14 The preliminary injunction will also apply to Section 509.056(1), which requires DSPs to "make a commercially reasonable effort to ensure that [their] algorithm does not interfere with the digital service provider's duties under" the monitoring-and-filtering requirements.

minors. Lacking narrow tailoring is, again, an independent reason that the targeted advertising requirements fail strict scrutiny. *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1119 (9th Cir. 2023) (enjoining advertising ban that was "too broad" because it "effectively constitutes a blanket restriction on firearm-product advertising," where no tailoring existed to ensure it advanced the state's interest of curbing unlawful firearm use or gun violence). Plaintiffs submit evidence of the beneficial aspects of targeted advertising and its positive uses; for example, they show that Plaintiff Ampersand uses advertisements to reach its members with informational campaigns about public health. (Mot. Prelim. Inj., Dkt. 17, at 8−9; Janeway Decl., Dkt. 18, at 2−5). Paxton agrees that advertising can be beneficial to minors in some contexts. Paxton calls some forms of advertising "public service advertising": "speech such as a university's post on its own social media identifying upcoming 'scholarship opportunities' or a nonprofit organization's announcement of an upcoming conference to discuss 'free speech' issues." (Resp., Dkt. 35, at 31). But the statute restricts those forms of advertising. Paxton agrees restricting such content is "absurd," (*id*. at 31), but this results from the statute's plain language, which uses the word "advertising" and creates no caveats to focus on any particularly harmful type of advertising.[15] That the statute includes within its ambit prohibiting speech that Paxton agrees is beneficial only underscores that the statute is over-inclusive.

On the other hand, the targeted advertising requirements are fatally under-inclusive, for similar reasons as the monitoring-and-filtering requirements. *Brown*, 564 U.S. at 802. Why, if the very use of targeted advertising toward minors creates a harm so acute as to create a compelling state interest, can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform? And why may the DSPs allow it so long as one parent logs onto their account and

[15] As discussed in Section III(C)(1), Paxton insists that the proper reading would carve-out those "public service" advertisements, because the law has the purpose of "protecting children from abuse and their privacy." (*Id.*). But as explained previously, Paxton offers—and the Court can identify—no basis for that limiting principle within the text of the targeted advertising requirements, and the Court cannot rewrite the statute. *Serafine*, 810 F.3d at 369; *Am. Booksellers*, 484 U.S. at 397.

permits it? *See Brown*, 564 U.S. at 802 (finding that statute which enabled minors to access "dangerous, mind-altering material" to minors "so long as one parent . . . says it's OK" was under-inclusive and failed strict scrutiny). For that third independent reason, the provisions fail strict scrutiny.

As with the monitoring-and-filtering requirements, the statute is invalid on its face. The targeted advertising requirements exclusively target speech, only a small portion of which, such as child pornography or defamation, falls outside First Amendment coverage. *See Brown*, 564 U.S. at 794. In every application, they limit DSPs' editorial "choices about . . . how to display" speech. *Moody*, 603 U.S. at 716. A substantial majority of the prevented speech is protected First Amendment activity, *id*. at 724, including both targeted advertising sharing undisputedly beneficial speech, and targeted advertising on topics that are highly disfavored by the state but retain First Amendment protection, *Brown*, 564 U.S. at 794. The court will facially enjoin the provision.

(c) Content Monitoring and Age-Verification Requirements

The content monitoring and age verification requirements suffer the same flaws. Paxton does not seriously contest that the restriction fails strict scrutiny, instead, he acknowledges that on "the merits, § 509.057 realistically shares the same fate as § 509.053(a)." (Dkt. 35, at 42). The Court agrees and finds that § 509.057 fails strict scrutiny for the same reasons that § 509.053 does.

Nowhere does Paxton make clear what compelling state interest in particular these provisions serve or how they are narrowly tailored to it. Protecting minors against speech the state deems offensive or inappropriate is not by itself a compelling state interest. *Erznoznik*, 422 U.S. at 213–14. Again, Paxton gestures toward mental health impacts of social media use, privacy concerns, and the presence of "predator[s]" on the Internet, (Dkt. 35, at 14−17), but nothing suggests the content monitoring and age-verification requirements would address any of those general problems. *See NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *15 (D. Utah Sept.

10, 2024) (enjoining similar law where Utah failed to "offer any evidence that these specific measures will alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease"); *Brown*, 564 U.S. at 799 (strict scrutiny requires the law "be actually necessary to the solution"). And even if there were a measurable impact of the requirements on mental health for teens, why would nothing less restrictive than the content-monitoring and age-verification requirements suffice? *See Playboy Ent. Grp.*, 529 U.S. at 816, 826. Section 509.057 requires limiting any speech on covered DSPs that Paxton or the DSP deems "harmful" (which is broad and undefined) or "obscene" (which is defined, but still reaches a broad range of speech); Paxton nowhere shows that a more targeted limitation would fail.

And, like the other provisions, the content monitoring and age-verification requirements are also fatally under- and over-inclusive. *Brown*, 564 U.S. at 802. They are under-inclusive, because the requirements would allow teenagers to view the same piece of sexually-oriented material on one DSP but not another, depending on whether it is a sports or shopping platform or not. *See* § 509.002(b)(10) (exempting those platforms). They are over-inclusive, because the content monitoring and age-verification regime also deters adults' access to protected speech, as DSPs have an incentive to limit their overall "harmful" or "obscene" content available. Finally, the content monitoring and age-verification regime denies minors access to DSPs even where most of the content is *not* "harmful" or "obscene." As such, the Court finds at this stage that the content monitoring and age-verification restrictions fail strict scrutiny.

As with the other requirements, the statute is invalid on its face. The content monitoring and age-verification requirements exclusively target speech; they limit DSPs' editorial "choices about . . . how to display" speech in all of their applications, *Moody*, 603 U.S. at 716, and a substantial majority of the prevented speech is protected First Amendment activity, *id.* at 724, even where the state views

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 30 of 37

certain topics as inappropriate or unseemly for minors, *Brown*, 564 U.S. at 794. The Court will facially enjoin the provision.

D. Vagueness

In addition to their First Amendment challenge, Plaintiffs argue that the three challenged provisions (monitoring-and-filtering, targeted advertising, and content monitoring and age-verification requirements) are void for vagueness. (Mot. Prelim. Inj., Dkt. 17, at 24–25). As to the monitoring-and-filtering requirements, Plaintiffs argue the terms "promote[]," "glorify," and "facilitate[]" are void for vagueness. (*Id.* at 26–27 (quoting HB 18 § 509.053(a))). As to the targeted advertising requirements, Plaintiffs argue that the term "advertising" is unconstitutionally vague (*id.*, quoting § 509.052(2)(D)), and so are the terms "facilitate" and "promote" when they appear in § 509.055, (*id.*). Finally, they challenge the content monitoring and age-verification requirements, as well as the "verified parent" definition, as unconstitutionally vague due to the term "commercially reasonable method." (*Id.* (quoting §§ 509.057(a), 509.101)).

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied* 144 S. Ct. 348 (2023). "A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). The Supreme Court has "expressed greater tolerance of

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 31 of 37

enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. However, if "the law interferes with the right of free speech or association, a more stringent vagueness test should apply." *Id.* at 499.

(a) Monitoring-and-Filtering Requirements

This Court has already held that the terms "promote, glorify, and facilitate" are vague within HB 18's monitoring and filtering requirements, and holds the same here. *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *16. To reiterate: those provisions require social media DSPs to track, filter, and block material that "promotes," "glorifies," or "facilitates" "suicide, self-harm,[] eating disorders[,] substance abuse[,] stalking, bullying, [] harassment[,] grooming, trafficking, child pornography,[] other sexual exploitation or abuse" and material that is sexually explicit for minors. HB 18 § 509.053. Those provisions are vague because both the verbs (promotes, glorifies, and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined. Especially when put together, the provisions are unconstitutionally vague.

Begin with the verbs: promote, glorify, and facilitate. One of those words—"promote"—has already been held to be vague when regulating First Amendment activity. In *Baggett v. Bullitt*, 377 U.S. 360, 371–72 (1964), the Supreme Court dealt with a regulation that imposed a loyalty oath for teachers to swear that they will "*promote* respect for the flag and the institutions of the United States." (emphasis added). The Supreme Court found that the term "promote" was "very wide indeed" and failed to "provide[] an ascertainable standard of conduct." *Id.*

The problem is even more acute with the term "glorifying." The word encompasses so wide an ambit that people "of common intelligence" can do no more than guess at its application. *McClelland*, 63 F.4th at 1013. To "glorify" potentially includes any content that favorably depicts a prohibited topic, leaving no clear answer on what content must be filtered. Do liquor and beer advertisements "glorify" "substance abuse?" Does *Othello* "glorify" suicide? Given the substantial

liability companies face for failing to comply (to say nothing of the private rights of action), it is reasonable to expect that companies will adopt broad definitions that do encompass such plainly protected speech.

In sum, HB 18 imposes requirements for entire categories of speech to be blocked. If those *ex-ante* restrictions are to be imposed, they cannot arguably cover such broad categories of protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).[16]

Paxton suggests that these terms can be "narrowly construed in a manner that would be constitutional," but he does not explain how. (Resp., Dkt. 35, at 43) (citing *Williams*, 553 U.S. at 290, then quoting *United States v. Hansen*, 599 U.S. 762, 770–73 (2023))). To the extent Paxton suggests those terms can be interpreted to mean "speech integral to unlawful conduct," as in *Hansen*, nowhere did the state make such a caveat explicit from the statute, even though it could have chosen to do so. Instead, the state used terms that reach a broader swath of conduct than criminal assistance or advocacy. And there are good reasons to believe the state deliberately sought a broader definition than criminal assistance or advocacy, because HB 18 also proscribes speech related to lawful conduct, such as having an eating disorder. Indeed, Paxton's brief would suggest that the law intends to prevent certain forms of legal speech because of their negative effects on teens (like access to information about dieting because of its potential to promote eating disorders). (*See* Resp., Dkt. 35, at 14–17). As a result, HB 18 is not "readily susceptible" to a "narrowing construction" to

[16] Paxton contends that the monitoring-and-filtering provisions are not vague to Plaintiffs because they "mirror social media companies' own content-moderation policies." (Resp., Dkt. 35, at 24). But a self-policed rule does not suffer the same vagueness problems as a state-backed proscription. Facebook may know their internal definition of "glorify" but the company cannot be assured that Paxton or Texas courts will abide by the same definition.

make it constitutional, as Paxton suggests. *Am. Booksellers*, 484 U.S. at 397 ("[T]he statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements.") (internal quotation omitted).

The final issue for HB 18 is that the law fails to define key categories of prohibited topics, including "grooming," "harassment," and "substance abuse." At what point, for example, does alcohol use become "substance abuse?" When does an extreme diet cross the line into an "eating disorder?" What defines "grooming" and "harassment?" Under these indefinite meanings, it is easy to see how an attorney general could arbitrarily discriminate in his enforcement of the law. *See Smith v. Goguen*, 415 U.S. 566, 575 ("Statutory language of such a standardless sweep allows [] prosecutors[] and juries to pursue their personal predilections."). These fears are not too distant—pro-LGBTQ content might be especially targeted for "grooming." *See Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *2 (W.D. Tex. Mar. 30, 2023) (finding that several books supporting pro-LGBTQ views were removed from library shelves for allegedly promoting "grooming"), *aff'd as modified*, 103 F.4th 1140 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 106 F.4th 426 (5th Cir. 2024). Content related to marijuana use might be prosecuted as "glorifying" "substance abuse," even if cigarette and alcohol use is not. This vast indefinite scope of enforcement would "effectively grant[] [the state] the discretion to [assign liability] selectively on the basis of the content of the speech." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 465 n.15 (1987). Such a sweeping grant of censorial power cannot pass First Amendment scrutiny.

(b) Targeted Advertising Requirements

Plaintiffs argue that the term "advertising" is unconstitutionally vague in § 509.052(2)(D)), and so are the terms "facilitate" and "promote" when they appear in § 509.055. (Mot. Prelim. Inj., Dkt. 17, at 26–27). The Court finds that the words "facilitate" and "promote" also render § 509.055 unconstitutionally vague, for the same reasons as when they appear elsewhere in the statute. As to

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 34 of 37

the term "advertising," however, at this stage, the Court agrees with Paxton. Several courts have held that the term "advertising" has a "common understanding" or is otherwise not void for vagueness in other contexts. *See, e.g.*, *Free Speech Coal., Inc. v. Shurtleff*, No. 2:05CV949DAK, 2007 WL 922247, at *16 (D. Utah Mar. 23, 2007) ("The term advertises has a common understanding."); *see also StreetMediaGroup, LLC v. Stockinger*, No. 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 534 (S.D.N.Y. 2018); *Texans Against Censorship, Inc. v. State Bar of Tex.*, 888 F. Supp. 1328, 1369–71 (E.D. Tex. 1995), *aff'd*, 100 F.3d 953 (5th Cir. 1996). Plaintiffs have not responded to this caselaw, nor provided examples of courts finding "advertising" to be an unconstitutionally vague term in similar contexts to HB 18. So, Plaintiffs have not established a substantial likelihood that "advertising" is unconstitutionally vague, as is their burden at this stage. Regardless, since the Court will enjoin the targeted advertising requirements because they fail strict scrutiny, it need not reach this issue.

(c) Content Monitoring and Age-Verification Requirements

Finally, Plaintiffs argue that the content monitoring and age-verification requirements, (§ 509.057), as well as its "verified parent" definition, is rendered unconstitutionally vague by the term "commercially reasonable method." (Mot. Prelim. Inj, Dkt. 17, at 27). In turn, Paxton argues that "commercial reasonableness" is used in many contexts across the Uniform Commercial Code and federal law. (Resp., Dkt. 35, at 44 (citing 17 U.S.C. § 115, 15 U.S.C. § 7706(f)(3)(D), U.C.C. § 2614(1), and U.C.C. § 2-402(2)). Plaintiffs do not respond other than to note that none of Paxton's examples involve protected speech. (Dkt. 37, at 27). While it is true that the standard for vagueness in a statute is stricter in First Amendment cases, *Vill. of Hoffman Ests.*, 455 U.S. at 498, the Court still finds it persuasive that numerous other statutes use the same term, and Plaintiffs have not at this stage provided evidence demonstrating the term's vagueness when it appears in HB 18. Given

that the Court has enjoined the statute on the grounds that it fails strict scrutiny, the Court will decline to reach this ground.

3. Prior Restraints

Separate from their other arguments, Plaintiffs argue that the challenged restrictions are unconstitutional because they impose a "system of prior restraint." (Mot. Prelim. Inj., Dkt. 17, at 19–21). Paxton responds that prior restraints must typically come from "administrative and judicial orders," so HB 18 does not qualify. (Resp., Dkt. 35, at 46). Finding the provisions invalid under strict scrutiny, and finding § 509.053 and § 509.055 unconstitutionally vague, the Court need not reach the issue.

E. Remaining Preliminary Injunction Factors

Paxton does not seriously contest the remining preliminary injunction factors, other than to suggest that Plaintiffs delayed in bringing suit. (Resp., Dkt. 35, at 47). Lengthy delays in filing suit do count against irreparable harm, especially in the context of a temporary restraining order. *See Luckenbach Texas, Inc. v. Skloss*, No. 1:21-CV-871-RP, 2022 WL 5568437, at *4–5 (W.D. Tex. July 8, 2022); *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017). That doctrine is less applicable here, where the law created a 14-month gap between enactment and taking effect, and Plaintiffs' delay does not automatically negate a finding of irreparable harm.

Setting aside their delay, Plaintiffs make a clear showing that they will suffer irreparable injury in the absence of an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). As described above in Section III(A)(1), Plaintiffs have submitted declarations attesting to their chilled speech because of HB 18, which suffices to show irreparable harm.

Case 1:24-cv-00945-RP Document 42 Filed 02/07/25 Page 36 of 37

The balance of equities and public interest follow likelihood of success. These last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (internal citation omitted). Because the Court has found that Plaintiffs have shown a substantial likelihood of success on the merits of their First Amendment claims, the Court finds that an injunction is in the public interest. *See id.; see also, e.g.*, *Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.").

## IV. CONCLUSION

Plaintiffs have shown that HB 18 is a content-based statute and is therefore subject to strict scrutiny. As to the monitoring-and-filtering requirements, HB 18 § 509.053 and § 509.056(1), the targeted advertising requirements, § 509.052(2)(D) and § 509.055, and the content monitoring and age-verification requirements, § 509.057, Plaintiffs have carried their burden in showing that the law's restrictions on speech fail strict scrutiny and should be facially invalidated, and in § 509.053 and § 509.055, are unconstitutionally vague. Because Plaintiffs also show that the remaining equitable factors weigh in their favor, the Court preliminarily enjoins Paxton from enforcing those provisions.[17] However, Plaintiffs do not show that the remaining provisions of HB 18 unconstitutionally regulate a meaningful amount of constitutionally protected speech or otherwise

[17] Plaintiffs are not required to post a security bond. *See Fitch*, 2024 WL 3276409, at *17.

fail strict scrutiny. Accordingly, the preliminary injunction is limited only to the provisions listed above.[18]

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, (Dkt. 17), is **GRANTED IN PART** and **DENIED IN PART** as set forth in this order.

**IT IS FURTHER ORDERED** that Paxton, his agents, employees, and persons working under his direction or control are **PRELIMINARILY ENJOINED** from enforcing the monitoring-and-filtering requirements, HB 18 § 509.053 and § 509.056(1), the targeted advertising requirements, § 509.052(2)(D) and § 509.055, and the content monitoring and age-verification requirements, § 509.057, pending a final judgment in this case or other modification of this order.

**SIGNED** on February 7, 2025.



ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

[18] More specifically, HB 18 Sections 509.001–002 are definitions and applicability provisions, and Plaintiffs do not show that they independently create an injury and likely violate the Constitution. Also, as to Section 509.051, Plaintiffs reference that the Act requires Texans to register their age before accessing a DSP but do not show how age registration alone (without the separate content-monitoring requirements requiring that DSPs bar known minors' access, which this Court will enjoin) independently prohibits speech and likely violates the Constitution. Similarly, as to Sections 509.101–102, Plaintiffs do not show that the process for verifying a parent and the powers of a verified parent under HB 18 independently creates an injury and violates the Constitution when not combined with the targeted advertising requirements, which this Court will enjoin. Accordingly, the Court will deny the motion in all other respects.

# TAB 6: *SEAT* NOTICE OF APPEAL (ROA.25-50096.874-875)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON,** | § § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 1:24-cv-945-RP** |
| **v.** | § § | |
| **KEN PAXTON, in his official capacity as Attorney General of Texas,** | § § § | |
| **Defendant.** | § | |

## DEFENDANT'S NOTICE OF APPEAL

Pursuant to Rules 3(a)(1) and 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Defendant Ken Paxton, in his official capacity as Attorney General for the State of Texas ("Defendant"), files this Notice of Appeal to the United States Court of Appeals for the Fifth Circuit from the Order entered on February 7, 2025.[1] This Order granted in part and denied in part Plaintiffs' Motion for a Preliminary Injunction. Defendant moved the Court to deny Plaintiffs' Motion for a Preliminary Injunction.[2] The order granting the preliminary injunction in part is immediately appealable under 28 U.S.C. § 1292(a)(1). This notice divests this Court of jurisdiction during the pendency of the appeal because Defendant asserted challenges against all claims brought by Plaintiffs in this lawsuit.[3] Based on the cited Fifth Circuit precedent, proceedings in this Court are suspended pending resolution of the appeal.

---

[1] ECF 42.
[2] ECF 35.
[3] *See* ECF 35; *Whole Woman's Health v. Jackson*, 13 F.4th 434, 444 (5th Cir. 2021) ("[T]he notice appealing the order 'divest[s] the district court of its control over those aspects of the case involved in the

Dated: February 7, 2025

Respectfully submitted,

**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**BRENT WEBSTER**
FIRST ASSISTANT ATTORNEY GENERAL

**RALPH MOLINA**
DEPUTY FIRST ASSISTANT ATTORNEY GENERAL

**JAMES LLOYD**
DEPUTY ATTORNEY GENERAL FOR CIVIL LITIGATION

**KIMBERLY GDULA**
CHIEF - GENERAL LITIGATION DIVISION

*/s/Todd Dickerson*
**TODD DICKERSON**
Attorney-in-charge
Assistant Attorney General
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667
***Counsel for Defendant***

## CERTIFICATE OF SERVICE

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on February 7, 2025, using the Federal Court CM/ECF system.

*/s/ Todd Dickerson*

appeal.'") (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)); *see also Wooten v. Roach*, 964 F.3d 395, 412 (5th Cir. 2020); *Williams v. Brooks*, 996 F.2d 728, 729–30 (5th Cir. 1993).