# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND
THROUGH NEXT FRIEND, VANESSA FERNANDEZ; AMPERSAND
GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General

CAMERON FRASER
Cameron.Fraser@oag.texas.gov
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

ERIC S. ABELS
Assistant Attorney General

*Counsel for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-50721

## COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

*v.*

## KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*and*

No. 25-50096

## STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees,*

*v.*

## KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

Under Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not provide a certificate of interested persons.

/s/ Cameron Fraser
CAMERON FRASER
*Counsel of Record for Defendant-Appellant*

i

## Statement Regarding Oral Argument

Texas requests oral argument. The district court's facial injunctions flouted the Supreme Court's requirements in *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), and raise complex issues of standing, the First Amendment, preemption, and severability. Oral argument will clarify HB18's text, context, and scope, as well as Texas's duty to shield minors from harmful content.

# Table of Contents

Page

Certificate of Interested Persons .................................................................. i

Statement Regarding Oral Argument ........................................................... ii

Table of Authorities ..................................................................................... iv

Introduction .................................................................................................. 1

Statement of Jurisdiction .............................................................................. 3

Issues Presented ........................................................................................... 3

Statement of the Case ................................................................................... 4

    I.   Factual Background ............................................................................ 4

    II.  Procedural History ............................................................................ 7

        A.  *CCIA v. Paxton* .................................................................... 7

        B.  *SEAT v. Paxton* .................................................................... 8

Summary of the Argument ......................................................................... 10

Standard of Review ..................................................................................... 14

Argument ..................................................................................................... 15

    I.   The *SEAT* Plaintiffs Lack Article III Standing. ........................... 15

        A.  The *SEAT* plaintiffs do not engage in conduct proscribed by HB18. ........................................................................ 17

        B.  No *SEAT* plaintiff faces a threat of HB18 enforcement. .................... 24

        C.  The *SEAT* plaintiffs' right-to-listen theory fails to establish standing. ............................................................. 25

        D.  The *SEAT* plaintiffs' injuries are neither traceable to HB18 enforcement nor redressable by a facial injunction. ........................... 27

    II.  The District Court's Flawed First Amendment Analysis Ignored *Moody*'s Requirements and Requires Reversal, or at Minimum Vacatur and Remand. ...................................................................... 29

        A.  HB18's threshold coverage definitions are content-neutral. ............. 30

        B.  The monitoring, filtering, and algorithm provisions are not facially invalid. ................................................................ 34

        C.  The targeted-advertising provisions are not facially invalid. ............. 38

    D.   The age-verification provision is permissible under binding precedent. ........................................ 41

  III.  HB18's Terms Are Not Unconstitutionally Vague. ................................ 43

  IV.  Section 230 Does Not Preempt HB18's Monitoring-and-Filtering Provision ...................................... 47

  V.  If Any Provision of HB18 Is Facially Unconstitutional, the Court Should Sever That Provision and Leave the Rest of the Statute Intact. ........................................... 50

  VI.  The Remaining Injunction Factors Favor Texas. .................................. 51

Conclusion ................................................................. 53

Certificate of Service .................................................... 54

Certificate of Compliance ................................................ 54

## Table of Authorities

Page(s)

**Cases:**

*A.B. v. Salesforce, Inc.*,
  123 F.4th 788 (5th Cir. 2024) ............................................ 48, 49

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ............................................ 16, 18

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engs.*,
  894 F.3d 692 (5th Cir. 2018) ............................................... 15

*Barr v. American Association of Political Consultants, Inc.*,
  591 U.S. 610 (2020) ............................................. 32, 33, 51

*Barrosse v. Huntington Ingalls, Inc.*,
  70 F.4th 315 (5th Cir. 2023) ............................................... 47

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ............................................ 10, 16

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) ....................................................... 47

*Clapper v. Amnesty Int'l USA,*
568 U.S. (2013) ................................................................ 21, 28

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
521 F.3d 1157 (9th Cir. 2008) ...........................................48

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................................. 16

*Free Speech Coal. v. Paxton,*
144 S. Ct. 1473 (2024) ........................................... 43, 47, 50

*Free Speech Coalition, Inc. v. Paxton,*
95 F.4th 263 (5th Cir. 2024) ....................................*passim*

*Giboney v. Empire Storage & Ice Co.,*
336 U.S. 490 (1949) ............................................................ 36

*Ginsberg v. New York,*
390 U.S. 629 (1968) ..................................................... 21, 44

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ..................................................... 13, 46

*Greater New Orleans Broadcasting Association v. United States,*
527 U.S. 173 (1999) ............................................................40

*Henderson v. Source for Pub. Data, L.P.,*
53 F.4th 110 (4th Cir. 2022) ............................................48

*Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.,*
747 F.3d 275 (5th Cir. 2014) ............................................ 43

*Kolender v. Lawson,*
461 U.S. 352 (1983). Civil...............................................44

*Kuhl v. State,*
497 S.W.3d 128 (Tex. App. —Texarkana 2016, no pet.) ................................. 45

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001)............................................................40

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)................................................ 11, 15, 28

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ........................................................... 47

*Melot v. Bergami,*
970 F.3d 596 (5th Cir. 2020) ............................................32

*Miller v. California,*
413 U.S. 15 (1973) ...................................................... 24, 42

*Mishkin v. New York*,
    383 U.S. 502 (1966)................................................................ 43

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)..........................................................*passim*

*Murthy v. Missouri*,
    603 U.S. 43 (2024)...........................................................*passim*

*NetChoice, LLC v. Fitch*,
    No. 24-60341, 2025 WL 1135279 (5th Cir. Apr. 17, 2025) ..........................*passim*

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) (*NetChoice I*) ........................................ 2, 31, 50, 52

*New York v. Ferber*,
    458 U.S. 747 (1982)................................................................ 36, 39

*Osborne v. Ohio*,
    495 U.S. 103 (1990)................................................................ 46

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ............................................................... 20

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................ 32, 33, 40

*Doe ex rel. Roe v. Snap, Inc.*,
    144 S. Ct. 2493 (2024) ............................................................ 50

*Doe ex rel. Roe v. Snap, Inc.*,
    88 F.4th 1069 (5th Cir. 2023)..................................................... 49

*Rose v. Doctors Hosp.*,
    801 S.W.2d 841 (Tex. 1990)...................................................... 51

*Roth v. United States*,
    354 U.S. 476 (1957) ............................................................... 42, 43

*Scott v. State*,
    322 S.W.3d 662 (Tex. Crim. App. 2010)......................................... 13, 45

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996)....................................................... 28

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020)..................................................... 23, 26

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ................................ 49

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................... 19

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ...................................................... 25
*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ......................................... 52
*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ...................................................... 19
*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................... 15
*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994) (*Turner I*) ............................. 2, 31, 32
*United States v. Hansen*,
  599 U.S. 762 (2023) ................................... 13, 45, 46, 47
*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995) ...................................................... 51
*United States v. O'Brien*,
  391 U.S. 367 (1968) ...................................................... 37
*United States v. Williams*,
  553 U.S. 285 (2008) ..................................... 20, 39, 46
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................15, 52
*Younger v. Harris*,
  401 U.S. 37 (1971) ........................................................ 25
*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) ......................................... 23
*Zyla Life Scis. v. Wells Pharma of Hous., LLC*,
  No. 23-20533, 2025 WL 1076889 (5th Cir. Apr. 10, 2025) .............................48

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
  amend. I....................................................*passim*
18 U.S.C. §2 ...................................................... 45
28 U.S.C. §1292(a)(1) ........................................... 3

47 U.S.C.:

 §230 ................................................................................................ *passim*
 §230(b)(4) ................................................................................................ 49
 §230(c) ................................................................................................ 48
 §230(c)(1) ................................................................................................ 48, 49
 §230(c)(2) ................................................................................................ 48, 49
 §230(e)(3) ................................................................................................ 48

Tex. Bus. & Com. Code:

 §506.053 ................................................................................................ 5
 §509.001(1)-(2) ................................................................................................ 5
 §509.001(3) ................................................................................................ 42
 §§509.001-509.901 ................................................................................................ 5
 §509.002 ................................................................................................ 8
 §509.002(a) ................................................................................................ 5
 §509.002(a)(1) ................................................................................................ 32
 §509.002(b) ................................................................................................ 5
 §509.002(b)(10) ................................................................................................ 32
 §509.051 ................................................................................................ 6
 §509.052 ................................................................................................ 17, 19, 21, 24, 40
 §509.052(1)-(2) ................................................................................................ 7
 §509.052(2)(A) ................................................................................................ 41
 §509.052(2)(D) ................................................................................................ *passim*
 §509.053 ................................................................................................ *passim*
 §509.053(a) ................................................................................................ *passim*
 §509.053(b) ................................................................................................ 6
 §509.054 ................................................................................................ 6
 §509.055 ................................................................................................ *passim*
 §509.055(a) ................................................................................................ 46

 §509.056 ................................................................................................ 7, 12, 23, 48
 §509.056(1) ................................................................................................ 8, 34, 38, 50
 §509.057 ................................................................................................ *passim*
 §509.057(a) ................................................................................................ 42
 §509.058 ................................................................................................ 6
 §509.101 ................................................................................................ 6
 §509.102 ................................................................................................ 6

§§509.151-.152 .................................................................................. 7

§§509.151-509.152 ........................................................................... 25

§541.001(31) ..................................................................................... 41

Tex. Gov. Code §311.032(c) ............................................................... 51

Texas Health and Safety Code §161.082 ...........................................40

Texas Penal Code:

§20A.02 ...................................................................................... 45, 46

§32.21 ................................................................................................ 39

§42.07...........................................................................................13, 45

§42.072 ............................................................................................. 36

§43.21 .................................................................................... 6, 41, 51

§43.24.............................................................................. 6, 41-42, 51

**Other Authorities:**

Act of May 28, 2023, 88th Leg., R.S., ch. 795, §5.01, 2023 Tex. Gen.
Laws 2516 ...................................................................................... 7, 50

Google, "Google Ads policies,
https://support.google.com/adspolicy/answer/6008942 (last
visited Apr. 19, 2025) ...........................................................................46

Meta, "Coordinating Harm and Promoting Crime,"
https://transparency.fb.com/policies/community-standards/ (last
visited Apr. 14, 2025) ...........................................................................45

Meta, "Introduction to the Advertising Standards,"
https://transparency.fb.com/policies/ad-standards/ (last visited
Apr. 15, 2025) .......................................................................................46

Meta, "Suicide, Self-Injury, and Eating Disorders,"
http://transparency.meta.com/policies/community-
standards/suicide-self-injury/ (last visited Apr. 19, 2025)...............45

X Corp., "Violent Content," "Safety and Moderation Policies,"
https://help.x.com/en/rules-and-policies/violent-content (last
visited Apr. 19, 2025) ...........................................................................45

YouTube, "Harmful or dangerous content policy,"
https://support.google.com/youtube/answer/2801964 (last visited
Apr. 19, 2025) .......................................................................................45

# INTRODUCTION

Texas House Bill 18 (HB18) protects children from the most harmful online content by requiring Digital Service Providers (DSPs) to monitor and filter from their view the worst the internet has to offer—content that promotes, glorifies, or facilitates things like suicide, human trafficking, child pornography, sexual abuse, and suicide. It also prohibits predatory advertisements targeting minors with illegal products, services, and activities, and requires DSPs to verify user ages on platforms laden with obscenity. These consolidated appeals challenge a district court's orders facially enjoining HB18's core provisions. The orders are flawed on multiple grounds and should be reversed.

First, the *Students Engaged in Advancing Texas* (*SEAT*) plaintiffs—SEAT itself (an advocacy group), M.F. (a minor who uses social media), Brandon Closson (an adult mental-health advocate), and Ampersand Group (an advertising agency)—lack Article III standing to facially challenge HB18. Their online activities, including educational posts, research, and public-health advocacy, are not within HB18's scope. M.F.'s debate research, SEAT's anti-bullying posts, Closson's mental-health advocacy, and Ampersand's anti-trafficking campaigns do not promote or facilitate HB18's narrow, enumerated harms, and thus the *SEAT* plaintiffs do not engage in conduct that HB18 prohibits. They face no threat of enforcement, because HB18 regulates DSPs—not users or advertisers. And their speculative right-to-listen claims lack the specific speaker-listener connection needed for such claims under *Murthy v. Missouri*, 603 U.S. 43 (2024). Because the *SEAT* plaintiffs lack standing,

the Court should at minimum reverse the injunctions of the provisions challenged only in that suit: the targeted-advertising provisions and the obscenity provision.

On the merits, the district court erred first by deeming HB18's threshold coverage definitions—the provisions defining which DSPs the law regulates—*themselves* content-based, thus triggering strict scrutiny for the entire statute. That holding was plainly wrong, as the definitions distinguish between platforms based on their mediums, not speech content, and thus are permissible under *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) (*Turner I*), and *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (*NetChoice I*).

The district court compounded this error when, addressing the substantive provisions of HB18, it effectively ignored the Supreme Court's mandate in *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024)—reaffirmed by this Court just 10 days ago—to rigorously map a statute's constitutional and unconstitutional applications, and facially enjoin provisions only if their unconstitutional applications "substantially outweigh" their constitutional applications. The district court did the opposite: it failed to consider HB18's countless constitutional applications—like filtering child pornography, blocking advertisements for illegal content, and requiring age verification for obscenity platforms, for example—and instead speculated about hypothetical edge cases (like policy debates about physician-assisted suicide and drug deregulation) without weighing them against valid applications.

The district court's vagueness holdings fare no better. Terms like "promote" and "glorify" are clear under Texas law and industry practice, and used in the

content-moderation policies of many DSPs. The targeted-advertising provisions and obscenity provision are similarly precise, targeting only unlawful or obscene content, neither of which is vague even in the more exacting criminal context.

Finally, HB18 is not preempted by 47 U.S.C. §230, as it imposes compliance duties, not publisher liability, and aligns with §230's child-protection goals, as confirmed by *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024).

The balance of equities and public-interest factors favor Texas, whose interests in protecting children far outweigh plaintiffs' speculative, premature speech harms.

This Court should reverse the facial injunctions—or at minimum vacate and remand for a proper *Moody* analysis—to uphold Texas's compelling interest in protecting children from insidious online harms. And even if the Court determines that any provision of HB18 is facially unconstitutional, it should sever that provision and preserve the remainder of the statute, thus maintaining Texas's vital interest in child safety.

## Statement of Jurisdiction

This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## Issues Presented

1. Whether the *SEAT* plaintiffs lack Article III standing to challenge HB18, given that their online educational, research, and advocacy activities fall outside the statute's scope, they face no credible threat of enforcement, their injuries are not traceable to HB18 enforcement or redressable by an

injunction, and they have identified no regulated third-party speech whatsoever.

2. Whether the district court erred by facially enjoining HB18's provisions under the First Amendment by categorically applying strict scrutiny to the entire statute and then failing to conduct the rigorous analysis required by *Moody*.

3. Whether the district court wrongly held HB18's monitoring-and-filtering and targeted-advertising provisions unconstitutionally vague, despite their clear meanings under Texas law and industry practice.

4. Whether HB18 is preempted by 47 U.S.C. §230, given its alignment with §230's immunity for good-faith content moderation and its focus on DSP compliance rather than liability for third-party speech.

5. Whether any facially unconstitutional provisions of HB18 should be severed, preserving its many constitutional applications.

6. Whether the balance of equities and public-interest factors favor Texas because HB18's mission to protect minors from harmful content outweighs the plaintiffs' speculative harms.

## Statement of the Case

## I. Factual Background

In May 2023, the Texas Legislature enacted HB18, the "Securing Children Online through Parental Empowerment" Act, to protect minors from online harms.

Tex. Bus. & Com. Code §§509.001-509.901.[1] Citing pervasive social-media use among minors—95% of children between 13 and 17 use social media, and over a third use it "almost constantly"—and risks like sexual exploitation, substance abuse, and mental-health crises, the Texas Legislature invoked its compelling interest in protecting minors' well-being. ROA.24-50721.285, 287.

HB18 regulates DSPs that enable social interaction through user-generated content. It defines DSPs as websites, applications, or software that collect personal identifying information (PII), allow users to create public or semi-public profiles, and permit posting content viewable by others—e.g., on message boards and user profiles. §§509.001(1)-(2), 509.002(a). HB18 exempts from regulation platforms on which social speech is "incidental"—like government websites, financial institutions, medical platforms, small businesses, higher education, employee or educational software, email services with incidental social features, and DSPs primarily providing news, sports, commerce, or provider-generated content. §509.002(b).

HB18 imposes several categories of targeted requirements:

*Monitoring and Filtering*: DSPs must implement strategies to prevent known minors' exposure to content that "promotes, glorifies, or facilitates" narrow, enumerated categories: suicide, self-harm, eating disorders, substance abuse, stalking, bullying, harassment, grooming, trafficking, child pornography, and other sexual exploitation or abuse. §509.053(a). Acceptable strategies include filtering and

---

[1] All further citations to HB18 in this brief will use only section symbols—e.g., "§506.053."

hash-sharing technologies, keyword databases preventing evasion tactics, human reviews, and algorithm transparency (trade secrets are exempted). §§509.053(b), 509.058.

*Targeted Advertising*: DSPs may not display targeted advertising to known minors, §509.052(2)(D), and they must make commercially reasonable efforts to prevent advertisers from targeting minors with ads for products, services, and activities that are illegal for minors in Texas, §509.055.

*Age Verification*: DSPs publishing at least one-third material that is obscene under Texas Penal Code §43.21 or "harmful" under Texas Penal Code §43.24 (meaning obscene for minors) must use commercially reasonable methods to verify that its users are adults. §509.057.

*Age Registration and Parental Tools*: DSPs must require users to register their age before creating an account and provide known minors' parents with tools to control the known minors' privacy, time limits, and data settings. §§509.051, 509.054, 509.101-102. Parents can override certain restrictions, like prohibitions on minors engaging in financial transactions. §509.102.

*Data Limits and Algorithm Disclosure*: DSPs must limit PII collection from minors, not share or sell it, and not collect minors' precise geolocation data. §509.052(1)-(2). DSPs using algorithms for content suggestions must disclose their means of doing so and ensure compliance with filtering duties. §509.056.

Enforcement of HB18 is restricted to Texas Attorney General actions for deceptive trade practices or parental suits for injunctive relief. §§509.151-.152. Class actions are prohibited. *Id.*

HB18's severability clause encourages courts to preserve "provisions or applications of" of HB18 "that can be given effect without" any portion that is deemed invalid. Act of May 28, 2023, 88th Leg., R.S., ch. 795, §5.01, 2023 Tex. Gen. Laws 2516, 2524 (hereinafter, "§5.01").

HB18 took effect on September 1, 2024. As discussed below, however, the district court facially enjoined its key provisions before that date. ROA.24-50721.430-31; ROA.25-50096.846-52.

## II.  Procedural History

Following the passage of HB18 but before its effective date, two groups of plaintiffs brought facial, pre-enforcement challenges against HB18 in the Western District of Texas and sought preliminary injunctions blocking its enforcement. The *CCIA* plaintiffs requested an injunction before HB18's effective date; the *SEAT* plaintiffs did not request an injunction by a specific date. Both cases were assigned to the same district judge.

### A.  *CCIA v. Paxton*

On July 30, 2024, the *CCIA* plaintiffs—nonprofits representing tech firms like Google, Meta, and X—sued Attorney General Ken Paxton in his official capacity. ROA.24-50721.7, 394-95. They alleged that HB18 violates the First Amendment as a content-based law that fails strict scrutiny, is unconstitutionally vague, imposes prior restraints, and is preempted by Section 230 of the Communications Decency Act. ROA.24-50721.7-75. They sought to enjoin HB18's monitoring-and-filtering provisions (§§509.053, 509.056(1)) and DSP coverage definitions (§509.002).

ROA.24-50721.75, 399-400. They did not challenge the targeted-advertising provisions (§§509.052(2)(D), 509.055) or the age-verification provision (§509.057). ROA.24-50721.399.

On August 30, 2024, the district court granted the motion in part and enjoined the monitoring-and-filtering provisions. ROA.24-50721.430-31. It concluded that HB18's threshold DSP definitions are content-based, triggering strict scrutiny for the rest of the statute, because they target "social" platforms but exempt non-social platforms like news and commerce DSPs. ROA.24-50721.411-15. According to the district court, the monitoring-and-filtering provisions fail strict scrutiny as overbroad (they apply to protected speech like discussions about eating disorders), underinclusive (they apply to user-generated content but not provider-generated content), and are not narrowly tailored. ROA.24-50721.417-21. The district court also held that terms like "promote" and "glorify" are unconstitutionally vague. ROA.24-50721.424-26. And it held that HB18's monitoring-and-filtering provision is preempted by §230 because HB18 imposes liability on DSPs for hosting third-party content. ROA.24-50721.427-28.

As for the remaining preliminary injunction factors, the district court concluded that Plaintiffs faced irreparable harm from chilled speech and compliance costs, outweighing Texas's interest in child safety. ROA.24-50721.429-30.

Texas appealed on September 5, 2024. ROA.24-50721.432.

### B.   *SEAT v. Paxton*

On August 16, 2024, SEAT, M.F. (a minor), Brandon Closson (an online advocate), and Ampersand Group (an advertising agency) sued General Paxton,

alleging that HB18 chills their social-media speech and blocks their access to the social-media speech of third parties. ROA.25-50096.12-52. The *SEAT* plaintiffs challenged the same provisions as the *CCIA* plaintiffs but also challenged the targeted-advertising provisions (§§509.052(2)(D), 509.055) and the age-verification provision (§509.057). They argued that the provisions are content-based, overbroad, unconstitutionally vague, and prior restraints. ROA.25-50096.12-52. They filed their motion for preliminary injunction on August 23, 2024. ROA.25-50096.130-58, 844-45.

On February 7, 2025, the district court granted the motion in part, again enjoining the monitoring-and-filtering provisions and, for the first time, enjoining the targeted-advertising provisions and the age-verification provision. ROA.25-50096.846-52, 872-73.

The district court held that the *SEAT* plaintiffs had standing as users whose speech is chilled by DSPs' predictable compliance with HB18's coercive penalties, analogizing to *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). ROA.25-50096.846-52.

On the merits, the district court reaffirmed its CCIA holdings and found HB18's DSP definitions content-based for targeting "social" DSPs. Thus, it again applied strict scrutiny to every challenged provision of HB18. ROA.25-50096.853-56.

As for the targeted-advertising provisions, the district court concluded that they lack a compelling interest, are overinclusive (banning beneficial advertisements), and underinclusive (allowing ads elsewhere). ROA.25-50096.862-64. As for the age-verification provision, the district court concluded that it lacked a compelling

interest and was not narrowly tailored to its goal of protecting children from harmful online content, and that it is overinclusive (deterring adult access) and underinclusive (exempting non-social platforms). ROA.25-50096.864-66. The district court also concluded that the monitoring-and-filtering and advertising provisions use unconstitutionally vague terms like "promote" and "facilitate." ROA.25-50096.867-71.

The district court held that the remaining preliminary injunction factors favored the plaintiffs: chilled speech constitutes irreparable harm, and the public-interest factor favors protecting plaintiffs' First Amendment rights. ROA.25-50096.871-72.

Texas again appealed, and this Court consolidated the *CCIA* and *SEAT* cases on February 21, 2025. Dkt. No. 54.

## Summary of the Argument

The district court's facial injunctions are fundamentally flawed and should be reversed. To protect children, HB18 imposes targeted obligations on DSPs to monitor and filter content promoting serious harms, restrict predatory advertising, and verify user ages on platforms rife with obscenity. The district court's rulings err on jurisdictional, substantive, and procedural grounds, undermining Texas's compelling interest in protecting children. This Court should reverse the injunctions outright, or at minimum vacate and remand for a proper analysis under *Moody*. Alternatively, if it deems any provision facially unconstitutional, it should sever that provision to preserve HB18's valid applications.

*First*, the *SEAT* plaintiffs lack Article III standing to challenge HB18. Their online activities—educational posts, debate research, mental-health advocacy, and

public-health campaigns—do not promote, glorify, or facilitate harms like suicide, trafficking, or child pornography. M.F.'s use of Instagram for news and music, SEAT's anti-bullying posts, Closson's recovery-focused content, and Ampersand's anti-trafficking ads align with HB18's protective goals, not its prohibitions. Their speculative fears about chilled speech or restricted access to third-party speech lack the kind of concrete, non-speculative injury required by *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Their right-to-listen theory fails under *Murthy*, 603 U.S. at 43, as they identify no specific speakers or content HB18 would block them from accessing. Their injuries are neither traceable to potential HB18 enforcement nor redressable by an order enjoining HB18, as DSPs already moderate much of the content covered by HB18. And HB18 regulates DSPs, not individual users or advertisers, so these plaintiffs face no credible threat of enforcement. Indeed, the district court's mistaken reliance on an enforcement action against TikTok—a DSP—proves the point.

*Second*, the district court's First Amendment rulings defy logic and precedent. The district court stumbled out of the gate by wrongly deeming HB18's DSP definitions content-based, triggering strict scrutiny for the entire statute, even though the DSP definitions permissibly differentiate based on *mediums*—social versus non-social platforms—and do not mention any specific kind of speech or content. This error allowed the district court to apply strict scrutiny to every provision of HB18, even though many applications of HB18 target commercial speech, unprotected speech, or non-speech conduct—thus triggering lower scrutiny or no scrutiny at all.

The district court next flouted *Moody*'s rigorous framework for facial challenges, recently reaffirmed by this Court in *NetChoice, LLC v. Fitch*, No. 24-60341, 2025 WL 1135279 (5th Cir. Apr. 17, 2025). In *Moody*, every justice on the Supreme Court agreed that facial challenges are disfavored and difficult to justify. *Moody* thus requires courts to map a statute's *full* range of applications, distinguishing the constitutional from the unconstitutional, and ensure the unconstitutional applications "substantially outweigh" constitutional applications before issuing a facial injunction. *Moody*, 603 U.S. at 724. It is not enough to "discuss [a statute's] inclusion and exclusion of *some* of the activities and actors arguably regulated by the law." *Fitch*, 2025 WL 1135279, at \*6 (emphasis added). But that is exactly what the district court did here. It failed to thoroughly analyze HB18 at all, let alone to acknowledge its many constitutional applications. The monitoring-and-filtering provisions (§§509.053, 509.056) target narrow harms, and many of its applications involve no protected speech at all. The targeted-advertising provisions (§§509.052(2)(D), 509.055) curb predatory marketing targeted at minors and advocating products, services, and activities that are illegal for minors, with available parental overrides that ensure tailoring. The age-verification provision (§509.057), upheld in a parallel law by this Court in *Free Speech Coalition*, 95 F.4th at 263, permissibly restricts content that is obscene for adults and minors. Instead of considering any of this, the district court speculated about a few hypothetical cases without justifying them or properly weighing them against constitutional applications.

*Third*, the district court's vagueness holding is erroneous. Terms like "promote," "glorify," and "facilitate" are clear under Texas law and used in DSP's own content-moderation policies. Other statutory terms, like "[h]arassment," track Texas Penal Code §42.07, which was upheld in *Scott v. State*, 322 S.W.3d 662 (Tex. Crim. App. 2010). And "facilitate" mirrors federal aiding-and-abetting laws, upheld in cases like *United States v. Hansen*, 599 U.S. 762 (2023). What's more, platforms like Instagram and Meta routinely use this kind of language to moderate identical content, confirming the terms' clarity and workability. The district court's drug-deregulation hypothetical ignores HB18's child-protection context, and judicial narrowing could resolve any ambiguity. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

*Fourth*, the monitoring-and-filtering provision is not preempted by 47 U.S.C. §230. HB18 imposes compliance duties, not publisher liability, and it aligns with §230's encouragement of good-faith moderation. HB18 complements §230's child-protection goals, and plaintiffs cannot claim both §230 protection and First Amendment violations—the theories are mutually exclusive, as the former claims liability for third-party speech and the latter claims constitutional protection for the platforms' own speech.

*Fifth*, if any challenged provision of HB18 is facially unconstitutional, HB18's severability clause preserves the remainder. Provisions like §509.053's filtering of child pornography and §509.057's age verification for obscene content are

unquestionably constitutional and operate independently. Severance will preserve these and other provisions, as well as Texas's child-safety mission.

*Finally*, the remaining injunction factors—balance of equities and public interest—favor Texas. Texas's interest in protecting children outweighs the plaintiffs' unfounded harms about access to things like drug-legalization debates, which are not regulated by HB18 in any event. The public-interest factor favors child safety, a paramount societal goal, over plaintiffs' speculative First Amendment concerns. The district court's cursory analysis incorrectly weighed these factors, ignoring HB18's tailored approach and Texas's duty to protect children.

This Court should reverse the facial injunctions for lack of standing or on the merits, given the court's failure to conduct a proper *Moody* analysis, erroneous vagueness and preemption holdings, and misapplication of the injunction factors. Alternatively, it should vacate and remand for a thorough analysis under *Moody* and *Fitch*, or sever any unconstitutional provisions, upholding HB18's vital role in shielding Texas children from online harms.

## Standard of Review

"A preliminary injunction is an extraordinary remedy." *Atchafalaya Basinkeeper v. U.S. Army Corps of Engs.*, 894 F.3d 692, 696 (5th Cir. 2018). Plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of such relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

When reviewing preliminary injunctions for legal error, this Court does not apply blind deference. Questions of law—standing, First Amendment violations, and preemption, for example—are reviewed de novo. *Id.*

**ARGUMENT**

## I.    The *SEAT* Plaintiffs Lack Article III Standing.

The *SEAT* plaintiffs—SEAT, M.F., Closson, and Ampersand—lack Article III standing to challenge HB18, depriving the district court of jurisdiction to adjudicate their facial challenges. Thus, at a minimum, this Court should reverse the injunctions of the provisions only the *SEAT* plaintiffs challenge: the targeted-advertising provisions and the age-verification provision.

Article III standing ensures federal courts resolve concrete disputes, not abstract grievances. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish standing, a plaintiff must show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury in fact is traceable to the defendant's conduct; and (3) that a favorable ruling would redress the injury in fact. *Lujan*, 504 U.S. at 560-61. For pre-enforcement challenges seeking prospective injunctive relief, plaintiffs must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) "arguably proscribed" by the statute, and (3) a "substantial threat of enforcement." *Book People*, 91 F.4th at 329. Speculative harm and "general legal, moral, ideological, or policy objection[s]" are not enough. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And a "right to listen" injury demands a specific speaker-listener connection, not a vague desire

to access unspecified content. *Murthy*, 603 U.S. at 74-76. For associational standing, the association must be comprised of members who would themselves have standing, the claims must not require individual participation, and the association's interests must be germane to the organization's purpose. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

Here, M.F., a 16-year-old, claims to use social media for news, music, and debate research, and he fears HB18 blocks content about bullying and suicide. ROA.25-50096.171-75. SEAT, an advocacy group, claims that HB18 will regulate it and its members posts advocating against bullying and suicide. ROA.25-50096.177-82. Closson, an adult, claims to fear HB18's restrictions because he shares helpful mental-health content with minors. ROA.25-50096.164-70. Ampersand, an advertising agency, claims to run public-health campaigns without using PII to target minors by age. ROA.25-50096.159-63. The district court found that each of these plaintiffs has standing, citing their intent to engage with regulated content and a Texas HB18 enforcement suit against TikTok as evidence of a threat of enforcement. ROA.25-50096.847-50.

That holding is plainly wrong. The *SEAT* plaintiffs' conduct falls outside HB18's scope, and they face no threat of enforcement because they are not DSPs. Their claimed injuries also lack traceability and redressability.

### A. The *SEAT* plaintiffs do not engage in conduct proscribed by HB18.

#### 1. SEAT and its members.

SEAT and its members lack standing because their activities and posts are not proscribed by HB18.

SEAT lacks individual standing because its Instagram posts don't promote content prohibited by HB18—they advocate against it. Its posts on Instagram seek to educate youth about bullying and suicide, not glorify or promote them. ROA.25-50096.177-82. Its sharing of resources about sexual assault, ROA.25-50096.179-80, likewise supports HB18's aims, not its prohibitions. As for advertising restrictions, SEAT isn't an advertiser, so §§509.052 and 509.055 don't apply to it. And its vague advertising concerns about posting social-media campaigns to decriminalize certain activity, ROA.25-50096.181, lack the specificity required to establish standing. In any event, minors have no right to view advertisements promoting illegal conduct, and SEAT makes vague references to banned books but fails to identify a single banned book by name. ROA.25-50096.181. Nor does §509.057's age-verification requirement for obscenity affect SEAT's platform or any platforms it intends to use, because SEAT itself doesn't post obscenity or indicate any desire to access platforms filled with it. ROA.25-50096.177-82.

SEAT also lacks associational standing because its members lack individual standing, as their conduct isn't even arguably proscribed by HB18. The members' discussions about bullying, suicide, and sex education aim to raise awareness and provide resources, not to "promote, glorify, or facilitate" bullying, suicide, or sexual

abuse. ROA.25-50096.178. Posting about sexual assault to educate peers, ROA.25-50096.179-80, doesn't trigger §509.053's filters, which target encouragement of harm, not advocacy or education against it. Likewise, SEAT's members' access to sex-education content, ROA.25-50096.178, remains unaffected, as HB18 doesn't bar educational discussions. As for targeted ads, §509.055's focus on illegal products, services, and activities doesn't implicate SEAT's members, who seek public-health resources, none of which are alleged to be illegal for minors. ROA.25-50096.178-81. Section 509.057's age-verification requirement applies to platforms rife with obscenity, and SEAT's members don't claim to use any platform that would be regulated by that provision. Without identifying proscribed conduct, SEAT's members lack standing, and thus so does SEAT. *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550.

The district court erred by holding that SEAT has individual and associational standing, claiming its "planned educational Instagram posts concern[ing] bullying, sexual assault, and suicide" are proscribed by HB18. ROA.25-50096.847. That misreads HB18's text, which doesn't regulate content that "concerns" these topics but content that "promotes, glorifies, or facilitates" it. §509.053(a). The district court's "concern[ing]" standard misreads the statute and lowers the jurisdictional bar to the floor. ROA.25-50096.847. The district court's single example—SEAT's posts advocating against bullying, sexual assault, and suicide—ignores their educational and advocacy purposes, which align with HB18's purposes. SEAT does not claim that it intends to post material promoting, glorifying, or facilitating any of the topics listed in §509.053(a). The district court also failed to analyze SEAT's

members' conduct, overlooking the requirement that associations' members themselves must face direct harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). The district court provided no analysis of §§509.052, 509.055, or 509.057, and wrongly conferred standing across all provisions without tying SEAT's actions to HB18's scope. That cursory approach violates the requirement for a "personal stake" in each challenged rule, *Summers*, 555 U.S. at 493, and impermissibly dispenses "standing . . . in gross," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

### 2.   M.F.

M.F., a 16-year-old, lacks standing to challenge HB18, because he uses social-media for news, music, and debate-research content that is not proscribed by HB18.

M.F.'s affidavit outlines his use of platforms like Instagram to communicate with friends, find musical inspiration, research debate topics like marijuana legalization, and support his peers by learning about the dangers of bullying, vaping, and suicide. ROA.25-50096.171-75. He is concerned that HB18 will prevent him from listening to songs like The Fray's "How to Save a Life," reading election news, and receiving unspecified targeted advertisements. ROA.25-50096.172-75. HB18 won't prohibit any of this.

Connecting with friends, researching debate arguments, and seeking resources to help peers does not promote, glorify, or facilitate any harm listed in §509.053(a)—like suicide or sexual abuse. To the contrary, content that advocates *against* bullying and substance abuse furthers HB18's purpose of protecting minors. Discussions about marijuana legalization for a debate tournament are political discourse, not

glorification or facilitation of substance abuse, and research into cyberbullying's negative effects doesn't promote harassment. M.F.'s fear that songs like "How to Save a Life" might be blocked misinterprets §509.053, which targets content encouraging harm, not artistic expression addressing serious topics. And, in any event, the song's theme of saving life and preventing suicide aligns with HB18's goals, not its prohibitions, rendering M.F.'s claimed concerns totally speculative.

M.F.'s standing to challenge the targeted-advertising claims fares no better. M.F.'s affidavit vaguely mentions advertisements but includes no claim that he seeks advertisements promoting unlawful products, services, or activities, which is all that §509.055 prohibits. More importantly, M.F. has no constitutional First Amendment right to view advertisements targeted at him for products, services, or activities that are illegal for him. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973); *United States v. Williams*, 553 U.S. 285, 297 (2008). Nor is his interest in public-health advertisements, like those about vaping's dangers, affected. Section 509.055 targets only advertisements that "facilitate, promote, or offer" illegal products, services, or activities, not advertisements about their dangers.

Similarly, M.F. has no standing to challenge §509.057's age-verification requirement for obscenity. That provision applies to platforms on which over one-third of content is obscene for adults or minors under Texas law. M.F. uses platforms like Instagram, which are not covered by the provision, and expresses no intent to access provisions that are. In any event, minors like M.F. have no First Amendment right to view obscenity, *Ginsberg v. New York*, 390 U.S. 629 (1968), and HB18 applies to DSPs, not users. M.F. therefore faces no statutory obligation to verify his own age.

The district court erred by holding that M.F. has standing to challenge all of HB18 provisions, claiming his affidavit shows intent to engage with content "prohibited" by the statute. ROA.25-50096.847-48. That conclusion misreads both M.F.'s testimony and HB18's text. The district court claimed that M.F. feared losing access to music like "How to Save a Life" or "Everybody Hurts" due to suicide references, ROA.25-50096.847, but §509.053 doesn't bar songs about the value (or difficulties) of life; it bars content promoting, glorifying, or facilitating suicide. M.F.'s affidavit establishes no intent to view those topics—his own speech seeks to prevent suicide and bullying, not promote, glorify, or facilitate them. ROA.25-50096.173-74. As for advertising and age verification, the court offered no specific analysis; it merely assumed M.F.'s injury. ROA.25-50096.848. This cursory approach ignores §509.052's parental override, §509.055's narrow scope, and §509.057's inapplicability to M.F.'s interests and the platforms he uses. By failing to scrutinize his testimony against HB18's text, the district court adopted a speculative injury, contravening *Clapper*'s demand for imminent harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. at 398, 409-10 (2013).

### 3. Closson.

Brandon Closson, an adult who shares mental-health content online, lacks standing to challenge HB18 because his advocacy of minors is unaffected by the statute's prohibitions.

Closson posts on Instagram about bipolar disorder, eating disorders, substance-abuse recovery, and his LGBTQ+ identity to help people feel less alone and reduce shame and stigma around mental health. ROA.25-50096.165-69. He seeks to help

minors recognize symptoms, guide some to professional help, ROA.25-50096.165-66, and discuss his journey from substance abuse to recovery, ROA.25-50096.167. He also seeks to discuss the intersectionality of being gay and bipolar. ROA.25-50096.168. He fears HB18 will block these posts, prevent his minor followers from receiving mental-health advertisements, and deter those who prefer to maintain an anonymous online presence and thus will not want to verify their ages. ROA.25-50096.169.

None of this is prohibited by HB18. Closson's posts promoting recovery and criticizing stigma align with §509.053(a)'s protective goals. So does sharing his bipolar and LGBTQ+ experiences to protect minors. ROA.25-50096.165-66, 168. His fear of blocked posts, ROA.25-50096.169, is speculative because §509.053 targets DSPs, not users. As for advertising concerns, his worry about minors' mental-health advertisements, ROA.25-50096.169, lacks a personal stake, as he's neither an advertiser nor a minor. As for age verification, Closson cites others' needs for anonymity, not his own. ROA.25-50096.169. Nor do his posts trigger §509.057, as there is no allegation that at least one-third of the content on Instagram is obscene for adults or minors. Without anything further, Closson's claim of chilled speech lacks the required specificity. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020); *Zimmerman v. City of Austin*, 881 F.3d 378, 388-91 (5th Cir. 2018).

The district court incorrectly determined that Closson's fears of blocked posts established an injury in fact. ROA.25-50096.847-48. The district court ignored that §509.053(a) focuses on material promoting, glorifying, and facilitating, not policy advocacy, outreach, or education. The district court also failed to discuss Closson's

standing to challenge the advertising provisions, ROA.25-50096.847-48, and overlooked his claimed harms that involve people other than himself—like minors and users who seek anonymity, of which he is neither.

### 4. Ampersand.

Ampersand, an advertising agency, lacks standing to challenge HB18 because HB18 does not prohibit its public-health campaigns.

Ampersand creates advertisements warning about sex trafficking and substance abuse, which can be seen by minors but do not target them using PII. ROA.25-50096.161-62. Ampersand fears that HB18 will block these campaigns or require age verification. ROA.25-50096.159-63. But its campaigns aim to prevent harm, not promote, glorify, or facilitate it. ROA.25-50096.161. Its ads don't promote trafficking or substance abuse under §509.053(a)—they oppose them, aligning with HB18's goals. As a non-DSP, Ampersand faces no filtering or algorithm duties, §§509.053, 509.056, negating any potential injury under those provisions. As for the advertising provisions, §509.055's ban on advertisements for illegal products, services, and activities doesn't affect Ampersand's health campaigns. ROA.25-50096.161. And section 509.052's targeted-advertising ban applies to DSPs, not agencies. Further, Ampersand admits its advertising doesn't target minors using PII, and thus §502.052 doesn't apply to it. As for age verification, that requirement regulates DSPs, not Ampersand. Nor would the age-verification provision otherwise implicate Ampersand, which doesn't claim to use a DSP whose content is at least one-third obscene, or to post advertisements involving obscene content. Given that Ampersand doesn't intend to engage in proscribed conduct, it lacks standing.

The district court erred by holding to the contrary. It claimed that HB18 would prevent Ampersand from viewing posts deemed harmful or obscene, ROA.25-50096.848, but this mischaracterizes Ampersand's role. Ampersand is an advertising agency, not a user posting or viewing content, ROA.25-50096.838, and HB18's filtering and age-verification rules target DSPs, not advertisers, §§509.053, 509.057. The district court's reliance on obscenity as a basis for injury, ROA.25-50096.848, ignores that obscenity lacks First Amendment protection, *Miller v. California*, 413 U.S. 15, 36 (1973), and that Ampersand's campaigns don't involve obscene material, ROA.25-50096.161. As for standing to challenge the monitoring-and-filtering requirements, the district court offered no analysis linking Ampersand to §509.053's DSP duties. As for standing to challenge the targeted-advertising provisions, the court failed to address Ampersand's testimony that it avoids age-based targeting using PII and focuses on lawful health campaigns, ROA.25-50096.161-62, thus implicating neither §509.052 (prohibiting advertising targeted at minors) nor §509.055 (prohibiting advertisements for products, services, or activities that are illegal for minors). By neglecting to evaluate each provision against Ampersand's sworn statements, the district court improperly conferred standing.

## B.    No *SEAT* plaintiff faces a threat of HB18 enforcement.

No *SEAT* plaintiff faces a credible threat of enforcement under HB18, as the statute is enforceable against DSPs, not users or advertisers, leaving them without a cognizable injury sufficient to bring a facial challenge.

Plaintiffs seeking prospective, pre-enforcement relief must show a substantial threat that the challenged law will be enforced against them. *Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149, 166 (2014). Speculative fears of prosecution are insufficient. *Younger v. Harris*, 401 U.S. 37, 41-42 (1971).

M.F. is a minor who uses social media for research and communication. ROA.25-50096.171-75. SEAT is an advocacy group; it and its members post about bullying and suicide. ROA.25-50096.177-82. Closson is an adult who shares mental-health content. ROA.25-50096.164-70. Ampersand is an advertising agency that creates public-health campaigns. ROA.25-50096.159-63, 838. HB18 will not be enforced against these plaintiffs, because it authorizes the Texas Attorney General to sue only DSPs, and the *SEAT* plaintiffs are not DSPs. §§509.151-509.152. HB18 imposes no penalties, and allows no enforcement, against users like M.F., SEAT, or Closson, or advertisers like Ampersand. ROA.25-50096.838. The *SEAT* plaintiffs' affidavits establish no enforcement actions or threats of enforcement against them or others similarly situated. ROA.25-50096.159-82.

In holding to the contrary, the district court relied on Texas's enforcement action against TikTok, ROA.25-50096.849, without acknowledging that TikTok, unlike the *SEAT* plaintiffs, is a DSP. By citing an action against a DSP as evidence of enforcement against the non-DSP *SEAT* plaintiffs, the court misconstrued the statute's scope and committed reversible error.

## C. The *SEAT* plaintiffs' right-to-listen theory fails to establish standing.

The *SEAT* plaintiffs also lack standing under their right-to-listen theory, as they fail to identify any third-party speakers or content that HB18 would regulate,

rendering this alleged injury speculative and insufficient to confer Article III jurisdiction.

A right-to-listen injury requires a concrete, specific connection to a speaker whose content is restricted by the challenged law. *Murthy*, 603 U.S. at 74-76. Broad desires to access unspecified social-media content are insufficient. *Speech First*, 979 F.3d at 335.

Here, the *SEAT* plaintiffs claim that HB18 chills their ability to receive and engage with other users' social-media content, ROA.25-50096.37-38, but they do not identify any third party whose speech HB18 would prevent them from hearing or seeing. M.F. discusses election news and researches debate issues like marijuana legalization, ROA.25-50096.171-73, which do not involve a third party's speech or the harmful promotion, glorification, or facilitation targeted by §509.053(a). "How to Save a Life," which is third-party speech, addresses suicide prevention, not glorification, and thus aligns with HB18's protective goals, not its prohibitions. SEAT's posts about social issues seek to educate minors, not harm them. ROA.25-50096.177-82. Its members' affidavits similarly lack any reference to third parties whose speech is restricted. ROA.25-50096.178. Closson's single mention of a Twitch streamer, ROA.25-50096.165, does not mention the speaker's identity or content beyond "news commentary," which §509.053(a) doesn't proscribe. His affidavit otherwise highlights his own posts, not third-party posts, ROA.25-50096.164-70, undermining a right-to-listen claim. Ampersand's testimony addresses creating advertisements, not accessing third-party content. ROA.25-50096.159-63. It identifies no speakers or topics HB18 would regulate, offering only

vague fears that HB18 will restrict its own campaigns, which doesn't implicate the speech or listening rights of third parties.

The *SEAT* plaintiffs' generalized concerns about losing access to unspecified posts resemble the overbroad assertions rejected in *Murthy*, where plaintiffs argued social-media content was critical to their work but failed to specify moderated third-party speakers or content. 603 U.S. at 75. The district court distinguished *Murthy* by claiming HB18 directly bans speech, ROA.25-50096.850, but that misses the right-to-listen injury's core requirement: a specific connection to a blocked third-party speaker, 603 U.S. at 75. The *SEAT* plaintiffs' affidavits fail to provide any examples of restricted third-party speakers or content.

### D. The *SEAT* plaintiffs' injuries are neither traceable to HB18 enforcement nor redressable by a facial injunction.

Even assuming the *SEAT* plaintiffs have suffered cognizable injuries, the injuries are not traceable to HB18 enforcement or General Paxton, or redressable by an order enjoining him from enforcing it.

To establish standing, a plaintiff must show that its "injury is fairly traceable to the defendant's actions" and will "likely be redressed if he prevails in his lawsuit." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 556 (5th Cir. 1996) (internal quotation marks omitted). To be traceable, an injury must be "certainly impending," not dependent on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414. This showing is "substantially more difficult to establish" when a plaintiff asserts injuries based on the government's regulation of someone else, *Lujan*, 504 U.S. at 562 (citation omitted), because courts are reluctant "to endorse

standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413.

Here, the district court found that plaintiffs' alleged injuries are traceable to "government action" because HB18 "requires DSPs to make certain changes to their policies." ROA.25-50096.849. It then determined that their injuries are redressable because "if HB 18's enforcement is enjoined in relevant part, DSPs have no reason to make the policy changes it requires." ROA.25-50096.849.

That is wrong for the reasons articulated in *Murthy*. There, the plaintiffs failed to establish standing because their alleged injuries—moderation of their online content—were not traceable to the federal government's actions. Specifically, the plaintiffs alleged that federal agencies and officials engaged in censorship by coercing social-media platforms to suppress content relating to, among other things, COVID-19 and the 2020 presidential election. 603 U.S. at 48-56. But the Court held that any injuries caused by the alleged censorship were not traceable to the federal government's actions, *id.* at 76, because the "platforms had independent incentives to moderate content and often exercised their own judgment," *id.* at 60.

So too here. DSPs admittedly engage in abundant content-moderation practices, many of which overlap with HB18's requirements. *See infra* 44-47; ROA.24-50721.137, 145-53, 162-71, 187-90 (testifying that even before HB18 was enacted, DSPs moderated content in many of the same ways). For example, before the Legislature enacted HB18, DSPs were already moderating content that promoted self-harm and glorified eating disorders, *infra* 44-45, and those practices worked alongside DSP policies protecting minors, ROA.24-50721.147. If any plaintiff

attempts to view "harmful material" on a DSP like Facebook or Instagram today, Meta's policies already block such content. ROA.24-50721.151. The same is true of platforms like X, YouTube, and Pinterest. ROA.24-50721.151-52. With these moderation policies already in place, Plaintiffs cannot establish that any future moderation decision will be triggered by HB18 rather than a DSP's existing content-moderation policy. As in *Murthy*, existing content-moderation policies weaken the likelihood that any future content restriction is traceable to a potential HB18 enforcement action rather than existing policies. Thus, an order enjoining HB18 will not redress plaintiffs' speculative future injuries, because DPSs have not indicated any intention to stop the moderation policies that precede and overlap with HB18's requirements.

## II. The District Court's Flawed First Amendment Analysis Ignored *Moody*'s Requirements and Requires Reversal, or at Minimum Vacatur and Remand.

The Texas Legislature carefully crafted HB18 to impose targeted protections—monitoring-and-filtering requirements, algorithm adjustments, prohibitions on predatory advertising, and age-verification requirements for platforms full of obscenity. Yet the district court facially enjoined these provisions on First Amendment grounds. Those holdings rested on erroneous and inadequate legal analysis.

The district court's determination that HB18's threshold coverage definitions are themselves content-based was not only wrong but also infected the rest of its analysis, as it allowed the district court to apply strict scrutiny to every provision of

HB18 without properly determining the appropriate level of scrutiny for each potential application of the statute, as *Moody* and *Fitch* require. Rather thoroughly examine the law's potential applications and weigh the constitutional against the unconstitutional, the district court speculated about edge cases and concluded without systematic analysis that the law's main provisions are facially invalid. This Court should correct those errors by reversing or, at a minimum, vacating the injunctions and remanding for the required analysis under *Moody* and *Fitch*.

### A. HB18's threshold coverage definitions are content-neutral.

The district court erred by concluding that HB18's threshold coverage definitions—provisions specifying which DSPs the statute regulates—are themselves content-based, thereby subjecting the entire statute to strict scrutiny. ROA.24-50721.411; ROA.25-50096.853. This conclusion contravenes controlling Supreme Court precedent in *Turner I* and persuasive reasoning from this Court's decision in *NetChoice I*. The error infected both orders and should be corrected.

In *Turner I*, the Supreme Court held that the 1992 Cable Act's "must-carry" provisions were content-neutral and subject to intermediate scrutiny. 512 U.S. at 642, 662. There, the cable industry alleged that the provisions, which required cable operators to include local broadcast stations in their offerings, violated the First Amendment by dictating content. *Id.* at 626-27. The Court explained that the rules did not target "the ideas or views expressed" but instead the technological and economic structure of cable systems. *Id.* at 643. The law applied uniformly, regardless of programming's subject matter—whether news, entertainment, or

otherwise—and did not favor or disfavor any particular message. *Id.* at 645-46. The Court emphasized that singling out a medium does not trigger First Amendment concerns if the regulation hinges on the medium's mechanics rather than its content. *Id.* at 642.

In *NetChoice I*, this Court relied on *Turner I* in holding that the threshold coverage definitions in a parallel statute, HB20, were not content-based. 49 F.4th at 480-81. HB20 regulated "social media platforms" while exempting websites primarily dedicated to news, sports, or entertainment, where social interaction was "incidental." *Id.* at 480. This Court applied *Turner I*, reasoning that HB20's distinctions were not content-based because they differentiated between mediums, not messages or ideas. *Id.* Although *Moody* later vacated *NetChoice I* for failing to conduct a proper facial analysis, 603 U.S. at 745, it left undisturbed *NetChoice I*'s content-neutrality analysis, which remains persuasive, *see Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (explaining that vacated opinions offer helpful guidance when consistent with binding law).

Here, HB18's threshold coverage definitions resemble HB20's and align with *Turner I*'s content-neutral framework. HB18 applies to DSPs "primarily" facilitating "social interaction," such as platforms where users drive conversation through posts, comments, or shares. §509.002(a)(1). It exempts platforms where social interaction is "incidental," like those focused on news, sports, commerce, or provider-generated content. §509.002(b)(10). These are medium-based distinctions, not content-based distinctions—the provisions do not target any specific speech content.

The district court erred by holding to the contrary. It claimed that the coverage provision "singles out specific subject matter" by regulating "social" DSPs while exempting others. ROA.24-50721.412; ROA.25-50096.853. It did not explain what "subject matter" the provision targets. Nor could it have, because distinguishing between social platforms and non-social platforms is not a content-based distinction. Social speech can (and does) encompass any topic. The district court's failure to identify a specific "topic discussed or message expressed" targeted by the definitions reveals the weakness of its position. And its underinclusivity critique misapplies First Amendment doctrine. Texas may prioritize social DSPs, where harms to minors are most acute, without regulating every platform on the internet.

The district court leaned heavily on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), and *Barr v. American Association of Political Consultants, Inc.*, 591 U.S. 610 (2020), but those cases do not support its conclusion. In *Reed*, the Supreme Court held unconstitutional a municipal sign code that imposed different requirements on temporary directional signs (e.g., for church services) and more long-term political signs (e.g., for elections). 576 U.S. at 159-61. The Court explained that the code was content-based because it required officials to examine the sign's message to determine which restrictions applied, explicitly regulating "the topic discussed or the idea or message expressed." *Id.* at 163-64. The Court clarified that a law is content-based if it "applies to particular speech because of" its subject matter or function, drawing lines based on what the speaker conveys. *Id.*

In *Barr*, the Supreme Court invalidated a robocall ban exemption for government-debt-collection calls, finding it content-based because it favored one

32

specific topic—government debt collection—over all others, and required a content review before applying the rule. 591 U.S. at 619-20 (plurality op.). The plurality opinion underscored that such differential treatment based on "specific subject matter" is content-based, triggering strict scrutiny. *Id.* (citation omitted).

*Reed* and *Barr* are distinguishable. In those cases, one could easily identify the speech content being regulated. In *Reed*, political speech was favored over religious speech; in *Barr*, government debt calls were favored over all other debt calls. Here, one cannot read the coverage definitions and determine what kind of content or message is being targeted. The definitions distinguish platforms based on who is primarily responsible for generating the content—users or providers—not the content itself. Social speech can be *about* anything. So can non-social speech.

By mischaracterizing HB18's threshold coverage definitions as content-based, the district court subjected the entire statute to an unjustified strict-scrutiny standard. This foundational error demands reversal to ensure HB18, which is the subject of a facial challenge, is properly analyzed through a rigorous *Moody* analysis that carefully considers all of the law's potential applications, and the appropriate level of scrutiny for each.[2]

---

[2] Before the district court, the *CCIA* and *SEAT* plaintiffs argued that HB18 imposes prior restraints. The district court determined that it "need not reach the issue," ROA.25-50096.871, and thus Texas does not address it here. But Texas reserves its right to address that argument on reply, should plaintiffs raise it in response.

**B.** **The monitoring, filtering, and algorithm provisions are not facially invalid.**

HB18's monitoring-and-filtering provisions, §§509.053 and 509.056(1), embody Texas's commitment to shielding minors from online harm. Yet the district court declared them facially invalid. In doing so, it failed to conduct the analysis *Moody* and *Fitch* require for facial challenges, and thus the injunctions should be reversed.

*Moody* affirms that facial challenges are disfavored and establishes a stringent framework for justifying them. 603 U.S. at 723. The Court emphasized again and again that the decision to bring a facial challenge "comes at a cost" and that plaintiffs bringing them must clear a "high bar," given that facial challenges require invalidating a law in *all* its potential applications. *Id. Moody* involved challenges to Texas and Florida social-media laws that lower courts facially enjoined without fully assessing the full scope and constitutionality of the laws. *Id.* at 717-18. The Court vacated the facial injunctions, holding that a proper facial analysis requires two steps: first, mapping the statute's "full range" of applications by identifying the actors and activities regulated and distinguishing between constitutional and unconstitutional applications; second, weighing the former against the latter and determining whether unconstitutional applications "substantially outweigh" constitutional ones. *Id.* at 717, 724. Only then may a district court facially enjoin a statute. This standard is intentionally difficult to meet.

Less than two weeks ago, this Court reaffirmed *Moody* and vacated a preliminary injunction of a similar law, remanding the case to the district court for a thorough *Moody* analysis. *Fitch*, 2025 WL 1135279, at *7. In *Fitch*, NetChoice brought similar

challenges to a similar law, Mississippi HB1126. *Id.* at *1. Although the district court discussed the bill's "inclusion and exclusion of *some* of the activities and actors arguably regulated by the law, it did not address the *full range* of activities the law covers, as required by *Moody*." *Id.* at *6 (cleaned up) (emphasis added). That error warranted vacatur and remand.

Here, as in *Fitch*, the district court failed to conduct an adequate *Moody* analysis. At step one, the district court did not come close to satisfying *Moody*'s requirement of identifying the full range of actors and activities regulated and distinguishing between constitutional and unconstitutional applications. It failed to meaningfully map §509.053's potential applications at all, and it offered no systematic account of which DSPs or content the law targets. Instead, it speculated that a minor could read Peter Singer's writings about physician-assisted suicide on Google Books but not watch his lectures on YouTube or review his book on Goodreads. ROA.24-50721.420; ROA.25-50096.860. The court offered no analysis explaining how Goodreads—a non-plaintiff—qualifies as a covered DSP under HB18. Nor did it rigorously distinguish between constitutional and unconstitutional applications of §509.053. Although it acknowledged Texas's compelling interest in prohibiting posts involving child pornography—a priority rooted in common sense and decades of Supreme Court precedent—it summarily dismissed other constitutional applications. The district court speculated that §509.053 might cover advocacy for "deregulation of drugs" or "physician-assisted suicide," but it never explained how that content is covered by the statute's operative terms—"promoting," "glorifying," or "facilitating" things like substance abuse and suicide. ROA.24-

50721.418. *Moody* and *Fitch* demand much more. 603 U.S. at 723; *Fitch*, 2025 WL 1135279, at \*6.

Although it is not Texas's burden to conduct a *Moody* analysis, 603 U.S. at 743-44, it briefly does so here only to show just how inadequate the district court's analysis was. HB18 has many potential applications that trigger no scrutiny at all and thus easily pass constitutional review. For example, §509.053 could permissibly require DSPs to block a chatroom where users coordinate stalking—a criminal act under Texas Penal Code §42.072, punishable as a felony. Such content, as the Supreme Court held in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949), receives no First Amendment protection when it is "an integral part of conduct in violation of a valid criminal statute." Similarly, §509.053 could require DSPs to filter posts containing explicit child sexual abuse, which the Supreme Court categorically excluded from First Amendment protection in *New York v. Ferber*, 458 U.S. 747, 758 (1982). The district court should have given these applications at least as much weight as its own speculative outlier cases.

Beyond unprotected speech, §509.053 may also permissibly regulate conduct with incidental speech effects, further adding to its constitutional applications. A video providing detailed instructions for constructing a suicide bomb could be filtered as "facilitating self-harm." This targets dangerous behavior, not expression, and may well satisfy even intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367, 377 (1968), which affirmed bans on conduct where speech is incidental. Filtering such tutorials would serve Texas's interest in child safety without broadly censoring speech. And even where §509.053 implicates protected speech, some

applications could withstand strict scrutiny. A social media thread "glorifying" bulimia with step-by-step starvation tips, targeted at middle-school children, could be permissibly regulated given Texas's compelling interest in protecting the health and safety of young children.

The district court failed at *Moody* step two as well, because it failed to weigh constitutional applications against unconstitutional ones—a critical omission. 603 U.S. at 726. It branded terms like "promoting," "glorifying," and "grooming" "exceedingly overbroad" without assessing their full range of applications. ROA.24-50721.418. That was a surprising omission, especially given that HB18 requires DSPs to filter several categories of illegal conduct or material—child pornography, trafficking, and sexual abuse, for example—which alone contradicts the district court's conclusory and dismissive overbreadth holding. The district court's concerns about hypothetical drug policy discussions ignore §509.053's narrow focus on unprotected speech, like child pornography, undermining its claim that the provision sweeps too broadly. Combined with other obviously valid uses, like blocking stalking forums, weapons-making guides, or drug-use tutorials, HB18's constitutional applications are not substantially outweighed by the court's hypothetical concerns about drug legalization. *Moody* and *Fitch* require rigorous weighing and balancing, which the district court did not do.

Finally, in a footnote, the district court also enjoined §509.056(1). ROA.25-50096.862 n.14. That provision requires DSPs to ensure that their algorithms "support the requirements" of §509.053. The district court summarily enjoined §509.056(1), assuming its invalidity—presumably tying it to the monitoring-and-

filtering holding—without any independent analysis. ROA.25-50096.862 n.14. This again defies *Moody*'s mandate for a rigorous, application-by-application analysis of facial challenges and warrants reversal. 603 U.S. at 723. The district court's failure to identify any unconstitutional application of §509.056(1)—let alone show that such applications "substantially outweigh" constitutional ones—exemplifies its disregard for *Moody*'s rigorous framework, necessitating reversal or, at minimum, vacatur and remand for a proper analysis.

### C. The targeted-advertising provisions are not facially invalid.

HB18's targeted-advertising provisions, §§509.052(2)(D) and 509.055, address the exploitation of minors through tailored online advertisements that promote unlawful products, services, or activities. The district court enjoined them as facially unconstitutional, asserting they prohibit protected speech. That conclusion rests on an improper application of strict scrutiny—rooted in the court's flawed coverage-definitions ruling—and a failure to undergo a proper *Moody* analysis. Reversal or vacatur are warranted here, too.

Section 509.052(2)(D) prohibits DSPs from directing "targeted advertising" at minors. Section 509.055 imposes a narrower restriction, barring advertisers from targeting minors with advertisements that "facilitate, promote, or offer" products, services, or activities unlawful for minors in Texas. The district court assumed both provisions primarily regulate fully protected speech, rather than non-protected speech or commercial speech, and then summarily concluded that a "substantial majority" of affected advertisements would be unconstitutionally regulated. ROA.25-50096.864. Although it used the words "substantial majority," the district

court did not map the provisions' potential applications or weigh the constitutional against the unconstitutional, as *Moody* and *Fitch* require.

At *Moody* step one, the district court should have determined under what circumstances §509.052(2)(D) and §509.055 regulate non-protected speech, protected commercial speech, and protected non-commercial speech, and then determined which applications would likely be constitutional and unconstitutional.

Start with unprotected speech. An Instagram advertisement promoting fake IDs facilitates forgery, a crime under Texas Penal Code §32.21, and thus lacks First Amendment protection as content promoting an illegal transaction. *Williams*, 553 U.S. at 297. Likewise, an advertisement for a "sexting app" featuring explicit content targeting minors falls outside constitutional safeguards. *Ferber*, 458 U.S. at 758. These applications trigger no scrutiny and would be constitutional.

As for commercial speech, a paid advertisement on X targeting a minor with a vaping product, illegal under Texas Health and Safety Code §161.082, might nonetheless be commercial speech triggering and passing intermediate scrutiny, since it advances a substantial state interest—protecting minors from exploitative marketing. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). It also includes a parental-override mechanism (§509.052), ensuring a reasonable fit between the restriction and the State's goal. Similarly, a paid advertisement directing minors to an illegal gambling site likely constitutes commercial speech, but it is tied to unlawful activity for minors and thus may be permissible under cases like *Greater New Orleans Broadcasting Association v. United States*, 527 U.S. 173, 185 (1999).

Other applications of these provisions might trigger and pass strict scrutiny. An advertisement for an underground fight club targeting teens could be deemed content-based under *Reed*. Yet even there, the restriction might survive strict scrutiny, given Texas's compelling interest in protecting the physical safety of minors. The district court's failure to categorize and analyze these varied applications flouts *Moody*'s requirements.

The district court further erred by assuming that the word "advertisement" encompasses only non-commercial speech simply because it does not include the word "paid." ROA.25-50096.857. That interpretation overlooks critical context. Section 509.052(2)(D) applies to "targeted advertising," which Texas law defines as "displaying to a consumer an advertisement that is selected based on personal data obtained from that consumer's activities over time and across nonaffiliated websites or online applications to predict the consumer's preferences or interests." Tex. Bus. & Com. Code §541.001(31). This definition codifies the obvious: targeted advertising harnesses DSP's data-driven technologies, which are not available to advertisers for free.

Section 509.055's reference to "advertisers" likewise denotes commercial entities, not individual users sharing opinions. And that provision's placement alongside other financial restrictions, like §509.052(2)(A)'s prohibition on minors' online purchases, reinforces its commercial focus. By ignoring all this, the district court mischaracterized the provisions' scope.

The district court was also overly concerned about so-called "beneficial" advertisements, like Ampersand's public-health campaigns, suggesting they could

be covered by the advertising provisions. ROA.25-50096.862-63. That misreads §509.055 altogether, which applies only to advertisements promoting "unlawful" products, services, or activities. Public-health campaigns, which do not facilitate crimes, are obviously not covered. Indeed, the district court's failure to distinguish §509.055's narrow scope from §509.052(2)(D)'s broader application *at all* reveals its error and warrants reversal.

### D. The age-verification provision is permissible under binding precedent.

HB18's age-verification provision, §509.057, helps Texas shield minors from exposure to obscene online content—material that poses immediate and profound risks to their safety and well-being. It does so by requiring DSPs to verify the ages of their users when more than one-third of their content is "obscene," as defined by Texas Penal Code §43.21, or "harmful material," as defined by Texas Penal Code §43.24 (obscene for minors), §509.001(3). The age-verification provision protects vulnerable youth in ways long upheld by courts as both compelling and constitutional. Yet the district court declared §509.057 facially invalid, claiming it restricts a substantial amount of protected speech and thus violates the First Amendment. ROA.25-50096.865. That conclusion fundamentally misapplies *Moody* and totally disregards not only that obscenity is not protected by the First Amendment but also that the age-verification provision is permissible under binding Fifth Circuit precedent.

Section 509.057(a) applies to platforms on which more than one-third of content is obscene for adults or minors under Texas law. The former is not protected by the

First Amendment at all. *Roth v. United States*, 354 U.S. 476, 485 (1957). The latter may permissibly be age-restricted under this Court's recent decision in *Free Speech Coal.*, 95 F.4th at 263. *Free Speech Coalition* upheld a parallel age-verification requirement under Texas HB1181 for material "harmful to minors." *Id.* at 267. HB1181 defined such material to include content obscene for minors—i.e., material appealing to prurient interests, patently offensive as to minors, and lacking serious value for minors, adapting the *Miller* test to a youth-focused standard. *Id.* at 267. This Court applied rational-basis review, finding age verification a permissible means to protect minors from harmful content without unduly burdening adult speech. *Id.* at 268-69.

Under *Free Speech Coalition*, age verification for content obscene for minors is permissible. And if age verification for content obscene for minors is permissible, then so is age verification for material that is obscene for everyone, as the latter enjoys no First Amendment protection whatsoever. *Roth*, 354 U.S. at 485; *Mishkin v. New York*, 383 U.S. 502, 508 (1966).

The district court's failure to reconcile its strict-scrutiny approach with *Free Speech Coalition*'s rational-basis holding is reversible error, as it ignores binding precedent permitting rational age checks to shield minors from unprotected or harmful content.[3]

_____

[3] After this Court's decision upholding HB1181, the *Free Speech Coalition* plaintiffs sought emergency relief in the Supreme Court, which was denied on April 30, 2024. *Free Speech Coal. v. Paxton*, 144 S. Ct. 1473 (2024). The Supreme Court then granted review, *id.* at 2714, and heard oral argument on January 15, 2025. The Court has not yet issued its opinion, and thus *Free Speech Coalition* remains binding

The district court claimed that the provision restricts "substantial" protected speech without specifying what that speech might be. ROA.25-50096.865. A DSP hosting 40% deviant sexual material falls squarely within the obscenity category, unprotected since *Mishkin*, 383 U.S. at 508-09. A DSP with one-third content depicting pornography legal for adults but not children would be regulable under *Free Speech Coalition*.

At *Moody* step two, the court again failed to weigh constitutional against unconstitutional applications. And given the provision's narrow definitions tied to material that is obscene under the Texas Penal Code, it is difficult to imagine any invalid applications at all.

## III. HB18's Terms Are Not Unconstitutionally Vague.

HB18's monitoring-and-filtering (§509.053) and targeted-advertising (§509.055) provisions provide DSPs with clear, actionable guidance to protect minors from harmful content and predatory marketing. The district court erroneously deemed terms like "promote," "glorify," and "facilitate" unconstitutionally vague, asserting they lack "objective criteria" and invite "arbitrary application." ROA.24-50721.421-22; ROA.25-50096.859, 864. This holding misapplies the vagueness doctrine, ignores the terms' established meanings under Texas law and industry practice, and overlooks judicial narrowing as a remedy. The Court should reverse.

_____

precedent. *Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*, 747 F.3d 275, 280 n.4 (5th Cir. 2014).

The vagueness doctrine ensures fair notice of prohibited conduct and "minimal guidelines" to prevent arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). Civil statutes, particularly those protecting minors, require only reasonable certainty, not scientific precision. *Ginsberg*, 390 U.S. at 643. HB18's terms meet this standard, as they are anchored in legal precedent, statutory definitions, and the DSPs' own moderation practices.

*Monitoring and Filtering.* Section 509.053(a) requires DSPs to filter content that "promotes, glorifies, or facilitates" harms like suicide, trafficking, or harassment. These terms are far from novel or vague—indeed, the DSPs themselves already use many of them. For example, X moderates the "glorification of violent actions," defining violent speech as that which "threatens, incites, glorifies, or expresses desire for violence or harm."[4] YouTube bans content "promoting" self-harm, and defines promotion as "any form of encouragement or praise of the act, or providing instructions on how to complete the act."[5] Meta moderates content that "celebrate[s] or promote[s] suicide, self-injury or eating disorders."[6] It also

---

[4] X Corp., "Violent Content," "Safety and Moderation Policies," https://help.x.com/en/rules-and-policies/violent-content (last visited Apr. 19, 2025).

[5] YouTube, "Harmful or dangerous content policy," https://support.google.com/youtube/answer/2801964 (last visited Apr. 19, 2025).

[6] Meta, "Suicide, Self-Injury, and Eating Disorders," http://transparency.meta.com/policies/community-standards/suicide-self-injury/ (last visited Apr. 19, 2025).

prohibits content "facilitating" or "promoting" "criminal or harmful activities."[7] These examples, taken from platforms' existing content-moderation policies, demonstrate that DSPs can and do understand and apply these terms all the time, negating any claimed vagueness concerns.

Texas law further clarifies many of HB18's key terms. "Harassment" tracks Texas Penal Code §42.07, which was upheld as sufficiently clear in *Scott*, 322 S.W.3d at 669-70. "Trafficking" aligns with Texas Penal Code §20A.02, a provision held not unconstitutionally vague in cases like *Kuhl v. State*, 497 S.W.3d 128, 130 (Tex. App. —Texarkana 2016, no pet.). "Facilitates" mirrors 18 U.S.C. §2's aiding-and-abetting standard, which was upheld in *Hansen*, 599 U.S. at 770-71.

The district court's drug-deregulation hypothetical—suggesting §509.053 might cover advocacy for drug legalization—divorces the term "promotes" from HB18's child-protection context. ROA.25-50096.859. A post teaching minors to smuggle drugs "promotes" trafficking under §20A.02, but a policy debate on drug legalization does not. Language is not math and cannot provide "mathematical certainty." *Grayned*, 408 U.S. at 110. Courts must therefore construe terms in context, resolving ambiguity wherever possible. *Id.* at 112. Here, "promotes" can be limited to direct inducement of harm, excluding protected speech. The district court's failure to consider this remedy was error.

---

[7]Meta, "Coordinating Harm and Promoting Crime," https://transparency.fb.com/policies/community-standards/ (last visited Apr. 14, 2025).

*Targeted Advertising.* Section 509.055(a) prohibits ads that "promote" or "facilitate" products, services, or activities unlawful for minors. "Unlawful" plainly refers to that which is prohibited for minors under Texas law. "Promote" and "facilitate" are similarly clear, upheld in several cases, including criminal contexts stricter than HB18's civil framework. *See Hansen*, 599 U.S. at 770; *Williams*, 553 U.S. at 294–95; *Osborne v. Ohio*, 495 U.S. 103, 112–14 (1990). And DSPs already regulate this kind of thing all the time. Meta's Advertising Standards ban advertisements for "illegal content, products or services" and have detailed guidelines that Meta enforces routinely.[8] Google prohibits 39 categories of content from its advertisements, all of which must comply with local laws.[9]

The district court's concern about "arbitrary … enforcement" ignores §509.055's narrow focus on commercial advertisements for illegal acts. ROA.25-50096.866. An ad for a fake ID "promotes" forgery; Ampersand's anti-trafficking campaign does not. Judicial narrowing—e.g., construing "promote" as "advertise for profit" in a narrow and constitutional way—would also avoid any vagueness problems. *Hansen*, 599 U.S. at 770. The court's reliance on speculative hypotheticals, untethered to HB18's text or industry practice, requires reversal.

---

[8] Meta, "Introduction to the Advertising Standards," https://transparency.fb.com/policies/ad-standards/ (last visited Apr. 15, 2025).

[9] Google, "Google Ads policies, https://support.google.com/adspolicy/answer/6008942 (last visited Apr. 19, 2025).

**IV. Section 230 Does Not Preempt HB18's Monitoring-and-Filtering Provision.**

The district court erred by holding that 47 U.S.C. §230 preempts HB18's monitoring-and-filtering provision. ROA.24-50721.427-28.

Conflict preemption occurs only when compliance with state and federal law is impossible or state law obstructs Congress's objectives. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Courts begin with a strong presumption against preemption—especially in areas of traditional state authority like child protection— absent clear congressional intent to the contrary. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). And courts "may not conduct a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 557 (2024) (citation omitted). Doing so "would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Id.* (citation omitted). Thus, courts must review the text and structure of the relevant federal law for evidence of preemptive purpose. *Zyla Life Scis. v. Wells Pharma of Hous., LLC*, No. 23-20533, 2025 WL 1076889 (5th Cir. Apr. 10, 2025).

Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc). Nor does §230 "insulate a company from liability for all conduct that happens to be transmitted through the internet." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). This Court has repeatedly emphasized that it will extend "section-230 immunity no further than the text

requires." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 793 (5th Cir. 2024). And the text itself is quite narrow. Section 230(c)(1) states that providers shall not be treated as "the publisher or speaker" of user-generated content, and §230(c)(2) immunizes good-faith efforts to restrict "obscene" or "otherwise objectionable" material. 47 U.S.C. §230(c). In addition, §230(e)(3) expressly states that it should not be construed to preempt "any State from enforcing any State law that is consistent with this section." *Id.* §230(e)(3).

Nothing in §230 is inconsistent with HB18's goal of protecting children. Section 509.056 requires DSPs to use "commercially reasonable" means to monitor and filter harmful content, much of which is illegal and receives no First Amendment protection at all. And liability under HB18 arises only from failing to implement those protections—not from third-party speech itself. Thus, HB18 is not preempted because it does not impose liability for "the harm done by third-party content." *Free Speech Coal.*, 95 F.4th at 285. In *Free Speech Coalition*, this Court upheld HB1181's age-verification mandate against a preemption challenge because its obligations are "plainly different" from publisher liability. *Id.* So too here: like HB1181, HB18 "imposes liability purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody." *Id.* Also like HB1181, HB18 focuses on DSPs' compliance with technological requirements—implementing content filtering using hash-sharing, for example—and does not treat DSPs as publishers.

Section 230's history further reinforces the conclusion that it does not preempt HB18. Congress enacted §230 to overturn *Stratton Oakmont, Inc. v. Prodigy Services*

*Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which held a provider liable as a publisher of one of its user's defamatory posts. Section 230(c)(1) abrogates that kind of liability—for third-party speech—while §230(c)(2) encourages companies to voluntarily filter offensive material, like material that is "obscene" or "harassing." *A.B.*, 123 F.4th at 792-93. Because HB18 does not treat any DSP as "the publisher or speaker of third-party content," it is not preempted by §230. *Id.*

In addition, HB18 is consistent with §230's stated policies of "empower[ing] parents" to control what their children see online, 47 U.S.C. §230(b)(4), because it requires DSPs to give parents more control over the content their minor children see. Plaintiffs' attempt to use §230(c)(1) as a "shield for purposefully putting 'offensive material' onto the Internet" inverts its purpose, *Free Speech Coal.*, 95 F.4th at 285, and would render §230 "ill-suited to the realities of the modern internet," *Doe ex rel. Roe v. Snap, Inc.*, 88 F.4th 1069, 1072 (5th Cir. 2023) (mem. op.) (Elrod, J., dissenting from denial of rehearing en banc).

If the *CCIA* plaintiffs were correct that §230 preempts HB18, that would mean it preempts all State efforts to protect children from online content that is illegal or otherwise unprotected by the First Amendment. That theory stretches §230 far beyond its "narrow focus." *Doe ex rel. Roe v. Snap, Inc.*, 144 S. Ct. 2493 (2024) (Thomas, J., dissenting from denial of certiorari).

What's more, plaintiffs cannot invoke §230 preemption while simultaneously claiming HB18 violates their own First Amendment rights. Section 230 preemption prevents social-media companies from being held liable for the speech of third parties. *NetChoice I*, 49 F.4th at 468-69. The *CCIA* plaintiffs thus cannot claim that

HB18 is infringing *their* speech rights while simultaneously claiming that it is preempted by §230 because it is imposing liability for the speech of other people. The *CCIA* plaintiffs must pick between these mutually exclusive theories.

## V. If Any Provision of HB18 Is Facially Unconstitutional, the Court Should Sever That Provision and Leave the Rest of the Statute Intact.

The district court's facial injunctions invalidated HB18's monitoring-and-filtering requirements (§§509.053, 509.056(1)), targeted-advertising restrictions (§§509.052(2)(D), 509.055), and age-verification rules (§509.057) wholesale, ignoring its duty to preserve valid statutory provisions. If any part of HB18 is facially unconstitutional, this Court should sever it and uphold the remainder, thus upholding Texas's compelling interest in child safety within constitutional limits.

HB18's severability clause says that if any provision or application of the statute is invalid, "the invalidity does not affect other provisions or applications" that can operate independently and lawfully. §5.01. This reaffirms Texas's presumption of severability, Tex. Gov. Code §311.032(c), which applies severability even to statutes without severability clauses and which the Texas Supreme Court enforces unless a statute's structure precludes it, *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990). The U.S. Supreme Court similarly favors severance to avoid the over-invalidation of statutes that contain at least some standalone validity. *Barr*, 591 U.S. at 635-36 (plurality op.); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478-79 (1995).

Here, HB18's design supports severability because its provision addresses different things and thus can operate independently. Section 509.053 requires

filtering things like child pornography and can remain in place regardless of whether other provisions are impermissible speech restrictions. Section 509.055's ban on advertisements for content that is illegal for minors is separate from, and does not affect, §509.052(2)(D)'s broader advertising restriction. Section 509.057's requirements that obscene platforms use age verification, rooted in Texas Penal Code §§43.21 and 43.24, are valid under *Free Speech Coalition* and operate independently of any other statutory provision.

This Court should reject the district court's categorical invalidation and sever any facially invalid provisions of HB18, consistent with Texas and federal law. Doing so will preserve Texas's child-protection goals.

## VI.   The Remaining Injunction Factors Favor Texas.

The remaining injunction factors favor Texas. Texas has a compelling interest in protecting children, and enforcing HB18 will not impose undue burdens on the plaintiffs, whose alleged harms are speculative.

A preliminary injunction requires plaintiffs to show that the balance of equities tips in their favor and an injunction serves the public interest. *Winter*, 555 U.S. at 20. Balancing the equities involves weighing the harm to plaintiffs if relief is denied against the harm to defendants if it is granted. *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016). The public-interest factor prioritizes outcomes advancing societal benefits, like child safety. *NetChoice II*, 49 F.4th at 449-51.

Here, Texas's interest in protecting its children from online harms outweighs plaintiffs' vague concerns and speculative fears. Enjoining HB18 significantly harms

Texas by delaying its ability to protect children from online content that glorifies, facilitates, and promotes things like suicide, trafficking, child pornography, and sexual abuse. Enjoining HB18 unnecessarily risks exposing minors to such material, contrary to federal and state priorities.

The public-interest factor also favors Texas because HB18 advances child safety, a fundamental public goal. Plaintiffs can offer no countervailing public harm.

The district court ignored Texas's compelling interest in protecting minors and HB18's tailored approach, improperly weighing the equities and public good.

## Conclusion

This Court should reverse the district court's orders granting facial preliminary injunctions. At minimum, it should vacate in remand for a proper analysis under *Moody* and *Fitch* or sever any provisions it deems facially unconstitutional.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

/s/ Cameron Fraser
Cameron Fraser
Cameron.Fraser@oag.texas.gov
Assistant Solicitor General

Eric S. Abels
Assistant Attorney General

*Counsel for Defendant-Appellant*

## Certificate of Service

On April 28, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Cameron Fraser
CAMERON FRASER

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,247 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Cameron Fraser
CAMERON FRASER