Nos. 24-50721 & 25-50096

# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION, ET AL.,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS, ET AL.,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

## BRIEF OF *AMICI CURIAE* FLORIDA, 18 STATES, AND THE ARIZONA LEGISLATURE IN SUPPORT OF APPELLANT AND REVERSAL

JAMES UTHMEIER
*Attorney General of Florida*

DARRICK W. MONSON
*Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

JEFFREY PAUL DESOUSA
*Acting Solicitor General*
DAVID M. COSTELLO
*Chief Deputy Solicitor General*
KEVIN A. GOLEMBIEWSKI
*Senior Deputy Solicitor General*

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-50721

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,
*Plaintiffs-Appellees*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant.*

*and*

No. 25-50096

STUDENTS ENGAGED IN ADVANCING TEXAS, ET AL.,
*Plaintiffs-Appellees*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant.*

Under Fifth Circuit Rule 28.2.1, *Amici Curiae*, as governmental parties, need not provide a certificate of interested persons.

*/s/ Kevin A. Golembiewski*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... i

TABLE OF AUTHORITIES .................................................... iii

INTRODUCTION AND INTEREST OF AMICI ...................................... 1

ARGUMENT ................................................................. 4

I.   SOCIAL-MEDIA COMPANIES ARE MISLEADING THE PUBLIC AND
     HARMING CHILDREN. ................................................... 4

II.  NETCHOICE AND CCIA LACK ASSOCIATIONAL STANDING TO
     CHALLENGE SECTION 509.053. ........................................ 11

III. NETCHOICE AND CCIA HAVE NOT SHOWN THAT SECTION
     509.053 IS FACIALLY UNCONSTITUTIONAL. ............................. 20

CONCLUSION ............................................................... 25

CERTIFICATE OF SERVICE ................................................... 28

CERTIFICATE OF COMPLIANCE ................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531
(6th Cir. 2021) ..................................................11

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004)...................10

*Bellotti v. Baird*, 443 U.S. 622 (1979) ...............................................20, 21

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ................23, 24

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) .......................21, 22

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)............................24

*CCIA v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024).................12, 18

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ....................20, 21

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) .........................................21

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).....................10, 11

*Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408 (3d Cir. 2020)......12, 15, 16

*Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores*, 284
F.3d 575 (5th Cir. 2002) ....................................................12

*Harris v. McRae*, 448 U.S. 297 (1980) .............................................12, 16

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) .......................21

*Hutchins v. Dist. of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ..............24

*Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156
(D.C. Cir. 2025)..................................................................11

*Int'l Union v. Brock*, 477 U.S. 274 (1986) ..............................................12

*Leaf Tobacco Exps. Ass'n v. Block*, 749 F.2d 1106 (4th Cir. 1984) ....................................................................................17

*Moody v. NetChoice*, 603 U.S. 707 (2024) ............. 2, 11, 13, 14, 15, 16, 18

*Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) ..................22

*NetChoice v. Bonta*, No. 5:24-cv-7885, 2024 WL 5264045 (N.D. Cal. Dec. 31, 2024) ....................................................................14

*NetChoice v. Fitch*, No. 24-60341, 2025 WL 1135279 (5th Cir. Apr. 17, 2025) ....................................................................................18

*NetChoice v. Paxton*, 121 F.4th 494 (5th Cir. 2024) .....................2, 12, 14

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)...........................10

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ........................ 4, 15, 20, 23

*Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115 (1989)............................10

*Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir. 1998) ....................................................................................................24

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)...............................................11, 17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544 (1996) ....................................................................11, 17

*Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412 (3d Cir. 2003) ...................................................................................23

**Statutes**

Book of the Gen. Laws and Liberties of Mass. (1649) ...........................22

Tex. Bus. & Com. Code § 509.053......................................................3, 20

## Treatises & Commentary

James Kent, Commentaries on American Law (1827) ...........................21

John Locke, Two Treatises of Government (Routledge 1884) ................21

William Macpherson, Treatise on the Law Relating to
    Infants (1843) ................................................................................22

## Other Authorities

Anne C. Dailey, *Children's Constitutional Rights*, 95 Minn.
    L. Rev. 2099 (2011)......................................................................23

Bobby Allyn et al., *TikTok Executives Know About App's
    Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11,
    2024), https://tinyurl.com/4e5un4ru...................................... 9

Bobby Allyn, *States Sue Meta, Claiming Instagram,
    Facebook Fueled Youth Mental Health Crisis*, NPR (Oct.
    24, 2023), https://tinyurl.com/y882nt5f ............................... 1

Brian Fung, *Execs Ignored the Damage Instagram Does to
    Teens, Meta Whistleblower Tells Congress*, CNN Business
    (Nov. 7, 2023), https://tinyurl.com/ak3d34p9 ..................... 5

Declaration of Jean M. Twenge, Ph.D., *CCIA v. Uthmeier*,
    No. 4:24-cv-438 (N.D. Fla. Oct. 28, 2024), ECF No. 51-1.........1, 4, 5, 9

Deposition of Bartlett Cleland, *CCIA v. Uthmeier*, No. 4:24-
    cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-4 ..................19

Deposition of Matthew Schruers, *CCIA v. Uthmeier*,
    No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-5 ..................19

*Five Ways to Respond to Sextortion*, Meta,
    https://tinyurl.com/292hmv44 ........................................... 6

Juries verdict agst Alice Thomas, Volume 29: Records of the
Suffolk Cnty. Ct. 1671-1680 Part 1, available at
https://www.colonialsociety.org/node/660 ..........................................22

Justin Rohrlich, *A 10-year-old girl died during the viral
'blackout challenge.' Now TikTok could be held liable*, The
Independent (Aug. 28, 2024),
https://tinyurl.com/yw3ebwj2 .............................................................. 6

Kalhan Rosenblatt et al., *Senate Hearing Highlights:
Lawmakers Grill CEOs from TikTok, X and Meta About
Online Child Safety*, NBC News (Jan. 31, 2024),
https://tinyurl.com/2p9vvy62................................................................ 2

Letter from Senators Richard Blumenthal and Marsha
Blackburn to Mark Zuckerberg, June 21, 2023,
https://tinyurl.com/2s4j243y................................................................ 6

Michael S. Wald, *Children's Rights: A Framework for
Analysis*, 12 U.C. Davis L. Rev. 255 (1979)......................................23

NetChoice & CCIA Discovery Responses, *CCIA v. Uthmeier*,
No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-8 .................19

Off. of the Surgeon Gen., *Social Media and Youth Mental
Health: The U.S. Surgeon General's Advisory* 11 (2023),
https://tinyurl.com/33u2t7kn .................................... 1, 2, 4, 5, 7, 9, 10

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress
that Facebook Products Harm Kids and Democracy*, NPR
(October 5, 2021), https://tinyurl.com/yc4zex93 ................................. 7

Sue Halpern, *Instagram for Kids and What Facebook Knows
About the Effects of Social Media*, New Yorker (Sept. 30,
2021), https://tinyurl.com/y3vrehyh................................................... 7

*What You Need to Know About Financial Sextortion*, Snap
Inc., https://tinyurl.com/4vwn9f39 ...................................................... 6

## INTRODUCTION AND INTEREST OF AMICI

From whistleblowers and leaked internal documents, the public has learned that social-media companies have known for years that their products are ravaging children's mental health. There is a "clear link" between social-media use and our kids' skyrocketing rates of depression, anxiety, self-harm, and suicide.[1] In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment."[2]

State and federal governments have come together to take swift, bipartisan action. Many States—including Texas and several *Amici*— have passed laws regulating social-media platforms' interactions with vulnerable children, and more than 40 states have sued platforms for the harm they have caused children.[3] Several CEOs were recently subjected to "a bipartisan thrashing" in the Senate Judiciary Committee, at which

---

[1] Decl. of Jean M. Twenge, Ph.D. ¶¶ 6, 59, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Oct. 28, 2024), ECF No. 51-1.

[2] Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 11 (2023), https://tinyurl.com/33u2t7kn.

[3] Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023), https://tinyurl.com/y882nt5f.

Mark Zuckerberg famously apologized to parents whose children had been harmed by Meta platforms.[4]

Yet in response, social-media companies have doubled down on their nothing-to-see-here approach, refusing "access to [their] data" and insisting on a "lack of transparency."[5] Much like tobacco companies years ago, secrecy is their top priority—even in litigation. Rather than face the public scrutiny that comes with litigation and the federal rules' demanding party-discovery requirements, social-media companies continue to hide behind trade associations NetChoice and CCIA. Not a single regulated company has itself challenged *Amici*'s laws even though this Court and a Supreme Court Justice have expressed skepticism that platforms can hide behind their trade associations in federal court.[6]

According to NetChoice and CCIA, tech conglomerates have a constitutional veto for laws that protect children because their platforms

---

[4] Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024), https://tinyurl.com/2p9vvy62.

[5] Surgeon General Advisory, *supra* n.2 at 11.

[6] *See NetChoice v. Paxton*, 121 F.4th 494, 500 n.3 (5th Cir. 2024); *Moody v. NetChoice*, 603 U.S. 707, 760 n.2 (2024) (Thomas, J., concurring in the judgment).

host speech. The First Amendment, they say, grants platforms a right to give children of all ages personal accounts, exploit their developing brains with addictive design features, expose them to sexual predators, and drive them to self-harm and suicide—all while misleading the public about their products.

*Amici* have an interest in resisting social-media companies' attempt to distort the First Amendment and associational standing. The First Amendment is not a shield for addicting children and destroying their mental health in the name of corporate bottom lines. Nor is associational standing a cloak that allows platforms to operate in the shadows, wielding the First Amendment to escape regulation that the public broadly supports without participating in federal courts' adversarial process.

The district court erred in preliminarily enjoining Texas from enforcing Tex. Bus. & Com. Code § 509.053. First, the First Amendment allows States to regulate the business practices of companies that are misleading the public and peddling a dangerous product to children. Second, NetChoice and CCIA lack associational standing because their facial challenge requires fact-finding about individual platforms. Last,

NetChoice and CCIA did not meet their demanding burden to show that the statute is facially unconstitutional because, at minimum, it can be validly enforced against platforms that choose to profit off young children. Platforms have no right to transmit harmful material to children of "tender years." *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944).

## ARGUMENT

### I. SOCIAL-MEDIA COMPANIES ARE MISLEADING THE PUBLIC AND HARMING CHILDREN.

In recent years, mounting evidence has emerged that social-media platforms are harming children. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled,[7] and children experienced a rise in anxiety, low self-esteem, poor body image, and eating disorders.[8] Associated behaviors like self-harm and suicide also "skyrocketed."[9] "Between 2010 and 2022, emergency room admissions for self-harm increased 192% among 15- to 19-year-old girls"

---

[7] Twenge Decl., *supra* n.1 ¶ 15.

[8] Surgeon General Advisory, *supra* n.2 at 6–7; *see also* Twenge Decl., *supra* n.1 ¶ 59.

[9] Twenge Decl., *supra* n.1 ¶¶ 17–18.

4

and "an incredible 411% among 10- to 14-year-old girls."[10] "The suicide rate among 10- to 14-year-old boys increased 166%," and "the suicide rate among 10- to 14-year-old girls increased 217%."[11] But for those spikes in youth suicide, "3,604 more" sons and daughters "would be alive today."[12]

Studies reveal that the correlation is no coincidence: Social-media use is a causal factor.[13] Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression.[14]

The harm does not stop there. Children are being victimized by "predatory behavior"—including "sexual solicitation"—on platforms.[15] For example, more than 25% of girls between ages 13 and 15 have "receiv[ed] unwanted sexual advances on Instagram."[16] Senators Richard

---

[10] *Id.* ¶ 17.

[11] *Id.* ¶ 18.

[12] *Id.*

[13] *Id.* ¶¶ 34, 47.

[14] *Id.* ¶¶ 39, 47; Surgeon General Advisory, *supra* n.2 at 6.

[15] Twenge Decl., *supra* n.1 ¶ 22; *see also* Surgeon General Advisory, *supra* n.2 at 9.

[16] Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023), https://tinyurl.com/ak3d34p9.

Blumenthal and Marsha Blackburn wrote to Meta after "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of children."[17] The problem is apparently so bad that Meta and Snap actively warn teen users of the dangers of "sextortion" on their own platforms.[18]

Platforms also market dangerous "challenges" to children, like "ten-year-old Nylah Anderson." *Anderson v. TikTok*, 116 F.4th 180, 181 (3d Cir. 2024). TikTok, "via its algorithm, recommended and promoted" to Nylah a video that "depicted the 'Blackout Challenge,' which encourages viewers to record themselves engaging in acts of self-asphyxiation." *Id.* "After watching the video, Nylah attempted the conduct depicted in the challenge and unintentionally hanged herself." *Id.* Her mother found her

---

[17]    Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023, https://tinyurl.com/2s4j243y.

[18]    *Five Ways to Respond to Sextortion*, Meta, https://tinyurl.com/292hmv44; *What You Need to Know About Financial Sextortion*, Snap Inc., https://tinyurl.com/4vwn9f39.

"lifeless body on the bedroom floor" and "rushed" her "to the hospital." [19] She later died.[20]

Even so, platforms have resisted any effort to research or mitigate their products' effects. As the U.S. Surgeon General recently explained, researching the danger that platforms' practices pose to children has proven difficult because platforms do not allow "access to data" and insist on a "lack of transparency."[21] Or as one former product manager at a social-media company put it, "executives hide research about the social network's risks to keep its business humming."[22] Only because of whistleblowers and accidental leaks do Americans know that platforms have long been aware of the dangers their products pose to children.

Meta, which operates Facebook and Instagram, is a prime example. A whistleblower exposed internal research showing that many of

---

[19] Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024), https://tinyurl.com/yw3ebwj2.

[20] *Id.*

[21] Surgeon General Advisory, *supra* n.2 at 11.

[22] Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93.

Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[23] Meta also acknowledged—internally—that Instagram was causing nearly one third of adolescent-girl users to develop body-image issues.[24] Rather than roll back the features it was privately acknowledging are addictive and destructive, Meta pressed on and even sought to expand its products to younger children. The company "commissioned strategy papers about the long-term business opportunities" with preteens and discussed "whether there might be a way to engage children during play dates."[25] Delivering its products to more "tweens," Meta explained in internal meetings, was imperative because "[t]hey are a valuable but untapped audience."[26]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant

---

[23] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, The New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[24] *Id.*

[25] *Id.*

[26] *Id.*

and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety."[27] TikTok acknowledged that features like infinite scroll were most likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[28] And although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take a break—TikTok determined that those features "had little impact" and are "not altogether effective."[29] But that did not matter because TikTok adopted the features solely to give it "a good talking point with policymakers."[30]

---

[27] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[28] *Id.*

[29] *Id.*

[30] *Id.*

Deceptive practices like Meta's and TikTok's have fueled the Nation's "youth mental health crisis."[31] The U.S. Surgeon General has thus called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children"—like "strengthening and enforcing age minimums."[32]

Texas and *Amici* have answered that call, passing laws that regulate platforms' harmful "commercial activity," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978), to vindicate their "compelling interest in protecting the physical and psychological well-being of minors[.]" *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). In response, NetChoice and CCIA have "roam[ed] the country" challenging the laws, as platforms have been unwilling to defend their dangerous practices themselves. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379–80 (2024).

---

[31] Surgeon General Advisory, *supra* n.2 at 13; *accord* Twenge Decl., *supra* n.1 ¶ 26.

[32] Surgeon General Advisory, *supra* n.2 at 15.

## II. NETCHOICE AND CCIA LACK ASSOCIATIONAL STANDING TO CHALLENGE SECTION 509.053.

Associational standing is a "narrow exception" to Article III and the prudential bar against asserting the constitutional rights of third parties. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004); *see also All. for Hippocratic Med.*, 602 U.S. at 399 (Thomas, J., concurring); *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996). It allows an association that has not itself suffered an injury in fact to challenge a law by asserting "its members' injuries" and rights. *All. for Hippocratic Med.*, 602 U.S. at 399 (Thomas, J., concurring). Because associational standing is at odds with "th[e] traditional understanding of the judicial power," it should be permitted only when an organization clearly satisfies its requirements. *See id.*; *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 542 (6th Cir. 2021); *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167–68 (D.C. Cir. 2025) (Henderson, J., concurring).

Associational standing has three requirements. "[A]n organization must demonstrate" that (1) its members would have standing, (2) "the interests it seeks to protect are germane to [its] purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit." *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). The member-participation requirement is a problem for NetChoice and CCIA in First Amendment cases like this one, where they facially challenge a law that regulates a variety of internet platforms. *See Moody*, 603. U.S. at 760 n.2 (Thomas, J., concurring); *NetChoice v. Paxton*, 121 F.4th 494, 500 n.3 (5th Cir. 2024) (instructing "the district court" to "thoroughly" consider Texas's argument that NetChoice lacked "associational standing" for its facial challenge).

That is so because such a challenge requires "individualized information" about each covered platform. *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores*, 284 F.3d 575, 577 (5th Cir. 2002). If a claim requires fact-finding about different members, *see Harris v. McRae*, 448 U.S. 297, 321 (1980), rather than presenting "a pure question of law," then members must participate. *Int'l Union v. Brock*, 477 U.S. 274, 287 (1986); *see also Friends for Am. Free Enter. Ass'n*, 284 F.3d at 577; *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring

associational standing is improper for claims requiring a fact-intensive-individual inquiry." (quotation omitted)).

NetChoice and CCIA's facial challenge to Section 509.053 requires a host of member-specific findings.[33] Section 509.053, NetChoice and CCIA argue, is facially unconstitutional because it interferes with covered platforms' "speech dissemination." Mot. for Prelim. Inj. at 11, *NetChoice v. Paxton*, No. 1:24-cv-849 (W.D. Tex. July 30, 2024), ECF No. 6 ("HB18's monitoring-and-censorship requirements unlawfully restrict websites' speech dissemination[.]"). But as the Supreme Court made clear in *Moody*, a platform is not necessarily engaged in protected expression simply because it engages in "speech dissemination." Rather, whether a platform's "speech dissemination" constitutes expression turns on specific facts about the platform's functions and how it transmits speech. *See Moody*, 603 U.S. at 725–26, 736 n.5; *id.* at 745–47 (Barrett, J., concurring). Thus, resolving NetChoice and CCIA's facial challenge requires the district court to determine which, if any, applications of the

---

[33] The district court enjoined Section 509.053 based solely on NetChoice and CCIA's facial challenge. *See CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1038 (W.D. Tex. 2024). It did not pass on their as-applied challenges.

statute implicate the First Amendment and then apply the appropriate level of scrutiny to each such application. *See id.* at 725–26 (majority op.).

Both steps are fact-intensive. The first step will require the district court to determine all the functions on covered platforms that Section 509.053 applies to; the "level[] of editorial choice" that each function involves; and whether and how the statute "intru[des] on" each protected function. *Id.* Those questions depend on each platform's operations. Whether a platform's feeds involve protected editorial judgment depends on the nuances of the "algorithms" that the platform uses, *id.* at 734; *id.* at 745–46 (Barrett, J., concurring); whether the feeds "exclude[]" certain types of content, *id.* at 731 (majority op.); whether the platform relies on "artificial intelligence" to operate the feeds, *id.* at 770, 795 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, JJ.); and the "corporate structure and ownership" of the platform. *Id.* at 746 (Barrett, J., concurring). It matters if an algorithm "respond[s] solely to how users act online," or if the algorithm instead incorporates "a wealth of user-agnostic judgments" about the kinds of speech it wants to promote. *Id.* at 736 n.5 (majority op.); *see also id.* at 745–46 (Barrett, J., concurring). "[T]he same covered actor might [even] use a different algorithm . . . on

14

different" feeds. *Paxton*, 121 F.4th at 499. "For example, it might be true that X is a covered actor and that both its 'For You' feed and its 'Following' feed are covered services." *Id.* "But it might also be true that X moderates content differently or that its algorithms otherwise operate differently across those two feeds." *Id.*; *see also NetChoice v. Bonta*, No. 5:24-cv-7885, 2024 WL 5264045, at *12, *18 (N.D. Cal. Dec. 31, 2024) (concluding that NetChoice lacked associational standing because platforms needed to participate to determine whether their feeds were expressive), *appeal pending*, No. 25-146 (9th Cir.).

On top of that, after identifying each application of Section 509.053 that affects the First Amendment rights of platforms, the district court will have to apply the appropriate level of scrutiny to those applications. *See Moody*, 603 U.S. at 724–26. "Given the diversity of circumstances presented by" platforms, that too is an "individualized inquiry." *Free Speech Coal.*, 974 F.3d at 422 (denying associational standing for as-applied First Amendment claims because they "require[d] an individualized inquiry for each . . . member"). Each platform's user base is relevant, for instance. If many of the minors on a platform are young children, then Texas would have an even greater interest in applying

15

Section 509.053 to the platform since young children are more vulnerable to "emotional excitement and psychological or physical injury." *Prince v. Massachusetts*, 321 U.S. 158, 169–70 (1944); *see also infra* 23–24. And if, as NetChoice and CCIA contend, the "effective[ness]" of each platform's "content moderation" is relevant to tailoring, Complaint ¶ 29, *NetChoice v. Paxton*, No. 1:24-cv-849 (W.D. Tex. July 30, 2024), ECF No. 1, then Section 509.053's provisions might be sufficiently tailored for "one association member" but not another. *Free Speech Coal.*, 974 F.3d at 422.

Under similar circumstances, the Supreme Court has rejected associational standing. Take *Harris*. The plaintiff-associations there "sought to enjoin the enforcement of" a federal "funding restriction on abortions," alleging that it violated the Free Exercise Clause. 448 U.S. at 303–05. That claim required the plaintiffs to show that the restriction had a "coercive effect" on the religious practices of individuals. *Id.* at 321. The Supreme Court held that the plaintiffs lacked associational standing because their members had a "diversity of [religious] view[s]," and so examining whether the restriction burdened them required individualized factual determinations. *Id.* Same here. NetChoice's and CCIA's members operate a variety of platforms that all "disseminate

speech" differently, Mot. for Prelim. Inj. at 2, *NetChoice v. Paxton*, No. 1:24-cv-849 (W.D. Tex. July 30, 2024), ECF No. 6, and so examining whether Section 509.053 burdens platforms' expression requires the district court to make factual determinations about the operations of each platform. *See Moody*, 603 U.S. at 724–25; *id.* at 745–46 (Barrett, J., concurring).

The district court erred in concluding that the availability of "detailed briefing and discovery" makes member participation unnecessary. *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1030 (W.D. Tex. 2024). For starters, that misunderstands the member-participation requirement. As a matter of law, if findings about individual members are necessary, members must participate. The district court held otherwise because it construed the requirement as "prudential" and as affording courts discretion to decide whether "administrative convenience" warrants member participation. *Id.* But just because "a standing requirement is prudential does not mean that its application is discretionary." *Leaf Tobacco Exps. Ass'n v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984) (Wilkinson, J.); *accord Tax Analysts & Advocs. v. Blumenthal*, 566 F.2d 130, 137 n.37 (D.C. Cir. 1977). The member-

17

participation requirement is "prudential and malleable by Congress"—
not courts. *Brown Grp.*, 517 U.S. at 551. Congress can "abrogate" the
requirement by "authoriz[ing]" an association "to sue for its members[],"
*id.* at 558, but "lower federal courts lack similar authority." *Leaf Tobacco*,
749 F.2d at 1112. They cannot pass on an association's "claim" if it
"requires the participation of individual members." *Students for Fair
Admissions*, 600 U.S. at 199.

Nor can CCIA and "NetChoice's claims . . . be proven by evidence
from representative injured members." *NetChoice v. Fitch*, No. 24-60341,
2025 WL 1135279, at *2 (5th Cir. Apr. 17, 2025).[34] Testimony from
YouTube about its algorithms, users, and accounts cannot substitute for
testimony from Facebook, Snap, X, TikTok, and other platforms. Five
Justices have already concluded that such platforms are diverse and that
First Amendment challenges pressing all their rights require fact-

---

[34] In *Fitch*, this Court held that NetChoice had associational standing to challenge a different social-media law (Mississippi's child-social media law), *see NetChoice v. Fitch*, No. 24-60341, 2025 WL 1135279 (5th Cir. Apr. 17, 2025), but Mississippi did not argue that member participation was necessary, *see* Br. for Defendant-Appellant at 20–30, *NetChoice v. Fitch*, No. 24-60341, 2024 WL 4093160 (5th Cir. Apr. 17, 2025), and the Court only briefly addressed the issue. *Fitch*, 2025 WL 1135279, at *2–3.

finding. *Moody*, 603 U.S. at 745-47 (Barrett, J., concurring); *id.* at 748–49 (Jackson, J., concurring in part and in the judgment); *id.* at 786–93 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, JJ.).

At any rate, "detailed" party discovery is meaningless here because NetChoice and CCIA have limited information about their members. *CCIA*, 747 F. Supp. 3d at 1030. In other litigation, NetChoice's and CCIA's representatives have testified that they know little about their members' platforms. In a suit pending in Florida, NetChoice's general counsel testified that he "do[es]n't know" whether any members even use algorithms. Dep. of Bartlett Cleland at 58:8–59:2, 131:15–19, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-4. Nor does he know whether "Meta does business around the world." *Id.* at 32:8–11. And CCIA's President and CEO testified that he only has general knowledge of CCIA's members, which he obtained from public documents. *See* Dep. of Matthew Schruers at 28, 57:16–25, 58:15–24, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-5. Both organizations also have admitted that they neither "know[]" nor could "reasonably obtain[]" the "information" necessary to answer basic

questions about their members' functions. NetChoice & CCIA Disc. Resp. at 16–18, 38–40, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-8.

The district court thus erred in holding that NetChoice and CCIA have associational standing for their facial challenge.

## III. NETCHOICE AND CCIA HAVE NOT SHOWN THAT SECTION 509.053 IS FACIALLY UNCONSTITUTIONAL.

Section 509.053 requires covered platforms to adopt a "strategy" for monitoring and filtering certain material for "known minor[s]." Tex. Bus. & Com. Code § 509.053(a). That requirement is not facially unconstitutional because, at minimum, it can be validly enforced against platforms that choose to transmit the material to children of "tender years." *Prince*, 321 U.S. at 170. The First Amendment does not protect platforms that "promote[]" "suicide," "substance abuse," "stalking," and "child pornography" to six-year-olds. Tex. Bus. & Com. Code § 509.053(a). States have always had the power to regulate the activities of young children.

"The [Supreme] Court long has recognized that the status of minors under the law is unique in many respects." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.); *Prince*, 321 U.S. at 169–70. "[A]lthough

children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability." *Bellotti*, 443 U.S. at 635. "It is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults" because "[t]he First Amendment rights of minors"—and thus the First Amendment right to speak to minors— "are not coextensive with those of adults." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 214 n.11 (1975); *see also FCC v. Pacifica Found.*, 438 U.S. 726, 749–50 (1978) (upholding restrictions on "offensive" and "indecent" radio broadcasts because they were "uniquely accessible to children"). "[E]ven where there is an invasion of protected freedoms[,] the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults[.]" *Bellotti*, 443 U.S. at 636 (quotation omitted); *see also* 2 John Locke, Two Treatises of Government 216–17 (Routledge 1884) ("Children . . . are not born in this full state of equality."). And when States regulate speech involving minors, "the age of the minor is a significant factor" in determining the

scope of the First Amendment interests at stake. *Erznoznik*, 422 U.S. at 214 n.11.

States have had more power to regulate children's activities since the Founding. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("When faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight." (quotation omitted)). At the Founding, minors were deemed unable "to take care of themselves," 2 James Kent, Commentaries on American Law 191 (1827), and viewed as "lack[ing] reason and decisionmaking ability." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 826 (2011) (Thomas, J., dissenting). The Founding generation therefore "imposed age limits on all manner of activities" to protect minors. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1123 (11th Cir. 2025) (en banc) (quotation omitted). Minors could not enlist in the military without parental consent. *See id.* at 1117 (citing the Act of March 16, 1802, ch. 9, sec. 11, 2 Stat. 132, 135). States "set age limits restricting marriage without parental consent." *Brown*, 564 U.S. at 834 (Thomas, J., dissenting). Minors also had no right to their wages—their parents "received the profits" of their labor. *Bondi*, 133 F.4th 1117 (quotation

omitted); William Macpherson, Treatise on the Law Relating to Infants 517 (1843) ("A father frequently sends out his son to work as journeyman, and his earnings are taken to be the father's.").

Nor did minors have access to the same speech as adults. "Parents controlled children's access to information, including books," *Bondi*, 133 F.4th at 1117, and States prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1, pp. 82–83, available at https://www.colonialsociety.org/node/660; *see also* Book of the Gen. Laws and Liberties of Mass. 137 (1649) (penalizing "entertain[ing]" children "to the dishonour of God and grief of their parents"). Because they were "[p]resumed by law to lack the capacity of adults, children [were] denied full participation in the political, legal and social processes." Michael S. Wald, *Children's Rights: A Framework for Analysis*, 12 U.C. Davis L. Rev. 255, 256 (1979). "[D]ecisionmaking autonomy [w]as a precondition for the exercise of many of the most important rights in a liberal state, including . . . freedom of speech." Anne C. Dailey, *Children's Constitutional Rights*, 95 Minn. L. Rev. 2099, 2106–07 (2011).

This longstanding "power" to regulate "children's activities" is at its zenith for children of "tender years." *Prince*, 321 U.S. at 168–70. For one, the State has a greater interest in protecting those children because they are more vulnerable to "emotional excitement and psychological or physical injury." *Id.* at 170; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683–84 (1986) (explaining that certain "speech could well be seriously damaging" to younger children). For another, the First Amendment interests of young children are lower because they "are at a stage in which learning how to develop relationships and behave in society is as or even more important than their forming particular views on controversial topics." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003).

Texas's law fits within this historical tradition. It does not on its face exceed the State's power to regulate children's activities because the State can validly regulate the transmission of certain speech to young children. *See Fraser*, 478 U.S. at 683–84. Given the Nation's "customary limitations" on young children, regulations aimed at them are "subject to less than the strictest level of scrutiny." *Schleifer v. City of*

*Charlottesville*, 159 F.3d 843, 847 (4th Cir. 1998) (Wilkinson, J.).[35] And

Section 509.053 satisfies strict scrutiny as applied to those children, let

alone a less-exacting standard.

## CONCLUSION

This Court should reverse the district court's grant of a preliminary

injunction.

---

[35] *See also Hutchins v. Dist. of Columbia*, 188 F.3d 531, 541 (D.C. Cir. 1999) ("[A] lesser degree of scrutiny is appropriate when evaluating restrictions on minors' activities where their unique vulnerability, immaturity, and need for parental guidance warrant increased state oversight."); *cf. Carey v. Population Servs. Int'l*, 431 U.S. 678, 693 n.15 (1977) (plurality op.) (When children are involved, the level of scrutiny "is apparently less rigorous than the 'compelling state interest' test applied to restrictions on the privacy rights of adults[.]").

May 5, 2025                           Respectfully submitted,

                                      JAMES UTHMEIER
                                        *Attorney General of Florida*

                                      */s/ Kevin A. Golembiewski*
                                      JEFFREY PAUL DESOUSA
                                        *Acting Solicitor General*
                                      DAVID M. COSTELLO
                                        *Chief Deputy Solicitor General*
                                      KEVIN A. GOLEMBIEWSKI
                                        *Senior Deputy Solicitor General*
                                      DARRICK W. MONSON
                                        *Deputy Solicitor General*
                                      Office of the Attorney General
                                      PL-01, The Capitol
                                      Tallahassee, FL 32399-1050
                                      (850) 414-3300
                                      (850) 414-2672 (fax)
                                      kevin.golembiewski@
                                        myfloridalegal.com

                                      *Counsel for Amici Curiae*

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
*Attorney General of Alabama*

STEVE MONTENEGRO
*Speaker of the Arizona
House of Representatives*

WARREN PETERSEN
*President of the Arizona Senate*

TIM GRIFFIN
*Attorney General of Arkansas*

CHRIS CARR
*Attorney General of Georgia*

RAUL LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

KRIS W. KOBACH
*Attorney General of Kansas*

RUSSELL COLEMAN
*Attorney General of Kentucky*

LIZ MURRILL
*Attorney General of Louisiana*

ANDREW BAILEY
*Attorney General of Missouri*

AUSTIN KNUDSEN
*Attorney General of Montana*

MIKE HILGERS
*Attorney General of Nebraska*

DAVE YOST
*Attorney General of Ohio*

ALAN WILSON
*Attorney General of South
Carolina*

MATT RICE
*Tennessee Solicitor General*

STANFORD PURSER
*Utah Solicitor General*

JASON S. MIYARES
*Attorney General of Virginia*

BRIDGET HILL
*Attorney General of Wyoming*

**CERTIFICATE OF SERVICE**

I certify that on May 5, 2025, I electronically filed this amicus brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

## CERTIFICATE OF COMPLIANCE

1.    This amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Fifth Circuit Rule 29 because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 4,656 words.

2.    This amicus brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29 and 32(a)(5)-(6) and Fifth Circuit Rules 29 and 32, because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General