**Nos. 24-50721 & 25-50096**

# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND
THROUGH NEXT FRIEND, VANESSA FERNANDEZ;
AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Nos. 1:24-cv-849 & 1:24-cv-945

## BRIEF OF PLAINTIFFS-APPELLEES CCIA AND NETCHOICE

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001

Scott A. Keller
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiffs-Appellees CCIA and NetChoice*

## CERTIFICATE OF INTERESTED PERSONS

24-50721

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiffs-Appellees CCIA and NetChoice have no parent corporations and no publicly held corporation owns 10% or more of their respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA; and NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice.

**Counsel for Plaintiffs-Appellees CCIA and NetChoice:**

Scott A. Keller (lead counsel)

Steven P. Lehotsky

Jeremy Evan Maltz

**Defendant-Appellant:**

Ken Paxton, in his official capacity as Attorney General of Texas

**Counsel for Defendant-Appellant:**

Ken Paxton

Eric Scott Abels

Todd A. Dickerson

Cameron Fraser

OFFICE OF THE ATTORNEY GENERAL

*/s/ Scott A. Keller*

Scott A. Keller

*Counsel of Record for*
*CCIA and NetChoice*
*Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The CCIA and NetChoice Plaintiffs agree with Defendant that oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

Page

Table of Authorities.................................................................................... vii

Introduction......................................................................................................1

Statement of Jurisdiction ...............................................................................2

Issue Presented ...............................................................................................2

Statement of the Case.....................................................................................3

      A.  Background. ...........................................................................................3

          1.  CCIA and NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment............................................3

          2.  Parents already have many tools to oversee how their children use the internet....................................................4

          3.  Covered websites' content-moderation policies prioritize user safety, and address the kind of content that Texas House Bill 18 (2023) requires to be monitored and blocked. ...........................................5

      B.  Texas HB18 is a content-based law that requires covered websites to block speech. ..................................................7

          1.  HB18's content-based coverage definition of "digital service provider." ................................................................7

          2.  HB18's monitoring-and-censorship requirements. ...............9

          3.  Enforcement. ..............................................................................11

      C.  Procedural history....................................................................11

Summary of the Argument ..........................................................................12

Standard of Review .......................................................................................14

Argument........................................................................................................14

    I.  CCIA and NetChoice have associational standing to challenge HB18's monitoring-and-censorship requirements...........14

II. HB18's monitoring-and-censorship provisions violate the First Amendment. ................................................................................16

   A. HB18's monitoring-and-censorship requirements trigger heightened First Amendment scrutiny for several reasons. ...............................................................................16

      1. HB18's monitoring-and-censorship requirements impose an impermissible prior restraint on speech. ............17

      2. HB18's monitoring-and-censorship requirements violate the First Amendment by regulating overbroad content-based and viewpoint-based categories of protected speech. .......................................................................19

      3. HB18's monitoring-and-censorship requirements trigger strict scrutiny for the additional reason that they rely on HB18's content-based coverage definition. ......................................................................................30

   B. HB18's monitoring-and-censorship requirements fail any form of heightened First Amendment scrutiny. ..................33

      1. The State lacks the necessary compelling governmental interest in regulating access to, and dissemination of, protected speech. ......................................34

      2. HB18's monitoring-and-censorship requirements are not the least-restrictive means of pursuing any legitimate governmental interest, and they are both overinclusive and underinclusive. ..........................................35

   C. The district court properly concluded that the Act is facially invalid under the First Amendment. ...............................40

      1. HB18's relevant "actors" and "activities" can be determined on the law's face and the factual record. ..........40

      2. The Act's unconstitutional applications are substantial, judged in relation to any hypothetically constitutional applications. ......................................................42

3.   Defendant misconstrues what the First Amendment facial-challenge analysis requires. ...........................................44

III.  HB18's monitoring-and-censorship requirements are also unconstitutionally vague. ......................................................46

IV.  47 U.S.C. § 230 preempts HB18's monitoring-and-censorship requirements......................................................51

V.   The other preliminary-injunction factors favor CCIA and NetChoice..........................................................................57

Conclusion...........................................................................................58

Certificate of Service .........................................................................59

Certificate of Compliance..................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Salesforce, Inc.,*
    123 F.4th 788 (5th Cir. 2024) .............................................51, 52, 53, 54, 55, 56

*Alexander v. United States,*
    509 U.S. 544 (1993) .......................................................................................18

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) .................................................................33, 35, 41, 46

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
    564 U.S. 721 (2011) .......................................................................................37

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002) .......................................................................................23

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) .......................................................................................47

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ...........................................................17, 18, 19, 37

*Barr v. Am. Ass'n of Pol. Consultants,*
    591 U.S. 610 (2020) .......................................................................................31

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) .......................................................................................36

*Book People, Inc. v. Wong,*
    91 F.4th 318 (5th Cir. 2024) .............................................................14, 48, 57

*Boos v. Barry,*
    485 U.S. 312 (1988) .......................................................................................21

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011) ...............................12, 19, 23, 24, 34, 35, 36, 37, 38, 39, 45

*Butler v. Michigan,*
   352 U.S. 380 (1957) ...................................................................................38

*City of Houston, Tex. v. Hill,*
   482 U.S. 451 (1987) .................................................................23, 29, 42, 48

*Comput. & Commc'ns. Indus. Ass'n v. Uthmeier,*
   2025 WL 1570007 (N.D. Fla. June 3, 2025) ................................................2, 16

*Counterman v. Colorado,*
   600 U.S. 66 (2023) ......................................................................................21

*Doe v. MySpace, Inc.,*
   528 F.3d 413 (5th Cir. 2008) ................................................................13, 53

*Elonis v. United States,*
   575 U.S. 723 (2015) ...................................................................................26

*Erznoznik v. Jacksonville,*
   422 U.S. 205 (1975) .............................................................................19, 34

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ...................................................................................46

*FEC v. Cruz,*
   596 U.S. 289 (2022) .............................................................................16, 37

*Free Speech Coalition, Inc. v. Paxton,*
   2025 WL 1773625 (U.S. June 27, 2025) ..............................................27, 28, 33

*Free Speech Coalition, Inc. v. Paxton,*
   95 F.4th 263 (5th Cir. 2024) ...............................................................54, 55, 56

*Gay Lesbian Bisexual All. v. Pryor,*
   110 F.3d 1543 (11th Cir. 1997) ...............................................................25, 31

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ....................................................48

*Henderson v. Source for Pub. Data, L.P.,*
   53 F.4th 110 (4th Cir. 2022) .......................................52

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
   515 U.S. 557 (1995) ....................................................32

*John Doe No. 1 v. Reed,*
   561 U.S. 186 (2010) ....................................................16

*Joseph Burstyn, Inc. v. Wilson,*
   343 U.S. 495 (1952) ......................................................4

*KMS Retail Rowlett, LP v. City of Rowlett,*
   593 S.W.3d 175 (Tex. 2019) .......................................30

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ....................................................47

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ............................. 1, 4, 5, 7-9, 17, 31, 32, 40-46, 49, 50, 56

*Moore v. City of Kilgore,*
   877 F.2d 364 (5th Cir. 1989) .....................................18

*Nat'l Gay Task Force v. Bd. of Educ. of City of Oklahoma City,*
   729 F.2d 1270 (10th Cir. 1984) .................................25

*Nat'l Press Photographers Ass'n v. McCraw,*
   90 F.4th 770 (5th Cir. 2024) ......................................47

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024) ....................................................18

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ....................................................18

ix

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ........................................................................17

*NetChoice v. Carr*,
    2025 WL 1768621 (N.D. Ga. June 26, 2025) ....................................2

*NetChoice v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ...........................................................31

*NetChoice, L.L.C. v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ........................8, 9, 12, 14, 15, 40, 41

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ......................................12, 16, 27, 46

*NetChoice, LLC v. Bonta*,
    2025 WL 807961 (N.D. Cal. Mar. 13, 2025) .....................................2

*NetChoice, LLC v. Fitch*,
    2025 WL 1709668 (S.D. Miss. June 18, 2025) ............................2, 46

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ...........................2, 4, 30

*NetChoice, LLC v. Paxton*,
    121 F.4th 494 (5th Cir. 2024) .........................................................46

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024) ...............................................2

*NetChoice, LLC v. Yost*,
    2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)....................................2

*Netflix, Inc. v. Babin*,
    88 F.4th 1080 (5th Cir. 2023) .........................................................57

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................58

*Nwanguma v. Trump,*
  903 F.3d 604 (6th Cir. 2018) ........................................................21

*Ohio v. EPA,*
  603 U.S. 279 (2024) ......................................................................57

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012) ..................................................57, 58

*Packingham v. North Carolina,*
  582 U.S. 98 (2017) ......................................................................4, 7

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ........................................................20, 30, 31

*Reno v. ACLU,*
  521 U.S. 844 (1997) ......................................................................32

*Robinson v. Hunt Cnty.,*
  921 F.3d 440 (5th Cir. 2019) ........................................................20

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ........................................................................57

*Seals v. McBee,*
  898 F.3d 587 (5th Cir. 2018) ........................................................44

*Serafine v. Branaman,*
  810 F.3d 354 (5th Cir. 2016) ........................................................23

*Matter of Sims,*
  994 F.2d 210 (5th Cir. 1993) ........................................................17

*Smith v. California,*
  361 U.S. 147 (1959) ........................................................18, 26, 27

*Smith v. Daily Mail Publ'g Co.,*
  443 U.S. 97 (1979) ........................................................................17

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................20

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ...........................55

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ......................................................15

*Texas v. Johnson*,
    491 U.S. 397 (1989) ...................................................................21

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ..............................................................31, 32

*United States v. Am. Library Ass'n, Inc.*,
    539 U.S. 194 (2003) ...................................................................39

*United States v. Edge Broad. Co.*,
    509 U.S. 418 (1993) ...................................................................43

*United States v. Hansen*,
    599 U.S. 762 (2023) .........................................24, 26, 29, 42, 49

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) .................................................21, 25

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) ...............................................12, 26, 34, 35, 50

*United States v. Stevens*,
    559 U.S. 460 (2010) .........................................................24, 44, 45

*United States v. Williams*,
    553 U.S. 285 (2008) ...................................................................47

*United States v. Zuniga*,
    860 F.3d 276 (5th Cir. 2017) ......................................................15

*Virginia v. Am. Booksellers Ass'n, Inc.,*
     484 U.S. 383 (1988) ...................................................................23, 38

*Ward v. Rock Against Racism,*
     491 U.S. 781 (1989) ...............................................................................38

*Wash. State Grange v. Wash. State Republican Party,*
     552 U.S. 442 (2008) ...............................................................................43

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
     455 U.S. 489 (1982) ...............................................................................46

**Statutes**

8 U.S.C. § 1324 ...............................................................................................26

28 U.S.C. § 1292 ...............................................................................................2

28 U.S.C. § 1331 ...............................................................................................2

28 U.S.C. § 1343 ...............................................................................................2

47 U.S.C. § 230 ...........................................................1, 13, 51, 52, 53, 54, 55, 56, 57

Tex. Bus. & Com. Code § 17.47 ................................................................11, 50

Tex. Bus. & Com. Code § 509.001 ..............................................................8, 29

Tex. Bus. & Com. Code § 509.002 ...............................................8, 29, 30, 31, 32

Tex. Bus. & Com. Code § 509.052 ....................................................................14

Tex. Bus. & Com. Code § 509.053

     ...................................1-2, 9-11, 14, 18, 20-25, 27, 29, 41, 48, 50-51, 53, 55

Tex. Bus. & Com. Code § 509.055 ....................................................................14

Tex. Bus. & Com. Code § 509.056 ...........................................1, 2, 10, 11, 14, 41

Tex. Bus. & Com. Code § 509.057 ........................................................14

Tex. Bus. & Com. Code § 509.151 ........................................................11

Tex. Bus. & Com. Code § 509.152 ........................................................11

Tex. Civ. Prac. & Rem. Code § 129A.002 ............................................37

Tex. Civ. Prac. & Rem. Code § 129B.002 ............................................27

Tex. Health & Safety Code § 461A.001-469.008 .................................37

Tex. Health & Safety Code § 481.122 ..................................................37

Tex. Hum. Res. Code § 42.0433 ...........................................................36

Tex. Pen. Code § 7.02 ...........................................................................37

Tex. Pen. Code § 15.032 .......................................................................37

Tex. Pen. Code § 20A.02 ......................................................................37

Tex. Pen. Code § 21.02 .........................................................................37

Tex. Pen. Code § 22.08 .........................................................................36

Tex. Pen. Code § 22.011 .......................................................................37

Tex. Pen. Code § 42.07 .........................................................................37

Tex. Pen. Code § 42.072 .......................................................................37

Tex. Pen. Code § 43.24 ......................................................................9, 37

Tex. Pen. Code § 43.26 ....................................................................25, 37

**Other Authorities**

Appellant Br., *Free Speech Coal., Inc. v. Paxton*,
    2023 WL 6465441 (5th Cir. Sept. 25, 2023)......................................13, 51, 54

Attorney General of Texas, Press Release: Attorney General Ken Paxton Launches Investigations into Character.AI, Reddit, Instagram, Discord, and Other Companies over Children's Privacy and Safety Practices as Texas Leads the Nation in Data Privacy Enforcement (Dec. 12, 2024), https://tinyurl.com/mrw355t8/ ........................................................................3

"*Glorify*," Oxford English Dictionary, https://perma.cc/27L8-YBUZ ...............................................................................................20

Peter Singer, *Practical Ethics* (3d ed. 2011)..........................................................21

"*Promote*," Cambridge Dictionary, https://perma.cc/V7KW-R5MY...............................................................................................20

Stalking – Fiction, Barnes & Noble, https://perma.cc/6T8L-DZGR ...................................................................................................22

## Introduction

The district court correctly concluded that no State can require private entities to seek out and censor protected speech, based on content and viewpoint, on the State's behalf. It is especially improper for *Texas* to have done so. After attempting to *prevent* social media websites from moderating content on their services, Texas now *requires* those same websites (and more) to censor broadly and vaguely defined categories of protected speech accessible to minors. "[U]nder the First Amendment, that is a preference Texas may not impose." *Moody v. NetChoice, LLC*, 603 U.S. 707, 743 (2024).

Through its "monitoring-and-censorship" provisions, Texas House Bill 18 (2023) ("Act" or "HB18") requires covered websites to "develop and implement a strategy to prevent" minors' "exposure to"—*e.g.*, "block[]"—broad, vague, and subjective categories of speech. §§ 509.053, 509.056(1).[1] Although CCIA and NetChoice members engage in their own extensive and effective "content moderation" to address potentially harmful content on their websites, the Act's vague governmental demand to do so will chill the dissemination of protected speech. And HB18's enumerated means of moderating such content may render websites' content moderation less effective. By directing websites' content moderation, HB18's monitoring-and-censorship requirements are also preempted by 47 U.S.C. § 230.

---

[1] Statutory citations in this brief refer to the Texas Business & Commerce Code, unless otherwise specified.

The district court's holding correctly followed Supreme Court precedent, and it aligns with judicial decisions nationwide enjoining enforcement of other online speech restrictions targeted at minors. *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Fitch*, 2025 WL 1709668 (S.D. Miss. June 18, 2025); *Comput. & Commc'ns. Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

This Court should therefore affirm the district court's preliminary injunction in this case, preventing Defendant's enforcement of § 509.053 and § 509.056(1).

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. § 1292.

## ISSUE PRESENTED

Whether the district court abused its discretion in preliminarily enjoining Defendant from enforcing HB18's monitoring-and-censorship provisions, §§ 509.053, 509.056(1).

## STATEMENT OF THE CASE

### A. Background.

### 1. CCIA and NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment.

CCIA and NetChoice are two leading trade associations focused on the internet and digital services. Based on the Act's central "digital service provider" coverage definition, the Act regulates websites operated by at least the following CCIA and NetChoice members: (1) Discord; (2) Facebook (Meta); (3) Instagram (Meta); (4) Nextdoor; (5) Pinterest; (6) Reddit; (7) Snapchat (Snap Inc.); (8) X; and (9) YouTube (Google). ROA.137 ¶ 23 (Schruers Decl.); ROA.155-56 ¶ 23 (Szabo Decl.); ROA.160 ¶ 5 (Veitch Decl.).[2]

HB18 regulates CCIA and NetChoice members based on their shared speech-facilitating functions. It is aimed at "social media" websites that "allow users to upload content . . . to share [it] with others," where those

---

[2] Discord and Reddit joined NetChoice after Defendant appealed.

Defendant has announced "investigations into . . . Reddit, Instagram, and Discord . . . pursuant to the Securing Children Online through Parental Empowerment ('SCOPE') Act [*i.e.*, Texas HB18] and the Texas Data Privacy and Security Act." Attorney General of Texas, Press Release: Attorney General Ken Paxton Launches Investigations into Character.AI, Reddit, Instagram, Discord, and Other Companies over Children's Privacy and Safety Practices as Texas Leads the Nation in Data Privacy Enforcement (Dec. 12, 2024), https://tinyurl.com/mrw355t8/.

"viewing the content can" "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719.

As a result, members are covered if they "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Teens (like adults) use these websites for protected expression, education, civic engagement, and plain "entertain[ment]," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). Both Plaintiffs have members fitting this description. *E.g.*, ROA.126-28 ¶¶ 4, 6-7 (Schruers Decl.); ROA.142 ¶ 6 (Szabo Decl.).

### 2. Parents already have many tools to oversee how their children use the internet.

"[P]arents may rightly decide to regulate their child's use of social media . . . . And many tools exist to help parents with this endeavor." *Griffin*, 2025 WL 978607, at *3.

Parents can control what *devices* minors can access—and when. ROA.143 ¶ 8 (Szabo Decl.). Not all devices are internet-enabled. ROA.143 ¶ 8 (*Id.*). And devices themselves come with many built-in parental-control options. ROA.143-44 ¶ 8.b (*Id.*). Those options include the ability to lock or limit apps and features, restrict settings to limit content, limit access to only approved websites, and set overall or time-of-day and usage limits. ROA.143-44 ¶ 8.b (*Id.*).

Parents also have control over the *networks* that minors use. ROA.143 ¶ 8.a (*Id.*). Wireless routers allow parents to manage which network a minor

4

connects to, if any. ROA.143 ¶ 8.a (*Id.*). They also allow parents to set up rules defining which websites minors can use (and at what times). ROA.143 ¶ 8.a (*Id.*). Many internet service providers offer similar tools. ROA.143 ¶ 8.a (*Id.*).

Parents can also control *software*. ROA.144 ¶ 8.c (*Id.*). Many web browsers offer parental controls. ROA.144 ¶ 8.c (*Id.*). Third-party parental control software is also available for many devices. ROA.143 ¶ 8.a (*Id.*).

Many CCIA and NetChoice members have developed their own suite of parental controls and other protections for minors. *E.g.*, ROA.144-46 ¶¶ 8.d, 9 (*Id.*); ROA.162-67 ¶¶ 11-16 (Veitch Decl.). In addition, their members' services do not permit minors younger than 13 to create accounts for accessing the services regulated by HB18. ROA.145 ¶ 9.a (Szabo Decl.). Thus, "minors" in this case refers only to teenagers.

### 3. Covered websites' content-moderation policies prioritize user safety, and address the kind of content that Texas House Bill 18 (2023) requires to be monitored and blocked.

Members' parental controls supplement the resources that members expend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *Moody*, 603 U.S. at 717; *e.g.*, ROA.128-29 ¶¶ 8-10 (Schruers Decl.); ROA.146 ¶¶ 10-17 (Szabo Decl.); ROA.167-75 ¶¶ 17-28 (Veitch Decl.); ROA.184-86 ¶¶ 10-14 (Pai Decl.).

Plaintiffs' members have content-moderation policies that address multiple kinds of content. A member website might remove content from its

website merely for being off-topic. *E.g.*, ROA.152 ¶ 17.c (Szabo Decl.) ("Nextdoor is intended primarily for neighbors to share community-related information," not "personal interests." (citation omitted)). Members also must contend with speech that is lawful yet considered objectionable by many, such as hate speech and graphic violence. *E.g.*, ROA.152 ¶ 17.b (*Id.*) ("Meta prohibits hate speech." (emphasis omitted)); ROA.152 ¶ 17.d (*Id.*) ("Pinterest prohibits . . . 'content that shows the use of violence.'" (cleaned up)). Members' content-moderation policies also seek to block material that is illegal, such as child sexual abuse material. *E.g.*, ROA.150 ¶ 15.a (*Id.*) ("YouTube prohibits all 'sexually explicit content featuring minors and content that sexually exploits minors.'" (emphasis omitted)).

The record shows that CCIA's and NetChoice's members already have content-moderation policies disallowing broad categories of objectionable speech, including content regulated by the Act. ROA.147-53 ¶¶ 12-17 (Szabo Decl.); ROA.168-70 ¶ 19 (Veitch Decl.); ROA.185 ¶ 13 (Pai Decl.).

The record also reflects that "'companies are successfully prioritizing the safety of their users.'" ROA.146 ¶ 10 (Szabo Decl.) (citation omitted). Yet, content moderation is difficult. ROA.153-54 ¶¶ 18-21 (*Id.*); *see* ROA.129-33 ¶¶ 11-17 (Schruers Decl.). Scale is one reason. "For instance, in just a six-month span from July to December 2020, Facebook (≈5.7 billion), Instagram (≈65.3 million), Pinterest (≈2.1 million), Snapchat (≈5.5 million), YouTube (≈17.2 million), and X (≈4.5 million) removed approximately 5.9 *billion* posts." ROA.153 ¶ 19 (Szabo Decl.); ROA.130-31 ¶ 13 (Schruers Decl.).

Complexity and subjectivity are others. ROA.154 ¶ 21 (Szabo Decl.). "Consequently, for many individual pieces of user-generated content, there will never be one 'correct' content-moderation answer[.]" ROA.131 ¶ 14 (Schruers Decl.). And successful content moderation requires constant innovation, because "malicious actors always attempt to find ways to avoid moderation." ROA.154 ¶ 21 (Szabo Decl.); ROA.133 ¶ 17 (Schruers Decl.).

## B. Texas HB18 is a content-based law that requires covered websites to block speech.

### 1. HB18's content-based coverage definition of "digital service provider."

In general, HB18 regulates "social media" websites that "allow users to upload content . . . to share [it] with others." *Moody*, 603 U.S. at 719. This is consistent with common usage of "social media." *See id.* HB18 regulates the kinds of "social media" websites that *Packingham* held people have a right to "access," free from governmental restraint. 582 U.S. at 108.

HB18 targets any "own[er]" or "operat[or]" of an online service that:

(1) "determines" the "means" and "purpose of collecting and processing [users'] personal identifying information";

(2) "connects users in a manner that allows users to *socially* interact with other users";

(3) "allows a user to create a *public* or *semi-public* profile for purposes of signing into and using the" website; and

(4) "allows a user to create or *post* content that can be viewed by other *users* . . . including *sharing* content on: (A) a *message board*; (B) a *chat*

*room*; or (C) a *landing page*, video *channel*, or main *feed* that presents to a user content created and *posted* by other *users*."

§§ 509.001(1)-(2), 509.002(a) (emphases added). By its plain language exemplified by the emphasized terms, HB18 is limited to services that publicly disseminate speech to multiple users.

This definition also has multiple content-based exceptions. For example, websites are excluded if they "primarily" feature "news, sports, commerce, or content primarily generated or selected by the [website]." § 509.002(b)(10). HB18 also excludes search engines, "small business[es]," and "institution[s] of higher education," among others. § 509.002(b).

The Act does *not* regulate the "kinds of" services for which *Moody* questioned whether a different First Amendment analysis might apply (in addressing the distinct context of *compelled*-speech-dissemination laws). 603 U.S. at 718, 724-25. The Act excludes "[e]mail," and "direct messaging services."§ 509.002(b)(9). So it excludes "email" and "direct messaging," *Moody*, 603 U.S. at 724-25, including services like "Google Mail" and direct messaging services like "Microsoft Teams" and "Google Meet," *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). The Act excludes content "primarily generated or selected by the [website]." § 509.002(b)(10). So it excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725, "Google Maps," and "DraftKings," *Fitch*, 134 F.4th at 808. And the Act excludes services that "primarily" feature "commerce" and "sports." § 509.002(b)(10). So it excludes

"payment service[s]," "online marketplace[s]," "ride-sharing service[s],"
*Moody*, 603 U.S. at 725, and "DraftKings," *Fitch*, 134 F.4th at 808.

### 2. HB18's monitoring-and-censorship requirements.

HB18 requires covered websites to monitor for and block many broad
and vaguely worded categories of speech. Under HB18, covered websites
must "develop and implement a strategy to prevent [a] known minor's ex-
posure to" subjective categories of speech. That includes content that "pro-
motes," "glorifies," or "facilitates," the following content-based catego-
ries: (1) suicide; (2) self-harm; (3) eating disorders; (4) substance abuse;
(5) stalking; (6) bullying; (7) harassment; (8) grooming; (9) trafficking;
(10) "child pornography"; or (11) other sexual exploitation or abuse.
§ 509.053(a). Likewise, websites must monitor for and block "harmful mate-
rial," *id.*—defined as obscenity for minors, § 509.001(3) (incorporating Tex.
Pen. Code § 43.24).

Accordingly, covered websites must determine which speech on their
services arguably falls within these categories of prohibited speech, and then
they must attempt to prevent minors from seeing (*i.e.*, being "expos[ed] to")
this prohibited speech. § 509.053(a). In addition, any covered website "that
uses algorithms to automate the suggestion, promotion, or ranking of infor-
mation to known minors on the digital service shall . . . make a commercially
reasonable effort to ensure that the algorithm does not interfere with" these

"duties." § 509.056(1). In other words, any algorithms used by covered websites must comply with the monitoring-and-censorship requirements.

The Act also details precisely *how* websites must monitor and block speech, by imposing mandatory and permissive technical requirements.

Websites' strategies "*must* include" mechanisms that would, among other things, "block from display" prohibited content, by:

(A) creating and maintaining a comprehensive list of harmful material or other content described by Subsection (a) to block from display to a known minor;

(B) using filtering technology and other protocols to enforce the blocking of material or content on the list under Paragraph (A);

(C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described by Subsection (a);

(D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;

(E) performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;

(F) making available to users a comprehensive description of the categories of harmful material or other content described by Subsection (a) that will be filtered; and

(G) making available the digital service provider's algorithm code to independent security researchers.

§ 509.053(b)(1) (emphasis added).

In addition to those mandatory actions, strategies "*may* include":

(A) engaging a third party to rigorously review the digital service provider's content filtering technology;

(B) participating in industry-specific partnerships to share best practices in preventing access to harmful material or other content described by Subsection (a); or

(C) conducting periodic independent audits to ensure:

> (i) continued compliance with the digital service provider's strategy; and

> (ii) efficacy of filtering technology and protocols used by the digital service provider.

§ 509.053(b)(2) (emphasis added).

### 3. Enforcement.

Any "violation" of HB18 is "a deceptive act or practice" under Texas law enforceable by "the attorney general's office." § 509.151. Defendant may seek civil penalties of "$10,000 per violation." § 17.47(c)(1). HB18 also creates a "private right of action." § 509.152(a).

### C. Procedural history.

Plaintiffs sued and filed a preliminary injunction motion. ROA.399. After full briefing, the district court preliminarily enjoined Defendant's enforcement of §§ 509.053, 509.056(1), under the First Amendment and Due Process Clause. ROA.431. Defendant appealed.

## SUMMARY OF THE ARGUMENT

**I.** Under this Court's precedent, CCIA and NetChoice have associational standing to raise their members' rights *and* "prudential standing [to] assert[]" members' "users' First Amendment rights." *Fitch*, 134 F.4th at 807.

**II.** HB18's monitoring-and-censorship requirements violate the First Amendment.

**A.** Whether understood as a prior restraint or a content-based and viewpoint-based regulation of speech, these requirements trigger heightened First Amendment scrutiny. States cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). Nor can States "deputize[] private actors into censoring speech based on its content." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (citing *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 806, 813 (2000)).

**B.** HB18's monitoring-and-censorship requirements cannot satisfy heightened First Amendment scrutiny. States do not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

The record shows that the Act's speech regulations are not the least restrictive means of achieving a compelling governmental interest. Covered websites already engage in extensive content moderation to address potentially harmful speech on their services. Parents already have tools to oversee

their children online. And the State itself can enforce criminal law addressing truly unprotected speech and conduct.

**C.** The district court correctly concluded that HB18's monitoring-and-censorship requirements are facially unconstitutional. Defendant's view of the First Amendment facial-challenge standard is contrary to longstanding precedent, and would condone all manner of censorship laws.

**III.** In addition, HB18's monitoring-and-censorship requirements are unconstitutionally vague. Deciding whether any individual piece of content falls within HB18's content categories requires subjective and context-dependent determinations to be made at enormous scale.

**IV.** 47 U.S.C. § 230 ("§ 230") preempts HB18's monitoring-and-censorship requirements. States cannot, consistent with § 230, penalize websites for their alleged "failure[s] to implement basic safety measures" or "decisions relating to the monitoring" or "screening" "of content"—*i.e.*, content moderation. *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-20 (5th Cir. 2008) (citation omitted). Defendant has previously recognized that States cannot "requir[e] the *monitoring or deletion* of third-party content" on online services. Appellant Br.31, *Free Speech Coal., Inc. v. Paxton*, 2023 WL 6465441 (5th Cir. Sept. 25, 2023) (emphasis added) ("*FSC* Br.").

**V.** The remaining preliminary injunction factors favor affirmance.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (cleaned up).

## ARGUMENT

Plaintiffs CCIA and NetChoice satisfied all four preliminary-injunction factors: (1) "likelihood of success on the merits," (2) "irreparable harm," (3) the "balance of equities," and (4) the "public interest." *Id.* at 336 (cleaned up).[3]

## I. CCIA and NetChoice have associational standing to challenge HB18's monitoring-and-censorship requirements.

CCIA and NetChoice have associational standing to challenge regulations of their members, like HB18. ROA.405-10. This Court's binding precedent holds that NetChoice has associational standing to raise both its members' rights *and* "prudential standing [to] assert[] [members'] users' First Amendment rights." *Fitch*, 134 F.4th at 805-07. CCIA is similarly, if not

---

[3] Plaintiffs CCIA and NetChoice defend the preliminary injunction issued in their case, W.D. Tex. No. 1:24-cv-849, prohibiting Defendant's enforcement of § 509.053 and § 509.056(1). *See* ROA.431. This brief therefore will not address many of Defendant's arguments related solely to the consolidated *SEAT* case. *See* Br.15-29 (*SEAT* plaintiffs' standing); Br.38-41, 46 (§§ 509.052(2)(D) and 509.055's targeted advertising provisions); Br.41-43 (§ 509.057's age-verification requirement).

identically, situated and likewise has associational standing. *See id. Fitch* is dispositive here because it concerned a nearly identical monitoring-and-censorship requirement. *See id.* at 803.

Perhaps that is why Defendant's brief does not contest either CCIA's or NetChoice's standing.[4] Defendant has therefore forfeited any argument about the *prudential* (as compared to jurisdictional) prong in the associational-standing analysis.[5] That prudential prong evaluates whether "the claim asserted []or the relief requested requires the participation of individual members in the lawsuit." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021). In any event, none of the claims or relief raised by CCIA and NetChoice in this case require the participation of their individual members as parties. *Fitch*, 134 F.4th at 805.[6]

---

[4] Purported lack of associational standing is just one of the arguments that Defendant abandons on appeal, including: (1) sovereign immunity, ROA.242-43; and (2) ripeness, ROA.244-45.

[5] "[A]ny issue not raised in an appellant's opening brief is forfeited." *United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017) (citation omitted).

[6] Amici States erroneously make the forfeited argument that CCIA and NetChoice lack standing because this case purportedly "requires the participation of individual members in the lawsuit." ECF 78 at 11-12 (citation omitted). They contend that evaluating how the monitoring-and-censorship requirements apply to individual members requires "fact-finding about different members." *Id.* at 12. But this Court does not need to inquire into the precise editorial discretion exercised by each covered website to determine whether it is unlawful for the State to tell private entities what content is appropriate on their services. Amici States rely heavily on deposition

## II. HB18's monitoring-and-censorship provisions violate the First Amendment.

The district court correctly concluded that HB18's monitoring-and-censorship requirements violate the First Amendment. ROA.417-21. They impose content-based and viewpoint-based speech restrictions that cannot satisfy strict scrutiny. Consequently, at a minimum, the Act is unconstitutional as applied to covered members' services. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing challenge "to the extent of [the] reach" defined by plaintiff). And the district court correctly held that the provisions are facially invalid as well.

### A. HB18's monitoring-and-censorship requirements trigger heightened First Amendment scrutiny for several reasons.

HB18's monitoring-and-censorship requirements trigger strict scrutiny in multiple ways. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). That is why "[t]he Supreme Court has previously applied First Amendment scrutiny to laws that deputize private actors into determining whether material is suitable for kids." *Bonta*, 113 F.4th at 1118.

---

testimony from a case where a Florida court held that both CCIA and NetChoice have associational standing. *Compare* ECF 78 at 19-20, *with Uthmeier*, 2025 WL 1570007, at *6-9.

First, HB18's monitoring-and-censorship requirements impose a prior restraint on disseminating speech to minors. As Defendant forthrightly acknowledges, these provisions require covered websites to "monitor and filter from [minors'] view" content-based and viewpoint-based categories of speech. Br.1.

Second, even if they were not prior restraints, these provisions violate websites' right to "control the content that will appear to users." *Moody*, 603 U.S. at 736. HB18 seeks to replace private websites' voluntary content-moderation policies with the State's own—enforced using tools prescribed by the State. But the Supreme Court has made clear that those decisions belong to private websites. *See id.*

### 1. HB18's monitoring-and-censorship requirements impose an impermissible prior restraint on speech.

HB18's monitoring-and-censorship requirements are an unconstitutional prior restraint on speech. The district court did not reach this issue, but it is alternative grounds for affirmance. *See* ROA.419 n.12; *see Matter of Sims*, 994 F.2d 210, 214 (5th Cir. 1993).

Prior restraints are the "least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Even prior restraints of *unprotected* speech must meet "the most exacting scrutiny." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979) (collecting cases); *e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). And requiring websites to

constantly pre-screen and monitor all content they disseminate to the State's standards will chill speech. *Smith v. California*, 361 U.S. 147, 153-54 (1959).

HB18 requires websites to "*implement*" "strateg[ies]" to "*prevent* [a] known minor's *exposure to*" multiple categories of content—including by "*blocking*" content. § 509.053(a), (b)(1)(B) (emphases added). This necessarily entails monitoring and acting as "a pre-clearance censor" for all speech on the website. *Moore v. City of Kilgore*, 877 F.2d 364, 383 (5th Cir. 1989). These monitoring-and-censorship requirements are a prior restraint, because they "bar[] speech in the future," rather than just "penalizing past speech." *Alexander v. United States*, 509 U.S. 544, 553 (1993).

States may not enact prior restraints by commandeering private actors into becoming pre-screening tribunals for the State. *E.g., Bantam Books*, 372 U.S. at 66. *Bantam Books* involved that kind of forced deputization, and the Supreme Court invalidated that scheme as a prior restraint because "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (discussing *Bantam Books*, 372 U.S. 58, 67-69).

Here, Defendant argued in the district court that "prior restraints must typically come from 'administrative and judicial orders,'" rather than statutes. ROA.419 n.12. That is incorrect. In addition to government licensing boards and judicial orders, *statutes* can impose prior restraints too. *E.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931) (statute was an unconstitutional prior restraint where its "operation and effect" was to "impose[]" a

"restraint upon" speech). Courts "look through forms" of speech regulation "to the substance," as even "informal censorship may" chill speech. *Bantam Books*, 372 U.S. at 67.

### 2. HB18's monitoring-and-censorship requirements violate the First Amendment by regulating overbroad content-based and viewpoint-based categories of protected speech.

**a.** Even if HB18 did not impose a prior restraint, its monitoring-and-censorship requirements independently trigger strict First Amendment scrutiny by requiring monitoring and censoring of content-based and viewpoint-based categories of speech. *See* ROA.417-18.

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). The "Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. Jacksonville*, 422 U.S. 205, 210 (1975). Contrary to Amici States' arguments, that is no less true when the government attempts to regulate speech available to minors. *Contra* ECF 78 at 20-25. "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (cleaned up) (quoting *Erznoznik*, 422 U.S. at 212-13).

HB18's plain language targets specific content categories encompassing wide swaths of protected speech. § 509.053(a). HB18's requirements are content-based, because they "single[] out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Id.* at 163-64 (citations omitted).

Likewise, HB18 discriminates on the basis of "viewpoint": the State's "judgment that the content of protected speech is offensive or inappropriate." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). Viewpoint-based restrictions likewise trigger strict scrutiny. *Id.* HB18 identifies speech that "promotes," "glorifies," or "facilitates" prohibited topics. § 509.053(a). None of these terms is defined by statute, but their plain meaning would force websites to make normative judgments about speech. The Supreme Court has held that a law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). "Promote" means "to encourage people to like, buy, use, do, or support something." "*Promote*," Cambridge Dictionary, https://perma.cc/V7KW-R5MY; *see United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (the plain meaning of "promote" encompasses "an abundance of hypothetical efforts to persuade that aren't likely to produce an imminent" lawless action). And "glorify" means "[t]o render glorious; to invest with glory, procure glory for." "*Glorify*," Oxford English Dictionary, https://perma.cc/27L8-YBUZ.

Like "promote," to "glorify" is to convey the viewpoint that whatever being "glorified" is good.

Even if objectionable to some, "'mere advocacy' of illegal acts" is "speech falling within the First Amendment's core." *Counterman v. Colorado*, 600 U.S. 66, 76 (2023) (citation omitted); *see Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018) ("[m]ere tendency of speech to encourage" or promote "unlawful acts" isn't "sufficient reason for banning it" (cleaned up)). And the government cannot purport to regulate only the *effects* of speech using content-based and viewpoint-based distinctions. *See Boos v. Barry*, 485 U.S. 312, 321 (1988).

As a result, HB18's prohibited speech categories cover a wide array of protected works of art, literature, philosophy, and plain everyday speech:

"*Suicide, self-harm, or eating disorders.*" Many protected works of art, literature, and philosophy "promote[], glorif[y], or facilitate[] . . . suicide, self-harm, or eating disorders," § 509.053(a)(1). Examples include books such as *The Awakening* (1899), Sylvia Plath's *The Bell Jar* (1963), *The Perks of Being a Wallflower* (1999), and television series like *13 Reasons Why* (2017-2020). In addition, discussions about assisted suicide for those with terminal illnesses in online support groups could be said to "glorify" suicide in some cases. *Cf.* Peter Singer, *Practical Ethics* (3d ed. 2011).

"*Substance abuse.*" Literature and popular culture are replete with examples of protected speech that "promotes, glorifies, or facilitates . . . substance abuse." § 509.053(a)(2). Examples include The Weeknd's Kids'-Choice-Award-nominated song *Can't Feel My Face* (2015) and the film *Fear and Loathing in Las Vegas* (1971). In everyday life, people discuss substance use when they are part of support-group discussions about using drugs to address illnesses or when they discuss weekend nights spent at the bar binge drinking. These examples "promote" or "glorify" "substance abuse."

"*Stalking, bullying, or harassment.*" Many protected works of art and literature "promote[], glorif[y], or facilitate[] . . . stalking, bullying, or harassment." § 509.053(a)(3). Examples include The Police's *Every Breath You Take* (1983) and entire categories at large bookstores (*e.g.*, Stalking – Fiction, Barnes & Noble, https://perma.cc/6T8L-DZGR). In some cases, posting copies (or "screenshots") of another user's speech may "facilitate" harassment of that user. In others, posts about confronting politicians at local town halls could "glorify" harassment of those politicians.

"*Grooming, trafficking, child pornography, or other sexual exploitation or abuse.*" Perhaps more than any other category that HB18 identifies, websites work diligently to avoid disseminating any speech that "promotes, glorifies, or facilitates . . . grooming, trafficking, child pornography, or other sexual exploitation or abuse." § 509.053(a)(4); *see supra* p.6; ROA.150 ¶ 15 (Szabo Decl.); ROA. 170-72 ¶¶ 19.e, 23 (Veitch Decl.); ROA.185 ¶¶ 12-13 (Pai Decl.). Although child pornography and sexual abuse are obviously illegal, the

Supreme Court has acknowledged that "teenage sexual activity and the sexual abuse of children" have "inspired countless literary works" protected by the First Amendment, such as "Romeo and Juliet" and "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247-48 (2002).

*"Harmful material."* HB18's definition of "harmful material" (§ 509.053(a)) does not distinguish between content that is obscene to children versus teenagers. Laws regulating even unprotected obscenity for minors must account for the differences between these ages. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 391 (1988).

**b.** Defendant does not refute that HB18's plain text encompasses wide swaths of protected speech. Instead, Defendant argues that the district court erred by not limiting the statute's scope in various ways, principally to content engendering "direct inducement of harm, excluding protected speech." Br.45. But Defendant must engage with HB18's plain language and cannot simply wave away all the obviously unconstitutional applications. Limiting constructions are permissible only when the statute's text is "susceptible" to such constructions. *City of Houston, Tex. v. Hill*, 482 U.S. 451, 468 (1987). Courts cannot "rewrite a . . . law to conform it to constitutional requirements." *Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016) (alteration in original; citation omitted).

At its core, HB18 impermissibly attempts to "create new categories of unprotected speech"—or "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*,

564 U.S. at 792, 794. The Supreme Court has repeatedly rejected this "mistaken" approach. *Id.*; *see United States v. Stevens*, 559 U.S. 460, 472 (2010) (States cannot "declare new categories of speech outside the scope of the First Amendment").

HB18's text is not susceptible to Defendant's limiting constructions because HB18's content categories stray far beyond well-constrained definitions of unprotected speech. ROA.425-26. Texas deliberately used novel statutory terms with unprecedented breadth. That entails First Amendment consequences. It is not permissible for the government to regulate speech *resembling* some elements of unprotected speech. Rather, governments must ensure the restrictions apply carefully to only historically recognized categories of unprotected speech. *E.g.*, *Brown*, 564 U.S. at 792 ("California has tried to make violent-speech regulation look like obscenity regulation by appending a saving clause required for the latter. That does not suffice."). And there are no "longstanding and pervasive" judicial constructions for what it means to unlawfully promote or glorify all manner of social ills. *United States v. Hansen*, 599 U.S. 762, 773 (2023).

HB18's unconstitutional breadth comes from its unique combination of verbs lacking constitutionally defined and approved limitations (*e.g.*, "glorify") and objects that can encompass (sometimes) unprotected conduct (*e.g.*, "trafficking"). The Act does not, as Defendant says, "require[] filtering things like child pornography." Br.50-51. HB18 requires filtering content that, *e.g.*, "glorifies" "child pornography." § 509.053(a). *Separate* Texas law

regulates "child pornography," Tex. Pen. Code § 43.26, and other conduct that Defendant highlights (*e.g.*, Br.37). *See infra* pp.36-37. However objectionable the State—as well as CCIA's and NetChoice's members—may find it, speech glorifying substance abuse is fully protected by the First Amendment. (Perhaps that is why, in the district court, Defendant all but conceded that HB18's use of "glorify" was unconstitutional. ROA.256.) HB18's other content categories fare no better. Several Circuits have held that statutes using similar language, including "promote," violate the First Amendment by restricting protected speech. *E.g.*, *Miselis*, 972 F.3d at 536 ("'promote'" is "overinclusive" as "between advocacy and action"); *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (law prohibiting "foster[ing]," "promot[ing]," and "encourag[ing]" "was overbroad"); *Nat'l Gay Task Force v. Bd. of Educ. of City of Oklahoma City*, 729 F.2d 1270, 1274 (10th Cir. 1984) (similar).

The only instance in which HB18 might regulate categories of unprotected speech is when it restricts speech that "facilitates" crimes. § 509.053(a)(4).[7] But other Texas law already regulates true facilitation of crimes. *See infra* pp.36-37. In any event, the *Hansen* case Defendant cites to support HB18's unique use of "facilitates" underscores how inappropriate that term is for a law mandating content filtering and blocking. Br.45. In

---

[7] Not all of HB18's content categories pertain to speech related to illegal actions. "Substance *abuse*," for example, is not necessarily illegal.

*Hansen*, the Supreme Court rejected a First Amendment overbreadth challenge to a federal law that "prohibits 'encouraging or inducing' illegal immigration." 599 U.S. at 766 (cleaned up) (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)). The Court said that this statute "refer[s] to criminal solicitation and facilitation," which both "require that the defendant *specifically intend* that a particular act be carried out." *Id.* at 771, 778 (emphasis added). In other words, the government must prove a criminal defendant's mens rea for "facilitation" to rise to the level of unprotected speech. These kinds of mens rea requirements are often integral to identifying unprotected speech. *E.g.*, *Elonis v. United States*, 575 U.S. 723, 737 (2015) ("The mental state requirement must therefore apply to the fact that the communication contains a threat."); *Smith*, 361 U.S. at 153 (invalidating ordinance that "dispens[ed] with any requirement of knowledge of the contents of the book").

Even assuming that a court could read a mens rea requirement into HB18 for its prohibited content categories, it is entirely unclear how *covered websites* are supposed to divine specific, criminal intent when pre-screening millions, if not billions, of online posts. That is a fundamental problem with atextually limiting HB18 to only unprotected speech: Defendant does not explain how websites should become arbiters of what speech is protected versus unprotected. "'[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn.' Error in marking that line exacts an extraordinary cost." *Playboy*, 529 U.S. at 817 (citation omitted). That is why we entrust *courts* to analyze speech

on a case-by-case basis, subject to due process and First Amendment safe-guards. But HB18 "delegat[es] the controversial question of what content may" fall into its censorship categories "to the companies themselves." *Bonta*, 113 F.4th at 1122. Governmental demands that websites make those granular distinctions at massive scale—upon threat of massive civil penal-ties—will inevitably chill the dissemination of protected speech.

Similarly, HB18's regulation of "harmful material" poses similar prob-lems. § 509.053(a). To be sure, obscene content for minors is unprotected speech as to minors. *Free Speech Coalition, Inc. v. Paxton*, 2025 WL 1773625, at *7 (U.S. June 27, 2025). That is why Texas separately regulates websites that "*knowingly and intentionally* publish[] or distribute[]" content "more than one-third of which is sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code § 129B.002(a) (emphasis added). By requiring *other* websites (lacking such mens rea) to continually monitor for individual pieces of such content, however, HB18 violates Supreme Court precedent preventing the government from requiring private entities to pre-screen the speech they dis-seminate to the public. Under such laws, private entities "will tend to restrict the" content they disseminate "to those [they have] inspected; and thus the State will have imposed a restriction upon the distribution of constitution-ally protected as well as obscene literature." *Smith*, 361 U.S. at 153.

More generally, the Supreme Court's decision in *Free Speech Coalition,* has no bearing here. HB18 triggers strict scrutiny because it imposes a prior restraint and content-based and viewpoint-based restrictions on *protected*

speech for minors. The Texas law in *Free Speech Coalition* required age verification to access websites with large amounts of obscenity for minors, which is *unprotected* for minors. 2025 WL 1773625, at *7. HB18 by contrast, "direct[ly] target[s] . . . fully protected speech." *Id.* at *12. And it affirmatively requires covered websites to monitor for and censor such content—which is different from the age verification Texas otherwise requires for dissemination of large amounts of obscenity for minors. Whatever kinds of "valid regulation[s]" the State can impose on "the pornography industry," *id.* at *18, HB18 here regulates websites that disseminate vast amounts of protected speech for minors and adults alike.

HB18 is therefore the kind of law regulating protected speech that the Supreme Court recognized would present far different issues. *Id.* at *10 n.7. That means strict scrutiny applies, which *Free Speech Coalition* declared "is fatal in fact absent truly extraordinary circumstances." *Id.* at *12.

**c.** Defendant also incorrectly claims that this Court can sever unlawful provisions, or even individual "applications," but keep HB18's monitoring-and-censorship requirements otherwise intact. Br.50-51.

To begin, there is no support for the proposition that overbroad speech restrictions can be saved by purporting to sever unconstitutional "applications" of these overbroad laws. This would nullify the First Amendment's overbreadth doctrine. It would permit governments to pass deliberately overbroad speech regulations—with both unconstitutional and constitutional applications—and then disclaim all unconstitutional applications.

Such a purported remedy would only exacerbate the problems the over-breadth doctrine is designed to address. *Hill*, 482 U.S. at 458-59. A statute prohibiting "all speech" with a judicial construction that "all speech" only means "all speech the government is allowed to regulate," would hardly provide people with the requisite notice. That lack of notice chills protected speech. *Hansen*, 599 U.S. at 769-70.

In addition, none of HB18's individual content categories are severable. For starters, HB18's prior restraint is a prior restraint in *all of its applications*. *See supra* pp.17-19. Plus, none of the Act's provisions are severable as permissible regulations of unprotected speech. For instance, the Act does not explicitly require "filtering things like child pornography." *Contra* Br.51. Rather, it regulates particular kinds of speech *about* prohibited topics—speech "glorifying, promoting, and facilitating" those topics. *See supra* pp.20-23; § 509.053(a). That regulation ensnares both protected and unprotected speech; it cannot be lopped off cleanly.

Finally, as discussed below in Part II.A.3, HB18 is pervasively infected with a central coverage definition that itself constitutes an unlawful content-based regulation of speech. Severing any of the separately unlawful operative provisions would not cleanse HB18 of its constitutional defects.

### 3. HB18's monitoring-and-censorship requirements trigger strict scrutiny for the additional reason that they rely on HB18's content-based coverage definition.

The district court also correctly concluded that HB18's central "digital service provider" coverage definition (§§ 509.001(1)-(2), 509.002(a)) selects websites for "regulation" based on "content." *Reed*, 576 U.S. at 163-64; ROA.411-15. Under HB18's plain text, "whether any particular [website] falls within the ban is determined by the content of the posts resting inside that" website. *Griffin*, 2025 WL 978607, at *9 (cleaned up).

At the outset, HB18's central coverage definition targets websites based on whether they allow users to interact "socially." § 509.002(a)(1). This definition singles out websites facilitating "social interaction" and user-generated dialogue, while exempting websites focused on other forms of content and communication. In other words, the Act will restrict speech based on the "topic[s]" that are generally "discussed" on the website. *Reed*, 576 U.S. at 163.

Defendant's position would require this Court to ignore the Act's limitation to "*social* interaction" by interpreting the phrase to include *all* expression online: "Social speech can be *about* anything." Br.33; *see* § 509.002(a)(1) ("socially interact"). If *any* online interaction is a "social" interaction, there was no reason for the Legislature to have added the qualifier "socially." Texas courts "giv[e] effect to every word, clause, and sentence" in a statute. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 184 (Tex. 2019) (alteration in original; citation omitted). And if Defendant were correct, that

would only expand the scope of the Act's coverage, requiring more websites to comply with the Act's unconstitutional speech restrictions.

In addition, HB18 codifies overtly content-based and speaker-based exceptions, including for websites that disseminate "content primarily generated or selected by the" website, or that "primarily" feature "news, sports, [or] commerce." § 509.002(b)(10)(A); *see Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620-21 (2020) (controlling plurality op.) (content-based exceptions render entire statute content-based).[8] So the Act offers favorable treatment to websites that allow interaction solely regarding some "content" (*e.g.*, news or sports), while restricting websites that allow people to interact regarding other "content" (*e.g.*, politics or religion). If a covered website changed to allow only (state-favored) speech about these excluded "topic[s]," it could escape regulation. *Reed*, 576 U.S. at 163.

In any event, HB18 is also speaker-based, for all of the reasons discussed above and for the additional reason that the Act singles out websites based on whether the speech on it is "primarily generated or selected by the digital service provider." § 509.002(10)(A). "[L]aws that single out the press, or certain elements thereof . . . are always subject to at least some degree of

---

[8] Even if *NetChoice, L.L.C. v. Paxton* held otherwise, that decision was vacated by the Supreme Court. *See* 49 F.4th 439, 481 (5th Cir. 2022), *vacated and remanded sub nom. Moody*, 603 U.S. 707.

heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (citation omitted).

Defendant's attempts to paint HB18 as content-neutral are unavailing. Defendant contends that the Act imposes "medium-based distinctions, not content-based distinctions." Br.31. But HB18 partially defines regulated media with reference *to its content*. If the State wanted to target only "platforms where users drive conversation through posts, comments, or shares," Br.31, there was no need to specify that HB18 exempts services that "primarily function[] to provide a user with access to *news, sports, [or] commerce*." § 509.002(10)(A).

Defendant's unwise reliance on *Turner* also illustrates why HB18 is content based. Br.30-31. In *Turner*, "Congress . . . required cable operators to provide carriage to broadcast stations, but [did] not impose[] like burdens on analogous video delivery systems." 512 U.S. at 659. The Supreme Court concluded that this distinction was *not* based on content. *Id.* at 643-44. After concluding that the law was content-neutral, *Turner* held that this must-carry law was one of the rare, permissible speaker-based distinctions "justified by special characteristics of the cable medium: the ['physical'] bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Id.* at 661. Or as *Moody* put it, *Turner* depended on "limit[ing] the cable operators' 'monopolistic,' gatekeeping position 'in order to allow for the survival of broadcasters.'" 603 U.S. at 742 n.10 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515

U.S. 557, 577 (1995)). In contrast, there are no such "special justifications" here or on the internet, as the Supreme Court subsequently clarified. *See Reno v. ACLU*, 521 U.S. 844, 868-69 (1997). *Turner* would have come out differently if Congress had privileged broadcast channels dedicated to particular content like news, or if it had only required cable companies that primarily distribute movie channels to carry broadcast channels. That is analogous to what HB18 does here.

## B. HB18's monitoring-and-censorship requirements fail any form of heightened First Amendment scrutiny.

Because HB18's monitoring-and-censorship requirements trigger strict scrutiny multiple times over, Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up). "Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech. . . . [A]s a practical matter, it is fatal in fact absent truly extraordinary circumstances." *Free Speech Coal.*, 2025 WL 1773625, at *12.

Even accepting that "protecting the physical and psychological well-being of minors" is a valid governmental interest for *some* of HB18's censorship categories, the district court correctly held that the monitoring-and-censorship requirements are not properly tailored. ROA.418-21 (citation omitted).

1. **The State lacks the necessary compelling governmental interest in regulating access to, and dissemination of, protected speech.**

The district court correctly recognized that "[i]t is far from clear that Texas has a compelling interest in preventing minors' access to every single category of information" that HB18 requires to be monitored and censored. ROA.418.

"No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95 (citation omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14. Accordingly, "many interests are not compelling, such as regulating content that might advocate for the deregulation of drugs (potentially 'promoting' 'substance abuse') or defending the morality of physician-assisted suicide (likely 'promoting' 'suicide')." ROA.418.

As for other content categories, Defendant must demonstrate "the curtailment of free speech [is] actually necessary to the solution," *Brown*, 564 U.S. at 799—including "hard evidence of how widespread or how serious the problem" is, *Playboy*, 529 U.S. at 819 (cleaned up). It must "show a direct causal link," *Brown*, 564 U.S. at 799, between that "problem" and the "speech

34

ban" it imposes, *Playboy*, 529 U.S. at 823. Defendant has failed entirely to make any such showing.

> ## 2. HB18's monitoring-and-censorship requirements are not the least-restrictive means of pursuing any legitimate governmental interest, and they are both overinclusive and underinclusive.

Regardless of the State's governmental interest, HB18's monitoring-and-censorship requirements are not properly tailored. *See* ROA.418-21.

**a.** HB18's requirements are not the "least restrictive means of achieving a compelling state interest." *AFP*, 594 U.S. at 607 (citation omitted); *see* ROA.419. There are many existing means to address the harms (and the speech) the State seeks to regulate.

Covered *websites*—and those operated by CCIA's and NetChoice's members in particular—already engage in extensive content moderation to address precisely the kinds of content that HB18 targets. *See supra* pp.5-7; ROA.147-53 ¶¶ 12-17 (Szabo Decl.); ROA.168-70 ¶ 19 (Veitch Decl.); ROA.185 ¶ 13 (Pai Decl.); ROA.419. The Supreme Court has endorsed similar "voluntary," industry-led efforts over governmental mandates restricting speech. *E.g.*, *Brown*, 564 U.S. at 803.

Supplementing covered websites' efforts, *parents* also have many tools—including those offered by social media companies—to control whether and how their children use covered websites. *See supra* pp.4-5; ROA.419. Texas could give "parents the information needed to engage in active supervision"

over their children's internet use. *Playboy*, 529 U.S. at 826. That would require little more than the State itself publicizing the diverse supervisory technologies that are widely available. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Id.* at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815. And whatever "modest gap in concerned parents' control" those tools may leave open, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

In addition, the *State* has its own remedial tools. For the potentially unprotected speech HB18 might regulate, the "normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). The Supreme Court has rejected "suppress[ing]" the speech of "law-abiding" private entities just "to deter conduct by a non-law-abiding third party." *Id.* at 529-30.

Texas already penalizes, or otherwise regulates, the harmful conduct related to the speech HB18 seeks to censor:

- "A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide." Tex. Pen. Code § 22.08(a); *see also* Tex. Hum. Res. Code § 42.0433 (requiring suicide-prevention in residential child-care facilities).

- "A person commits an offense if the person knowingly delivers a controlled substance . . . [or] marihuana . . . to a person . . . who is a

child." Tex. Health & Safety Code § 481.122(a); *see also id.* §§ 461A.001-469.008 (establishing substance abuse programs).

- "A person commits an offense [by] . . . send[ing] repeated electronic communications in a manner reasonably likely to harass." Tex. Pen. Code § 42.07(a); *see also id.* §§ 42.07(c) (raising offense level if "the offense was . . . against a child"); 42.072 (establishing stalking as an offense); Tex. Civ. Prac. & Rem. Code § 129A.002(a) (establishing remedies for a victim "of cyberbullying behavior who is younger than 18").

- Texas law also has criminal provisions prohibiting child grooming, Tex. Pen. Code § 15.032; child trafficking, *id.* § 20A.02; child sexual abuse, *id.* § 21.02; sexual assault, *id.* § 22.011; "child pornography," *id.* § 43.26; and obscenity for minors, *id.* § 43.24.

In addition to these direct prohibitions, Texas law separately provides for criminal liability for aiding or abetting other crimes, including actions made with the "intent *to promote* or assist the commission of the offense." *Id.* § 7.02(2) (emphasis added).

When speech restrictions are "superimposed upon the State's criminal regulation[s]," as HB18 does here, the speech restrictions are "largely unnecessary." *Bantam Books*, 372 U.S. at 69. HB18 will chill protected speech with virtually no corresponding benefit. *E.g., Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 752 (2011). That is why the Supreme Court has repeatedly rejected this kind of "prophylaxis-upon-prophylaxis" approach for speech regulations. *Cruz*, 596 U.S. at 306.

**b.** HB18's monitoring-and-censorship requirements are both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805.

HB18 is overinclusive for multiple reasons. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). For instance, HB18 regulates websites no matter whether minors are likely to use them, and without determining which websites (if any) may be harmful to minors.

The Act is overinclusive also because it fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. Even assuming that the government can prevent younger teenagers from "read[ing] Peter Singer advocate for physician-assisted suicide in *Practical Ethics*," it has no legitimate interest in preventing a 17-year-old college freshman from doing so. ROA.420.

And HB18's overinclusive effects may not be limited only to minors. Some covered websites may not be able to "age-gate" content such that minors and adults view different content on the service. ROA.132 ¶ 15 (Schruers Decl.). So the Act could "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

HB18 is also "wildly underinclusive when judged against its asserted justification," which "is alone enough to defeat it." *Brown*, 564 U.S. at 802; ROA.420. The Act's coverage definition targets only a handful of websites for regulation. Minors can encounter speech identified by the Act in books, television, movies, and *other websites* excluded from the Act's scope—such as streaming services like Hulu and myriad blogs and other websites.

"Websites that 'primarily' produce their own content are exempted, even if they host the same explicitly harmful content such as 'promoting' 'eating disorders' or 'facilitating' 'self-harm.'" ROA.420. The State's "wise" decision not to regulate other protected media sources ("wise" because it would be similarly unconstitutional) nevertheless renders the Act "underinclusive." *See Brown*, 564 U.S. at 801-02. If anything, HB18 targets the kinds of websites that are *most likely* to have content moderation in place to address this kind of content.

**c.** Finally, HB18's monitoring-and-censorship requirements risk being counterproductive to the State's goal of effective content moderation.

HB18 will hinder websites' ability to address potentially harmful content by dictating the technical means by which websites must moderate that content. Each website has developed its own content-moderation system that it continuously calibrates to address the content on its service and the specific mix of hurdles it faces. *E.g.*, ROA.177-79 ¶¶ 35-39 (Veitch Decl.). HB18 will replace those bespoke systems with an already-outmoded, static checklist. *E.g.*, ROA.136-37 ¶ 21 (Schruers Decl.); ROA.186 ¶ 15 (Pai Decl.); ROA.178-79 ¶ 37 (Veitch Decl.). For example, filtering and hashing content is not well-suited to monitoring for behavioral violations, such as harassment and grooming. ROA.134-35 ¶ 19.a-b (Schruers Decl.); ROA.154-55 ¶ 22 (Szabo Decl.); ROA.178 ¶ 36 (Veitch Decl.). Filtering is ill-suited to address context, making it both over- and underinclusive. ROA.178 ¶ 36 (Veitch Decl.); *see* ROA.134 ¶ 19.a (Schruers Decl.); *United States v. Am. Library Ass'n, Inc.*, 539

U.S. 194, 201 (2003). And hashing capabilities do not exist in meaningful forms for almost all of the categories identified by the Act. ROA.178 ¶ 36 (Veitch Decl.). Regardless, even if such capabilities existed, hashing is not a viable approach to identifying new content or text-based content. *See* ROA.154-55 ¶¶ 22 (Szabo Decl.). Finally, sharing websites' proprietary algorithms with third parties could enable malicious actors to evade moderation. ROA.136 ¶ 19.f (Schruers Decl.); ROA.179 ¶ 38 (Veitch Decl.).

## C. The district court properly concluded that the Act is facially invalid under the First Amendment.

### 1. HB18's relevant "actors" and "activities" can be determined on the law's face and the factual record.

This Court can determine "to whom the Act applies [and] the activities it regulates" on the face of the law and with the facts in the record. *Fitch*, 134 F.4th at 809. Defendant does not dispute the range of "actors" CCIA and NetChoice say are covered by the Act.

For the relevant "actors," CCIA and NetChoice have identified their covered members and the "other *kinds of* websites" the Act "might apply to." *Moody*, 603 U.S. at 718 (emphasis added); *see supra* pp.3, 7-9. CCIA and NetChoice have likewise identified other "kinds of" websites that are *not* regulated by the Act, including those identified by the Fifth Circuit. *Supra* pp.7-9; *Fitch*, 134 F.4th at 808-09. To the extent that HB18's scope may be different from what CCIA and NetChoice have identified, those hypothetical services do not present "pertinent facts" affecting the constitutional analysis.

*AFP*, 594 U.S. at 618. The government has no more power to require a hardware store to censor protected speech on its premises than the government has to tell social media websites. *Moody*, 603 U.S. at 718. For example, if a government prohibited playing The Beatles' *Lucy in the Sky with Diamonds*, it would not matter whether that law applied to radio stations, streaming services, nightclubs, or clothing stores.

As for "activities," *Moody*, 603 U.S. at 724, HB18 requires covered websites to monitor for and block content-based and viewpoint-based categories of speech. That is censorship. Here too, the government cannot demand censorship in "[f]eed[s]," "direct messag[es]," or "events management." *Id.* Nor does this law only require, as Defendant claims, "'commercially reasonable' means to monitor and filter harmful content." Br.48; *cf. Fitch*, 134 F.4th at 809 ("The district court also did not determine the 'commercially reasonable efforts,' as used in the Act."). HB18 requires a covered website to "develop and implement a strategy to prevent the known minor's exposure to" prohibited content—not only commercially reasonable means of doing so. § 509.053(a). Rather, HB18 requires "commercially reasonable effort[s] to ensure that the algorithm does not interfere with the digital service provider's duties" to censor speech on the State's behalf. § 509.056. So all covered websites must, *e.g.*, "us[e] hash-sharing technology." § 509.053(b)(1)(C). Regardless, there is no such thing as "commercially reasonable" censorship. It would be "commercially reasonable" for a newspaper to not publish sports content if ordered by the State—it might actually save the newspaper money. But the

State cannot demand that newspapers decline to publish speech about sports.

HB18's outright censorship demands distinguish this case from *Moody* and *Paxton*. The editorial discretion rights at issue in *Moody* differed from those at issue here, for which the First Amendment prohibits the government from banning or requiring private entities to block speech the government has determined to be unacceptable. Nothing in *Moody* suggested the government has authority to tell *any* websites they cannot disseminate particular kinds of speech.

## 2. The Act's unconstitutional applications are substantial, judged in relation to any hypothetically constitutional applications.

The district court correctly concluded that HB18's monitoring-and-censorship requirements are facially unconstitutional. ROA.420-21. The First Amendment facial-challenge standard's "less demanding" analysis asks whether a "law's unconstitutional applications *substantially outweigh* its constitutional ones." *Moody*, 603 U.S. at 723-24 (emphasis added). So when a law prohibits publication of "a substantial amount of constitutionally protected" speech defined by both content and viewpoint, it is "facially invalid." *Hill*, 482 U.S. at 458-59. "Overbroad laws may deter or chill constitutionally protected speech, and if would-be speakers remain silent, society will lose their contributions to the marketplace of ideas.'" *Hansen*, 599 U.S. at 769-70 (cleaned up). This First Amendment standard is designed to prevent

governments from passing poorly drafted, poorly tailored restrictions on speech to insulate them from facial challenges. In other words, it is designed for laws like HB18.

Once HB18's scope is established, "the strict scrutiny test parallels the facial challenge framework." ROA.420. And under strict scrutiny, "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) (citation omitted). Put another way, when governments impose programmatic broad restrictions on speech, courts must analyze those broad restrictions and *not* individual applications of that broad restriction. *Contra* Br.36-37.

And when viewing those programmatic restrictions, courts should "not . . . go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up). Rather, courts must look to a statute's plain meaning. For instance, a law preventing "criticism" of political figures is facially unconstitutional, even though "criticism" is a broad enough term to include (unprotected) defamatory criticism. The same is true here. Defendant's brief identifies hypothetical, constitutional applications of the law. Br.36-37. Overbroad restrictions of speech will, of necessity, reach unprotected speech. But the State cannot impose overbroad restrictions

43

failing heightened First Amendment scrutiny and point to scattered, potentially constitutional applications to defeat relief.

Under this standard, this Court may hold HB18 unconstitutional even if HB18's content categories sweep far enough to regulate unprotected speech. Its "presumptively impermissible applications" to protected speech "far outnumber any permissible ones" to unprotected speech. *Stevens*, 559 U.S. at 481-82. "[G]overnment [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content." *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

### 3. Defendant misconstrues what the First Amendment facial-challenge analysis requires.

Defendant asks this Court to apply *Moody* and Fifth Circuit precedent in a way unmoored from First Amendment facial-challenge precedent. *Moody*'s facial-challenge analysis did not change the standard. 603 U.S. at 723 (citing existing standard). Nor is it a Sisyphean mandate designed to shield overbroad censorship laws from review. Defendant incorrectly asserts that a First Amendment facial challenge requires a granular census of every individual speech service *and* every piece of content possibly covered by a governmental speech restriction. Br.35 ("systematic account of which DSPs or content the law targets"). That is not the law, and *Moody*'s reaffirmation of the preexisting First Amendment facial-challenge standard did not hold otherwise.

*Moody* directed courts to identify "kinds of" websites—that is, categories—for which a different First Amendment analysis "might apply" based

on the First Amendment merits arguments raised. 603 U.S. at 718. Here, CCIA, NetChoice, and the district court did precisely that. *See supra* pp.3-4, 7-9; ROA.395-96.

When the government broadly censors speech—whether directly or indirectly—courts look to the statute's text to determine its plain scope. *E.g.*, *Stevens*, 559 U.S. at 474 ("We read § 48 to create a criminal prohibition of alarming breadth."). This, too, is not a fact-intensive inquiry. CCIA, NetChoice, and the district court did this as well. *See supra* pp.20-28; ROA.417-21; ROA.424-26.

Defendant's erroneous articulation of the First Amendment facial-challenge standard would make facial challenges virtually impossible, requiring evidence about every single entity affected by the law and any potential utterance affected by the law. That is not consistent with the "less demanding" facial-challenge standard for First Amendment claims. *Moody*, 603 U.S. at 723-24. Under Defendant's view, this Court could not hold facially unconstitutional a law requiring, *e.g.*, websites to monitor for and block speech critical of politicians. Litigants would first need to catalog every website on the Internet, which would be outdated almost immediately because new websites emerge every day. And then litigants would need to exhaustively identify every hypothetical piece of content criticizing politicians. The First Amendment requires no such acrobatics to declare a content-based regulation of speech facially unconstitutional. *E.g.*, *Brown*, 564 U.S. at 802. The same is true here.

Nothing in *Moody*, *Fitch*, or *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024), holds anything to the contrary. Rather, as has always been true, courts must identify the "pertinent facts" to the constitutional merits analysis. *AFP*, 594 U.S. at 618. Each kind of speech regulation will have different "pertinent facts." *Id.* When those facts "are the same across the board," facial relief is proper. *Id.*

Here, the "pertinent facts" are that HB18 requires covered websites to monitor for and block content-based and viewpoint-based categories of speech that are overly broad. Those unconstitutional proscriptions will fall upon every covered service, and "in every application to a covered business, raise[] the same First Amendment issues." *Bonta*, 113 F.4th at 1116; *see* ROA.420-21.

## III. HB18's monitoring-and-censorship requirements are also unconstitutionally vague.

The district court correctly concluded that HB18's monitoring-and-censorship requirements are "unconstitutionally vague" because "both the verbs (promotes,  glorifies, and  facilitates) and the objects of those verbs (*e.g.*, stalking, bullying, substance abuse, and grooming) are broad and undefined." ROA.424. Laws must "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). If "the law interferes with the right of free speech or association, a more stringent vagueness test should apply." ROA.422 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). Consequently,

"vagueness may be grounds for a pre-enforcement challenge" if a law "chills protected speech," even if not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024).

"Terms like 'promoting,' 'glorifying,' 'substance abuse,' 'harassment,' and 'grooming' are undefined, despite their potential wide breadth and politically charged nature." ROA.418. HB18 does not define these liability-assigning terms with the "sufficient definiteness" required to ensure "that ordinary people can understand" their obligations. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Accordingly, websites cannot be sure that their voluntary content-moderation efforts comply with HB18's governmental demands—chilling their dissemination of speech. *E.g.*, ROA.175-77 ¶¶ 31-34 (Veitch Decl.).

For instance, the Supreme Court has held that a law regulating speech is void "because of vagueness" when compliance hinges on the word "promote." *Baggett v. Bullitt*, 377 U.S. 360, 371-72 (1964); *see* ROA.424. The "range of activities which are or might be deemed inconsistent with" promoting an idea "is very wide indeed" and fails to "provide[] an ascertainable standard of conduct." *Baggett*, 377 U.S. at 372. Put another way, "'promotes' . . . [is] susceptible of multiple and wide-ranging meanings." *United States v. Williams*, 553 U.S. 285, 294 (2008).

"The problem is even more acute with the term 'glorifying.'" ROA.425. The district court correctly recognized that this term "potentially includes any content that favorably depicts a prohibited topic." ROA.425. Given the

breadth of this provision and uncertainty about how it will be applied, "it is reasonable to expect that companies will adopt broad definitions that do encompass such plainly protected speech." ROA.425.

HB18's vagueness is exacerbated by the nature of content moderation itself: Context (across language and culture) helps determine whether content "promotes, glorifies, or facilitates" something else. ROA.131-32 ¶ 14 (Schruers Decl.); ROA.178-79 ¶¶ 36-37 (Veitch Decl.). These determinations require "contextual analyses, weighing and balancing many factors." *Book People*, 91 F.4th at 340. The phrase "drugs are glorious!" could be sarcastic, earnest, or quoting another person. What that phrase means depends on the vagaries of human communication, and thus risks being "completely subjective." *Grayned*, 408 U.S. at 113. Covered websites may disagree among themselves about the proper application of similar policies to identical content, to say nothing of what Defendant might think.

Accordingly, HB18 "effectively grants [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *Hill*, 482 U.S. at 465 n.15. And given the sheer volume of speech, covered websites will be required to simply guess at Defendant's subjective determinations for potentially *billions* of individual pieces of speech. ROA.424.

Defendant's arguments do not alleviate HB18's vagueness. Defendant first responds that *portions* of § 509.053(a) are similar to *some* aspects of *some* of Plaintiffs' members' policies. Br.44-45. Similarity is not the point: The State cannot transform subjective, private editorial standards into law. *E.g.*,

*Moody*, 603 U.S. at 742. Nor do alleged similarities render HB18 less vague. Companies decide how to apply *their own* policies, and there are *still* indeterminacies, given the complexity and variety of content. *See supra* p.7. Companies do not—and cannot—know what *Defendant* thinks similar language means. ROA.425 n.16. In addition, the fact that HB18 purportedly draws from *some* companies' editorial policies does not provide notice to *other* companies about what those policies mean, or what Defendant thinks they mean.

This case illustrates the dissonance. Defendant argues that many of HB18's prohibitions should "exclud[e] protected speech." Br.45. But Plaintiffs' members' policies prohibit more than unprotected speech. ROA.128-29 ¶¶ 8-10 (Schruers Decl.); ROA.146-53 ¶¶ 11-17 (Szabo Decl.); ROA.167-71 ¶¶ 17-21 (Veitch Decl.); ROA.184-87 ¶¶ 10-17 (Pai Decl.). In fact, through Texas House Bill 20 (2021), Texas has purported to require social media websites to disseminate that objectionable (yet nevertheless protected) speech. *See Moody*, 603 U.S. at 736-37.

Defendant also argues that covered websites need only consult Texas caselaw to find the meaning of terms like "harassment" and "trafficking." *See* Br.45 (citing cases and statutes). There are several problems with this argument. First, HB18 does not prohibit the *conduct* of "harassment" or "trafficking." It regulates *speech* about those topics. Criminal laws regulating conduct have "longstanding and pervasive" judicial constructions that speech laws lack. *Hansen*, 599 U.S. at 773; *see supra* pp.23-25. And of course, the term "glorify" has no such basis in existing criminal law. Second, HB18 requires

49

covered websites to make judgments about prohibited content at enormous scale across billions of posts. Prosecuting criminal violations, however, requires case-by-case adjudication ensuring that governments prove every element for criminal liability, including mens rea requirements.

Likewise, Defendant's argument that HB18's content categories should be limited to what the State considers harmful content only magnifies the constitutional injury. Br.45. When it comes to protected speech, covered websites and Defendant may disagree in many cases on what is harmful. Subjective and value-laden judgments have no role in the regulation of speech. The State cannot pass overbroad speech restrictions and then tell regulated entities that only the "bad speech" need be censored. "[E]sthetic and moral judgments about art and literature . . . are for the individual to make, not for the Government to decree." *Playboy*, 529 U.S. at 818.

Plaintiffs' members cannot be made to guess what kind of content "promotes, glorifies, or facilitates" HB18's content-based categories, § 509.053(a), *and* could "harm minors" in Defendant's estimation. That is especially true considering they face civil penalties of "$10,000 *per violation*" if they guess incorrectly. § 17.47(c)(1) (emphasis added). Rather, covered websites must take the statute as written by the Texas Legislature—which requires blocking a large amount of protected speech.

## IV. 47 U.S.C. § 230 preempts HB18's monitoring-and-censorship requirements.

The district court correctly enjoined enforcement of HB18's monitoring-and-censorship requirements under 47 U.S.C. § 230 as well. ROA.427-28. In Defendant's words, § 230 "immunizes website operators from state-law obligations . . . requir[ing] the *monitoring or deletion* of third-party content." *FSC* Br.30-31 (emphasis added). Yet that is precisely what HB18 does, by making websites liable for failing to monitor and block—that is, failing to "prevent the known minor's exposure to"—certain user-generated content. § 509.053(a). In other words, HB18 purports to direct—and impose liability for—the way that websites engage in content-moderation. It therefore runs headlong into § 230 and is preempted.

Congress in § 230 granted websites "broad immunity" for "all claims stemming from their publication of information created by third parties." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (emphasis omitted). Under § 230, no "interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," *e.g.*, a user or advertiser. 47 U.S.C. § 230(c)(1). Congress expressly preempted "inconsistent" state laws, protecting websites from "cause[s] of action" and "liability." *Id.* § 230(e)(3). So this Court need not deeply inquire into § 230's "preemptive purpose," as Defendant argues. *Contra* Br.47.

This Court has established a straightforward test to determine whether § 230 applies: "[I]f the [law] would not require the defendant to *exercise some kind of publication or editorial function*, then section 230 does not preclude liability." *Salesforce*, 123 F.4th at 797. In other words, this Court must ask whether HB18 would "require [websites] to exercise publication or editorial functions to avoid liability." *Id*. Such "publication" and "editorial" functions include: (1) "screening, monitoring, or filtering content"; (2) "reviewing or analyzing third-party content"; (3) "transmitting or hosting third-party content"; (4) "editing or altering third-party content"; (5) "developing or enforcing content-moderation policies"; or (6) "deciding how third-party content was organized or displayed." *Id.* at 799.

This Court's § 230 test accords with § 230's plain meaning. *Contra* Br.47-48 (contending that § 230 should be construed "no further than the text requires" (citation omitted)). On its face, § 230 precludes liability for websites failing to block user-generated content. 47 U.S.C. § 230(c), (f)(4) ("filter[ing]," "screen[ing]," or "disallow[ing]" content). Furthermore, § 230 adopted the common law's conception that "treat as the publisher" means to assign fault for the speech's content to the speech disseminator. *Id.* § 230(c)(1); *see Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022) ("[T]o hold someone liable as a publisher at common law was to hold them responsible for the content's improper character.").

Under this Court's test, HB18's monitoring-and-censorship requirements plainly "require [websites] to exercise publication or editorial

functions to avoid liability." *Salesforce*, 123 F.4th at 797. Section 230 likewise preempts purported "failure[s] to implement basic safety measures to protect minors." *MySpace*, 528 F.3d at 418-19. HB18 impermissibly compels websites to "develop[]" and "enforc[e] content-moderation policies" that accord with the State's standards. *Salesforce*, 123 F.4th at 799. The monitoring-and-censorship requirements are therefore preempted.

Defendant concedes many factors justifying § 230 preemption, each of which are plain on the face of the law and would be sufficient to declare HB18's monitoring-and-censorship requirements preempted. For example, under HB18, covered websites must "filter[] content" and HB18 would penalize websites for "deciding how third-party content was organized or displayed." *Salesforce*, 123 F.4th at 799. The statute says that websites must, *e.g.*, "enforce the blocking of material or content," § 509.053(b)(1)(B). Defendant concedes that HB18 generally requires "filtering" or "blocking" content. *E.g.*, Br.1, 5-6, 10, 36, 48. Likewise, covered websites must engage in the protected "publication" and "editorial" functions of "screening" and "monitoring content." *Salesforce*, 123 F.4th at 799; *id.* ("reviewing or analyzing third-party content"). The statutory text says as much, requiring websites to, *e.g.*, "identify recurring harmful material or other content." § 509.053(b)(1)(C). Defendant concedes this as well. Br.1, 10, 48.

These facts and concessions demonstrate that § 230 preempts HB18's monitoring-and-censorship provisions under binding precedent.

Defendant's contrary arguments ignore this Court's decision in *Salesforce* and threaten to nullify § 230. Defendant also misreads *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024) ("*FSC*"), in multiple ways. In that case, this Court held that § 230 did not preempt a law implementing "age verification" on pornographic websites—it did *not* address monitoring or removing content. *Id.* at 285. All *FSC* did was "reject[] a . . . but-for reading of section 230" that asks "whether third-party speech lies anywhere in the chain of causation." *Salesforce*, 123 F.4th at 794. But preempting requirements "to moderate content or any other functions traditionally associated with a publisher's role" does not rest on a "but-for" reading of § 230. *Id.* at 798. Rather, they fall in the heartland of § 230's protections, as websites "cannot be held liable for harmful communications that they fail to remove." *FSC*, 95 F.4th at 285. HB18's "monitoring-and-filtering requirements necessarily derive their liability from the type of content a site displays." ROA.428.

Thus, Defendant is incorrect in claiming that § 230 permits States to require "compliance with technological requirements" for "content filtering." Br.48. In essence, Defendant argues that States are allowed to require content moderation. *FSC* said no such thing. *Cf. Salesforce*, 123 F.4th at 794. And Defendant's own defense of the age-verification law in *FSC* rested on precisely the argument that requiring age verification is permissible because it does not "require the *monitoring or deletion* of third-party content." *FSC* Br.30-31 (emphasis added).

54

Defendant's defamation example illustrates the problem with this argument. Br.48-49 (discussing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)); *see* ROA.428. Under Defendant's § 230 interpretation, States could penalize websites for alleged failures to adopt "technological requirements" "implementing content filters," Br.48, addressing *defamatory* content. Yet, Defendant recognizes that Congress intended § 230 to protect websites from defamation liability for third-party content. Br.48-49. What Defendant contends are paradigmatic cases for § 230 protection are thus the same cases where websites disseminate and *fail to moderate content*.

Defendant also incorrectly argues that § 230 preempts only laws that "impose liability for 'the harm done by third-party content.'" Br.38 (quoting *FSC*, 95 F.4th at 285). As an initial matter, HB18's monitoring-and-censorship requirements would satisfy even this test. Both HB18's text and Defendant's arguments rely on the idea of HB18 preventing harm. The monitoring-and-censorship requirements are referred to in HB18 as "digital service provider duty *to prevent harm*." § 509.053 (emphasis added). And Defendant repeatedly says that the monitoring-and-censorship requirements are intended to "protect[] children from insidious online harms." Br.3; *see* Br.4, 10-12, 14, 19-20, 26, 32, 34, 43-45.

Regardless, *Salesforce* makes clear that the core inquiry is whether a law requires websites to "exercise some kind of publication or editorial function." *Salesforce*, 123 F.4th at 797. There is no additional requirement for a law

to specifically address harms to users. Nor are there § 230 exceptions for laws that purportedly aim to "give parents more control over the content their minor children see." *Contra* Br.49.

Defendant meritlessly asserts that applying § 230's plain text here "would mean [§ 230] preempts all State efforts to protect children from online content." Br.49. That is not true. This Court's precedents provide examples of ways to address online harms. *See Salesforce*, 123 F.4th at 797; *FSC*, 95 F.4th at 285. What States cannot do is commandeer websites' content moderation and penalize imperfect content moderation.[9]

Finally, there is no tension between websites asserting both First Amendment rights and § 230's protections. The First Amendment protects websites' "content choices" with respect to the display of user-generated content. *Moody*, 603 U.S. at 742 (citation omitted). And § 230 says that websites are not liable for removing or not removing (due to mistake or otherwise) speech "provided by another [user]." 47 U.S.C. § 230(c)(1). In other words, § 230 protection applies to protect a website's decisions as to user-generated speech, even though websites simultaneously are engaging in First Amendment protected activity when they curate compilations of, and display and

---

[9] Covered websites' own private content moderation demonstrates that they are not "purposefully putting 'offensive material' onto the Internet," as Defendant suggests. Br.49 (citation omitted).

disseminate, that speech. *Moody*, 603 U.S. at 728. The First Amendment and § 230 each promote free speech, and there is no conflict between them.

## V. The other preliminary-injunction factors favor CCIA and NetChoice.

CCIA and NetChoice have shown "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). They meet the other factors too.

Because CCIA and NetChoice are likely to succeed on the merits of their First Amendment challenge, HB18 necessarily causes irreparable harm. Litigants "satisf[y] the irreparable-harm requirement" when they "allege[] violations of [the] First Amendment." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012); *id.* ("no further showing of irreparable injury is necessary" (citation omitted)); *see Book People*, 91 F.4th at 340-41 (same). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The Act's penalties magnify these harms: $10,000 per violation.

Lifting the injunction would also require covered websites to incur unrecoverable compliance costs. *Ohio v. EPA*, 603 U.S. 279, 291-92 (2024); *Book People*, 91 F.4th at 341 ("almost *always* produces the irreparable harm of non-recoverable compliance costs" (citation omitted)). Covered websites will need to adopt systems that comply with HB18's technical requirements. ROA.177-79 ¶ 35-37 (Veitch Decl.); ROA.186 ¶ 15 (Pai Decl.).

The final factors—"harm to the opposing party and weighing the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life*, 697 F.3d at 298 (cleaned up).

Defendant disputes none of this. *See* Br. 51-52. Instead, Defendant argues that the injunction "delay[s] [Texas's] ability to protect children." Br.52. Yet the State cannot do that in an unconstitutional manner. Many other actors will continue to protect minors. CCIA's and NetChoice's members will continue moderating content. *See supra* p.6. Parents can use existing private tools, which the State can support. *See supra* pp.4-5. And Texas can enforce existing laws. *See supra* p.37.

## CONCLUSION

This Court should affirm.

Dated: July 3, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

| | |
|---|---|
| Steven P. Lehotsky | Scott A. Keller |
| Jeremy Evan Maltz | *Counsel of Record* |
| LEHOTSKY KELLER COHN LLP | LEHOTSKY KELLER COHN LLP |
| 200 Massachusetts Avenue, NW | 408 W. 11th Street, 5th Floor |
| Suite 700 | Austin, TX 78701 |
| Washington, DC 20001 | (512) 693-8350 |
| | scott@lkcfirm.com |

*Counsel for Plaintiffs-Appellees CCIA and NetChoice*

## CERTIFICATE OF SERVICE

I certify that on July 3, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. No paper copies were filed in accordance with the changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,867 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller