Nos. 24-50721 & 25-50096 (cons.)

# U.S. Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASS'N; NETCHOICE, L.L.C.,
*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant,*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F.,
*by and through next friend,* VANESSA FERNANDEZ;
AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,
*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant.*

On Appeals from the U.S. District Court for the Western District of Texas
Nos. 1:24-cv-849 & 1:24-cv-945

## RESPONSE BRIEF FOR APPELLEES
## STUDENTS ENGAGED IN ADVANCING TEXAS, ET AL.

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Ave., 27th Floor
Los Angeles, CA 90071

David M. Gossett
Chelsea T. Kelly
Marietta Catsambas
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005

Robert Corn-Revere
JT Morris
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
bob.corn-revere@thefire.org
(215) 717-3473

Ambika Kumar
Caesar Kalinowski IV
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104

*Counsel for Appellees Students Engaged In Advancing Texas, et al.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Plaintiffs-Appellees in No. 25-50096:

  o Students Engaged in Advancing Texas (SEAT). SEAT is a Texas nonprofit corporation with IRS 501(c)(3) tax status. It has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

  o M.F., by and through his next friend, Vanessa Fernandez

  o Ampersand Group LLC. The Ampersand Group has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

  o Brandon Closson

- Counsel for Plaintiffs-Appellees in No. 25-50096:

  o Davis Wright Tremaine LLP

i

- o Marietta Catsambas, Esq.

- o David M. Gossett, Esq.

- o Caesar T. Kalinowski IV, Esq.

- o Chelsea T. Kelly, Esq.

- o Ambika Kumar, Esq.

- o Adam S. Sieff, Esq.

- o Foundation for Individual Rights and Expression

- o Robert Corn-Revere, Esq.

- o JT Morris, Esq.

- Plaintiffs-Appellees in No. 24-50721:

  - o Computer & Communications Industry Association

  - o NetChoice, LLC

- Counsel for Plaintiffs-Appellees in No. 24-50721:

  - o Lehotsky Keller Cohn LLP

  - o Steven P. Lehotsky, Esq.

  - o Scott A. Keller, Esq.

  - o Jeremy Evan Maltz, Esq.

- Defendant-Appellant:

  - o Ken Paxton, Attorney General, State of Texas

- Counsel for Defendant-Appellant:

    o Eric Abels, Esq.

    o Cameron Fraser, Esq.

    o Aaron L. Nielsen, Esq.

    o Ken Paxton, Esq.

    o Brent Webster, Esq.

*/s/ Adam S. Sieff*
Adam S. Sieff

Attorney of Record for
Plaintiffs-Appellees in No. 25-50096

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, Plaintiffs-Appellees in No. 25-50096 agree with the State that oral argument is appropriate in these consolidated cases. These cases raise complex, cutting-edge issues of standing and the application of the First Amendment, on which we believe oral argument may assist the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT REGARDING ORAL ARGUMENT ................................iv

TABLE OF AUTHORITIES ...............................................................vii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION .................................................... 3

ISSUES PRESENTED ....................................................................... 3

STATEMENT OF THE CASE ............................................................ 4

    A.    Digital services are a forum for expression. ........................... 4

    B.    Existing tools enable individual choice in regulating online services. ...................................................................... 5

    C.    Texas enacts HB 18 to censor speech online. ........................ 6

    D.    Plaintiffs-Appellees challenge the Act. .................................. 9

    E.    The District Court enjoins the challenged provisions. .......... 11

SUMMARY OF THE ARGUMENT ...................................................... 12

STANDARD OF REVIEW ................................................................. 15

ARGUMENT ................................................................................... 15

I.    Appellees' First Amendment Claims Are Justiciable.................... 16

    A.    Appellees have standing to challenge each provision. ......... 16

        1.    The Act proscribes Appellees' protected speech. ......... 19

        2.    Appellees have shown a threat of enforcement........... 27

        3.    Appellees' injuries are traceable to the Act and redressable by a preliminary injunction. .................... 28

    B.    SEAT has associational standing. ....................................... 30

II.    Appellees Will Prevail on Their First Amendment Claims. ........ 31

    A.    The challenged provisions restrict protected speech............ 33

B.    The State has not carried its First Amendment burden............................................................... 38

    1.    The challenged provisions are subject to strict scrutiny............................................... 38

        a.    The challenged provisions effect a system of prior restraint. ...................................... 38

        b.    The challenged provisions are content-based regulations. .......................................... 43

        c.    The Act is content-based because of its coverage definition. ...................................... 45

    2.    The challenged provisions fail strict scrutiny. ............ 47

    3.    The challenged provisions fail any level of First Amendment scrutiny.................................. 52

    4.    The challenged provisions are unconstitutionally vague. ........................................... 59

C.    The challenged provisions are facially invalid. .................... 63

III.    The Remaining Injunction Factors Favor Appellees..................... 68

CONCLUSION ................................................................. 68

CERTIFICATE OF SERVICE................................................. 70

CERTIFICATE OF COMPLIANCE...................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*AAPS, Inc. v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) ............................................................. 30

*ACA v. Douds*,
339 U.S. 382 (1950) .......................................................................... 40

*Air Evac EMS, Inc. v. Tex. Dep't Ins.*,
851 F.3d 507 (5th Cir. 2017) ............................................................. 29

*Alexander v. United States*,
509 U.S. 544 (1993) .......................................................................... 41

*Am. Acad. of Implant Dentistry v. Parker*,
860 F.3d 300 (5th Cir. 2017) .................................................. 53, 56, 58

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .................................................................... 64, 65

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .................................................................... 44, 50

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ............................................................. 40

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .......................................................................... 22

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................ 17, 18, 39, 40, 43, 65

*Barilla v. City of Houston*,
13 F.4th 427 (5th Cir. 2021) ............................................................. 16

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .................................................................... 44, 46

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960) ................................................................... 41

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................... 29

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ................................................................... 23

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986) ....................................... 18

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ................................ 16, 18, 19, 28, 29, 30

*Boos v. Barry*,
    485 U.S. 312 (1988) ................................................................... 45

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ................................................................... 23

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ................................................................ *passim*

*BST Hldgs. LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ............................................... 68

*Butler v. Michigan*,
    352 U.S. 380 (1957) ................................................................... 66

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) .............................................. 15

*Chiu v. Plano Indep. Sch. Dist.*,
    339 F.3d 273 (5th Cir. 2003) .............................................. 42

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ................................................................... 17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) ....................................................... 21, 34, 35, 63

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
   78 F.3d 920 (5th Cir. 1996) .................................................. 29

*Denver Area Educ. Telecommc'ns Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996) ........................................................... 43

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................... 68

*Engdahl v. City of Kenosha*,
   317 F. Supp. 1133 (E.D. Wis. 1970) .................................. 61

*FEC v. Cruz*,
   596 U.S. 289 (2022) ........................................................... 55

*Flynt v. Rumsfeld*,
   355 F.3d 697 (D.C. Cir. 2004) ........................................... 21

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. ---, 2025 WL 1773625 (U.S. June 27, 2025) ................. 2, 3, 66

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ........................................................... 37

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
   527 U.S. 173 (1999) ........................................................... 57

*Interstate Circuit, Inc. v. City of Dallas*,
   390 U.S. 676 (1968) ...................................................... 43, 61

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) ........................................................... 60

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) ...................................................... 23, 54

*LSO, Ltd. v. Stroh*,
   205 F.3d 1146 (9th Cir. 2000) ........................................... 18

*McConnell v. FEC*,
   540 U.S. 93 (2003) ........................................................ 17, 42

*McCullen v. Coakley,*
   573 U.S. 464 (2014)............................................................53

*Midwest Video Corp. v. FCC,*
   571 F.2d 1025 (8th Cir. 1978)............................................42

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.,*
   460 U.S. 575 (1983)............................................................47

*Moody v. NetChoice LLC,*
   603 U.S. 707 (2024)..................................................... *passim*

*MPAA v. Specter,*
   315 F. Supp. 824 (E.D. Pa. 1970)......................................61

*Murthy v. Missouri,*
   603 U.S. 43 (2024)......................................................25, 26

*N.Y. Times Co. v. United States,*
   403 U.S. 713 (1971)............................................................39

*NAACP v. Button,*
   371 U.S. 415 (1963)......................................................59, 63

*Nat'l Press Photographers Ass'n v. McCraw,*
   90 F.4th 770 (5th Cir. 2024) ..............................................16

*Neb. Press Ass'n v. Stuart,*
   427 U.S. 539 (1976)............................................................39

*NetChoice, LLC v. Bonta,*
   113 F.4th 1101 (9th Cir. 2024) ........................... 39, 40, 43, 50, 58, 61

*NetChoice, LLC v. Bonta,*
   770 F. Supp. 3d 1164 (N.D. Cal. 2025)................................61

*NetChoice, LLC v. Fitch,*
   134 F.4th 799 (5th Cir. 2025) ............................................33

*NRA of Am. v. Vullo,*
   602 U.S. 175 (2024)............................................................40

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .................................................................... 36, 59

*Piazza's Seafood World, LLC v. Odom*,
448 F.3d 744 (5th Cir. 2006) ............................................................ 48

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .................................................. 43, 44, 45, 46, 47

*Reno v. ACLU*,
521 U.S. 844 (1997) .................................................................... 32, 67

*Rest. L. Ctr. v. United States Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023) ............................................................ 15

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995) .................................................................... 57, 66

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ........................................................................ 39

*Serafine v. Branaman*,
810 F.3d 354 (5th Cir. 2016) .................................................. 34, 36, 62

*Silva-Trevino v. Holder*,
742 F.3d 197 (5th Cir. 2014) ............................................................ 35

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) .......................................................................... 39

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .................................................................... 31, 38

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) .................................................. 17, 24, 27

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
560 U.S. 702 (2010) .................................................................... 21, 26

*Supreme Inv. Corp. v. United States*,
468 F.2d 370 (5th Cir. 1972) ............................................................ 35

*Swope v. Lubbers,*
  560 F. Supp. 1328 (W.D. Mich. 1983)................................................. 61

*Tex. VFW of U.S. v. Tex. Lottery Comm'n,*
  760 F.3d 427 (5th Cir. 2014)............................................................. 52

*Trump v. CASA, Inc.,*
  603 U.S. ---, 2025 WL 1773631 (U.S. June 27, 2025)......................... 68

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994)........................................................ 53, 57, 65, 66

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996)............................................................................ 31

*United States v. Fernandez,*
  48 F.4th 405 (5th Cir. 2022) ............................................................. 38

*United States v. Hansen,*
  599 U.S. 762 (2023).......................................................................... 62

*United States v. Miselis,*
  972 F.3d 518 (4th Cir. 2020).............................................. 37, 41, 62

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000)................................................................. *passim*

*United States v. Rundo,*
  990 F.3d 709 (9th Cir. 2021)...................................................... 42, 62

*United States v. Stevens,*
  559 U.S. 460 (2010)....................................................... 22, 26, 62

*United States v. Williams,*
  553 U.S. 285 (2008)........................................................................ 59

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976)........................................... 17, 18, 25, 65

*Vance v. Universal Amusement Co.,*
  445 U.S. 308 (1980).......................................................................... 41

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ............................................................... 16, 22

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ............................................................ 41

## Constitutional Provisions

U.S. Const., amend. I ................................................................... *passim*

## Federal Statutes

18 U.S.C § 2 ...................................................................................... 61

47 U.S.C. § 230 ................................................................................ 11

## State Statutes

Tex. Bus. & Com. Code
    § 17.47(c)(1) ................................................................................ 8
    § 509.001 ......................................................................... 6, 7, 11
    § 509.002 ............................................................ 6, 7, 45, 46, 51
    § 509.051 ............................................................................ 6, 11
    § 509.052 ................................................................... *passim*
    § 509.053 ................................................................... *passim*
    § 509.054 ........................................................................ 50, 58
    § 509.055 ................................................................... *passim*
    § 509.056 .................................................................. 8, 12, 40
    § 509.057 .................................................................. 2, 10, 12
    § 509.058-059 ........................................................................ 11
    § 509.101-04 .......................................................................... 11
    § 509.102-103 ................................................................... 8, 42
    § 509.151 .......................................................................... 8, 11
    § 509.152(b) ............................................................................ 8

Tex. Pen. Code
    § 7.02(a)(1)-(2) ..................................................................... 35
    § 20A.02 ................................................................................. 61
    § 42.07 .................................................................................... 61
    § 42.072 ................................................................................. 35

## INTRODUCTION

The Securing Children Online Through Parental Empowerment Act, 2023 Tex. Sess. Law Serv., 88th Reg. Sess., Ch. 795 (HB 18 or Act), imposes overt content-based censorship and is a prior restraint on protected speech. Defying the Supreme Court's consistent reaffirmation that governments have no "free-floating power to restrict the ideas to which children may be exposed," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011), the Act prohibits young people in Texas from accessing and exchanging fully protected speech, and limits Texans of all ages from sending and receiving communications based on content and intended audience. It violates the rules that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent.*" *Id.* at 795 & 795 n.3 (citation and quotation marks omitted).

The Act's challenged provisions are subject to strict scrutiny, cannot withstand any level of First Amendment review, and are invalid on their

face. Because Appellees—young people in Texas and adults who publish content geared toward them—will suffer irreparable loss of fundamental freedoms if the Act takes effect, the district court appropriately preliminarily enjoined enforcement of the provisions that Appellees challenge—the content exposure restrictions in Tex. Bus. & Com. Code §§ 509.053 and 509.056(1), and the targeted advertising restrictions in *id.* §§ 509.052(2)(D) and 509.055.[1]

This Court should affirm. The State has never presented evidence, nor even meaningful argument, that the Act's challenged provisions survive First Amendment scrutiny. Its opening brief seeks reversal not by defending the law Texas passed, but by claiming that some of the Act's *intended applications* reach only unprotected speech like obscenity or advertisements for illegal products. The actual language of the

---

[1] The Act also—separately—compels online intermediaries to enforce age-verification requirements triggered by a vague and arbitrary content-based threshold that will pressure online publishers to limit the expressive content they disseminate. *See* Tex. Bus. & Com. Code § 509.057. Although Appellees believe, and the district court found, that this provision restricts the rights of Texans of all ages, the Supreme Court upheld a materially similar requirement in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. ---, 2025 WL 1773625 (U.S. June 27, 2025), so Appellees do not defend that portion (ROA.25-50096.864-866) of the district court's injunction.

challenged provisions is not so limited. Unlike the law at issue in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. ---, 2025 WL 1773625 (U.S. June 27, 2025), the challenged provisions proscribe speech and even political advocacy related to lawful conduct and subject matter, and also prevent minors from receiving *any* targeting advertising—not just advertising for illegal products—without a parent's consent.

The challenged provisions thus have substantially more unconstitutional applications than lawful ones. The law is facially overbroad, and the only way to afford Appellees relief is to enjoin the State from enforcing the Act at all. Consequently, the Court should affirm the district court's injunction of the challenged provisions.

## STATEMENT OF JURISDICTION

Appellees agree with the State's jurisdictional statement.

## ISSUES PRESENTED

1.    Whether at least one Appellee has Article III standing to challenge each challenged regulation.

2.    Whether Appellees are likely to prevail on their First Amendment claims.

3.     Whether the other preliminary injunction factors favor an injunction.

## STATEMENT OF THE CASE

### A.     Digital services are a forum for expression.

Teens use social media for political advocacy, education, community, and creative expression. ROA.25-50096.171-173 ¶¶ 2-9; ROA.25-50096.177-178 ¶¶ 2-3. Social networks are an essential medium to communicate political and social messages, ROA.25-50096.160-161 ¶¶ 3-6, providing a training ground for citizenship. ROA.25-50096.174 ¶¶ 12-13; ROA.25-50096.177 ¶¶ 1-2. They enable young people to find purpose and community. ROA.25-50096.187-190.

Teenagers who use social media report feeling more connected to their friends (80%); better able to express their creativity (71%); more supported (67%); and generally more accepted (58%). ROA.25-50096.216-217. Overall, U.S. teenagers report that social media has positive rather than negative effects. *Id.* The isolation that results from disconnecting teens from social media may be more harmful than heavy use. ROA.25-50096.222-299.

Social networks particularly benefit at-risk youth. ROA.25-

50096.204-211. "Nearly seven-in-ten teens receive support from friends through social media during tough times." ROA.25-50096.207. Access to social media is also important for teens with mental health conditions, ROA.25-50096.165-166 ¶¶ 5-9; ROA.25-50096.300-374, and mental health professionals use social media to treat problems affecting teens. ROA.25-50096.375-380.

### B. Existing tools enable individual choice in regulating online services.

Limits to social media use require a tailored approach based on individual needs. Minors' use of social networks is not monolithic and "adolescents are affected by social media in different ways[.]" ROA.25-50096.386. The "use and effects of social media depend on a number of factors specific to individual teens." ROA.25-50096.417. Families are thus better positioned than the State to determine how to guide their children's social media usage. *See* ROA.25-50096.174-175 ¶ 14; ROA.25-50096.498-539 (scientific research).

Online services, communication devices, and third-party apps provide tools allowing parents to tailor their children's social media use. *See* ROA.24-50721.137 ¶ 22; ROA.24-50721.143-145 ¶ 8; ROA.24-50721.162-164 ¶ 13. Third-party applications also enable parents to

regulate their children's social media accounts. ROA.25-50096.432-465. And device makers offer parental controls to manage a child's online activities. ROA.25-50096.466-474.

### C.   Texas enacts HB 18 to censor speech online.

HB 18, enacted to broadly regulate social networks and online services, was slated to take effect September 1, 2024. ROA.25-50096.53-72. The Act requires all Texans to "register" their age before accessing "digital service provider[s]" (DSPs), Tex. Bus. & Com. Code § 509.051, and defines "known minors" as users whose registration shows they are under 18. § 509.001(4).[2]

The Act defines DSPs as services that (1) allow users to socially interact with other users on the digital service; (2) allow users to create public or semi-public profiles; and (3) allow users to create or post content that can be viewed by others, including sharing content on message boards, chat rooms, landing pages, video channels, or main feeds that present content created and posted by others. §§ 509.001(1)-(3), 509.002(a). This covers services like YouTube and Instagram, as well as Goodreads, IMDb, Nextdoor, and Words with Friends. It also extends to

---

[2] Like the State (Br. 5 n.1), we hereafter cite to HB 18 with just § symbols.

bulletin-board style fora like Quora and Reddit.

The Act exempts certain services from being regulated as DSPs based on those services' content. It does not regulate services that "primarily function[] to provide a user with access to news, sports, commerce, or content primarily generated or selected" by the DSP, § 509.002(b)(10)(A); internet service providers, search engines, or cloud services that are not "responsible for" the "harmful" content the law restricts, § 509.002(c); entities that do not control the means or purpose of collecting user information, § 509.001(2)(B), (C); and small businesses, colleges, education services, or messaging and email-only services, § 509.002(b).

***Content Exposure Prohibitions***. The Act requires DSPs to prevent known minors from accessing or exchanging sexual material, as well as "content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." § 509.053(a). Providers must use "filtering technology" to block this content, and must maintain a "comprehensive list" of filtered content, and a "database of keywords" that might be used

to evade the filter. § 509.053(b)(1). Providers must also configure any algorithms they use to compile and arrange content to enforce these restrictions. § 509.056.

*Targeted Advertising Restrictions*. The Act bans DSPs from "display[ing] targeted advertising" to known minors unless a "verified parent" consents. §§ 509.052, 509.102. Obtaining consent from a verified parent requires a teen to grant that person full access to their account and communications. § 509.102.

Even with parental consent, DSPs must block minors from receiving "advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor." § 509.055. These requirements are not limited to commercial ads. They encompass all "advertising," including, for example, PSAs providing information about forbidden activities, as well as messages advocating for changes in the law. Appellees wish to receive this content. *See* ROA.25-50096.181 ¶ 13.

*Penalties*. The Texas Attorney General may enforce the Act through the Deceptive Trade Practices Act, § 509.151, and parents may seek declaratory and injunctive relief, § 509.152(b). Penalties are $10,000 per violation. Tex. Bus. & Com. Code § 17.47(c)(1).

### D.     Plaintiffs-Appellees challenge the Act.

Plaintiffs-Appellees are Texas-based individuals and organizations, including teenagers and those seeking to communicate with other teens, whose speech would be abridged were HB 18 to take effect.

- Students Engaged in Advancing Texas (SEAT) represents a coalition of young people, from middle-school to college, who seek to increase youth awareness and participation in policymaking via social media. ROA.25-50096.177 ¶¶ 1-2. SEAT built a network of students bound together by public policy advocacy. ROA.25-50096.177 ¶ 2.

- M.F. is a 17-year-old high school student who uses social media to learn about current events, follow the news, discover music, gain inspiration for his own compositions, and conduct research for his debate team and other school activities. ROA.25-50096.171-173 ¶¶ 1-9.

- The Ampersand Group publishes social-good and public service advertisements on YouTube, Instagram, Facebook, and gaming platforms, and managed the distribution of an advertising campaign on Facebook to prevent teen sex trafficking. ROA.25-50096.159 ¶¶ 1-2; ROA.25-50096.161 ¶ 6.

- Brandon Closson turned to Reddit for information and belonging when he was diagnosed with bipolar disorder, and now creates content about living with bipolar disorder on Instagram. ROA.25-50096.164-165 ¶¶ 2, 5-6.

Appellees filed suit on August 16, 2024 challenging provisions of HB 18 on the grounds that the law restricts speech in violation of Appellees' First Amendment rights and is void for vagueness, and moved for a preliminary injunction. ROA.25-50096.12-52, 130-157. Appellees'

facial challenge focused on H.B. 18's content-exposure restrictions, the targeted advertising restrictions, and (originally) the content-monitoring and age-verification mandate in § 509.057.

Appellees wish to send and receive educational, informational, artistic, and community-building material related to the listed subjects. *See* ROA.25-50096.178-181 ¶¶ 6-11; ROA.25-50096.166-169 ¶¶ 10-14; ROA.25-50096.173-174 ¶¶ 10-13; ROA.25-50096.160-161 ¶¶ 5-8. And the DSPs they rely on to disseminate and access that protected information would continue to allow them to do so but for the Act's requirements. *See* ROA.24-50721.136-137 ¶ 21; ROA.24-50721.154-156 ¶¶ 22-25; ROA.24-50721.176-179 ¶¶ 32-37. Appellees also wish to send and receive targeted advertised content restricted by the Act. *See* ROA.25-50096.161-163 ¶¶ 9-12; ROA.25-50096.175 ¶¶ 15-16. And the DSPs would continue to allow them to do so but for the Act's requirements. *See* ROA.24-50721.23, 25-26 ¶¶ 61-62, 70, 72; ROA.24-50721.154-155 ¶ 22; ROA.24-50721.176-177, 179-180 ¶¶ 33-34, 40-42.

Separately, Co-Appellees Computer & Communications Industry Association and NetChoice, LLC filed a related case and preliminary injunction motion challenging some of the same provisions of the law—

§§ 509.001-002, 509.051-056, 509.058-059, 509.101-04, 509.151—as unconstitutional as applied to its members and preempted by 47 U.S.C. § 230 (Section 230). *See CCIA, et al., v. Paxton*, No. 1:24-cv-00849-RP (W.D. Tex. 2024) (the CCIA case).

### E.     The District Court enjoins the challenged provisions.

The district court granted Co-Appellees' motion for a preliminary injunction in the CCIA case on August 30, 2024. ROA.24-50721.394-431. It held that HB 18 is content-based because it regulates DSPs that host or broadcast "social" speech, thereby subjecting "social" content to heightened regulation over non-social (*i.e.*, professional) interactions. ROA.24-50721.411. The court enjoined the law's content exposure requirements (§§ 509.053, 509.056(1)) because they fail strict scrutiny, are unconstitutionally vague, and are preempted by Section 230. ROA.24-50721.430-431. It concluded Texas had failed to show a compelling interest in blocking minors' access to every category of information the law restricts; and the requirements were not narrowly tailored and both over-and under-inclusive. ROA.24-50721.417-421.

The district court granted the SEAT Appellees' motion for a preliminary injunction on February 7, 2025. ROA.25-50096.837-873. The

court found that these Appellees had standing to challenge the law on its face because the DSPs would react to HB 18 in a way that would prevent or chill Appellees' speech. ROA.25-50096.846-847. It re-affirmed its ruling in the CCIA case, and further held that HB 18's targeted advertising requirements (§§ 509.052(2)(D) & 509.055) and age-verification requirements (§ 509.057) also fail strict scrutiny and are likely facially invalid. The court found no compelling government interest in removing teens' access to all targeted advertising or in shielding minors from protected speech that the state deems offensive. ROA.25-50096.862-866. It held the content-exposure requirements in §§ 509.053 and 509.056(1)—as well as the use of the words "facilitate" and "promote" in the § 509.055 advertising restriction—were unconstitutionally vague. ROA.25-50096.867-870.

The cases were consolidated for purposes of this ensuing appeal.

## SUMMARY OF THE ARGUMENT

This Court should affirm the orders enjoining §§ 509.052(2)(D), 509.053, 509.055, and 509.056(1) of the Act.

**I.**     The district court correctly held that Appellees have standing to challenge these provisions. Speakers and listeners may challenge

regulations of intermediaries that disseminate their speech, even if those speakers and listeners are not directly regulated. The Act proscribes Appellees' protected speech through covered intermediaries; the State has enforced and intends to continue enforcing the Act against those intermediaries; and Appellees' injuries are traceable to the State because the intermediaries regulated by the Act have testified that they would not censor Appellees' protected speech but for the obligations imposed upon them by the Act. *See* Part I.A. Appellee SEAT, moreover, has associational standing to vindicate the rights of its affected members, as SEAT has demonstrated its members will suffer these injuries traceable to the State, and because the State does not dispute that SEAT's involvement in this action is related to its purpose, or that member participation is unnecessary. *See* Part I.B.

**II.** Appellees will succeed on the merits of their First Amendment claims. Although the State claims the Act regulates only unprotected speech like obscenity or speech integral to criminal conduct, that is not the statute Texas actually enacted. *See* Part II.A. The statute uses broad terms, unconfined to the unprotected categories of speech recognized by history and tradition, and covers political advocacy, public health

information, and even casual discussions of controversial topics such as eating disorders, depression, and drug and alcohol abuse.

Strict scrutiny applies because the Act imposes prior restraints on this protected speech, which it further regulates based on the speech's content—both in its specific applications and by its overall coverage definition, which singles out communications services for regulation based on the type of content they publish. *See* Part II.B.1.

The State has not presented evidence, or made any showing, that the challenged provisions survive any level of First Amendment scrutiny. *See* Parts II.B.2-3. Meanwhile, Appellees have presented unrebutted evidence and expert analysis demonstrating that the Act does not even address—much less alleviate—any real problems, while suppressing a significant range of protected speech. And Appellees have further shown that the challenged provisions are unconstitutionally vague, resting on broad undefined terms that invite arbitrary enforcement and widespread self-censorship. *See* Part II.B.4.

The law is facially overbroad because its blanket approach means its many unconstitutional restrictions of protected speech substantially outnumber its few incidental applications to speech that just happens to

be unprotected. *See* Part II.C.

**III**.   The other preliminary injunction factors support affirming the injunction of the challenged provisions. The State does not dispute that the loss of First Amendment rights for any period of time is an irreparable injury. And equity and the public interest support injunctive relief because protecting First Amendment rights is always in the public interest, while the State has no interest in enforcing an unconstitutional law. *See* Part III.

## STANDARD OF REVIEW

This Court reviews preliminary injunctions for an abuse of discretion, reviewing the district court's legal conclusions de novo and its factual findings for clear error. *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Whether First Amendment free speech rights have been infringed is a mixed question of law and fact, reviewed de novo. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

## ARGUMENT

This Court should affirm the district court's preliminary injunctions in relevant part. The lower court correctly held that Appellees in No. 25-50096 have standing in their individual capacities and that

SEAT has associational standing; its conclusion that Appellees will prevail on their First Amendment claims is plainly right; and there is no serious question about the remaining preliminary injunction factors.

## I. Appellees' First Amendment Claims Are Justiciable.

The district court correctly held that the Appellees in No. 25-50096 have standing to raise their challenges because they have "specific, demonstrated interests in sharing and engaging with the types of content that HB 18 prohibits DSPs" from publishing, ROA.25-50096.847, and because Appellee SEAT has associational standing to vindicate the rights of its members, ROA.25-50096.851.

### A. Appellees have standing to challenge each provision.

Standing requires (1) an injury in fact, (2) fairly traceable to the defendant, (3) likely to be redressed by a favorable decision. *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024). "[S]tanding rules are relaxed for First Amendment cases," *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024), where "chilled speech or self-censorship is an injury sufficient to confer standing," *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (collecting cases); *see Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (same principle). It

is accordingly "not hard to sustain standing for a pre-enforcement challenge" to speech regulations. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-31 (5th Cir. 2020).

Speakers and listeners may challenge regulations of intermediaries that disseminate speech, even where those speakers and listeners are not directly regulated. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963); *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 & 757 n.15 (1976). This is because "[l]aws enacted to control or suppress speech may operate at different points in the speech process" and restrict expression at many levels. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). The First Amendment precludes the government from "halt[ing] the whole apparatus" of free expression by exploiting the inherent division of labor that "requires the speaker to make use of the services of others." *McConnell v. FEC*, 540 U.S. 93, 251 (2003) (Scalia, J., concurring in part, dissenting in part).

Thus, in *Bantam Books*, book publishers that distributed through local bookstores had standing to challenge a Rhode Island regime restricting how those bookstores—which would not have self-censored otherwise—could sell books to young adults. The publishers were "not in

the position of mere proxies arguing another's constitutional rights" to circulate their speech; they were asserting *their own* right to publish. 372 U.S. at 64 n.6. Similarly, in *Virginia State Board of Pharmacy*, consumers not subject to regulation had standing to challenge advertising restrictions on companies that were willing to provide the information prohibited. 425 U.S. at 756-57 & 757 n.15; *see also, e.g.*, *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153-54 (9th Cir. 2000) (standing to challenge speech restriction on downstream intermediary); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (similar).

This Court applied this principle in *Book People*, holding that booksellers had standing to challenge a law restricting purchases by school districts. Even though the injury "depend[ed] upon the decision of an independent third party," booksellers had standing because "the school districts' purchasing decisions" were "coerced by the State." 91 F.4th at 329-33. It was enough that plaintiffs alleged school districts would "react in predictable ways" to the law which would chill the booksellers' speech. *Id.* at 332.

As the district court found, Appellees satisfy this test. They have demonstrated an injury-in-fact by showing that (1) at least one plaintiff

intends to engage in a course of conduct affected with a constitutional interest arguably proscribed by each of the challenged provisions, and (2) the threat of future enforcement is substantial. *Id.* at 229. Appellees have also (3) satisfied the traceability and redressability requirements by showing that DSPs would not censor their speech but for the Act's requirements.

### 1.    The Act proscribes Appellees' protected speech.

The challenged portions of the Act—the content-exposure restrictions and the targeted advertising restrictions—regulate Appellees' speech. Testimony that a plaintiff even generally intends to engage in the type of speech regulated by a challenged law satisfies this element of an injury-in-fact. *Book People*, 91 F.4th at 327 (booksellers had standing based on declarations that they "have sold and would like to continue selling library material to public-school libraries").

***Content-exposure restrictions.*** Here, Appellees established that §§ 509.053(a) and 509.056 will restrict their ability to access and post constitutionally protected content related to self-harm, substance abuse, bullying, and sexual exploitation. This clearly implicates a constitutional interest. *E.g.*, *Brown*, 564 U.S. at 794 (recognizing right to produce and

disseminate protected content to minors and minors' rights to receive it).

Each of the Appellees has been chilled by HB 18:

- SEAT identified specific Instagram posts regarding its advocacy and resources on anti-bullying, sexual assault, and suicide that would become inaccessible to minors. ROA.25-50096.178-179 ¶¶ 7-8. SEAT is concerned that its online posts about gender and sexuality could trigger web filters related to "pornography" or "grooming," as required by § 509.053(a)(4). ROA.25-50096.180-181 ¶¶ 10-11.

- Closson cited specific online posts in which he discussed or joked about disordered eating, substance abuse, and hypersexuality as consequences of bipolar disorder, which could easily be misinterpreted by a filter as promoting, glorifying, or facilitating these issues. ROA.25-50096.166-167, 169 ¶¶ 11-12, 14.

- M.F. would be prevented from listening to songs that address mature topics like suicide or substance abuse, as well as researching controversial issues for his debate team, such as marijuana legalization—which very well could involve reviewing content that expressly promotes marijuana usage. ROA.25-50096.172-173 ¶¶ 7, 10. He also would be unable to send resources to his friends regarding substance abuse, eating disorders, or self-harm. ROA.25-50096.174 ¶ 11.

- The Ampersand Group has and intends to run ads helping teens recognize the warning signs of sex trafficking and promoting sex-positive education, and intends to engage in future campaigns touching on restricted topics like substance abuse. ROA.25-50096.160-161 ¶¶ 5-8.

These concerns are concrete. DSPs have testified that requiring them to use keyword filters to restrict content that "promotes, glorifies, or facilitates" activities related to the forbidden topics, § 509.053(a), will

require blocking Appellees' protected speech, including advocacy, satire, public health information, and even everyday communication. *See* ROA.25-50096.35-36 ¶ 81; ROA.24-50721.129-130, 136-137 ¶¶ 11, 21; ROA.24-50721.154 ¶ 21; ROA.24-50721.176-177 ¶¶ 33-34.

The State concedes that the First Amendment protects at least some of the speech Appellees intend to publish and access, but asserts there is no justiciable injury-in-fact because §§ 509.053 and 509.056(1) do not *intend* to reach—and thus DSPs should not need to filter—that content. *See, e.g.*, Br. at 18, 20. In assessing standing, however, courts review what the legislature *enacted*, not what the State now says it *intended*. In this regard, "the text of a law controls over purported legislative intentions." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (quotation omitted).

Courts analyze whether a claim is justiciable by assuming it is sound, not by covertly rejecting the merits of the plaintiff's case. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 729 n.10 (2010) ("accepting [plaintiff's] version of Florida law as true" to assess Article III standing); *Flynt v. Rumsfeld*, 355 F.3d 697, 702 (D.C. Cir. 2004) (assuming the validity of plaintiff's legal theory to hold First

21

Amendment challenge justiciable). Here—and as DSPs testified—the plain text of §§ 509.053 and 509.056(1) requires DSPs to err on the side of restricting publication of undisputedly protected content Appellees wish to send and receive. *See* ROA.24-50721.129-130, 136-137 ¶¶ 11, 21; ROA.24-50721.154 ¶ 21; ROA.24-50721.176-177 ¶¶ 33-34; ROA.25-50096.181 ¶ 11; ROA.25-50096.168-169 ¶ 13; ROA.25-50096.161 ¶ 8.

The State's representation (Br. 17-23) that it will enforce §§ 509.053 and 509.056(1) "more restrictively than [their] language provides" implicitly acknowledges the potential constitutional problems with a "more natural reading" that requires DSPs to censor Appellees' protected speech. *United States v. Stevens*, 559 U.S. 460, 480 (2010). Actionable First Amendment harms arise from the *possibility* of enforcement, *Am. Booksellers*, 484 U.S. at 384, 393, because speech regulations compel speakers and their intermediaries to "steer far wider of the unlawful zone" by over-censoring. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). Accordingly, Appellees' challenge to §§ 509.053 and 509.056(1) does not become non-justiciable "merely because the Government promise[s]" to enforce them "responsibly," *Stevens*, 559 U.S. at 480. "[T]he First Amendment protects against the Government; it does not leave us at the

22

mercy of *noblesse oblige*." *Id.*

   ***Targeted advertising restrictions.*** Appellees are also injured by the Act's advertising restrictions. The First Amendment protects distributing and receiving targeted ads, including on topics related to unlawful activity. *See Bigelow v. Virginia*, 421 U.S. 809, 818-21 (1975) (First Amendment protections extend to advertising); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) (speech restriction intended to protect minors from tobacco advertising failed First Amendment scrutiny); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (First Amendment protects advocacy and education, even on criminal topics). The Act's advertising restrictions regulate Appellees as both publishers and recipients of advertising.

   First, the Act's advertising restrictions regulate Appellees by restricting and burdening their ability to run ad campaigns intended for teenagers. ROA.25-50096.32 ¶ 66. Absent parental consent, for example, § 509.052(2)(D) would block The Ampersand Group from using social media to distribute to minors purely educational resources about vaccine access, illness prevention, and participation in the U.S. Census. ROA.25-50096.160 ¶¶ 3-4. *Even with parental consent*, § 509.055 prohibits The

Ampersand Group from publishing ads promoting subject matter the Act forbids for minors, like PSAs about sex trafficking and substance abuse, or ads advocating decriminalizing certain activities. ROA.25-50096.160-161, 162-163 ¶¶ 5-7, 12. Because of the legal risk, The Ampersand Group declined to pursue a grant to disseminate public service advertising involving school shootings to teens, since running those ads arguably constituted "targeted advertising" DSPs would be obligated to block without consent. ROA.25-50096.835-836 ¶¶ 7-8.

The advertising provisions also interfere with SEAT's political speech. SEAT "wants to use targeted digital advertising … to mobilize students," including "promoting the protection of conduct that is currently deemed unlawful for minors" like gender-affirming healthcare or access to certain books. ROA.25-50096.832 ¶¶ 7-8. Sections 509.052(2)(D) and 509.055 would burden that advocacy by forcing DSPs to block or restrict its dissemination. This "is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First*, 979 F.3d at 330-31 (citation omitted) (collecting cases). Although the State asserts "SEAT isn't an advertiser, so §§ 509.052 and 509.055 don't apply to it," Br. 17, this is just another attempt to supplant the law's actual

language with the government's asserted enforcement intentions. *See* § 509.052(2)(D) (barring digital services from "display[ing] targeted advertising to [a] known minor" without parental consent).

Second, the advertising provisions restrict minors from receiving desired ads. *See* ROA.25-50096.175 ¶ 15. Just as the Act stops The Ampersand Group and SEAT from distributing advertisements about decriminalization, § 509.055 would also "prevent SEAT members from receiving advertisements over social media about campaigns to decriminalize certain activity … such as reading banned books or participating in a drag queen read-aloud in a school library." ROA.25-50096.181 ¶ 13. And § 509.052(2)(D) would even burden minors like M.F. from receiving garden-variety targeted advertising for clothing and other items they have a right to access. ROA.25-50096.175 ¶¶ 15-16.

Appellees thus present a separate and independently actionable "right-to-listen" injury, *cf.* Br. 25-27, because Texas has *categorically* restricted DSPs from publishing ads based on their content and intended audience. *See Va. State Bd. of Pharm.*, 425 U.S. at 756-57 & 757 n.15 (consumers had standing to receive specific category of censored commercial speech). This is unlike *Murthy v. Missouri*, where plaintiffs'

25

injuries could not be traced to content decisions that the government had *not yet* coerced. 603 U.S. 43, 54-55 (2024).

The State does not dispute that the First Amendment protects the advertising Appellees wish to disseminate and receive. Instead, the State repeats its assertion that the Act should not be read to restrict Appellees' protected activity. *See generally* Br. 17-24. That *merits* contention is again not a basis to hold Appellees' First Amendment claims non-justiciable. *See Stop the Beach Renourishment, Inc.*, 560 U.S. at 729 n.10. It is also wrong.

The plain language of § 509.055 broadly regulates protected speech promoting presently unlawful activities to minors, including advocacy, and cannot be rewritten to conform with constitutional requirements. *See Stevens*, 559 U.S. at 481 (rejecting similar gambit); *infra* pp. 35-37. The "parental override," Br. 21, in § 509.052(2)(D), moreover, undisputedly burdens minors' access to protected speech because it imposes government censorship "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3; *infra* pp. 35-37. And even for DSPs that do not allow "targeting" minors—or for advertisers, like The Ampersand Group, that do not *directly* target minors, *cf.* Br. 23—the State ignores that the term

"targeted" is undefined. Sections 509.055 and 509.052(2)(D) thus regulate efforts to direct information to minors even by proxy, such as targeting "content or topics already frequented by teens." ROA.25-50096.162 ¶ 10. That is how DSPs have stated they will respond to the Act: "overinclusive moderation." ROA.24-50721.177 ¶ 34; ROA.24-50721.154 ¶ 21.

### 2. Appellees have shown a threat of enforcement.

Appellees have also shown an injury in fact because of the likelihood that the State will enforce the Act to the detriment of their First Amendment rights.

The State has not disavowed enforcing the Act, much less presented "compelling contrary evidence" to that effect. *Speech First*, 979 F.3d at 335. Absent such evidence, the threat of enforcement is "assume[d]" in First Amendment challenges to recently enacted statutes that, if enforced, would regulate a plaintiff's speech. *Id.* In fact, the State has *already* begun enforcing the Act against DSPs like TikTok. *See, e.g.*, ROA.25-50096.794-796.

The State argues that the statute is only directly enforceable against DSPs, and since none of the Appellees in No. 25-50096 is a DSP,

there is no actionable threat of enforcement against them. *See* Br. 24-25. But this argument again ignores the established rule that affected speakers and listeners who are not directly regulated by a law still have standing to challenge it. *Book People*, 91 F.4th at 330-31 ("plaintiffs have standing to sue government entities that injure them through another entity"); *supra* pp. 16-18. The State intends to enforce the Act against DSPs that Appellees use, and Appellees have presented evidence confirming that these DSPs will respond by restricting speech Appellees wish to send and receive. *Id*. at 332; ROA.24-50721.129-130, 163-137 ¶¶ 11, 21; ROA.24-50721.154-155 ¶¶ 21-22; ROA.24-50721.176-177 ¶¶ 33-34; ROA.25-50096.541-542, 544 at 1-2, 4.

### 3. Appellees' injuries are traceable to the Act and redressable by a preliminary injunction.

For the same reasons that the threat of enforcement against DSPs affects Appellees, Appellees' injuries are traceable to the State and redressable by the district court's injunction. These requirements are satisfied in a First Amendment case involving government censorship through a third-party intermediary where a plaintiff shows that the intermediary "will likely react in predictable ways" to the government's regulation by censoring the plaintiff's speech. *Book People*, 91 F.4th at

332; *see also, e.g., Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926-27 (5th Cir. 1996) (same involving orders restraining speech).[3]

Appellees here have shown more than a *likelihood* that DSPs will react to the Act by restricting Appellees' speech; they have demonstrated it: DSPs have stated without contradiction that they would have to engage in overinclusive moderation to comply with the Act's requirements. *See* ROA.24-50721.136-137 ¶ 21 (warning of "increased use of filtering"); ROA.24-50721.127-177 ¶¶ 33-34 (YouTube may "alter" policy and take "overinclusive approach to content moderation"); ROA.24-50721.154 ¶ 21 ("overreliance on automated systems of content moderation may result in overinclusive removal of content that may not violate websites' policies").

The State asserts that DSPs already have policies and use their discretion to block much of the content restricted by the Act. Br. 29. But the State ignores DSPs' testimony that they would *not* censor Appellees' content *but for* the Act's requirements. ROA.24-50721.133-137 ¶¶ 18-19,

---

[3] This Court applies the same test in cases involving invasions of other rights, as well. *See Air Evac EMS, Inc. v. Tex. Dep't Ins.*, 851 F.3d 507, 513 (5th Cir. 2017) (finding standing traceable to government action even where provision was "not directly 'enforced' against" plaintiffs); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (same).

29

21 (discussing burden Act would place on DSPs to change their existing policies); ROA.24-50721.154-155 ¶ 22 (same); ROA.24-50721.175-180 ¶¶ 30, 32-33, 35-37, 39, 41 (same); ROA.24-50721.187-188, 190-191 ¶¶ 22-23, 30 (same); ROA.24-50721.198-200 ¶¶ 7-9 (same). In fact, the State ignores that DSPs have historically *allowed* the content Appellees intend to send and receive—content the Act now compels DSPs to restrict.

### B.    SEAT has associational standing.

Associational standing exists when (i) a plaintiff's members would have standing; (ii) it seeks to protect interests related to its purpose; and (iii) member participation is not needed to litigate the case. *See AAPS, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

SEAT meets these requirements: Its members would have standing to challenge H.B. 18's restrictions. *Book People*, 91 F.4th at 330. But for the Act, the services SEAT's members use would continue to disseminate their speech and provide them information. *See supra* p. 29. The interest SEAT seeks to protect is germane to its organizational purpose of mobilizing students. ROA.25-50096.13, 15-16 ¶¶ 2, 7; ROA.25-50096.177-178 ¶¶ 2-6. And member participation "is not normally

necessary" in actions for injunctive relief. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

As it did below, the State implicitly recognizes it cannot contest that SEAT has satisfied the second or third requirements. Br. at 17-18. On the first, the State is wrong that SEAT's members would not have standing to sue in their own right. *See supra* § I.A; ROA.25-50096.177.

## II.  Appellees Will Prevail on Their First Amendment Claims.

The First Amendment protects the creation, dissemination, and right to access ideas and expression. *See Brown*, 564 U.S. at 792 & n.1. These protections apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in protected speech "cannot be suppressed solely to protect [them] from ideas or images that a legislative body thinks unsuitable." *Id.* at 794-95 (citation omitted). They also bar the government from restricting adults' protected speech in the name of shielding children. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

When a law regulates protected speech, the government "bears the burden of proving the constitutionality" of that regulation, *id.* at 816, under at least some form of "heightened judicial scrutiny." *Sorrell v. IMS*

*Health Inc.*, 564 U.S. 552, 557, 565 (2011). And when, as here, the restriction is content-based, the government must satisfy strict scrutiny. *Playboy*, 529 U.S. at 813. A law violates the First Amendment on its face if a substantial number of its applications regulate speech without constitutional justification, compared to its plainly legitimate sweep. *See Moody v. NetChoice LLC*, 603 U.S. 707, 723-24 (2024).

The State short circuits this analysis. Offering no defense of the challenged provisions on their merits, it jumps to the final steps of facial review, mischaracterizing the Act's unconstitutional applications as "edge cases." The State seeks reversal by claiming some unspecified number of the Act's intended applications reach only unprotected speech (like harassment, obscenity, incitement, or child sexual abuse material). *See* Br. 30, 36-37, 39-40, 41-42. This ignores that the Act restricts a broad range of protected speech, from political advocacy and public service announcements to everyday human communication. And it violates the baseline rule that the government may not "torch a large segment" of protected speech to shield some teenagers from a more finite subset of unprotected speech. *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

Unlike the district court in *NetChoice LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025)—which released its decision hours after the Supreme Court decided *Moody*, and without meaningfully incorporating that case's guidance—the district court here applied the required analysis to each of the challenged provisions. It correctly held that each regulates protected speech; that the State could not justify these regulations under the scrutiny required by the First Amendment; and that the regulations were facially invalid because a "large" and "substantial majority" of their applications unconstitutionally regulate protected speech compared to the relatively "small portion" of their lawful applications to speech that "falls outside First Amendment coverage." ROA.25-50096.862, 864, 865-866.

**A.    The challenged provisions restrict protected speech.**

The undisputed intent and effect of the Act's challenged provisions is to regulate human communication; the parties only disagree about the extent the First Amendment protects the speech regulated.

The State admits the targeted advertising restrictions in § 509.052(2)(D) restrict protected speech. *See* Br. 38-40. And it does not dispute that the content-exposure restrictions in §§ 509.053 and

509.056(1) and targeted-advertising restrictions in § 509.055 restrict speech in general. *See id.* at 34, 38-40. The State merely asserts that these regulations escape constitutional scrutiny because they predominantly regulate *unprotected* speech that harasses, incites, displays obscenity, or is integral to "unlawful" conduct. *Id.* at 36, 39, 41.

This is not the law the State enacted, however, and the State cannot now pretend otherwise "to conform it to constitutional requirements." *Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016) (citation omitted). The district court properly held that the challenged provisions as drafted were not susceptible to the State's imagined narrowing construction.

**Content exposure restrictions.** The State suggests §§ 509.053 and 509.056(1) have a "narrow focus on unprotected speech, like child pornography," "stalking forums," "weapons-making guides," and "drug-use tutorials[.]" Br. 37. But while prohibiting speech integral to such criminal conduct might have been the Legislature's *intent*, that is not the statute it wrote. *See Corner Post, Inc.*, 603 U.S. at 815 (text controls, not intentions).

As the district court explained, the statute does not just proscribe

criminal facilitation but uses the words "'[g]lorify' and 'promote'" that "taint the understanding of 'facilitate' beyond direct criminal advocacy" and cause the law to reach more "than criminal assistance." ROA.25-50096.868. The State "deliberately sought a broader definition" that "also proscribes speech related to *lawful* conduct, such as having an eating disorder." *Id.*

This interpretation of the statutory text makes sense, as criminal advocacy is already a crime, *e.g.*, Tex. Pen. Code § 7.02(a)(1)-(2), and "courts will not construe a statute to make it redundant, absent a clear legislative purpose to the contrary." *Supreme Inv. Corp. v. United States*, 468 F.2d 370, 381 (5th Cir. 1972) (Wisdom, J.); *e.g., Silva-Trevino v. Holder*, 742 F.3d 197, 203-04 (5th Cir. 2014) (rejecting redundant interpretation); *see also* Br. 36 (conceding that Tex. Penal Code § 42.072 already prohibits stalking communications).

Texas knows how to write criminal advocacy laws. If it "intended to proscribe only speech 'integral to unlawful conduct,' it could have" done so. *CCIA*, 747 F. Supp. 3d at 1041.

***Targeted advertising restrictions.*** The State does not dispute that § 509.052(2)(D) regulates a wide range of protected speech. And for

good reason: the regulation presumptively bans the targeted dissemination of any sort of information to minors on any topic. *Brown*, 564 U.S. at 794-95 (minors' have a right to access and engage in speech that is not obscene as to them). Categorically prohibiting minors' access to protected speech "*without their parents' prior consent*" inherently burdens their rights to free expression. *Id.* at 795 n.3 (strict scrutiny applies to such restrictions).

By their plain text, neither § 509.052 nor § 509.055 regulates only commercial speech that "*proposes* a commercial transaction." *Serafine*, 810 F.3d at 365 (citation omitted). The word "advertisements" means any speech—paid or not—that provides "public notice," *Advertisement*, Merriam-Webster (2024), or "call[s] something to the attention of the public," *Advertising*, Merriam-Webster (2024). By its plain terms, the law reaches political ads, paid advocacy, and materials encouraging attendance at events, participation in boycotts, or other forms of civil disobedience promoting reforms. The landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 256-58 (1964), involved such an advertisement purchased by the Committee to Defend Martin Luther King and Struggle for Freedom in the South. Could Texas have restricted

that ad's publication to minors without implicating the First Amendment? Hardly.

The State concedes that § 509.055 regulates speech, but defends it on the ground that its focus is "non-protected speech or commercial speech" that advertises illegal products and services to minors like "fake IDs," "sexting," "vaping," "illegal gambling," and "underground fight club[s]." Br. 38, 39-40. But the statutory language is not so limited.

As the district court found, ROA.25-50096.856-857, nothing in § 509.055 limits its restrictions to advertising the sale of illegal goods or services, or advocacy of illegal conduct integral to the "violation of a valid criminal statute," *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Rather, it regulates any speech that "promote[s]" or "offer[s]" an "activity that is unlawful for a minor" to "engage in[,]" § 509.055, a vast category that includes, for example, driving under the age of 16. Moreover, the expansive language "promote[s]" or "offer[s]" in the law falls short of constitutional requirements. *E.g.*, *United States v. Miselis*, 972 F.3d 518, 536-37 (4th Cir. 2020) (statutory ban on "encouraging" or "promoting" illegal activity violated the First Amendment).

**B.**     **The State has not carried its First Amendment burden.**

Because the challenged provisions restrict protected speech, the State must demonstrate that they withstand First Amendment scrutiny. But as it did below, the State makes no effort to satisfy any level of First Amendment scrutiny—a concession that could well be dispositive. *See, e.g.*, *United States v. Fernandez*, 48 F.4th 405, 412 (5th Cir. 2022) (failure to brief an issue in an opening brief waives it). In any event, the district court was correct that Appellees will likely prevail under whatever form of "heightened judicial scrutiny[,]" *Sorrell*, 564 U.S. at 557, applies.

**1.**     **The challenged provisions are subject to strict scrutiny.**

Resting on its meritless arguments that the challenged regulations do not restrict protected speech at all, the State only hints at the appropriate level of scrutiny to apply. But as the district court concluded, the challenged provisions regulate speech in ways that require strict scrutiny.

**a.**     **The challenged provisions effect a system of prior restraint.**

A prior restraint is any government action that prevents or deters speech without a prior judicial determination "that such publications

may lawfully be banned." *Bantam Books*, 372 U.S. at 67, 70-71. Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976); *see Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). To survive review, a prior restraint must supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude—a standard at least as stringent as strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726-27 (Brennan, J., concurring) (same).

Requiring intermediaries to classify the suitability of third-party content before publishing it creates a prior restraint because threatening penalties for speech that falls into a proscribed class results in collateral censorship. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024) (requiring online businesses to classify and block potentially harmful content "deputizes covered businesses into serving as censors for the State"); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975). Even "informal" methods "of coercion, persuasion, and intimidation" effectuate a prior restraint when directed at intermediaries to restrict the

dissemination of third-party speech the government "deem[s] 'objectionable.'" *Bantam Books*, 372 U.S. at 67; *see also NRA of Am. v. Vullo*, 602 U.S. 175, 180-81, 188-91 (2024); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235-36 (7th Cir. 2015) (Posner, J.).

Although the district court saw no need to decide whether the Act imposed a system of prior restraint, ROA.25-50096.871, it found that the Act's restrictions were "akin to prior restraints." ROA.25-50096.860. In fact, the Act establishes several independent and interlocking prior restraints—against displaying certain content or publishing certain ads—that individually and collectively must satisfy strict scrutiny.

***Content-exposure restrictions.*** The Act threatens liability if DSPs fail to block Appellees from sending and receiving protected content on a variety of subjects the State deems unsuitable. *See* §§ 509.053, 509.056. As in *Bantam Books,* this type of proxy censorship is a prior restraint because it forces intermediaries to block protected speech the government disfavors. 372 U.S. at 66-67, 70-71. The government cannot "deputize" online businesses to act as "censors for the State," *Bonta*, 113 F.4th at 1118, or use "indirect 'discouragements,'" *ACA v. Douds*, 339 U.S. 382, 402 (1950), or other "subtle" forms of "interference" to restrict

40

expression, when it could not do so through "frontal attack," *Bates v. City of Little Rock*, 361 U.S. 516, 523-24 (1960); *see also Wash. Post v. McManus*, 944 F.3d 506, 517 (4th Cir. 2019) (Wilkinson, J.) (regulating online "platforms" impermissibly censored speech "indirectly").

***Targeted advertising restrictions.*** The Act's targeted advertising restrictions are prior restraints because they threaten civil liability to coerce intermediaries into "*forbidding* certain communications" before they "occur," *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted), and impose formal statutory preconditions (state-ordered parental consent) on minors' ability to access and disseminate advertised information. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316-17 (1980) (statutory prohibition established a prior restraint).

The prohibition in § 509.055 absolutely bans DSPs from disseminating protected speech—such as advertisements for a homecoming party where there may be underage drinking, or for a peaceful rally to protest Texas's restrictions on abortion—that may "facilitate" or "promote" illegal activity without abetting it, *even if* a parent would consent to that material. *See, e.g., Miselis*, 972 F.3d at 530,

535 (speech that promotes but does not abet unlawful activity is protected); *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same).

Section 509.052(2)(D) gives adults a veto over all other targeted speech minors may be sent. Whether or not a teenager obtains consent from a "verified parent" to receive the type of targeted advertising the Act conditionally allows—which requires granting that person permission to surveil and restrict the minor's expression, *see* §§ 509.052(2)(D), 509.102-103—the Act still imposes an unlawful preclearance requirement that burdens the speech both of those minors and of persons who wish to speak with them. *See Brown*, 564 U.S. at 795 n.3; *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 277, 283 (5th Cir. 2003) ("pre-clearance" to distribute information was a prior restraint).

*    *    *    *

The State's attempt to transform DSPs into "a corps of involuntary government surrogates," *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978), is nothing new. Censors from time immemorial have commandeered intermediaries to act as censors precisely because it "halt[s] the whole apparatus" of free expression. *McConnell*, 540 U.S. at

251 (Scalia, J., concurring in part and dissenting in part). But the government can no more conscript online platforms to restrict online speech than it could compel cable systems to restrict third-party programming, *Denver Area Educ. Telecommc'ns Consortium, Inc. v. FCC*, 518 U.S. 727, 732, 753-60 (1996); *Playboy*, 529 U.S. at 806, theaters to restrict films, *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 678, 684 (1968), or bookstores to restrict the sale of books, *Bantam Books*, 372 U.S. at 66-67, 70-71. Like each of those laws, the Act's proxy censorship is presumptively invalid as a prior restraint and subject to the Constitution's most demanding scrutiny. *See Bonta*, 113 F.4th at 1118.

> **b.     The challenged provisions are content-based regulations.**

Each challenged provision regulates speech based on its content, which independently requires application of strict scrutiny.

"Government regulation of speech is content based" and subject to strict scrutiny "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The State never addresses (much less denies) the ways each challenged provision regulates speech based on its content, focusing instead (Br. 30-33) on whether the Act's content-based coverage

definition renders the Act as a whole content-based. *See infra* § II.B.1.c (rebutting that argument). The challenged provisions are content-based in obvious respects; their overall premise is that DSPs must take actions to shield minors from "harmful" content. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004).

*Content-exposure restrictions.* The requirements in §§ 509.053 and 509.056(1) are content-based since they require the restriction of speech "because of the topic discussed" and "particular subject matter" addressed. *Reed*, 576 U.S. at 163. That is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811-12. Or, as the district court put it, these requirements are "as content based as it gets." ROA.25-50096.858. The State may not "create a wholly new category of content-based regulation" for certain classes of protected speech "directed at children." *Brown*, 564 U.S. at 794.

*Targeted advertising restrictions.* The prohibition in § 509.055 is content-based on its face because it absolutely prohibits targeted communications to minors based on the "topic" or "subject matter" of the communication—*i.e.*, whether it relates to conduct that the State deems unlawful. *Reed*, 576 U.S. at 163; *see also Barr v. Am. Ass'n of Pol.*

*Consultants, Inc.*, 591 U.S. 610, 619 (2020) (law that "singles out specific subject matter for differential treatment" is content-based) (quoting *Reed*, 576 U.S. at 169).

The overall ban-without-consent regime in § 509.052(2)(D) is also content-based because it regulates speech based on "its function or purpose" (*i.e.*, what it is predicted to arouse in its audience), *Reed*, 576 U.S. at 163, which means it cannot be justified without reference to "the direct impact that speech has on its listeners[,]" *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 812 (same). Requiring parental consent for teenagers to access protected speech was for this reason subject to strict scrutiny in *Brown*, 564 U.S. at 795 n.3.

### c. The Act is content-based because of its coverage definition.

Even if the challenged provisions did not individually regulate speech based on content, the Act's content-based coverage definition makes *any* application of those provisions burden speech based on its content. *See* ROA.25-50096.853-857.

This is plain from the Act's text. The Act's obligations apply to DSPs that publish "social[]" content, § 509.002(a)(1), *but not* DSPs operated by governments, healthcare providers, banks, schools, and businesses that

45

primarily publish "news," "sports," "commerce," "educational," health-related, or "financial" content related to those operators, § 509.002(b)(1)-(10) (listing these arbitrary exemptions). Thus, as in *Barr*—where an anti-robocalling law's content-based coverage exemptions for robocalls on some topics but not others rendered the law's entire operation content-based and subject to strict scrutiny, 591 U.S. at 619-21—the Act's coverage definition "singles out specific subject matter for differential treatment" and is accordingly content-based, *Reed*, 576 U.S. at 163-64, 169.

The State concedes this framework, Br. 5, but claims its approach discriminates against certain *media* and not particular *content*. *See id.* at 31. This mischaracterizes the Act. While it applies to certain online media, the Act regulates covered entities based on the *types of communication and content* they provide (while exempting others based entirely on subject matter). The Act does not single-out messaging boards or social media platforms as a class, but *only* those whose content is not characterized by any of the speaker-based topical exemptions. *See* § 509.002(b)(1)-(10). "[L]aws favoring some speakers over others demand

strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170.

Even if the State's asserted "medium-based" approach were accurate, moreover, it would not solve the First Amendment problem. The Supreme Court recognized this in *Reed*, explaining that "a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny." 576 U.S. at 170. Likewise, a burden imposed selectively on only certain newspapers is in the same boat. *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 584-86, 592-93 (1983) (tax on newsprint and ink imposed only on certain newspapers failed strict scrutiny). Under this rule, the Act is content-based even accepting the State's interpretation.

## 2.     The challenged provisions fail strict scrutiny.

A law subject to strict scrutiny is presumptively invalid unless the government proves it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813. This is a "demanding standard" that vanishingly few restrictions survive. *Brown*, 564 U.S. at 799.

The State fails to carry its burden. It made no effort below to show

how the challenged regulations satisfy this standard, and without a record, makes no effort now beyond inchoate assertions that the Act "might," "may well," or "could withstand strict scrutiny." Br. 36, 36-37, 40. That alone suffices to hold the challenged provisions unconstitutional. *See Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (law unconstitutional where government "made no effort to defend" it under applicable scrutiny). But in all events, the State cannot carry its burden.

***Not necessary to serve a compelling interest***. Although protecting minors from harm may present a compelling interest in the abstract, the State "must present more than anecdote and supposition" to show each restriction is necessary to that objective. *Playboy*, 529 U.S. at 822. The record contains no such evidence. *Cf.* ROA.25-50096.491-497. The State assumes a problem and asserts that censorship is the solution. That is not enough. *See Brown*, 564 U.S. at 799-800 ("predictive judgment" inadequate; causal link required).

The lack of evidence is unsurprising. *See* ROA.25-50096.717-732 ¶¶ 10-40 (Plaintiff's expert, Dr. Christopher J. Ferguson, Ph.D.,

describing flaws in State's hastily assembled internet research).[4] Data and expert analysis show that access to social media provides benefits to many young people, and demonstrate no causal link between use of social media and adverse adolescent mental health outcomes. *See* ROA.25-50096.732-734 ¶¶ 41-46; ROA.25-50096.191-203, 381-406, 498-539. And this research is consistent with Appellees' own experience, which they discussed in the record before the district court. *See* ROA.25-50096.171-173 ¶¶ 2-9; ROA.25-50096.177-178 ¶¶ 2-4; ROA.25-50096.165-166 ¶¶ 5-9. In fact, preventing teens from talking about these issues could itself harm their mental health. *See* ROA.25-50096.174 ¶ 11.

***Not the least restrictive means.*** The State cannot show that limiting all Texans' speech is the "least restrictive" means to eliminate even the harms it hypothesizes will be suffered by some children from some speech. *Playboy*, 529 U.S. at 827.

The Ninth Circuit recently affirmed in relevant part a preliminary injunction against a similar California regime requiring online services to monitor and block speech to prevent minors from "being exposed to

---

[4] Dr. Ferguson is professor of psychology at Stetson University, and is known for his work researching media effects. ROA.25-50096.714-715 ¶¶ 1, 6.

potentially harmful content." *Bonta*, 113 F.4th at 1121. The court held the law failed strict scrutiny because it "necessarily compels companies" to shield minors from "online mental health resources and communities that many children turn to for support," publicly important "reporting" on sensitive topics, and even "minors' own political or religious speech, as well as their personal updates about deaths in the family, rejection from a college, or a breakup." *Id.* (citation omitted). It concluded California "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Id.*

Same here. Existing tools allow families to govern internet use by children, and a less restrictive law might have focused on informing parents about these tools. *See Playboy*, 529 U.S. at 823-26; *Ashcroft*, 542 U.S. at 669. Virtually every social media service and smartphone manufacturer provides these tools. *See* ROA.24-50721.137 ¶ 22; ROA.24-50721.142 ¶ 8; ROA.24-50721.162-164 ¶ 13. And even the Act's unchallenged provisions *requiring* such tools, § 509.054, would have been

less restrictive. *Cf. Playboy*, 529 U.S. at 816, 825-26 (mandatory restrictions invalid where same law provided voluntary measures). The State ignored these alternatives, instead imposing what it "thinks parents *ought* to want." *Brown*, 564 U.S. at 804.

**Underinclusive.** The Act's simultaneous underinclusivity "is alone enough to defeat it." *Id.* at 802. A law that professes to serve broad goals like the well-being of minors, and yet regulates only a slice of potential causes, "raises serious doubts about whether the government is in fact pursuing the interest it invokes[.]" *Id.* Here as in *Brown*, the Act focuses on one type of media—DSPs that permit account holders to create profiles and interact socially, *see* § 509.002(a)—and arbitrarily exempts services that, among other things, "primarily" provide a user "with access to news, sports, commerce, or content primarily generated or selected by the [DSP]." § 509.002(b)(10)(A). As the district court explained, a teenager "can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books" under the Act, "but cannot watch his lectures on YouTube." ROA.25-50096.860. The State does not explain why—or even *if*—these other services have less effect on young people. *See* ROA.25-50096.717-734 ¶¶ 10-46.

Other arbitrary distinctions raise similar problems. The ***content-exposure restrictions*** prohibit DSPs from showing minors content related to "self-harm," "eating disorders," "substance abuse," "bullying," and "sexual exploitation," § 509.053, without explaining what sets those categories apart, or what distinguishes DSPs from other media. And the ***targeted advertising restrictions*** allow DSPs to publish certain kinds of supposedly "dangerous, mind-altering material" to minors "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802. In all these respects, the Act "leave[s] significant influences bearing on the [State's] interest unregulated." *Tex. VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014).

The First Amendment "does not go on leave when social media are involved[,]" *Moody*, 603 U.S. at 719, and "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply[,]" *Brown*, 564 U.S. at 804-05. Texas has failed to show how the Act satisfies strict scrutiny.

### 3. The challenged provisions fail any level of First Amendment scrutiny.

The State also makes no attempt to show that the challenged regulations satisfy even the intermediate scrutiny applicable to content-

neutral or commercial speech regulations.

A speech restriction survives intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and (2) "will in fact" serve that interest in "a direct and material way" (3) that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-64 (1994)). If shown, the government still must prove its regulation (4) leaves open "ample alternative channels for communication." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).

***No evidence the regulations achieve a state interest.*** At the outset, the State does not show how *any* of the challenged regulations "in fact" advances the solution to an actual problem in a "direct and material way." *Turner*, 512 U.S. at 662-64. The State's burden under this standard "is significant" and "not satisfied by mere speculation or conjecture." *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309 (5th Cir. 2017) (citation omitted). Although the State claims interests in "protecting children from insidious online harms," Br. 3, it cites no *evidence* that the provisions address these issues. The few reports it cited below (ROA.25-

50096.595-598)—now abandoned on appeal—suggest only that social media (*i.e.*, one kind of regulated DSP) *may* have *some* adverse mental health effect on *some* young people. *See* ROA.25-50096.717-732 ¶¶ 10-40 (Dr. Ferguson's review).

Even if the State's interest were the well-being of minors generally and not their privacy or exposure to abuse, restricting *protected* speech because of its supposedly harmful effects is *directly* related to the suppression of speech and an invalid justification for censorship under intermediate scrutiny. *See Lorillard Tobacco Co.*, 533 U.S. at 567 (speech restriction intended to protect minors failed intermediate scrutiny since the "attempt to regulate directly the communicative impact" of the suppressed speech was not "unrelated to expression"); *see also Moody*, 603 U.S. at 740-41 (altering mix of protected speech impermissible justification for its restriction under any standard).

In any event, the State's sparse and now-abandoned evidence is the definition of "ambiguous proof." *Brown*, 564 U.S. at 800. The Surgeon General's Advisory, for example, finds social media positively affects many young people, and has varied effects that cannot be generalized— let alone causally linked—to any particular outcomes. *See* ROA.25-

50096.597 (citing Dep't of Health & Hum. Servs., *Social Media and Youth Mental Health* 4, 6, 11 (2023)); *see also* ROA.25-50096.732-734 ¶¶ 41-46 (Dr. Ferguson reviewing research showing benefits).

The State's other reports rest on "weak correlational data" that conflict with "large-scale preregistered studies" finding no "sizeable or practically meaningful associations between adolescents' digital technology usage and well-being." ROA.25-50096.501-523; *see* ROA.25-50096.717-732 ¶¶ 10-40 (Dr. Ferguson describing flaws in State's sources). "[M]ere conjecture" that posits the existence of a problem is not "adequate to carry a First Amendment burden," and the government may not restrict speech just because it *might* prevent *some* subsequent "anticipated harm." *FEC v. Cruz*, 596 U.S. 289, 307 (2022).

The State has never addressed Appellees' evidence—including the "largest long-term study of adolescent brain development" in the nation, which found "no consistent or measurable associations between well-being and the roll-out of social media" to minors. ROA.25-50096.498-500; *see also, e.g.,* ROA.25-50096.524-539. As Dr. Ferguson explains, "there is no evidence establishing a cause-and-effect relationship." ROA.25-50096.717 ¶ 10. The State "ignores that mental health data for less-

technology-adopting older generations is actually *worse* than for teens," and that the same trends "are not observed for other high-technology adopting countries." ROA.25-50096.717-729 ¶¶ 10-32; *see also* ROA.25-50096.729-732 ¶¶ 34-40 (Dr. Ferguson finding inconsistent evidence even of correlation, let alone causation).

Even had the State had shown that social media directly cause the harms it asserts, it never attempted to show how the challenged regulations do anything to "in fact alleviate them to a material degree." *Am. Acad. of Implant Dentistry*, 860 F.3d at 309, 310-11 (advertising restriction failed intermediate scrutiny where the government failed to prove that any person was actually harmed by the restricted speech, much less remedied by the state's censorship). The State submits no evidence showing how restricting the content teenagers may send and receive using just one class of online services ameliorates the alleged harms.

Appellees, meanwhile, supplied ample evidence establishing that restricting teens' access to social media will, for many, do more harm than good. ROA.25-50096.732-734 ¶¶ 41-46; ROA.25-50096.191-203, 381-406, 498-539; ROA.25-50096.171-173, 174 ¶¶ 2-9, 11; ROA.25-50096.177-178

¶¶ 2-4; ROA.25-50096.165-166 ¶¶ 5-9. A statute cannot meaningfully advance the government's interests if it "undermine[s] and counteract[s]" its stated goals. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (such a law fails intermediate scrutiny); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999) (same).

***No evidence of narrow tailoring.*** The State asserts the district court ignored "HB 18's tailored approach," Br. 14, 52, but makes no attempt to show how these regulations restrict no more speech than needed to achieve its professed objectives. *See Turner*, 512 U.S. at 662.

The content-exposure restrictions in §§ 509.053 and 509.056(1) use vague and overbroad terms that require suppressing far more protected material than needed to shield minors from unprotected obscenity, harassment, and sexual exploitation, which Texas can lawfully regulate. *See Brown*, 564 U.S. at 791 ("new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated").

Nor does the State explain how the targeted advertising restrictions in §§ 509.052(2)(D) and 509.055 regulate no more speech than necessary to prevent "the exploitation of minors through tailored online

advertisements that promote unlawful products, services, or activities." Br. 38. As the district court found, ROA.25-50096.856-857, 863, these provisions are not so limited and reach a significant range of protected speech—speech minors are entitled to make and receive. *See Brown*, 564 U.S. at 802 (doubting that "punishing third parties for conveying protected speech to children just in case their parents disapprove" is ever narrowly tailored under any standard).

The State also fails to rebut any of the less-restrictive household-based alternatives Appellees identified—such as third-party voluntary content filters and campaigns to educate parents on the importance of supervising their family's use of DSPs—or even the other less-restrictive portions of the Act that Appellees did not challenge (*e.g.*, § 509.054, requiring DSPs to offer parental controls). Additionally, the State might enforce the panoply of existing criminal and civil laws restricting speech integral to unlawful conduct, incitement, deceptive advertising, child sexual abuse, or the sale of illegal goods and services. *Cf. Bonta*, 113 F.4th at 1121 (discussing these alternatives). This failure to explain the inadequacy of alternatives is fatal under intermediate scrutiny. *See Am. Acad. of Implant Dentistry*, 860 F.3d at 311.

**4.    The challenged provisions are unconstitutionally vague.**

The challenged provisions are independently invalid because they are unconstitutionally vague. *See* ROA.25-50096.867-869 (holding that the content-exposure provisions in § 509.053 were vague but declining to decide whether other provisions of the Act were vague).

A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "[S]tandards of permissible statutory vagueness are strict in the area of free expression" because vague laws force speakers to self-censor to avoid liability. *NAACP v. Button*, 371 U.S. 415, 432 (1963). And contrary to the State's baseless assertion, Br. 44, this heightened standard applies equally to laws that threaten only civil penalties since the "threat of sanctions may deter [the] exercise" of First Amendment freedoms just as effectively as criminal penalties. *Button*, 371 U.S. at 429 n.11, 432-33; *N.Y. Times*, 376 U.S. at 277-78.

The Act's speech regulations are void for vagueness because they fail to define key terms underpinning their restrictions. The ***content-***

***exposure restriction*** does not define "promot[ing], glorif[ying], or facilitat[ing]" suicide, self-harm, eating disorders, substance abuse, stalking, bullying, or harassment, § 509.053(a). Nor do the ***targeted advertising restrictions*** make clear what counts as advertising that "facilitate[s]," "[o]ffer[s]," or "promote[s]" unlawful activity. § 509.055. Section 509.053(a) ostensibly prohibits DSPs from disseminating discussions of *Hamlet* and *Madame Bovary*. Section 509.055 could be used to penalize the dissemination of speech advocating for the decriminalization of abortions or recreational drugs, or encouraging civil disobedience. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.,* 385 U.S. 589, 601 (1967) (proscribing speech teaching or advising the overthrow of government was vague and overbroad because it threatened advocacy and inquiry).

The State responds that DSPs surely know what it means to "promote," "glorify," or "facilitate" undefined harms like suicide, self-harm, eating disorders, substance abuse, stalking, bullying, or harassment since many DSPs enforce private house rules with similar terms to moderate user-generated content. *See* Br. 44-45. But a private editorial policy that a DSP writes and interprets itself is not the same as

a state-backed proscription forcing companies to guess "whether material is suitable for kids" according to regulators' whims. *Bonta*, 113 F.4th at 1118 (citing *Interstate Circuit*, 390 U.S. at 678, 684).[5]

The problem is not that DSPs do not understand the terms in "their own policies well enough to enforce them." *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1204 (N.D. Cal. 2025). It's that the Act "invite[s] arbitrary and discriminatory enforcement because the State will have wide discretion to interpret" these terms "differently from the [DSPs] themselves." *Id.* (law requiring DSPs to enforce their own content-moderation policies was vague for this reason).

The State next contends that terms like "promote," "glorify," and "facilitate" are clear because of established meanings in other parts of Texas law. *See* Br. 45-46. But most of the terms are *not* defined by state law, and the examples the State provides—"harassment" in Tex. Penal Code § 42.07; "trafficking" in Tex. Penal Code § 20A.02; "facilitates" in 18

---

[5] Courts have consistently rejected analogous attempts to disguise state censorship using laws that incorporate enforcement of private rules. *See, e.g.*, *Engdahl v. City of Kenosha*, 317 F. Supp. 1133 (E.D. Wis. 1970) (ordinance incorporating private film ratings into the city code violated First Amendment ); *MPAA v. Specter*, 315 F. Supp. 824, 825-26 (E.D. Pa. 1970) (same); *Swope v. Lubbers*, 560 F. Supp. 1328, 1334 (W.D. Mich. 1983) (similar).

U.S.C § 2—arise in different contexts, surrounded by other terms, where interpretive canons avail constructions that do not tread on free expression.

Thus, in *United States v. Hansen*, 599 U.S. 762, 778-79 (2023), the Supreme Court upheld the government's authority to criminalize speech specifically intended to facilitate *a crime* when Congress writes a law using established terminology that respects expressive freedoms. Br. 45. But that case teaches us nothing about the Act, which uses broader strings of verbs ("glorifies," "promotes," "offers") to penalize speech involving *lawful* but unhealthy or risky behaviors and activities. *See also, e.g., Miselis*, 972 F.3d at 536-37 (term "promoting" is too broad to survive First Amendment scrutiny); *Rundo*, 990 F.3d at 717 (same).

The State's renewed pleas for "judicial narrowing," Br. 13, 43, 46, are confessions that change nothing. The avoidance canon is inapplicable "in the overbreadth context[,]" and courts may not give a law's text "an additional extra-textual limiting construction in a frantic attempt to rescue it." *Serafine*, 810 F.3d at 369 & n.34 (citing cases). To read the Act "as the Government desires requires rewriting, not just reinterpretation." *Stevens*, 559 U.S. at 481. Giving the Act "the ordinary

meaning of the text that actually applies," *Corner Post*, 603 U.S. at 816, the challenged provisions regulate a wide and significant amount of protected speech. The Court "cannot assume that, in its subsequent enforcement, [the Act's] ambiguities will be resolved in favor of adequate protection of First Amendment rights." *Button*, 371 U.S. at 438.

### C.    The challenged provisions are facially invalid.

Although facial relief ordinarily requires a plaintiff to show that *all* of a challenged regulation's applications are unconstitutional (*i.e.*, that it has no permissible sweep), facial challenges under the First Amendment are subject to a "less demanding" standard to "provide breathing room for free expression." *Moody*, 603 U.S. at 723 (citing cases). A regulation is facially invalid under the First Amendment if even "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id.* (citation omitted).

The Supreme Court in *Moody* described this longstanding test as a two-step process. Courts first determine a challenged law's "full range of applications" (*i.e.*, does it regulate speech in some, most, or all cases). *Id.* at 726. They next decide which of the laws' applications to speech "violate the First Amendment," and compare the unconstitutional and

63

unconstitutional applications. When the pertinent facts "are the same across the board" and the substantial effect of a law is to regulate protected speech without constitutional justification, the law is overbroad and facially invalid. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021).

Facial relief is the natural remedy here, and the district court properly applied the *Moody* framework to hold each of the challenged provisions facially invalid. The decision below canvassed the Act's applications to DSPs, and individually concluded that each of the challenged requirements in §§ 509.052(2)(D), 509.053, 509.055, and 509.056(1) "exclusively," "substantial[ly]," and "large[ly]" regulated protected speech in ways the State could not justify under the First Amendment. ROA.25-50096.860-862, 864-866. Comparing those unlawful applications to the "small portion" of these provisions' lawful applications to speech that "falls outside First Amendment coverage," *id.*, the district court concluded that these provisions' unconstitutional applications were substantial relative to their permissible applications and thus held the provisions invalid on their face.

That was manifestly correct. At the first step, prohibiting a DSP

from publishing certain speech based on its content, speaker, or intended audience—as each of the challenged provisions do—inherently regulates that DSP's speech, as well as the speech of the speakers who use that DSP to communicate in ways the Act restricts. *See Playboy*, 529 U.S. at 816; *Bantam Books*, 372 U.S. at 64 n.6; *Va. State Bd. of Pharm.*, 425 U.S. at 756-57 & 757 n.15. Thus unlike the statutes in *Moody*—where the evidence did not show that every covered entity actually engaged in protected speech that could be unconstitutionally commandeered in the first place, 603 U.S. at 726—these provisions regulate speech "in every case," in the same ways. *Americans for Prosperity*, 594 U.S. at 618.

The question at step two is which of those provisions' applications are unconstitutional, which are constitutional, and how do those buckets compare. The analysis above, *supra* §§ II.A-B, demonstrates that *every* application of these challenged provisions to protected speech is unconstitutional.

Under any level of First Amendment review, and in any application to protected speech, the State must justify these provisions' application to protected speech by demonstrating that they advance a solution to a real problem. *See Brown*, 564 U.S. at 799-800; *Turner*, 512 U.S. at 662-

64; *Rubin*, 514 U.S. at 489. The State has advanced no record evidence that could possibly carry its constitutional burden.

Likewise, under any level of review, and in any application to protected speech, the State must show that these requirements are (at least to some degree) narrowly tailored. *Playboy*, 529 U.S. at 827; *Turner*, 512 U.S. at 662-64. The State cannot satisfy that obligation, either, since the challenged provisions indisputably regulate more protected speech than necessary to protect minors from the kinds of illegal exploitation and unprotected obscenity the State is permitted to regulate.

This reduces the facial analysis into a comparison between the challenged provisions' substantial regulations of protected speech (none of which the State can show is constitutional) versus their catch-as-catch-can regulation of unprotected speech the provisions may incidentally reach. To describe this comparison is to decide the question, as prophylactic blanket regulations of communication enacted to shield minors from potential exposure to unprotected speech present the archetype of overbroad legislation that "turns the First Amendment upside down." *Free Speech Coal.*, 535 U.S. at 255; *see also Butler v. Michigan*, 352 U.S. 380, 383 (1957) ("quarantining the general reading

public … to shield juvenile innocence … burn[s] the house to roast the pig"); *Reno*, 521 U.S. at 882 (same).

This is especially so online. "[C]ontent on the Internet is as diverse as human thought," *Reno,* 521 U.S. at 852, while the "narrowly limited classes of speech" that fall outside the First Amendment's protection, *Brown*, 564 U.S. at 790-91 (citation omitted), comprise but a fraction of the speech communicated through DSPs—*less than 1%* of the content on several of the largest DSPs, according to the State. *See* ROA.25-50096.594 (citing reports from Meta, Snap, and X.com). The cherry-picked examples the State assumes (without authority) *might* pass muster—"starvation tips," "stalking forums," "weapons-making guides," "drug-use tutorials," and instructions to build a "suicide bomb," for example, Br. 36-37—must be understood in the context of that admission.

Where the government admits 99% of the speech it restricts is protected, but restricts that speech anyway to block the infinitesimal percentage of unprotected speech it may ban, the government's regulations have substantially more unconstitutional applications than lawful ones, and facial relief is required. *See Moody*, 603 U.S. at 723. And since "it is all but impossible" to award Appellee internet users "complete

relief" without enjoining the State from enforcing the Act's unconstitutional provisions against *any* covered intermediaries, *Trump v. CASA, Inc.*, 603 U.S. ---, 2025 WL 1773631, at \*11, \*11 n.12, \*15 (U.S. June 27, 2025), the injunction against the challenged provisions should be reaffirmed.

## III. The Remaining Injunction Factors Favor Appellees.

The State does not deny (Br. 51-52) that Appellees will suffer irreparable harm if the challenged provisions are permitted to take effect. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); ROA.25-50096.178-182 ¶¶ 6-14; ROA.25-50096.173-175 ¶¶ 10-17; ROA.25-50096.166-170 ¶¶ 10-18; ROA.25-50096.160-163 ¶¶ 5-14. And the State has no valid interest in enforcing unconstitutional laws, meaning equity and the public interest—which merge in a challenge to government action—favor an injunction. *BST Hldgs. LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

## CONCLUSION

The Court should affirm the preliminary injunctions with respect to the content exposure restrictions in §§ 509.053 and 509.056(1), and the targeted advertising restrictions in §§ 509.052(2)(D) and 509.055.

Respectfully submitted,

/s/ Adam S. Sieff                       /s/ Robert Corn-Revere
Adam S. Sieff                           Robert Corn-Revere
DAVIS WRIGHT TREMAINE LLP               JT Morris
350 S. Grand Ave., 27th Floor           FOUNDATION FOR INDIVIDUAL RIGHTS
Los Angeles, CA 90071                   AND EXPRESSION
                                        700 Pennsylvania Ave. SE, Ste. 340
David M. Gossett                        Washington, DC 20003
Chelsea T. Kelly                        bob.corn-revere@thefire.org
Marietta Catsambas                      (215) 717-3473
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East        Ambika Kumar
Washington, DC 20005                    Caesar Kalinowski IV
                                        DAVIS WRIGHT TREMAINE LLP
                                        920 Fifth Avenue, Suite 3300
                                        Seattle, WA 98104

*Counsel for Appellees*
*Students Engaged In Advancing Texas, et al.*

July 3, 2025

## CERTIFICATE OF SERVICE

On July 3, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Adam S. Sieff*
Adam S. Sieff

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,857 words, excluding the parts of exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

*/s/ Adam S. Sieff*
Adam S. Sieff