Nos. 24-50721 & 25-50096

# United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., by and through next friend, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas, Austin Division, Nos. 1:24-cv-849 & 1:24-cv-945

**BRIEF OF NATIONAL COALITION AGAINST CENSORSHIP AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES SUPPORTING AFFIRMANCE**

Rachel E. Craft
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100

Benjamin S. Softness
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
(415) 318-1200
bsoftness@kslaw.com

*Counsel for Amicus Curiae National Coalition Against Censorship*

July 10, 2025          *(Additional counsel listed on inside cover)*

Lee Rowland
Erika Sanders
NATIONAL COALITION
AGAINST CENSORSHIP
29 Broadway, Suite 1400
New York, NY 10006
(212) 807-6222

*Counsel for Amicus Curiae*
*National Coalition Against*
*Censorship*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for *amicus curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1, in addition to those listed in the parties' Certificates of Interested Persons, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus:*** The National Coalition Against Censorship is a non-profit, tax-exempt organization incorporated in the State of New York. The National Coalition Against Censorship has no parent corporation, and no publicly held company has 10% or greater ownership in the National Coalition Against Censorship.

***Counsel for Amicus:*** Benjamin S. Softness and Rachel E. Craft of King & Spalding LLP and Lee Rowland and Erika Sanders of the National Coalition Against Censorship.

Date: July 10, 2025

*s/Benjamin S. Softness*
Benjamin S. Softness

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...........................................i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICUS CURIAE.............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT............................2

ARGUMENT .............................................................................................4

I.    THE PLAIN TEXT OF HB18 ELUCIDATES ITS SCOPE
      AND CONFIRMS THE ACT'S SUSCEPTIBILITY TO
      FACIAL CHALLENGE ....................................................................4

II.   HB18'S CONTENT- AND VIEWPOINT-BASED
      MANDATES MERIT STRICT SCRUTINY ...................................11

CONCLUSION .........................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. ACLU,*
535 U.S. 564 (2002) ..................................................................... 11

*Bd. of Educ., Island Trees*
*Union Free Sch. Dist. No. 26 v. Pico ex rel. Pico,*
457 U.S. 853 (1982) ..................................................................... 16

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ....................................................................... 11

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ..................................................................... 12

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ..................................................................... 16

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ..................................................................... 16

*Free Speech Coalition, Inc. v. Paxton,*
606 U.S. ---, 2025 WL 1773625 (June 27, 2025) ........................ *passim*

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
594 U.S. 180 (2021) ..................................................................... 16

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013) ..................................................................... 14

*Miller v. California,*
413 U.S. 15 (1973) .................................................................... 1, 15

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ............................................................... *passim*

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .................................................................. 9, 11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ............................................................... 10

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ............................................................... 16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ............................................................... 16

*United States v. Hansen*,
  599 U.S. 762 (2023) ................................................................. 7

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................... 12

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ................................................................. 7

*Washington State Grange*
  *v. Washington State Republican Party*,
  552 U.S. 442 (2008) ............................................................ 4, 6

**Other Authorities**

H.B. 18,
  88th Leg., Reg. Sess. (Tex. 2023) ................................. *passim*

# INTEREST OF *AMICUS CURIAE*[1]

The National Coalition Against Censorship ("NCAC" or "*amicus*") is an alliance of more than 50 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the Supreme Court's landmark decision *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to protect freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians, artists, students, and others. NCAC has long recognized—and opposed—attempts to censor or limit access to speech, including great works of literature and art, under the guise of labeling it as obscene, pornographic, or sexually explicit. It therefore has a longstanding interest in assuring the continuance of robust First Amendment

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

protections for all. The positions advocated in this brief reflect NCAC's views and do not necessarily reflect the views of NCAC's member organizations.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

*Amicus* submits this brief to make two straightforward points that, together, are sufficient to require the application of strict scrutiny.

*First*, Plaintiffs' facial First Amendment challenge does not require the court to analyze every possible application of HB18 ("the Act"), as the Attorney General incorrectly suggests. *Moody v. NetChoice, LLC* clarified the existing First Amendment facial-challenge standard, which requires a court deciding a facial challenge to first determine a statute's "scope." 603 U.S. 707, 724 (2024). That analysis requires reviewing a law's *text* to determine "[w]hat activities, by what actors, do the laws prohibit or otherwise regulate" on the face of the statute. *Id. Moody* did not heighten the existing standard, which does not require a court to imagine every possible factual application of an act. Indeed, Supreme Court precedent forecloses such an approach.

The "scope" analysis is straightforward here because HB18 imposes content- and viewpoint-based restrictions on expression in *all* of its

applications. The Act applies only to digital platforms that "allow[] users to socially interact with other users" and *excludes* the direct-messaging and email services that complicated the facial-challenge analysis in *Moody*. HB18 has a content-based carveout for favored subject matters— "news, sports, [or] commerce"—and imposes content- and viewpoint-based publication restrictions and monitoring obligations on the rest of a service's expressive conduct. For example, HB18 targets for restriction "content that promotes, glorifies, or facilitates[] suicide, self-harm, [] eating disorders[,] substance abuse," and other topics. HB18 is a textbook case of content- and viewpoint-based speech discrimination.

*Second*, HB18 reaches far beyond obscene material and therefore is not exempted from First Amendment scrutiny. HB18 restricts the publication of "harmful material"—defined as material obscene to minors—"***and other content*** that promotes, glorifies, or facilitates" a list of subject matters targeted for regulation. The "other content" following the word "and" enjoys full constitutional protection—for both adults and minors. Texas's decision to regulate that content on the bases of subject matter and viewpoint is subject to strict scrutiny.

3

# ARGUMENT

## I.    THE PLAIN TEXT OF HB18 ELUCIDATES ITS SCOPE AND CONFIRMS THE ACT'S SUSCEPTIBILITY TO FACIAL CHALLENGE

**A.**    In a facial First Amendment challenge, "[t]he first step . . . is to assess the state law['s] scope." *Moody*, 603 U.S. at 724. "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* HB18's scope is clear from its text, which outlines a strict set of content- and viewpoint-based restrictions that limit expression in all of the law's applications. It is thus susceptible to a facial challenge.

*Moody v. NetChoice*—a focus of much of the parties' briefing and the district court's opinion—applied, but did not change, the existing standard for facial First Amendment challenges. *See* 603 U.S. at 723-26 (explaining and applying the existing standard). That well-worn approach calls for review of the statute's text and consideration of the "kinds" of content and conduct it might regulate, *id.* at 718, based on "the statute's facial requirements." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). It does not require an analysis of every hypothetically possible application of the law.

*Moody* itself highlights the purpose, and limited extent, of the scope analysis called for in a facial First Amendment challenge. That case

concerned two laws—out of Texas and Florida—that purport to restrict content moderation by social media platforms. *Moody*, 603 U.S. at 720-21. As the case reached the Supreme Court, the parties had focused on the most common forms of moderated social media: "Facebook's News Feed and its ilk." *Id.* at 724. The laws' text, however, left unclear whether their prohibitions also applied to less curated forms of social media, such as "direct messaging" and "email." *Id.* at 724-25.

The parties' focus on curated social media feeds mattered to the facial challenge in *Moody*, the Court held, because the First Amendment could conceivably treat a news feed differently from a direct messaging service. "Curating a feed and transmitting direct messages, one might think, involve different levels of editorial choice, so that the one creates an expressive product and the other does not." *Id.* at 725-26. Put another way, in the case of a direct messaging service, the provider arguably exercises less editorial discretion and behaves in a manner closer to a so-called "dumb pipe." Because the statutes' provisions arguably reached beyond the use cases the parties had litigated, the parties had "treated these cases more like as-applied claims than like facial ones," and the

Court could not decide the statutes' facial validity on the merits. *Id.* at 724, 726.

In short, *Moody* held that the challengers had failed to consider what "other kinds of websites and apps" the statutes might cover, beyond the social-media feeds in the "heartland" of the laws at issue. *Id.* at 718, 724. Plaintiffs here have provided that analysis. *See, e.g.*, Br. of Pls.-Appellees CCIA & NetChoice ("NetChoice Br.") at 3-4, 7-9, 44-45. That is all that *Moody* requires.

The Attorney General is wrong to contend (at 35-36) that *Moody* requires more. The Attorney General offers (at 37) a few supposedly "valid uses" of HB18, such as "blocking stalking forums," and argues (at 35) that Plaintiffs should have provided a "systematic" accounting of every possible application of the law. Interpreting *Moody* this way would violate, rather than follow, Supreme Court precedent, which prohibits a reviewing court from "go[ing] beyond the statute's facial requirements and speculat[ing] about 'hypothetical' or 'imaginary' cases." *Washington State Grange*, 552 U.S. at 449-50. That is exactly what the Attorney General would have this Court do here.

Nor is the Attorney General's approach consistent with the "lowered . . . bar" applicable to First Amendment cases in particular. *Moody*, 603 U.S. at 723. Because a broad prohibition on speech "'may deter or chill constitutionally protected speech,'" a law can be invalidated in full under the First Amendment "even though it has lawful applications." *United States v. Hansen*, 599 U.S. 762, 769-70 (2023) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). For that reason, listing a few hypothetically valid applications of a law that may never come to pass cannot be enough to justify unconstitutional restrictions within the law's heartland. Put another way, the fact that HB18 is *so broad* that the Attorney General can name hypothetically permissible uses at the margins cuts against its validity, not for it.

**B.**    The "scope" analysis is straightforward here because HB18's scope is clearly defined and, in a key way, narrower than the law in *Moody*. Summarizing slightly, HB18 applies to online services that (1) allow a user to create a profile, (2) facilitate social interaction, and (3) allow users to post or share content with other users. NetChoice Br. 7-8 (citing HB18 §§ 509.001(1)-(2), 509.002(a)). In other words, HB18

7

applies to the sorts of curated social media feeds that the *Moody* Court addressed in Part III of its opinion (603 U.S. at 726-43).

The text of the Act contains explicit limitations that clarify "what actors" (*Moody*, 603 U.S. at 724) HB18 regulates. Notably, the Act does not apply to service providers that provide only "e-mail or direct messaging," HB18 § 509.002(b)(9). Those were the sorts of the services the Court in *Moody* believed could involve less editorial discretion and thus might merit reduced First Amendment scrutiny, thereby complicating review of the parties' facial challenge. HB18's text avoids that issue. Moreover, Plaintiffs here have outlined the specific "kinds of websites and apps," *Moody*, 603 U.S. at 718, that HB18 regulates. *See* NetChoice Br. 3-4, 7-9, 44-45. The claims here are thus *not* being litigated "more like as-applied claims." *Moody*, 603 U.S. at 724. The Court can reach the facial challenge.

HB18 is likewise clear about "[w]hat activities" (*Moody*, 603 U.S. at 724) it regulates. At the threshold, the Act does *not* regulate a provider's service if it "primarily functions to provide a user with access to news, sports, or commerce." HB18 § 509.002(b)(10). Those favored subject matters are excluded from HB18's coverage. Then, as to the rest, the Act

requires service providers to (among other things) prevent minors from being exposed to content that falls into a list of categories defined by subject matter and viewpoint. *See* HB18 § 509.053(a); NetChoice Br. 9. Specifically, the Act requires covered services to prevent minors' exposure to "harmful material and other content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB18 § 509.053(a).

HB18's text thus unambiguously "singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). At the threshold, the Act exempts from regulation service providers that focus on certain favored content—"news, sports, [or] commerce," HB18 § 509.002(b)(10). As to what remains covered, HB18 takes dead aim at content based both on its content and its viewpoint: Providers must prevent minors' exposure—that is, they must block or censor on Texas's behalf—material that "promotes, glorifies, or facilitates" expression within a number of categories defined by subject

matter, such as substance abuse, eating disorders, and self-harm. *Id.* § 509.053(a).[2]

Furthermore, and unlike in *Moody*, HB18's restrictions "intru[d]e on protected editorial discretion" (*Moody*, 603 U.S. at 725) in all of the Act's applications. As noted, HB18 generally excludes the direct messaging and email services that complicated the analysis in *Moody*. As a result, the Act is laser focused on the sorts of curated social media feeds the *Moody* Court held constitute protected expression by service providers. As to those feeds, the Court explained: "Deciding on the third-party speech that will be included in *or excluded from* a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 603 U.S. at 731 (emphasis added). The activity "is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint" and of "a set

---

[2] It bears repeating that these subject areas are targeted based not just on subject matter, *but on viewpoint*. Material that "promotes" self-harm is subject to regulation; material that *discourages* self-harm is not. Viewpoint restrictions are especially disfavored under the First Amendment. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." (citation omitted)).

of beliefs about *which messages are appropriate and which are not.*" *Id.* at 738 (emphasis added).

## II. HB18'S CONTENT- AND VIEWPOINT-BASED MANDATES MERIT STRICT SCRUTINY

As the foregoing makes clear, HB18 is a set of content-based and (more egregiously) viewpoint-based restrictions on the expressive content contained in social media feeds and similar services. It is hornbook First Amendment law that any regulation that would have the government "restrict expression because of . . . its content" is subject to strict scrutiny. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. That is plainly the case with HB18, which singles out non-sports, non-news, and non-commerce websites, and then requires the remaining sites to block minors from seeing content that promotes certain disfavored content.

The Supreme Court's recent decision in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. ---, 2025 WL 1773625 (June 27, 2025), is not to the contrary. *Free Speech Coalition* considered HB1181, also out of Texas,

which requires digital providers, in the absence of proof of age, to restrict access to content "that is obscene to minors." *Id.* at *11. HB1181's focus on "obscene" content was critical to the Court's reasoning and holding.

Obscenity falls outside the First Amendment's protection of free expression.[3] Accordingly, as to minors, the Court reasoned, HB1181 merely prevents minors from viewing content they "have no First Amendment right to access" in the first place. *Id.* And as to adults, HB1181's imposition was considered merely "incidental" to the statute's core aim of protecting minors. *Id.* at *8 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000)). The Court thus applied intermediate scrutiny to HB1181, *see id.* at *11, and sustained the law.

The Court in *Free Speech Coalition* said nothing to suggest that content- or viewpoint-based restrictions on fully protected expression are subject to anything less than strict scrutiny. On the contrary, *Free Speech Coalition* re-affirmed that strict scrutiny remains the appropriate

---

[3] The Supreme Court has long held certain very narrow categories of expression to fall outside the protections of the First Amendment. Those narrow categories include "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Free Speech Coalition*, 2025 WL 1773625, at *5 (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). The strict definition of obscenity is loosened somewhat in the context of minors under the so-called "junior obscenity" standard.

standard for laws that target fully protected content well afield of obscenity. *See id.* at *5.

HB18 is such a law. It requires service providers to prevent minors from viewing two categories of content: (1) "harmful material" "*and*" (2) "other content that promotes, glorifies, or facilitates" an enumerated list of other topics. HB18 § 509.053(a). The statute defines "harmful material"—numeral (1) above—to mean content that is obscene to minors (and may be subject to reduced constitutional scrutiny). *See id.* § 509.001(3) (defining "harmful material" by reference to Texas's penal code, which mirrors the Supreme Court's obscenity test). But the defined term "harmful material" is then followed by the conjunction "and" and an additional list of *other* enumerated restricted subjects of expression, such as "suicide, self-harm, [and] eating disorders." HB18 § 509.053(a).[4]

The additional subjects referenced in HB18 cannot be considered obscenity subject to reduced scrutiny. *First*, as a matter of straightforward statutory interpretation. HB18 lists several topics for censorship *after and in addition to* the explicit reference to obscenity. If

---

[4] The Attorney General is thus simply wrong to suggest (at 41-43) that HB18's age-verification provision does no more than "shield minors from exposure to obscene online content."

the additionally banned topics themselves met the definition of obscenity, then the phrase "and other content that promotes, glorifies, or facilitates suicide, [etc.]" would be meaningless. The only sensible reading of HB18 gives distinct meaning to those additional terms. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385-86 (2013) (canon against surplusage).

*Second*, as a matter of First Amendment law, the topics HB18 targets for censorship flunk the First Amendment's demanding obscenity standard. Content is obscene for minors only if the content "(a) taken as a whole, and under contemporary community standards, appeal[s] to the prurient interest of minors; (b) depict[s] or describe[s] specifically defined sexual conduct in a way that is patently offensive for minors; and (c) taken as a whole, lack[s] serious literary, artistic, political, or scientific value for minors." *Free Speech Coalition*, 2025 WL 1773625, at *7 (emphasis omitted). That definition is sufficiently demanding that it "could not conceivably be read to cover, say, a PG-13- or R-rated movie." *Id.* at *10 n.7.[5]

---

[5] And with good reason. Because the government may, under *Free Speech Coalition*, incidentally burden *adults'* access to speech that is obscene only for minors, every expansion to the "junior obscenity" standard also contracts the First Amendment rights of adults.

Whatever one's views of the categories listed for censorship in HB18, they do not clear this historically high bar. (To borrow *Free Speech Coalition*'s litmus test, they could easily be the subject of an R-rated movie.) It is also easy to see how content within the targeted categories—even if risqué or unsavory—could contain "serious literary, artistic, political, or scientific value for minors." *Id.* at *7 (emphasis omitted). Indeed, the "value" inquiry is especially vital in this context, because minors are not a monolith: the same content about "substance abuse," for example, *see* HB18 § 509.053(a)(2), that may tempt an 11-year old may have tremendous artistic or educational value to a 17-year-old minor on the cusp of becoming a full-fledged, politically engaged citizen.[6] Yet HB18—which does not assess the value of the "other content" it regulates—would treat those two minors exactly alike.

---

[6] To this point, *Free Speech Coalition* strongly suggests that the obscenity analysis—including the value prong—should be assessed "from the perspective of an adolescent." 2025 WL 1773625, at *10 n.7. More broadly, the obscenity doctrine's requirement that a work be assessed for the *total absence* of serious value acts as an important bulwark against governmental attempts to dictate morals and beliefs. The First Amendment protects expression and access to information "regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller*, 413 U.S. at 34.

Because HB18's "other content" restrictions do not target obscenity, they must satisfy full-strength First Amendment scrutiny. Minors, like adults, enjoy "robust First Amendment protections." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 193 (2021). This includes the right to expression, *see, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511-14 (1969), as well as "the right to receive information and ideas," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico ex rel. Pico*, 457 U.S. 853, 867-68 (1982) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). Accordingly, "[i]n most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) (footnote omitted).

The upshot is that the First Amendment deprives Texas of "a free-floating power to restrict the ideas to which children may be exposed. 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794-95 (2011) (quoting *Erznoznik*, 422 U.S. at 213-14).

16

HB18 runs afoul of these well-settled principles. And because of the way it was crafted, it does so in all of its applications. Facial review is appropriate here, and strict scrutiny applies.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

*s/Benjamin S. Softness*

| | |
|---|---|
| Lee Rowland | Benjamin S. Softness |
| Erika Sanders | KING & SPALDING LLP |
| NATIONAL COALITION | 50 California Street |
| AGAINST CENSORSHIP | Suite 3300 |
| 29 Broadway, Suite 1400 | San Francisco, CA 94111 |
| New York, NY 10006 | (415) 318-1200 |
| (212) 807-6222 | bsoftness@kslaw.com |
| | |
| | Rachel E. Craft |
| | KING & SPALDING LLP |
| | 1185 Avenue of the Americas |
| | 34th Floor |
| | New York, NY 10036 |
| | (212) 556-2100 |
| | rcraft@kslaw.com |

*Counsel for Amicus Curiae National Coalition Against Censorship*

July 10, 2025

## CERTIFICATE OF SERVICE

I certify that on July 10, 2025, I caused the foregoing *amicus* brief to be filed with the Court electronically using the CM/ECF system. All counsel will receive service through the CM/ECF system.

*s/Benjamin S. Softness*
Benjamin S. Softness

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5), because it contains 3,321 words, as counted by Microsoft Word, excluding the parts of the brief excluded by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared using Microsoft Word in Century Schoolbook 14-point font.

I further certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of Microsoft Defender and is free of viruses.

Date: July 10, 2025

*s/Benjamin S. Softness*
Benjamin S. Softness

*Counsel for Amicus Curiae*