# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, et al.,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, Attorney General of Texas

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS, et al.,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, Attorney General of Texas

*Defendant-Appellant.*

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
CASE NOS. 1:24-CV-849 & 1:24-CV-945

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION,
ACLU OF TEXAS, CATO INSTITUTE, STUDENT PRESS LAW CENTER,
TECHFREEDOM, WIKIMEDIA, AND WOODHULL FREEDOM
FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

Chloe Kempf
Brian Klosterboer
Edgar Saldivar
Thomas Buser-Clancy
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
ckempf@aclutx.org

Vera Eidelman
Lauren Yu
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae American Civil Liberties Union, ACLU of Texas, Cato Institute, Student Press Law Center, TechFreedom, Wikimedia, and Woodhull Freedom Foundation state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

Pursuant to Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| American Civil Liberties Union | Amicus curiae |
| ACLU of Texas | Amicus curiae |
| Cato Institute | Amicus curiae |
| Student Press Law Center | Amicus curiae |
| TechFreedom | Amicus curiae |
| Wikimedia | Amicus curiae |
| Woodhull Freedom Foundation | Amicus curiae |
| Thomas Buser-Clancy | Counsel to amici |

Vera Eidelman                        Counsel to amici

Chloe Kempf                          Counsel to amici

Brian Klosterboer                    Counsel to amici

Edgar Saldivar                       Counsel to amici

Lauren Yu                            Counsel to amici


Dated: July 10, 2025                 By: */s/ Vera Eidelman*
                                     Vera Eidelman

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... iv

STATEMENT OF INTEREST...............................................................................1

INTRODUCTION .................................................................................................5

ARGUMENT .........................................................................................................7

    I.  Core First Amendment Activity Takes Place Online...................................7

    II.  Content-Based Burdens Trigger Strict Scrutiny, Even If They Aim
          to Protect Minors .................................................................................9

    III. Requiring Social Media Platforms to Filter Out Content That
          Could Lead to Harmful Behaviors Violates the First Amendment. ........12

         A. Speech Cannot Be Suppressed Simply Because the
             Government Deems It Unsuitable for Minors. .............................13

         B. Because of the Overly Broad Nature of Section 509.053, It
             Is Not Narrowly Tailored. ............................................................16

         C. Vague Laws Fail Strict Scrutiny......................................................19

         D. Narrow Tailoring Requires No Less Restrictive Alternatives........20

CONCLUSION ....................................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................................25

CERTIFICATE OF SERVICE .............................................................................26

# TABLE OF AUTHORITIES

## Cases

*American Amusement Machine Association v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) ................................................. 13, 14, 15

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ............................................................... 15, 16, 18

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................. 21

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) .................................................................... passim

*Computer & Communications Industry Association v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ................................. 9, 13, 22

*Connick v. Myers*,
461 U.S. 138 (1983) .......................................................................... 14

*Dennis v. United States*,
341 U.S. 494 (1951) .......................................................................... 18

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ................................................... 7, 10, 15, 19

*Free Speech Coal. v. Paxton*,
606 U.S. __, No. 23-1122, 2025 WL 1773625 (June 27, 2025) .............. 1, 12, 13

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) .......................................................................... 18

*Interstate Circuit, Inc. v. City of Dallas*,
390 U.S. 676 (1968) .......................................................................... 20

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) .......................................................................... 19

*Mahanoy Area School District v. B. L. by & through Levy*,
594 U.S. 180 (2021) ................................................................. 1, 11, 12

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)......................................................................22

*NetChoice, LLC v. Bonta,*
113 F.4th 1101 (9th Cir. 2024) .................................................. 17, 23

*NetChoice, LLC v. Griffin,*
No. 5:23-cv-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .....................23

*NetChoice, LLC v. Paxton,*
49 F.4th 439 (5th Cir. 2022)...........................................................8

*NetChoice, LLC v. Reyes,*
748 F. Supp. 3d 1105 (D. Utah 2024)...................................................16

*New York v. Ferber,*
458 U.S. 747 (1982)..................................................................18

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ................................................................ 1, 7, 9

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,*
413 U.S. 376 (1973)..................................................................21

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)................................................................9, 12

*Reno v. ACLU,*
521 U.S. 844 (1997)............................................................. passim

*Rowan v. U.S. Post Office Department,*
397 U.S. 728 (1970)..................................................................10

*Snyder v. Phelps,*
562 U.S. 443 (2011)..................................................................14

*Terminiello v. City of Chicago,*
337 U.S. 1 (1949)....................................................................14

*Tinker v. Des Moines Independent Community School District,*
393 U.S. 503 (1969)....................................................................1

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000).................................................................. 9, 22, 23

*United States v. Williams*,
  553 U.S. 285 (2008).........................................................................18

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943).........................................................................11

*Yellowhammer Fund v. Attorney General of Alabama Steve Marshall*,
  733 F. Supp. 3d 1167 (M.D. Ala. 2024)............................................18

**Statutes**

Texas House Bill 18 § 509.002 ..............................................................16

Texas House Bill 18 § 509.053 ..................................................... passim

Texas Penal Code § 43.24 .....................................................................12

**Other Authorities**

*Common Law School Abbreviations*, Reddit (last updated July 5, 2021)...............21

Corbin K. Barthold, *Age-Verification Laws Are a Verified Mistake*, Law &
  Liberty (Jan. 9, 2025).........................................................................3

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key
  Findings From Pew Research Center Surveys*, Pew Research Center (Apr.
  24, 2023) ...........................................................................................8

*Facilitate,* Merriam-Webster Dictionary (last updated June 16, 2025) ..................17

Jeffrey Gottfried, *Americans' Social Media Use*, Pew Research Center (Jan.
  31, 2024) ............................................................................................8

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People
  Online*, The Verge (July 27, 2021).....................................................11

Melina Delkic, *Leg Booty? Panoramic? Seggs? How TikTok Is Changing
  Language*, N.Y. Times (Nov. 19, 2022), (last updated Jan. 4, 2024). ...............21

Michelle Faverio & Olivia Sidoti, *Teens, Social Media and Technology
  2024*, Pew Research Center (Dec. 12, 2024).......................................8

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) ........................................................................8, 11

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* (2022) ..................................................................................8

**STATEMENT OF INTEREST**[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The ACLU of Texas is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. The ACLU and ACLU of Texas have frequently appeared before courts to advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), *Free Speech Coal. v. Paxton*, 606 U.S. __, No. 23-1122, 2025 WL 1773625 (June 27, 2025) (counsel), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel). As organizations committed to protecting the rights to freedom of speech and freedom from government censorship, the ACLU and ACLU of Texas have a strong interest in the proper resolution of this case.

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, files amicus briefs, and produces the annual *Cato Supreme Court Review*. This case interests Cato because it concerns the application of core First Amendment principles to online communication, a critically important issue in the digital age.

The Student Press Law Center ("SPLC") is a national, nonprofit, nonpartisan organization established in 1974 that works to promote, support, and defend the press freedom and freedom of information rights of high school and college journalists. As the only national organization devoted exclusively to defending the legal rights of the school-sponsored and independent student press, SPLC collects information on student press cases nationwide and produces many resources on student press law, including its book, *Law of the Student Press* (4th ed.). In finding that the act of newsgathering itself would potentially expose minors to harmful or potentially harmful content, SPLC is concerned that Texas House Bill 18 ("HB 18") would significantly hinder both those students seeking news as well as the student journalists who report it.

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. TechFreedom opposes government efforts to control online speech,

including laws that explicitly or implicitly mandate age-gating online content at the source. As TechFreedom's experts have explained in extensive expert commentary, online age-verification laws sacrifice privacy, free speech, and parental authority on the altar of good intentions. *See*, *e.g.*, Corbin K. Barthold, *Age-Verification Laws Are a Verified Mistake*, L. & Liberty (Jan. 9, 2025), tinyurl.com/2avh8w48.

Wikimedia is a nonprofit charitable foundation based in San Francisco, California on a mission to "keep knowledge free." It accomplishes that goal through advocacy work and by hosting thirteen free-knowledge platforms known as the Wikimedia Projects. Wikipedia, Wikimedia's most well-known platform, serves as a free online encyclopedia that allows users to write and edit content collaboratively. The Wikimedia Projects host factual and educational content that is created, edited, and moderated by over 275,000 volunteer contributors per month worldwide. Volunteer editors determine whether a topic is notable enough to deserve its own page, confirm that content remains accurate, and ensure that pages are notable, neutral, and cited by reliable sources.

The Woodhull Freedom Foundation ("Woodhull") is a nonprofit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. The organization works to improve the well-being, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull is

particularly concerned with governmental attempts to censor or burden access to online speech, as sexual expression is often a target of such efforts. Woodhull believes that if this Court upholds the constitutionality of the challenged law, more jurisdictions will be incentivized to pass similar statutes threatening the ability of its members to effectively advocate for sexual freedom and communicate about human sexuality online.

## INTRODUCTION

People rely on social media to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and build movements. Platforms like YouTube, TikTok, and Instagram allow children and teenagers to discover different perspectives, discuss social and political issues, and develop a better understanding of others' beliefs and opinions. Social media provides access to a vast array of information and ideas, and fosters communication and association between people who might otherwise never speak to each other. Such social media use lies at the heart of First Amendment protection.

In 2023, the Texas Legislature passed Texas House Bill 18 ("HB 18") in an effort to "prevent harm to known minors" online, including by blocking access to large swaths of content to any user of a social media platform who registers as under 18, or whose purported parent or guardian registers them as such. In particular, Section 509.053 forbids exposing "known minors" to "content that promotes, glorifies, or facilitates (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB 18 § 509.053(a).

In passing the law, the Legislature was understandably concerned with the wellbeing and safety of minors. But, by the law's plain text, it restricts much more than just "harmful" content online. For example, any content with a comment section

can "facilitate" bullying by providing a way for users to communicate and interact with each other online, potentially cutting off children and teens from accessing educational, artistic, and other beneficial material on social media. Similarly, content that "facilitates" or "promotes" self-harm or substance abuse could reach anything that might cause a young person deep anguish, from reporting about school shootings, war, and teen suicide, to minors' own personal updates about deaths in the family, rejection from a college, or a breakup. Such a regulation is content-based, triggers strict scrutiny, and falls far short of the narrow tailoring required for governmental intrusion into constitutionally protected speech.

Section 509.053's regulation of how social media platforms must implement these content blocks further highlights its insufficient tailoring. Pursuant to the law, platforms must "creat[e] and maintain[] a comprehensive list of [such] harmful material," and then use "filtering technology," "hash-sharing technology," "human-performed monitoring reviews," *and* "other protocols" to block content on that list, while also "making available the [platform's] algorithm code" (a term not defined in the law) and "creating and maintaining a database of keywords used for filter evasion." HB 18 § 509.053(b)(1). Not only is it unclear how feasible and effective it would be for every platform to follow each of these mandates, but these requirements will inevitably restrict more content than necessary. Whether content "promotes, glorifies, or facilitates" the behaviors targeted by HB 18 depends on

context that filters do not account for. The technologies involved are likely to be overinclusive, and, if anything, the regulated social media platforms will be pushed by the law to overcomply.

The Supreme Court has made clear that, even where children are concerned, the government cannot regulate speech "solely to protect the[m] . . . from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214–15 (1975). Notwithstanding societal fears about new technologies and mediums—including the ideas they might expose minors to—the Supreme Court has, time and again, struck down legislation seeking to protect kids from their purported dangers, from violent video games, *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789 (2011), to communications online, *Reno*, 521 U.S. at 874, to drive-in movies, *Erznoznik*, 422 U.S. at 212–13. The same result is warranted here. Despite any good intentions, HB 18 goes too far in regulating protected speech online.

## ARGUMENT

## I.     Core First Amendment Activity Takes Place Online

In 2017, the Supreme Court recognized that the "most important places . . . for the exchange of views" are "the 'vast democratic forums of the Internet' in general . . . and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno*, 521 U.S. at 868). Since then, social media platforms'

"position as the modern public square has only become more entrenched," "as the public's usage of and dependence on the Platforms has continued to increase." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 475 (5th Cir. 2022) (footnote omitted).

The vast majority of Americans use social media today,[2] and teens are no different—for example, over 60 percent of teens use TikTok and Instagram, and 90 percent use YouTube.[3] Teens often turn to social media to express themselves. The majority of teens reported that social media offers them "a place where they can show their creative side,"[4] and tweens and teens regularly "use their digital devices to create some type of art or music."[5] Although teens are too young to vote, they use social media to educate themselves and share political opinions.[6] "In short, social media users employ these websites to engage in a wide array of protected First

---

[2] Jeffrey Gottfried, *Americans' Social Media Use*, Pew Rsch. Ctr. (Jan. 31, 2024), https://perma.cc/9C5P-TSTV.

[3] Michelle Faverio & Olivia Sidoti, *Teens, Social Media and Technology 2024*, Pew Rsch. Ctr. (Dec. 12, 2024), https://perma.cc/3YYS-K8LB.

[4] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/MMZ6-WVA5.

[5] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41 (2022), https://perma.cc/HW8D-CHMA.

[6] Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/X9SZ-9ZLH.

Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno*, 521 U.S. at 852).

## II.   Content-Based Burdens Trigger Strict Scrutiny, Even If They Aim to Protect Minors

By its plain language, Section 509.053 is content-based: it regulates speech that "promotes, glorifies, or facilitates" four categories of harmful behavior: "(1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB 18 § 509.053(a). Whether online speech triggers the regulation necessarily depends on "the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). To quote the district court, "[t]hat is as content based as it gets." *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036 (W.D. Tex. 2024). Indeed, while Texas objects to the district court's holding that HB 18 is content-based as a whole, it does not contest the holding that Section 509.053 is independently content-based. *See* Appellant's Br. at 30–33, ECF No. 75.

Because Section 509.053 is a content-based regulation, it is subject to strict scrutiny. *Brown*, 564 U.S. at 799; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The level of scrutiny that must be applied does not change simply because the regulation concerns minors.

To the contrary, content-based laws, even if meant to protect minors, trigger the same concern about government regulation as all content-based regulations of speech do. Where it is the details of the regulated speech or medium that "arouse[s] the reader's ire, and the reader's desire to put an end to th[e] horrible message," the danger is "that the *ideas* expressed by speech—whether it be violence, or gore, or racism—and not its objective effects, may be the real reason for governmental proscription." *Brown*, 564 U.S. at 799; *see also Reno*, 521 U.S. at 868 (noting that a statute regulating minors' access to "indecent" and "patently offensive" material online was "a content-based blanket restriction on speech").

Moreover, "[m]inors are entitled to a significant measure of First Amendment protection." *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). The First Amendment protects the "public dissemination of protected materials to [minors]." *Erznoznik*, 422 U.S. at 212–13; *see also Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 741 (1970) (Brennan, J., concurring) (statute providing that "parents could[] prevent their children, even if they are 18 years old, from receiving political, religious, or other materials that the parents find offensive . . . [would] not [be] without constitutional difficulties").

And the First Amendment also protects what young people—who are often at the forefront of movements, trends, and technologies[7]—can say. *Mahanoy*, 594 U.S. at 187 (recognizing "significant . . . First Amendment protection" for what minors say online (quoting *Brown*, 564 U.S. at 794)); *see also Brown*, 564 U.S. at 795 n.3 (discussing importance of protecting minors' right to attend rallies "in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"). "Even where the protection of children is the object, the constitutional limits on governmental action apply." *Id*. at 804–05.

Indeed, the fact that a speaker or listener is young is reason not for the diminution of their rights, but "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Even when minors are involved, "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.* at 641. "Our representative democracy only works if we protect the 'marketplace of ideas,'" which "facilitates an informed public opinion" and

---

[7] *See, e.g.*, Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, The Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation; Harris, *supra* note 6.

ultimately "helps produce laws that reflect the People's will," including young

people. *Mahanoy,* 594 U.S. at 190.[8]

### III. Requiring Social Media Platforms to Filter Out Content That Could Lead to Harmful Behaviors Violates the First Amendment.

To survive strict scrutiny, Texas must "prove that the restriction furthers a

compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S.

at 171 (citations omitted). "Strict scrutiny—which requires a restriction to be the

---

[8] The only category of speech in which minors' rights are diminished as compared to adults is sexual content that meets the standard for "harmful to minors" content. Specifically, "a State may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*" even if the works do not qualify as obscenity for adults, as long as the regulation burdens only access by minors and is reasonably related to a legitimate government interest. *Free Speech Coal., Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625, at *7 (June 27, 2025). That test does not govern here, given the breadth of non-sexual content covered by the law.

Even if the statute's requirement that platforms block "harmful [sexual] material," as defined in Section 43.24 of the Texas Penal Code, from minors could be severed from the rest of the statute, it is not clear that it would survive. The Texas Penal Code defines the relevant content as "material whose dominant theme taken as a whole: (A) appeals to the prurient interest of a minor, in sex, nudity, or excretion; (B) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) is utterly without redeeming social value for minors." Tex. Penal Code § 43.24(2). This falls short of the strict requirements for "harmful to minors" content in several ways: it does not specifically define the sexual conduct that triggers the prohibition; it requires only that the work's "dominant theme" be "taken as a whole," not that the entirety of the work is; and it fails to specify the age of the relevant minor, potentially reaching beyond "the perspective of an adolescent." *See Free Speech Coal.*, 2025 WL 1773625, at *10 n.7.

least restrictive means of achieving a compelling governmental interest—is the most demanding test known to constitutional law." *Free Speech Coal., Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625, at *11 (June 27, 2025) (cleaned up). Texas cannot satisfy that stringent burden here.

> ### A. Speech Cannot Be Suppressed Simply Because the Government Deems It Unsuitable for Minors.

First, with respect to the state's interest, the district court correctly observed that "[i]t is far from clear that Texas has a compelling interest in preventing minors' access to every single category of information listed above." *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1036. As the Supreme Court has recognized, although the government "possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (cleaned up).

Put even more plainly, "it is obvious that [young people] must be allowed the freedom to form their political views on the basis of uncensored speech," in part because they "are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). "To shield children right

up to the age of 18 from exposure to violent descriptions and images," and other troubling content, "would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id*. Blocking minors' access to content about suicide, substance abuse, eating disorders, and sexual abuse does not remove those harms from their reality; it just makes young people less equipped to deal with and combat them.

The Supreme Court's admonition that speech that causes deep anguish or severe emotional distress cannot be banned or burdened based on "the content and viewpoint of the message conveyed" also dooms the law. *Snyder v. Phelps*, 562 U.S. 443, 457 (2011). This prohibition on regulating speech *because* of its offensive, hurtful, and even materially harmful message derives, in part, from the recognition that such speech often deals with matters of public concern and so "occupies the highest rung of the hierarchy of First Amendment values." *Id.* at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Speech at the zenith of protection "is often provocative and challenging" and "may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

This is no less true where the government's stated interest is to protect minors. Nearly every time a new communications technology emerges, some in society fear the effects it will have on minors. "In the 1800's, dime novels depicting crime . . .

were blamed in some quarters for juvenile delinquency. When motion pictures came along, they became the villains instead. . . . Radio dramas were next, and then came comic books. . . . And, of course, after comic books came television and music lyrics." *Brown,* 564 U.S. at 797–98 (citations omitted). Video games followed. *Id.* And yet, the Supreme Court has repeatedly struck down legislation seeking to protect kids from purportedly dangerous new mediums. *See id.* at 805 (striking down law requiring parental consent before minors can access violent video games); *Reno*, 521 U.S. at 874 (invalidating statute prohibiting indecent communications available to minors online); *Erznoznik*, 422 U.S. at 212–13 (invalidating restriction on drive-in movies designed to protect minors).[9]

Relatedly, speech about "teenage sexual activity and the sexual abuse of children" cannot be banned out of concern that it is bad for minors; to the contrary, "[b]oth themes . . . have inspired countless literary works," including everything from *Romeo and Juliet* to Oscar-nominated or -winning films like *Traffic* and *American Beauty*. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247–48 (2002). "Our

---

[9] Often, as may be the case here, the concerns are motivated by perceptions that the medium at issue is uniquely "interactive"—but that too "is nothing new," for "all literature is interactive." *Brown,* 564 U.S. at 798. Indeed, "the better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *Id.* (quoting *Am. Amusement Mach. Ass'n.*, 244 F.3d at 577).

society, like other cultures, has empathy and enduring fascination with the lives and destinies of the young . . . when wounds can be so grievous, disappointment so profound, and mistaken choices so tragic, but when moral acts and self-fulfillment are still in reach." *Id.* at 248. Laws that sweep so broadly as to sweep in such content are "inconsistent with [the] First Amendment." *Id.*

### B. Because of the Overly Broad Nature of Section 509.053, It Is Not Narrowly Tailored.

Even if Texas could show a compelling interest in restricting minors' access to the content covered by Section 509.053, the law is undoubtedly overinclusive such that it is not narrowly tailored to the government's interest in preventing minors' exposure to the content the legislature deems harmful.[10]

---

[10] It is also underinclusive as a means of protecting minors from harmful content online because it only regulates digital services that allow users to "socially interact with others," create a public or semi-public profile, and post content. HB 18 § 509.002(a). It does not reach the exact same categories of "harmful" content when they are sent via e-mail or direct messaging services, or appear on sites that "primarily function[] to provide . . . access to news, sports, commerce, or content primarily generated or selected by the digital service provider." *Id* § 509.002(b). Thus, the law could require a social media platform to block access to any posts about a news article, while leaving the article itself untouched. *Cf. NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1128 (D. Utah 2024) (finding that a law was underinclusive because it "preserve[d] minors' access to the addictive features Defendants express particular concern with on all internet platforms other than social media services" (footnote omitted)). Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

Under the plain language of the statute, there is no shortage of indisputably valuable speech that is prohibited. For example, in its ordinary meaning, to "facilitate" means "to make (something) easier."[11] Nutrition information, which could help someone make better food choices for their health, might make it easier for another person to obsessively track their food and develop an eating disorder.

A song with lyrics expressing the artist's feelings of depression, including thoughts of self-harm and/or suicide, could be a source of comfort for one person, but also introduce another person to the concept of self-harm and/or suicide, thereby making it easier for them to engage in such harmful behavior. *See also, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (finding that a law intended to protect minors from harmful material online would also restrict "online mental health resources and communities that many children turn to for support").

An educational video about the dangers of drugs could similarly "facilitate" substance abuse by introducing a drug that a person had not heard of before and thereby make it easier for that person to become addicted to that substance. A social media post commenting on interpersonal dynamics in an episode of reality television could be considered "glorif[ying]" bullying or harassment. A "day in my life" video

---

[11] *Facilitate,* Merriam-Webster Dictionary, https://perma.cc/G385-89HU (last updated June 16, 2025).

could "facilitate" stalking by showing locations where a creator can frequently be found and what routes they take when going about a typical day.[12]

In addition, virtually any digital service provider, as defined by HB 18, may "facilitate" bullying or harassment because it provides an opportunity for minors to

---

[12] These examples also highlight the flaws in the government's attempt to argue that the law regulates only unprotected speech. *See* Appellant's Br. at 36 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (speech integral to criminal conduct); and then citing *New York v. Ferber*, 458 U.S. 747, 758 (1982) (child pornography)).

As an initial matter, not all of the targeted behaviors—such as self-harm, eating disorders, and, given the lack of any limiting definition, substance abuse, bullying, harassment, and grooming—are illegal. Moreover, to suggest that the examples above are all intended for, or integral to, any illegal conduct—as is required for them to fall within the speech-integral-to-criminal-conduct exception—strains credulity. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 298 (2008) (speech "intended to induce or commence illegal activities" is not protected by the First Amendment). "[E]ven speech related to unlawful conduct can have constitutional value, including the potential to inform, critique, entertain, and otherwise enrich the 'interchange of ideas.'" *Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*, 733 F. Supp. 3d 1167, 1195 (M.D. Ala. 2024) (quoting *Dennis v. United States*, 341 U.S. 494, 549 (1951) (Frankfurter, J., concurring in the judgment)). Thus, in *Williams*, the Supreme Court instructed that speech that recommends "a *particular* piece of . . . child pornography with the *intent of initiating a transfer*" could be prohibited while other kinds of speech about child pornography could not. 553 U.S. at 300 (emphasis added).

For similar reasons, the government is wrong to suggest that the statute is limited to regulating child sexual abuse material—"pornography produced with real children"—which the government can regulate because "[t]he production of the work, not its content" is the target of the government's concern. *Ashcroft*, 535 U.S. at 246, 249. HB 18 is not limited to content that is created through or depicts the sexual abuse of minors.

socially interact with each other—in some ways, not unlike how letting them out for recess in a schoolyard may result in bullying. That the interaction takes place online should not make a meaningful difference. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).

The sheer breadth of content restricted by Section 509.053 runs counter to the Supreme Court's admonition that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14 (voiding a law that "suppressed" the showing of adult films at drive-in theaters even though the speech would remain available to adults in other venues).

### C.    Vague Laws Fail Strict Scrutiny

That many of the terms used in the statute—including "promotes, glorifies, or facilitates," "self-harm," "bullying," and "grooming," among others—are vague only adds to the law's "obvious chilling effect on free speech," and also opens the door to "discriminatory enforcement," thus "pos[ing] great[] First Amendment concerns." *Reno*, 521 U.S. at 872 (cleaned up). The fact that this law purports to

protect children does not diminish the standard. *See id.* at 875. "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (quotation marks and citation omitted) (striking down city ordinance imposing misdemeanor penalty on movie theaters for showing films "not suitable for young persons" as impermissibly vague).

### D. Narrow Tailoring Requires No Less Restrictive Alternatives

The law's insufficient tailoring can also be seen in the implementation requirements laid out by Section 509.053, which will inevitably capture and block access to content even beyond the categories identified in the statute. For example, the law requires digital service providers to "creat[e] and maintain[] a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs." HB 18 § 509.053(b)(1)(D). It also requires using content filtering to block minors' access to content deemed harmful by the statute. *Id.* § 509.053(b)(1)(B).

As a matter of law, filtering content before it is published to willing listeners— and "before an adequate determination that it is unprotected"—is, by definition, less tailored than punishing posting after the fact. *See Pittsburgh Press Co. v. Pittsburgh*

*Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (prior restraints "come[] to [court] bearing a heavy presumption against [their] constitutional validity"). As a matter of implementation, filtering content risks blocking content without context, which can sweep in innocuous material that should not be blocked, even under the terms of the statute itself.

This can be illustrated easily with the keyword filtering requirement. If, for example, the words used in Section 509.053 itself are included on the list, both content about the "grooming" of minors and content about pet grooming would be blocked, even though the latter would not be considered harmful within the statute's definition. That the list of keywords must include words often used to evade content filters only expands the reach of the statute. A common abbreviation for sexual assault used on TikTok is "SA,"[13] which is also the abbreviation used to describe San Antonio or a summer associate at a law firm during their 2L summer.[14] This is far from narrow tailoring.

---

[13] Melina Delkic, *Leg Booty? Panoramic? Seggs? How TikTok Is Changing Language*, N.Y. Times (Nov. 19, 2022), https://www.nytimes.com/2022/11/19/style/tiktok-avoid-moderators-words.html (last updated Jan. 4, 2024).

[14] *Common Law School Abbreviations*, Reddit, https://www.reddit.com/r/LawSchool/wiki/abbreviations (last updated July 5, 2021).

The sheer number of implementation requirements—maintaining a comprehensive list of harmful content, using filtering technology, using hash-sharing technology, maintaining a keyword database, relying on human-performed monitoring, and making the platform's full algorithmic code available to independent researchers—further shows that Section 509.053 is not the least restrictive means for blocking minors from accessing the regulated material. Texas has not explained how *all* of these are necessary to prevent harm to minors. For example, the district court found that, on the factual record before it, Texas had not shown the necessity of "hash-sharing technology" and "publishing depictions of filtered content." *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1037.

The existence of less restrictive alternatives that do not appear in the statute at all also shows that Section 509.053 is not narrowly tailored. *See Playboy Ent. Grp.*, 529 U.S. at 814. This includes, as the district court found on the record below, digital service providers' implementation of their existing "content-moderation policies to ensure that minors cannot access harmful content." *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1037; *see also, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 738–39 (2024) (finding that Facebook and YouTube's content moderation guidelines already excluded a lot of content that was targeted by the law in question).

And further examples of less restrictive alternatives can be found in case law. In *Reno*, where the Supreme Court considered a prohibition on the "transmission of

obscene or indecent messages to any recipient under 18 years of age," the Court held that the government had failed to explain why the prohibition was the least restrictive means necessary, noting possible alternatives such as tagging indecent material to facilitate parental control, "making exceptions for messages with artistic or educational value," and "providing some tolerance for parental choice." 521 U.S. at 879. *Playboy Entertainment Group* also concerned the issue of protecting minors from indecent material; there, the Court considered a statute requiring cable television operators to limit transmission of "sexually-oriented programming" to "hours when children are unlikely to be viewing," as set by administrative regulations. 529 U.S. at 806. In identifying a less restrictive alternative, the Court highlighted the capability of cable television operators to block channels "on a household-by-household basis" upon request, holding that this "targeted blocking enable[d] the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners." *Id.* at 815–16; *see also, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th at 1121 (listing "voluntary content filters or application blockers" as a less restrictive means to protect minors from harmful content online); *NetChoice, LLC v. Griffin*, No. 5:23-cv-5105, 2025 WL 978607, at *13–14 (W.D. Ark. Mar. 31, 2025) (finding that "encouraging users (or their parents) to control their own access to information" was a less restrictive alternative).

Here, similar alternatives exist. Digital service platforms could implement parental controls such that content is blocked for a user only when that user or their parent has requested the content be blocked. And the categories in Section 509.053 could be more narrowly defined to, for example, allow for "exceptions for messages with artistic or educational value," *Reno*, 521 U.S. at 879, among others, which could help to avoid the law's troublingly sweeping reach, as described above.

## CONCLUSION

For these reasons, the Court should affirm the court below and hold that Section 509.053 violates the First Amendment.

Dated:                                                Respectfully submitted,

*/s/ Vera Eidelman*
Vera Eidelman
Lauren Yu
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

Chloe Kempf
Brian Klosterboer
Edgar Saldivar
Thomas Buser-Clancy
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
ckempf@aclutx.org

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains ___5738___ words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 365.

Dated: July 10, 2025                                By: */s/ Vera Eidelman*
                                                                    Vera Eidelman

                                                                    *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 10, 2025

By: */s/ Vera Eidelman*
Vera Eidelman

*Counsel for Amici Curiae*