Nos. 24-50721 & 25-50096

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE L.L.C.,

PLAINTIFFS – APPELLEES,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

DEFENDANT – APPELLANT.

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., by and through next
friend, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON
CLOSSON,

PLAINTIFFS – APPELLEES,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

DEFENDANT – APPELLANT.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

## BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION,
## FREEDOM TO READ FOUNDATION, AND LGBT TECH IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

David Greene
 Counsel of Record
Aaron Mackey
Emma Armstrong
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org
Telephone: (415) 436-9333
Fax:  (415) 436-9993

*Counsel for Amici Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certifies that the following additional persons and entities have an interest in the outcome of this case:

1. Electronic Frontier Foundation, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2. Freedom to Read Foundation, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

3. LGBT Tech, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

4. David Greene, Aaron Mackey, Emma Armstrong, attorneys for *amici curiae*.

Dated: July 10, 2025

/s/ *David Greene*
David Greene

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ............................ i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF INTEREST OF AMICI ............................................... 1

INTRODUCTION .................................................................................. 3

ARGUMENT ......................................................................................... 5

I.  HB 18 BLOCKS MINORS FROM ACCESSING LAWFUL SPEECH ON
    SOME OF THE MOST IMPORTANT DIGITAL FORUMS ........................ 5

    A.  ADULTS AND MINORS RELY ON THE INTERNET TO
        ENGAGE IN A DIVERSE RANGE OF PROTECTED
        EXPRESSION ........................................................................ 5

    B.  THE VAST MAJORITY OF ONLINE CONTENT THAT WILL BE
        AGE-GATED FOR ALL USERS AND BLOCKED FOR MINORS
        IS CONSTITUTIONALLY PROTECTED. ..................................... 12

II. HB 18 BURDENS MINORS AND ADULTS' FIRST AMENDMENT
    RIGHTS .................................................................................... 15

    A.  THE ACT IMPERMISSIBLY PREVENTS MINORS FROM
        ACCESSING PROTECTED SPEECH ........................................... 15

    B.  THE ACT ALSO BURDENS THE FIRST AMENDMENT RIGHTS
        OF ADULTS AND MINORS BY IMPOSING AGE GATES THAT
        BURDEN EXPRESSION, ANONYMITY, AND PRIVACY. ............. 17

        1.  Many verification requirements will either chill or entirely
            block access to lawful speech. .................................. 19

        2.  Online age-assurance schemes impermissibly burden the right
            to be anonymous online. .......................................... 21

        3.  Many age-verification systems put internet users' sensitive
            personal data at risk. ............................................... 22

CONCLUSION .................................................................................................... 26

CERTIFICATE OF COMPLIANCE ...................................................................... 27

CERTIFICATE OF SERVICE ............................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Gonzales*,
    478 F. Supp. 2d 775 (E.D. Pa. 2007) ........................................................... 22, 23

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008) ......................................................................... 23

*Am. Amusement Mach. Ass'n v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) ......................................................................... 8

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ..................................................................... 19, 21

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ..................................................................................... 19

*Brown v. Entertainment Merchs. Ass'n*,
    564 U.S. 786 (2011) ..............................................................................*passim*

*Carey v. Population Servs. Int'l*,
    431 U.S. 678 (1977) ..................................................................................... 12

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
    2025 WL 1570007 (N.D. Fla. June 3, 2025) ................................................. 5

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ..................................................................................... 13

*Free Speech Coalition v. Paxton*,
    606 US ___, 2025 WL 1773625 (June 27, 2025) ................................. 4, 13, 14

*In re Anonymous Online Speakers*,
    661 F.3d 1168 (9th Cir. 2011) ..................................................................... 22

*Interstate Cir., Inc. v. City of Dallas*,
    390 U.S. 676 (1968) ..................................................................................... 16

*Lamont v. Postmaster Gen. of U. S.*,
    381 U.S. 301 (1965) ..................................................................................... 16

*Mahanoy Area School District v. B.L.*,
    594 U.S. 180 (2021) ..................................................................................... 16

*Martin v. City of Struthers, Ohio*,
    319 U.S. 141 (1943) ................................................................................. 6, 16

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ...................................................................... 22

*NetChoice LLC v. Carr*,
2025 WL 1768621 (N.D. Ga. June 26, 2025) ................................ 5, 18

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)...................................................... 16

*NetChoice, LLC v. Bonta*,
770 F.Supp.3d 1164 (N.D. Cal. 2025) ........................................... 5

*NetChoice, LLC v. Brown*,
No. 24-4100 (10th Cir. Oct. 11, 2024) .......................................... 5

*NetChoice, LLC v. Fitch*,
2025 WL 1709668 (S.D. Miss. June 18, 2025).............................. 5

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ............................... 5

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024), .......................................... 5

*NetChoice, LLC v. Yost*,
2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)............................... 5

*New York v. Ferber*,
458 U.S. 747 (1982) ...................................................................... 13

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ................................................................ 6, 8, 16

*PSINet, Inc. v. Chapman*,
167 F. Supp. 2d 878 (W.D. Va. 2001) ........................................... 23

*PSINet, Inc. v. Chapman*,
362 F.3d 227 (4th Cir. 2004).............................................. 19, 22, 23

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ...................................................................... 16

*Reno v. ACLU*,
521 U.S. 844 (1997) ............................................................... *passim*

*Snyder v. Phelps*,
562 U.S. 443 (2011) ...................................................................... 12

*Stanley v. Georgia*,
394 U.S. 557 (1969) ...................................................................... 16

*State v. Weidner*,
  235 Wis. 2d 306 (2000) ...................................................................... 22

*Students Engaged in Advancing Texas v. Paxton*,
  765 F. Supp. 3d 575 (W.D. Tex. 2025) ............................................. 16

**Statutes**

18 U.S.C. §§ 2721 *et seq* ...................................................................... 23

Tex. H.B. 18, 88th Leg., R.S. (2023) ............................................... *passim*

**Other Authorities**

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
  BBC (Nov. 28, 2020) .......................................................................... 12

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive
  Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2,
  2019) ................................................................................................... 24

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for
  Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) ............................. 11

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*,
  Travel + Leisure (Oct. 21, 2022) ........................................................ 11

Chabad Young Jewish Professionals & Downtown Austin (@yjpaustion),
  Facebook ............................................................................................ 10

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr.
  (Sept. 17, 2024) ................................................................................... 7

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear
  Net Benefit*, N.Y. Times (May 24, 2023) ............................................ 12

*Common Sense & Hopelab, A Double-Edged Sword: How Diverse Communities of
  Young People Think About the Multifaceted Relationship Between Social Media
  and Mental Health* 17 (2024) ............................................................... 7

Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (May 2015) .......... 20

*Digital Advertising in the United States – Statistics & Facts*, Statista
  (May 20, 2025) .................................................................................... 24

Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010) ....... 7

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times
  (Jul. 25, 2021) ..................................................................................... 10

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023) ................. 9

Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26 (2022) ........................ 12

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022) ............................................ 11

Gov. Greg Abbott (@GregAbbott_TX), X .................................................. 8

Identity Theft Res. Ctr., *2023 Data Brach Report* 3 (Jan. 2024) ........................... 25

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022) ............... 11

Jackie Snow, *Why Age Verification Is So Difficult for Website*s, Wall St. J. (Feb. 27, 2022) .................................................................................. 21

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF Deeplinks Block, (Mar. 15, 2024) ................... 9

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persp. Psych. Sci. 662 (May 9, 2022) .................................................... 8

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024) .................................................... 19, 20

Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016) ................................................ 10

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021) .................................................................... 11

Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 1(Aug. 5, 2022) ............................................... 12

Kim Ward, *How Teachers Can Use Social Media to Improve Learning This Fall*, Mich. State Univ. (June 23, 2020) ........................................................ 8

Lakewood Youth (@lakewoodyth), YouTube ............................................ 10

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013) ............................................................................. 21

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023) ................................................... 20

Number of Internet and Social Media Users Worldwide as of February 2025, Statista (Feb. 2025) ............................................................................... 6

*Position Paper: Online Age Verification and Children's Rights,* European Digital Rights (Oct. 4, 2023) ............................................................................ 21

Press Release, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023) ................................................................................... 25

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) ...................................................................................... 8

Ramona Alaggia & Susan Wang, "*I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (May 2020), ............................................................................................... 7

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020) ............................................... 10

Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab (2011) ........................................................................... 25, 26

Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) ......................................... 7

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations (Feb. 2017) ........................................................................................ 22

Sen. Ted Cruz (@SenTedCruz), X ......................................................... 8

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024) .............................. 21

The Porch (@theporchdallas), Facebook .................................................. 10

*The Robloxian Christians*, Exponential ................................................... 10

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy (2018) .......................................... 11

U.S. Census Bureau, CB 25-58, *Quarterly Residential Vacancies and Homeownership: First Quarter 2024* (Apr. 28, 2025)........................................ 20

United Nations, *E-Government Survey 2022: The Future of Digital Government* 106 (2022) ............................................................................................... 8

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41, Common Sense (2021).......................................................... 9

Young Muslims Houston (@ym.houston.sisters), Instagram................................ 10

*YouTube for Press: YouTube by the Numbers*, YouTube....................................... 9

## STATEMENT OF INTEREST OF AMICI[1]

The Electronic Frontier Foundation (EFF) is a nonprofit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825-27 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno,* 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Freedom to Read Foundation (FTRF) is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amicus certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

The LGBT Technology Institute ("LGBT Tech") is a nonprofit organization dedicated to promoting technology adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ+) community. LGBT Tech encourages the continued early adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach.  An important function of LGBT Tech is to advocate for policies that benefit the LGBTQ+ community. To that end, LGBT Tech files amici curiae, singularly or jointly, in cases like this which raise issues of concern to the LGBTQ+ community.

## INTRODUCTION

Texas's Securing Children Online Through Parental Empowerment Act ("the Act," "HB 18") violates the First Amendment rights of Texas minors and adults. The Act blocks minors from accessing protected speech on social media and engaging in their own protected expression. It also prevents adult and minor social media users from accessing social media without first confirming their age in ways that compromise their anonymity, privacy, and security.

The Act significantly burdens minors' use of social media. *See* Section 509.002(a)(1)-(3) (regulating "digital service[s]" that allow users to "socially interact," "create a public or semi-public profile," and "create or post content."). Social media services provide an essential expressive medium that enables users to create art, connect with loved ones, form political opinions, find community, and much more. The Act requires that users register their age with the provider before they can make an account. 509.051(a). If users register as being under 18, or their parents tell the service that they are minors, social media services must monitor and censor their speech as well as the speech they can receive. 509.051(b)-(e), 509.053. The Act compels censorship on a wide array of vague topics—the majority of which concern protected speech—that the statute deems "harmful" to minors. 509.053(a)-(b).

The Act extends its First Amendment violations beyond minors to all Texas

internet users through three different types of privacy and speech-invasive age assurance processes. Besides requiring that all users register their ages, the Act requires parents and guardians to verify their identity and relationship to the minor to oversee their children's social media use. 509.051(a), 509.101(a), 509.102(b). The Act also requires all users to verify their age on social media when more than one-third of the content is "harmful" or "obscene." 509.057(a). The Act does not define harmful content.

The three age-verification provisions of HB 18 together block minor and adult internet users from accessing lawful speech online when they cannot to verify their ages or are unwilling to do so. It will likewise chill the users' ability to speak anonymously and increase users' risk of privacy invasions and data breaches.

Because the Act applies to speech that is legal for both adults and minors, this case is not controlled by *Free Speech Coalition v. Paxton*, 606 US ___, 2025 WL 1773625 (June 27, 2025). In that case, the Supreme Court relied on the fact that minors had no First Amendment rights to read and view the prohibited speech. As explained further below, that key distinction renders *Paxton* irrelevant.

HB 18 frustrates all Texans' First Amendment rights to speak and to access protected online speech. Because HB 18 imposes a content-based restriction on minors' and adults' ability to access lawful speech, the statute is subject to strict scrutiny. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

Moreover, Section 590.053's requirement that platforms monitor and censor speech on particular topics, such as eating disorders and substance abuse, is a classic content-based distinction that is subject to strict scrutiny. *Id.*

Texas has a legitimate interest in protecting minors from harm, "but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. Courts have also repeatedly struck down online age-verification mandates like those imposed by HB 18 because they burden users' access to, and ability to engage with, protected speech.[2] The same result is warranted here.

## ARGUMENT

I. **HB 18 BLOCKS MINORS FROM ACCESSING LAWFUL SPEECH ON SOME OF THE MOST IMPORTANT DIGITAL FORUMS**

    A. **Adults and Minors Rely on the Internet to Engage in a Diverse Range of Protected Expression.**

The internet plays a dominant role in the exercise of First Amendment rights

---

[2] *See NetChoice LLC v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025), appeal docketed No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), appeal docketed No. 25-1889 (8th Cir. May 2, 2025); *NetChoice, LLC v. Bonta*, 770 F.Supp.3d 1164 (N.D. Cal. 2025), appeal docketed No. 25-2366 (9th Cir. Apr. 11, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), appeal docketed *NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025), appeal docketed 25-11881 (11th Cir. June 5, 2025); *NetChoice, LLC v. Fitch*, 2025 WL 1709668 (S.D. Miss. June 18, 2025).

today, and social media services are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Internet users of all ages rely on social media "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)).

The social nature of the medium furthers the "fundamental principle of the First Amendment" that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. The First Amendment protects both the right to distribute speech "and necessarily protects the right to receive it" because it is an essential to encourage further expression and "vigorous enlightenment." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943).

Social media has flourished into an important hub of diverse expression. An estimated 5.24 billion people use social media for everything from political expression, engaging with elected representatives, learning new dances, and finding community.[3] These billions of social media users routinely flock to online forums to express their political views or to get their news. For instance, 80 percent

---

[3] Number of Internet and Social Media Users Worldwide as of February 2025, Statista (Feb. 2025), https://www.statista.com/statistics/617136/digital-population-worldwide/.

of Black young people, 69 percent of Latino young people, and 65 percent of white young people rely on social media to stay informed.[4] And 54 percent of American adults "at least sometimes" get their news from social media.[5]

Social media is also central to organizing, joining, and participating in social and political activities, from national campaigns like the Tea Party movement[6] to the #MeToo movement.[7] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to take action, looking up information about rallies or protests, or using hashtags to show support for a cause.[8] And the interactive nature of many online services also enables direct interactions with elected officials.

---

[4] *Common Sense & Hopelab, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[5] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

[6] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), http://on.wsj.com/2hZCWio.

[7] Ramona Alaggia & Susan Wang, "*I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://pubmed.ncbi.nlm.nih.gov/32200194/.

[8] Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://www.pewresearch.org/internet/2023/06/29/americans-views-of-and-experiences-with-activism-on-social-media/.

*Packingham*, 582 U.S. at 104–105.[9]

Minors' access to such information is essential to their growth into productive members of adult society because it helps them develop their own ideas, learn to express themselves, and engage productively with others in our democratic public sphere.[10] "[I]t is obvious that [minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J). Social media is a key venue for just that.[11]

Social media is also a forum for artistic creation. In one study, 71 percent of

---

[9] *See*, *e.g.*, Gov. Greg Abbott (@GregAbbott_TX), X, https://x.com/gregabbott_tx (over 1.4 million followers); Sen. Ted Cruz (@SenTedCruz), X, https://x.com/sentedcruz (over 4.1 million followers); *see also* United Nations, *E-Government Survey 2022: The Future of Digital Government* 106 (2022), https://publicadministration.un.org/egovkb/en-us/Reports/UN-E-Government-Survey-2022.

[10] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/classroom-voices/student-voices/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persp. Psych. Sci. 662, 667 (May 9, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9081105/ ("Social media provides readily-accessible tools for teens to share developing thoughts and experiment with new social identities, particularly without access to traditional methods.").

[11] *See*, *e.g.*, Kim Ward, *How Teachers Can Use Social Media to Improve Learning This Fall*, Mich. State Univ. (June 23, 2020), https://msutoday.msu.edu/news/2020/how-teachers-can-use-social-media-to-improve-learning-this-fall.

teens reported that what they see on social media makes them feel "like they have a place where they can show their creative side."[12] And thanks to abundant new online resources,[13] children no longer need to enroll in expensive art classes or work with private tutors to practice artistic skills; they can create and share for free on social media. "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[14] In addition, minors and young adults report that the internet helps them learn about art and music history and affords them opportunities to distribute their creative works.[15]

Many people also take to social media to share religious beliefs, connect with others of the same faith, or explore their religious identity. Places of worship use social media to share information about upcoming events, livestream services,

---

[12] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[13] *YouTube for Press: YouTube by the Numbers*, YouTube, https://blog.youtube/press/.

[14] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41, Common Sense (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[15] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF Deeplinks Block, (Mar. 15, 2024), https://www.eff.org/deeplinks/2024/03/thousands-young-people-told-us-why-kids-online-safety-act-will-be-harmful-minors#art.

and foster community.[16] Social media is also a vital source of religious and

spiritual community and information for young people.[17] One young person even

created an online church, "The Robloxian Christians," in 2011 as a place for kids

on the Roblox gaming platform to pray for one another and talk about their faith.[18]

Over the following decade, it expanded into a "youth-led virtual church ministry

serving upwards of 40,000 young people from over 85 countries."[19]

Finally, social media enables individuals whose voices would otherwise not

be heard to make vital and even lifesaving connections with one another, and to

---

[16] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://www.vox.com/recode/2020/9/18/21443661/religion-logging-off-online-engagement-content-creators; *see also, e.g.*, The Porch (@theporchdallas), Facebook, https://www.facebook.com/theporchdallas/ (Official Facebook for young adult ministry of Watermark Church); Chabad Young Jewish Professionals & Downtown Austin (@yjpaustion), Facebook, https://www.facebook.com/yjpaustin/; Lakewood Youth (@lakewoodyth), YouTube, https://www.youtube.com/@lakewoodyth (Official YouTube for Lakewood Church youth ministry); Young Muslims Houston (@ym.houston.sisters), Instagram, https://www.instagram.com/ym.houston.sisters/.

[17] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

[18] Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016), https://faithandleadership.com/teens-online-church-draws-young-people-around-the-world.

[19] *The Robloxian Christians*, Exponential, https://exponential.org/the-robloxian-christians.

share their unique perspectives more widely.[20] For example, people with

disabilities have used social media to build community, reduce isolation and

stigma, and educate others.[21] Survivors of abuse, especially women and children

who have survived domestic violence, rely on the accessibility and anonymity of

online communities to seek advice and resources to help them cope.[22] Social media

use has also been shown to reduce loneliness, social isolation, and depression in

rural and elderly populations, both of whom face limited mobility and decreased

---

[20] *See, e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel + Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.

[21] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation.

[22] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://www.crimejusticejournal.com/article/view/893; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022), https://www.nsvrc.org/blogs/online-communities-survivors-websites-and-resources-offering-support-and-help1.

ability to socialize in person.[23] And many young LGBTQ+ people who face

discrimination and judgment offline turn to social media for community,

exploration, and support.[24]

> ### B.     The Vast Majority of Online Content That Will Be Age-Gated for All Users and Blocked For Minors Is Constitutionally Protected.

Minors enjoy the same First Amendment right as adults to access protected

speech on social media. As the foregoing examples demonstrate, socially valuable

speech is abundant on social media. But online speech and access to it is protected

as to both minors and adults, even if its social value is not obvious, or even when

Texas labels protected speech "harmful." Section 509.057; *Snyder v. Phelps*, 562

U.S. 443, 458 (2011); *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 701

(1977); *Reno*, 521 U.S. at 874–75. And First Amendment principles apply to new

forms of communication regardless of their esthetic and moral value. *See Brown*,

---

[23] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626, 641(Aug. 5, 2022), https://journals.sagepub.com/doi/full/10.1177/08944393221117466 (finding that social media supplements time spent with loved ones, and does not displace it); Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26, 29 (2022), https://psycnet.apa.org/record/2022-43114-005.

[24] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

564 U.S. at 790.

Bedrock First Amendment principles apply to minors "[e]ven where the protection of children is the object." *Id*. at 804–05 (state cannot prohibit sales of violent video games to children); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) (city cannot prohibit nudity being displayed at drive-in theaters to protect children); *Reno*, 521 U.S. at 874 (Congress cannot restrict the distribution of indecent content online to protect children).

The Supreme Court's decision in *Paxton*, 2025 WL 1773625, does not alter the Act's unconstitutional restraint on minors' ability to speak and to receive speech online. The Act here goes much further to directly restrict access to content that is lawful as to both minors and adults. The Act's user-age registration and parental-verification provisions apply to all speech on social media, the vast majority of which is protected as to *all* internet users. And the content-monitoring and filtering provisions block minors from broad categories of protected speech, including discussions regarding substance abuse, bullying, and eating disorders. Section 509.053.[25] The same is true of the Act's requirements to verify the ages of users of any social media service in which one-third or more its content is "harmful material or obscene." Section 509.057.

---

[25] Only the final category, "child pornography," is unprotected as to minors and adults alike. *New York v. Ferber*, 458 U.S. 747, 774 (1982).

By contrast, *Paxton*, 2025 WL 1773625, depends in all relevant parts on the Texas law at issue blocking minors' access to speech to which they had no First Amendment right to access in the first place. The foundation of the Court's decision is that history, tradition, and precedent allows states to "prevent children from accessing speech that is obscene to children," *id.* at *6, rather than a more generalized concern for child welfare. The Court explained that "because the First Amendment permits States to prohibit minors from accessing speech that is obscene to them, it likewise permits States to employ the ordinary and appropriate means of enforcing such a prohibition." *Id.* at *9.

The burden of the Texas law at issue in *Paxton* was "incidental" to adults' protected speech—thus triggering intermediate, rather than strict, scrutiny—only because the law was aimed at "harmful to minors" speech that minors sought to access. *Id.* at *11. As the Court explained, "where the speech in question is unprotected, States may impose 'restrictions' based on 'content' without triggering strict scrutiny." *Id.* at *15.

Strict scrutiny remains "the standard for reviewing the direct targeting of fully protected speech." *Id.* at *12. And as explained below, the Act triggers strict scrutiny review because it targets protected speech.

## II.    HB 18 BURDENS MINORS AND ADULTS' FIRST AMENDMENT RIGHTS.

Minors and adults alike enjoy the First Amendment right to access and engage in protected speech online. No legal authority permits lawmakers to block minors categorically from accessing protected expression on social media sites like those regulated by HB 18. Nor is there any legal authority that permits lawmakers to burden adults' access to political, religious, educational, and artistic speech with restrictive age-verification regimes out of a concern for what minors might see.

### A.    The Act Impermissibly Prevents Minors From Accessing Protected Speech.

HB 18 violates the First Amendment because it imposes content-based restrictions on minors' ability to engage in and to receive protected speech. Section 509.053(a) singles out specific categories of protected speech—including discussions of self-harm, eating disorders, substance abuse, and bullying—for disfavored treatment. The Act then requires that platforms "develop and implement a strategy to prevent" minors from being exposed to this and other "harmful" content. *Id*.; Section 509.053(b). Among numerous obligations, providers must filter and tag the speech they believe qualifies as "harmful," maintain a database of related keywords and misspellings to catch all speech that may be "harmful," perform human review to quality control the filtering, and make public a database of descriptions of the "harmful" material. *Id*.

The Act's restrictions are classic content-based distinctions, and the law is thus subject to strict scrutiny. *See Brown*, 564 U.S. at 799. Texas cannot avoid First Amendment scrutiny for its content-based restrictions by outsourcing its censorship to social media services. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024) (applying strict scrutiny to state law requiring platforms "assess the likelihood that a child will be exposed to harmful or potentially harmful materials on its platform"); *see also Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 683-84, (1968). As the district court correctly held, coercing social media companies into Texas' censorship campaign "threatens to censor social discussions of controversial topics." *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 597 (W.D. Tex. 2025).

The First Amendment protects minors and adults' right to receive speech. *See Mahanoy Area School District v. B.L.*, 594 U.S. 180, 190 (2021) (students have a right to receive unpopular, off-campus speech); *Struthers*, 319 U.S. at 143 (right to receive literature); *Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 307-308 (1965) (right to receive mail); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). Minors have this First Amendment protection to receive information in both digital and physical spaces. *Packingham*, 582 U.S. 98, 107-108 (holding that social media prohibition violated the First Amendment right of internet users to "gain access to information").

**B.     The Act Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Gates that Burden Expression, Anonymity, and Privacy.**

The Act also violates the First Amendment rights of all social media users because it requires every user to, at minimum, attest to their age, and, at most, verify their age with documentation. That process compromises internet users' anonymity and privacy, before using social media.

Three separate provisions of the Act require digital services providers to demand personal identifying information about their users:

First, the Act requires that every user register their age before they can make an account on social media. Section 509.051(a); 509.002(a)(1)-(3). This provision mandates what is essentially age attestation for every user of every covered provider. If a user attests to being under eighteen years old, they will be blocked from seeing the content described *supra*, Section II.A.

Second, the Act requires that services use a "commercially reasonable method" to verify the status that someone is a parent or guardian of a minor user. Section 509.101(a). Providers must verify both the parents' identity and their parental relationship to the minor to whose account they seek to gain access. *Id.* Only a "verified parent" may supervise a minor's use of a service and control various settings of their accounts. Section 509.054(a)-(b).

Third, Section 509.057 mandates that social media services verify that their

users are adults should more than one-third of the material they distribute be considered "harmful material or obscene." Because the statute does not define "harmful material," the statute could trigger age-verification for nearly all social media sites that feature some discussion of content Texas deems harmful.

Although the Act does not specify how social media services must comply with the provisions above, their combined effect would likely push most to adopt the most invasive forms of age verification via government-issued identification or similar means. These systems thus require users to disclose sensitive, private information. Indeed, it is hard to fathom how a parent or guardian could verify their relationship to their child on a social media service without providing government-issued documentation, such as birth certificates.

Because the Act creates liability for services that fail to prevent minors from accessing "harmful content" under the Act, a service would be risking state enforcement should it not be confident it has accurately separated its minor users from adults.[26] *See Carr*, 2025 WL 1768621 at *14 ("[G]iven the Act's novelty and lack of clarity, the [requirement that social media companies implement "commercially reasonable" age verification] would incentivize social media platforms to err toward the side of caution to avoid liability" by "collect[ing]

---

[26] Liability can be significant under the Act; it contemplates both public enforcement by the attorney general and private, equitable relief by parents. Sections 509.151-52.

government-issued identification").

Imposing age-verification mandates before accessing speech that is protected as to both minors and adults burdens the First Amendment rights of all internet users in several respects. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004).

### 1. Many verification requirements will either chill or entirely block access to lawful speech.

Should social media companies implement verification via government-issued identification or similar means, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[27] Estimates show over 34.5 million adult citizens have neither a driver's license nor

---

[27] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement 2 (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

a state ID card with their current name or address.[28]

Non-ID-based methods that have been suggested or implemented elsewhere also burden the First Amendment rights of many internet users. Age verification based on public or private transactional data will exclude many adults. For example, a service relying on mortgage documents would exclude the nearly 35 percent of Americans who do not own a home.[29] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-verifying vendors to check.[30]

Should social media services be permitted to use data brokers and commercial services to verify their users' ages, similar problems would arise.

---

[28] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement 5 (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[29] *See* U.S. Census Bureau, CB 25-58, *Quarterly Residential Vacancies and Homeownership: First Quarter 2024*, 5 (Apr. 28, 2025), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[30] Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

These entities purchase and collect massive amounts of private data.[31] But the data often contains inaccurate or outdated information, resulting in errors that could mistakenly block adults from accessing social media.[32]

### 2.  Online age-assurance schemes impermissibly burden the right to be anonymous online.

Should users have to provide identifying information to services seeking to comply with the Act, it would impermissibly burden their First Amendment right to anonymity online. *See Am. Booksellers Found.*, 342 F.3d at 99 (age-verification schemes "require that website visitors forgo the anonymity otherwise available on the internet"). A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[33]

Anonymity is a time-honored, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use

---

[31] *See Position Paper: Online Age Verification and Children's Rights,* European Digital Rights, 16-17 (Oct. 4, 2023), https://edri.org/wp-content/uploads/2023/10/Online-age-verification-and-childrens-rights-EDRi-position-paper.pdf; Jackie Snow, *Why Age Verification Is So Difficult for Website*s, Wall St. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728.

[32] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://therecord.media/junk-inferences-data-brokers.

[33] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Not surprisingly, without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. The absence of anonymity will chill users' ability to engage in dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help from online support communities.[34] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Many age-verification systems put internet users' sensitive personal data at risk.

Even when users are comfortable with forgoing their anonymity, legitimate

---

[34] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98, 99 (Feb. 2017), https://pubmed.ncbi.nlm.nih.gov/26725547/.

privacy and security concerns may dissuade them from accessing social media in the face of the Act's age-verification requirements. "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

The personal data that platforms may be required to collect to verify users' ages is extremely sensitive and often immutable.[35] Whereas usernames, passwords, and even credit card information can easily be changed in the event of identity theft or data breach, users' personal information contained in a government-issued ID (such as date of birth, name, and home address) are much more permanent.

Although Texas enacted the Act out of concern for children's wellbeing and privacy, the law's online age-verification regime will make children and adults less safe given the realities of the online advertising industry and data insecurity. All

---

[35] *See*, *e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq*.

online data, including the sensitive personal data platforms would need to collect from all users to verify age and parental status under the Act, is transmitted through a host of intermediaries. This means that when a user shares identifying information with a website to verify their age, that data can be transmitted beyond the site, including to age-verification vendors and a series of additional parties.[36] Moreover, almost all websites and services host a network of dozens of private, third-party trackers managed by data brokers, advertisers, and other companies that are constantly collecting data about a user's browsing activity.[37] Personal information collected online sells for astonishing profits.[38]

These privacy concerns are not adequately addressed by the Act's prohibition on the use of data collected in the age-verification process for anything other than website functions. Section 509.052(1). This provision bars the use of minors' data for anything other than what it was collected for, but it does not limit the use of adults' data, which will also be collected under this scheme, including for parental-status verification. Moreover, this provision bars the sale and sharing

---

[36] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.

[37] *Id.*

[38] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://www.statista.com/topics/1176/online-advertising/#topicOverview (the U.S. digital advertising market boasted "a revenue of over 317 billion dollars in 2024").

of that data only by the social media services subject to the law; it does not limit

the third parties described above from collecting, selling, or otherwise disclosing

the data should they acquire it. And once those entities collect users' personal

information, they are likely to disclose it more broadly.

At minimum, the data will present a potential target for data thieves. Data

breaches are an endemic and ever-increasing part of life. A record 3,205 data

breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the

previous record of 1,860 breaches in 2021.[39] Over 350 million people—more than

the entire population of the United States—have been affected by these breaches,

and 69 percent of general consumers have been victims of an identity crime more

than once.[40]

Compounding this concern, children are attractive targets for identity theft

due to their "uniquely valuable" unused Social Security numbers.[41] A 2021 study

---

[39] Identity Theft Res. Ctr., *2023 Data Brach Report* 3 (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[40] *Id.*; *see also* Press Release, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/.

[41] Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab 3 (2011), https://www.akleg.gov/basis/get_documents.asp?session=29&docid=40175 ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[42] The risk of data breach is likely to chill constitutionally protected expression.

## CONCLUSION

For the reasons stated above, this Court should affirm the lower court's decision.

Dated: July 10, 2025

/s/ *David Greene*
David Greene
  *Counsel of Record*
Aaron Mackey
Emma Armstrong
Electronic Frontier
Foundation 815 Eddy Street
San Francisco, CA 94109
davidg@eff.org
Telephone: (415) 436-9333
Fax:  (415) 436-9993

*Counsel for Amici Curiae*

---

[42] *Id.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.    This Brief of Amici Curiae the Electronic Frontier Foundation, Freedom to Read Foundation, and LGBT Tech in Support of Plaintiffs-Appellees and Affirmance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,739 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: July 10, 2025

/s/ *David Greene*
David Greene

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on July 10, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 10, 2025

/s/ *David Greene*
David Greene