In The

# United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, *et al.*,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS, *et al.*,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas
Case Nos. 1:24-cv-849 & 1:24-cv-945 (Hon. Robert L. Pitman)

**BRIEF OF CHAMBER OF PROGRESS AS AMICUS CURIAE IN
SUPPORT OF PLAINTIFFS-APPELLEES**

Kathleen Farley*
Vice President of Litigation
CHAMBER OF PROGRESS
1390 CHAIN BRIDGE ROAD #A108
McLean, VA 22101
info@progresschamber.org
*admitted in New York

Sean Marotta
Mark W. Brennan
Thomas B. Veitch
Jordyn Johnson
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-6409
sean.marotta@hoganlovells.com

*Counsel for Chamber of Progress*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. *Amicus curiae on this brief*: Chamber of Progress is a non-profit, tax-exempt organization. It has no parent company, and no publicly held company has any ownership interest in it of any kind.

2. *Counsel for amicus curiae on this brief*: Sean Marotta of Hogan Lovells US LLP.

/s/ Sean Marotta
Sean Marotta

July 10, 2025

# TABLE OF CONTENTS

Page

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ........................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT ................................................................... 2

ARGUMENT ....................................................................................... 5

    I.    Online platforms moderate a massive amount of
        content under complex constraints ............................................ 5

    II.   HB 18 violates basic legal principles developed to
        promote free exchange of ideas ............................................... 11

        A.    Section 230 preempts liability for monitoring,
               screening, and deleting content in order to promote
               free discourse online ................................................... 12

        B.    The First and Fourteenth Amendments forbid vague
               standards that chill speech ............................................ 14

        C.    The content-and-filtering requirement chills
               speech and squelches exchange of ideas ........................ 15

    III.  HB 18 would diminish online speech by censoring
        alternative viewpoints and limiting youth access
        to digital spaces ................................................................... 18

        A.    HB 18 could eliminate discussions of important
               issues and viewpoint diversity ..................................... 19

        B.    Young people may be blocked outright from
               social media, walling off important speech venues ....... 22

CONCLUSION .................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

Connally v. General Constr. Co.,
   269 U.S. 385 (1926)...................................................................17

Diez v. Google, Inc.,
   831 F. App'x 723 (5th Cir. 2020) ...............................................14

Doe v. MySpace, Inc.,
   528 F.3d 413 (5th Cir. 2008) ..................................2, 3, 13, 14, 16

Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,
   521 F.3d 1157 (9th Cir. 2008) .....................................................16

FCC v. Fox Television Stations, Inc.,
   567 U.S. 239 (2012)...............................................................3, 15

Gonzalez v. Google LLC,
   2 F.4th 871 (9th Cir. 2021) ...........................................................3

Green v. Am. Online (AOL),
   318 F.3d 465 (3d Cir. 2003) .....................................2, 3, 14, 16

Holder v. Humanitarian Law Project,
   561 U.S. 1 (2010)........................................................................15

Interstate Cir., Inc. v. City of Dallas,
   390 U.S. 676 (1968).....................................................................15

Moody v. NetChoice, LLC,
   603 U.S. 707 (2024)................................................................5, 23

Packingham v. North Carolina,
   582 U.S. 98 (2017).......................................................................22

Reno v. ACLU,
   521 U.S. 844 (1997).......................................................................5

United States v. Playboy Ent. Grp., Inc.,
   529 U.S. 803 (2000).....................................................................23

iii

*United States v. Williams*,
 553 U.S. 285 (2008)..........................................................................15

*Zeran v. Am. Online, Inc.*,
 129 F.3d 327 (4th Cir. 1997) ....................................................3, 13

STATUTES:

47 U.S.C. § 230(a) ...............................................................................12

47 U.S.C. § 230(b) ...............................................................................13

47 U.S.C. § 230(c)(1)........................................................................2, 14

47 U.S.C. § 230(e)(3)...............................................................................2

Tex. Bus. & Com. Code § 509.053.........................................3, 4, 15, 16, 17

Tex. Pen. Code § 43.24 ........................................................................16

OTHER AUTHORITIES:

2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People,
 TREVOR PROJECT (last visited July 7, 2025),
 https://www.thetrevorproject.org/survey-2024/#intro...................................26

Abdul Rahman Al Jaloud et al., *Caught in the Net: The Impact of "Extremist"
 Speech Regulations on Human Rights Content*, ELECTRONIC FRONTIER
 FOUND. (May 30, 2019), https://www.eff.org/wp/caught-net-impact-
 extremist-speech-regulations-human-rights-content ......................................8

Monica Anderson et al., *Connection, Creativity and Drama:
 Teen Life on Social Media in 2022*, PEW RSCH. CTR.
 (Nov. 16, 2022), https://pewrsr.ch/3whSY2z ...............................................25

Apprehensive-Space94 (@Apprehensive-Space94), REDDIT (r/cancer),
 *being a teenager with a rare and incurable type of cancer* (2023),
 https://www.reddit.com/r/cancer/comments/15k4rkc/
 being_a_teenager_with_a_rare_and_incurable_type ....................................26

# TABLE OF AUTHORITIES–Continued

Avi Asher-Schapiro, *YouTube and Facebook Are Removing Evidence of Atrocities, Jeopardizing Cases Against War Criminals,* THE INTERCEPT (Nov. 2, 2017, at 14:55 ET), https://theintercept.com/2017/11/02/war-crimes-youtube-facebook-syria-rohingya ............................ 8

Thomas A. Berry & David Meyer-Lindenberg, *The Supreme Court Should Reject an Attempt to Undermine Section 230,* CATO AT LIBERTY (Jan. 23, 2023), https://www.cato.org/blog/supreme-court-should-reject-attempt-undermine-section-230 ................. 2, 21

Josephine Campbell, Internet troll, EBSCO RESEARCH STARTERS (2023), https://www.ebsco.com/research-starters/science/internet-troll ..................................................................................... 10

Christian Catalini, *Why Big Tech Can't Solve the Content Moderation Problem,* FORBES (Aug. 28, 2024, at 13:38 ET), https://www.forbes.com/sites/digital-assets/2024/08/28/why-big-tech-cant-solve-the-content-moderation-problem/ [https://perma.cc/2PNQ-M9NY] .................................................... 7

David Ch, *TikTok Statistics: Revenue & Usage,* SENDSHORT (Apr. 1, 2025), https://sendshort.ai/statistics/tiktok/ ................................. 6, 9

*Community Guidelines Enforcement Report,* TIKTOK (Mar. 28, 2025), https://www.tiktok.com/transparency/en-us/community-guidelines-enforcement-2024-4 ............................................................................. 6, 7

*Community Standards Enforcement Report: Q1 2025 report,* META TRANSPARENCY CTR., https://transparency.meta.com/reports/community-standards-enforcement/ (last visited July 7, 2025) .......... 6

*Content Moderation in a New Era for AI and Automation,* OVERSIGHT BD. (Sept. 2024), https://www.oversightboard.com/wp-content/uploads/2024/09/Oversight-Board-Content-Moderation-in-a-New-Era-for-AI-and-Automation-September-2024.pdf [https://perma.cc/F8UF-MN5Z] ........................... 10, 11

Ángel Díaz & Laura Hecht-Felella, *Double Standards in Social Media Content Moderation,* BRENNAN CENTER FOR JUSTICE (Aug. 4, 2021), https://bit.ly/497xuUH ....................................... 21

Stacy Jo Dixon, *Most popular social networks worldwide as of February 2025, by number of monthly active users,* STATISTA (Mar. 26, 2025), https://www.statista.com/statistics/ 272014/global-social-networks-ranked-by-number-of-users ..........................6

Robert Gorwa, Reuben Binns & Christian Katzenbach, *Algorithmic Content Moderation: Technical and Political Challenges in the Automation of Platform Governance*, BIG DATA & SOC'Y, Jan.-June 2020, https://journals.sagepub.com/doi/epub/10.1177/ 2053951719897945 ...................................................................................10

Spencer Hillbert (@spencerhillbert_yt), TIKTOK, https://www.tiktok.com/@spencerhilbert_yt.................................................26

Khan Academy, *Differential Equations*, YOUTUBE https://www.youtube.com/playlist?list=PL96AE8D9C68FEB902 (last visited July 7, 2025).................................................................................25

Kate Klonick, *Facebook Under Pressure*, SLATE (Sept. 12, 2016, at 14:48 ET), https://slate.com/technology/2016/09/facebook- erred-by-taking-down-the-napalm-girl-photo- what-happens-next.html ..................................................................................8

Kirsten Lavery, U.S. Comm'n on Protecting Religious Freedom, Protecting Religious Freedom Online 4-6 (2021), https://www.uscirf.gov/sites/default/files/2021-12/2021%20 Factsheet%20-%20Protecting%20Religious%20Freedom%20 Online.pdf [https://perma.cc/J5US-PXUD]....................................................21

Alexander Lekhtman, *Social Media Bill Passed by Senate Threatens Harm Reduction and More*, FILTER (Aug. 6, 2024), https://filtermag.org/social- media-bill-harm-reduction............................................................................20

Mike Masnick, *The Challenge In Content Moderation And Politics: How Do You Deal With Bad Faith Actors?*, TECHDIRT (Sept. 3, 2021, at 9:28 ET), https://www.techdirt.com/2021/ 09/03/challenge-content-moderation-politics-how-do-you- deal-with-bad-faith-actors ...........................................................................10

Kobi McNutt (@K_nutt3), INSTAGRAM,
    https://www.instagram.com/k_nutt3/ ...........................................................26

Alexander Monea, The Digital Closet: How the Internet
    Became Straight (2022) ....................................................................22

Note, *Section 230 as First Amendment Rule*,
    131 HARV. L. REV. 2027 (2018) ....................................................21

*r/Christian*, REDDIT, https://www.reddit.com/r/Christian/
    (last visited July 7, 2025)...............................................................26

*r/LonghornNation*, REDDIT, https://www.reddit.com/r/LonghornNation
    (last visited July 7, 2025)...............................................................26

Maarten Sap, et al., The Risk of Racial Bias in Hate Speech Detection,
    PROCEEDINGS OF THE 57TH ANNUAL MEETING OF THE
    ASSOCIATION FOR COMPUTATIONAL LINGUISTICS 1668
    (2019), https://bit.ly/3ODPs8S ....................................................22

Zoë Schiffer, *The Social Security Administration Is Gutting
    Regional Staff and Shifting All Public Communications to X*,
    WIRED (Apr. 11 2025, at 13:39 ET), https://www.wired.com/
    story/social-security-administration-regional-office-elon-musk-x/ ..............24

StudiosS (@StudiosS), REDDIT (r/architecture), *How can I learn
    architecture?* (2022), https://www.reddit.com/r/architecture/
    comments/u6ebxu/how_can_i_learn_architecture .......................................26

Ted-Ed, *Why you procrastinate even when it feels bad*,
    YOUTUBE (Oct. 27, 2022), https://www.youtube.com/
    watch?v=FWTNMzK9vG4 ...........................................................25

Ted, *How to Speak So That People Want to Listen*,
    YOUTUBE (June 27, 2014), https://www.youtube.com/
    watch?v=eIho2S0ZahI.................................................................25

The Closet (@theclosetpgh), TIKTOK,
    https://www.tiktok.com/@theclosetpgh ......................................................26

# TABLE OF AUTHORITIES–Continued

Page(s)

Scott Wallsten, *No Perfect Solution: Content Moderation
Will Always Reflect Politics*, Tech. Pol'y Inst. (Jan. 10, 2025),
https://techpolicyinstitute.org/publications/content-
moderation/no-perfect-solution-content-moderation-will-
always-reflect-politics/ [https://perma.cc/6Y5B-3XEN]................................9

*YouTube Community Guidelines enforcement*, YouTube,
https://transparencyreport.google.com/youtube-policy/
removals (last visited July 7, 2025)............................................................6, 7

**INTEREST OF *AMICUS CURIAE***

**Chamber of Progress** is a tech-industry coalition that seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users.[1] In keeping with that mission, Chamber of Progress believes that a legal framework that permits the free exchange of ideas will benefit society at large. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies and remains true to its stated principles when its partners disagree.[2]

Chamber of Progress supports the development of features to keep kids safe online, such as applications that exclude age-inappropriate content and tools that permit parental supervision. But it is concerned that Texas's HB 18 threatens to strip the Internet of wide swathes of speech. That, in turn, jeopardizes healthy and safe online communities that support a range of viewpoints. Chamber of Progress

---

[1] All parties have consented to the filing of this brief. We certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

[2] A list of Chamber of Progress's partners can be found at https://perma.cc/54VB-VBFF.

therefore submits this brief in support of Appellees CCIA, NetChoice, and Students Engaged in Advancing Texas.

## SUMMARY OF ARGUMENT

Online platforms burst with content, allowing people all over the world to explore topics at the click of a button from college football to astrophysics, and from the best Texas BBQ to electoral politics. Through content moderation, platforms strive to make these spaces safe and vibrant for everyone. Content moderation is a complex undertaking that involves many challenges, including the dynamic flood of user ideas and creative expression, time pressures, the subjectivity of certain judgments, operating across languages and cultural norms, bad actors trying to circumvent established processes, and automated systems with inherent limitations.

Important legal protections help to encourage content moderation that keeps users safe and avoids chilling speech. Section 230 preempts state laws that impose liability based on "monitoring, screening, and deletion of content."[3] Given the challenges of moderating online content, liability for monitoring, screening, and deleting would disincentivize reasonable protective measures and incentivize the mass removal of content.[4] "Congress considered the weight of the speech interests

---

[3] *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (quoting *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)); *see* 47 U.S.C. § 230(c)(1), (e)(3).

[4] *See* Thomas A. Berry & David Meyer-Lindenberg, *The Supreme Court Should Reject an Attempt to Undermine Section 230*, CATO AT LIBERTY (Jan. 23, 2023), https://www.cato.org/blog/supreme-court-should-reject-attempt-undermine-

implicated and chose to immunize service providers to avoid any such restrictive effect."[5] The First and Fourteenth Amendments provide another backstop for online publishing decisions. Any standards a State imposes cannot be overly vague because vagueness in speech-regulating laws chills speech and invites arbitrary government enforcement.[6]

HB 18's monitoring-and-filtering requirement violates these critical protections. It requires online platforms to "implement a strategy to prevent" a minor's "exposure to harmful materials and other content that promotes, glorifies, or facilitates" certain topics.[7] This is precisely the type of state law imposing liability based on "monitoring, screening, and deletion of content" that Section 230 preempts.[8] Further, with its broad, subjective terms, HB 18's standards are too vague for any platform to effectively implement without resorting to severe curtailment of user contributions on topics with the barest connection to controversy.

---

section-230 ("Thanks to Section 230, websites can afford to offer forums for freewheeling speech. . . . It's no exaggeration to say that the open, creative, disruptive internet we know today wouldn't exist without Section 230.").

[5] *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *see also Gonzalez v. Google LLC*, 2 F.4th 871, 886 (9th Cir. 2021) (explaining that Section 230 seeks "[t]o avoid chilling speech"), *vacated and remanded on other grounds*, 598 U.S. 617 (2023), *and rev'd on other grounds sub nom.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

[6] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

[7] Tex. Bus. & Com. Code § 509.053.

[8] *MySpace*, 528 F.3d at 420 (quoting *Green*, 318 F.3d at 471).

The harms go beyond the Constitution. HB 18's monitoring-and-filtering requirement would make online platforms zealous censors and could introduce new safety risks. HB 18's standards incentivize platforms to remove content rather than face burdensome investigations and potential liability—even if some of the removed content might arguably be allowed under HB 18. That overbroad state censorship could make discussion of certain topics impossible and reduce viewpoint diversity in the topics that remain. Moreover, the heavy fines for violations of HB 18 could lead some online platforms to effectively ban minor users, which could prevent young people from accessing key speech venues up until their 18th birthdays. And despite its aims, HB 18 could make young people less safe by cutting off discussion of important but sensitive topics that the law restricts, such as resources related to surviving sexual abuse.[9]

In sum, though it aims to protect youth, HB 18 is likely to bulldoze online speech and may even increase some safety risks for young people. To prevent these harms, protect safety and speech, and promote a vibrant Internet, this Court should affirm the district court's injunction.

---

[9] *See* Tex. Bus. & Com. Code § 509.053 (restricting material related to "sexual exploitation or abuse").

**ARGUMENT**

## I. Online platforms moderate a massive amount of content under complex constraints.

Content moderation is difficult. Challenges include the sheer volume of online content, the time pressure of moderation decisions, the subjectivity inherent to policy enforcement, the nuances of language and culture, bad actors seeking to circumvent platform policies, and the essential but imperfect use of automated moderation.

*Volume.* Content moderation requires platforms to sift through a staggering and ever-multiplying volume of content. As the Supreme Court has noted, the Internet is a resource like no other—a "vast library" bursting with content "as diverse as human thought."[10] It enables people to pursue limitless knowledge, connect with people near and far, express themselves in creative ways, and participate in global conversations about the most-important issues facing humanity.

In this rapidly growing digital environment, YouTube "sees more than 500 hours of video uploaded every minute," ranging from math tutoring to church services, from tips about how to fix a flat tire to discussions of President Trump's immigration policies.[11] On TikTok, roughly "716.67 million videos are uploaded per month, 23.56 million videos per day, 981,735 videos per hour, 16,363 videos per

---

[10] *Reno v. ACLU*, 521 U.S. 844, 853, 870 (1997).

[11] *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

minute, and 273 videos per second."[12] Facebook, YouTube, Instagram, WhatsApp, TikTok, and WeChat all have over 1 billion monthly active users contributing to this dynamic landscape.[13]

To keep up with this stream of content, content moderation must occur at a vast scale. TikTok removed more than 153 million videos for violating community guidelines during the last quarter of 2024.[14] YouTube removed 8,617,605 videos in the first quarter of 2025 for violations of its policies.[15] Over the same time period, Meta took action on almost 24 million pieces of content across Facebook and Instagram for breaches of its violence-and-incitement policies alone.[16]

*Time.* Time pressures add to these challenges. Moderators typically have a matter of seconds to make judgment calls as they remove hundreds of millions of

---

[12] David Ch, *TikTok Statistics: Revenue & Usage*, SENDSHORT (Apr. 1, 2025), https://sendshort.ai/statistics/tiktok.

[13] Stacy Jo Dixon, *Most popular social networks worldwide as of February 2025, by number of monthly active users,* STATISTA (Mar. 26, 2025), https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users.

[14] *Community Guidelines Enforcement Report*, TIKTOK (Mar. 28, 2025), https://www.tiktok.com/transparency/en-us/community-guidelines-enforcement-2024-4.

[15] *YouTube Community Guidelines enforcement*, YOUTUBE, https://transparencyreport.google.com/youtube-policy/removals (last visited July 7, 2025).

[16] *Community Standards Enforcement Report: Q1 2025 report*, META TRANSPARENCY CTR., https://transparency.meta.com/reports/community-standards-enforcement (last visited July 7, 2025).

policy-violating content items each year. For example, TikTok takes action on 83% of videos reported by users within two hours.[17] And YouTube is able to remove 82% of videos that break platform rules before they receive more than ten views.[18]

*Subjectivity.* The difficulty of categorizing content further complicates platforms' moderation programs. Platforms employ thousands of professionals to apply content moderation guidelines to millions of pieces of content posted daily. These professional moderators can undergo months of training to learn how to enforce detailed policies, but it often remains unclear whether a given piece of content violates a platform's policy. "Even with the best intentions, the need for quick decision-making under uncertainty guarantees errors on both ends: censoring content that shouldn't be, while simultaneously allowing fake or harmful content to spread before the truth can catch up. It's a classic case of damned if you do, damned if you don't."[19]

---

[17] *Community Guidelines Enforcement Report*, TIKTOK (Mar. 28, 2025), https://www.tiktok.com/transparency/en-us/community-guidelines-enforcement-2024-4.

[18] *YouTube Community Guidelines enforcement*, YOUTUBE, https://transparencyreport.google.com/youtube-policy/removals (last visited July 7, 2025).

[19] Christian Catalini, *Why Big Tech Can't Solve the Content Moderation Problem*, FORBES (Aug. 28, 2024), https://www.forbes.com/sites/digital-assets/2024/08/28/why-big-tech-cant-solve-the-content-moderation-problem.

For example, take Nick Ut's famous Pulitzer Prize-winning photograph of a young, naked girl running from a napalm attack during the Vietnam War. If that photograph is uploaded to an Internet platform whose content policies limit nudity, should the photograph be removed? Facebook dealt with this situation in 2016, initially removing a post by the then-prime minister of Norway sharing the photograph but ultimately restoring it.[20] Added to this ambiguity are the often-serious consequences of a mistaken takedown. How should a moderator treat a video depicting violence in a warzone? Should the moderator remove the content for violating policies against extremist content, as YouTube has with videos of the Syrian conflict?[21] What if those videos provide evidence of human rights abuses and are of public interest?

*Language and culture.* Another hurdle is platforms' need to satisfy a wide array of users who do not share the same language or cultural norms. Platforms operate in many countries, creating opportunities for global interaction. For

---

[20] *See* Kate Klonick, *Facebook Under Pressure*, SLATE (Sept. 12, 2016), https://slate.com/technology/2016/09/facebook-erred-by-taking-down-the-napalm-girl-photo-what-happens-next.html.

[21] *See* Abdul Rahman Al Jaloud et al., *Caught in the Net: The Impact of "Extremist" Speech Regulations on Human Rights Content*, ELECTRONIC FRONTIER FOUND. (May 30, 2019), https://www.eff.org/wp/caught-net-impact-extremist-speech-regulations-human-rights-content; Avi Asher-Schapiro, *YouTube and Facebook Are Removing Evidence of Atrocities, Jeopardizing Cases Against War Criminals*, THE INTERCEPT (Nov. 2, 2017), https://theintercept.com/2017/11/02/war-crimes-youtube-facebook-syria-rohingya.

example, "TikTok is available in 155 countries and supports 75 languages."[22] What constitutes acceptable content is a subjective standard. Technology companies strive to improve and experiment with novel techniques, but nevertheless, "[e]very line drawn will displease significant portions of the community."[23]

Some differences are legal: a post that criticizes the government, engages in blasphemy, or depicts a woman in a bathing suit might be protected by the First Amendment in the United States, but illegal in another country. Other differences are cultural. For instance, the swastika is associated with the horrors of Nazi Germany, but it is also a sacred religious symbol in some Asian countries. Even the same word in the same language can have different meanings depending on geography. For example, the word "pants" refers to trousers in the United States but to undergarments in the United Kingdom. Platforms must account for all of these nuances when deciding how to moderate.

*Bad actors.* Content moderation is also difficult because some Internet users may act in bad faith to harm other users or the platform itself. For example, some users may employ thousands of "bots" to attempt to flood a platform with spam,

---

[22] David Ch, *TikTok Statistics: Revenue & Usage*, SENDSHORT (Apr. 1, 2025), https://sendshort.ai/statistics/tiktok/.

[23] Scott Wallsten, *No Perfect Solution: Content Moderation Will Always Reflect Politics*, TECH. POL'Y INST. (Jan. 10, 2025), https://techpolicyinstitute.org/publications/content-moderation/no-perfect-solution-content-moderation-will-always-reflect-politics.

toxic content, or information that is irrelevant to a particular platform's designated purpose. Users may also report posts because they disagree with the viewpoint expressed or are seeking to harass or "troll" the poster, rather than because the post creates a genuine risk of harm.[24]

*Automation.* Moreover, platforms often need to rely on automated processes to assist with content moderation, but this approach is imperfect. Although artificial intelligence has allowed for the automation of more than half of content moderation decisions, it also runs the risk of amplifying human errors and enforcing biases present in its training data, such as biases against political viewpoints or racial groups.[25] Even the cutting-edge automated content moderation tools adopted by online platforms frequently make mistakes, struggle with categorizing hate speech, and make decisions opaquely.[26]

---

[24] Mike Masnick, *The Challenge In Content Moderation And Politics: How Do You Deal With Bad Faith Actors?*, TECHDIRT (Sept. 3, 2021), https://www.techdirt.com/2021/09/03/challenge-content-moderation-politics-how-do-you-deal-with-bad-faith-actors; Josephine Campbell, *Internet troll*, EBSCO RESEARCH STARTERS (2023), https://www.ebsco.com/research-starters/science/internet-troll.

[25] *Content Moderation in a New Era for AI and Automation*, OVERSIGHT BD. 2-3 (Sept. 2024), https://www.oversightboard.com/wp-content/uploads/2024/09/Oversight-Board-Content-Moderation-in-a-New-Era-for-AI-and-Automation-September-2024.pdf.

[26] Robert Gorwa, Reuben Binns & Christian Katzenbach, *Algorithmic Content Moderation: Technical and Political Challenges in the Automation of Platform Governance*, BIG DATA & SOC'Y, Jan.-June 2020, at 1, 3, 10-12, https://journals.sagepub.com/doi/epub/10.1177/2053951719897945.

In 2021, for example, Facebook's machine learning-based content moderation tools censored breast cancer awareness posts in Brazil. The posts showed female breasts exhibiting physical symptoms of breast cancer and were classified as nudity by the automated system, despite such educational content being permissible under Meta's Community Standards. Meta also adjusted its content moderation confidence thresholds for posts originating in Israel and Gaza in 2023, which "led to drastic removal of non-violating content related to the conflict."[27] Meta then added features to update its content moderation process in 2023 and 2024 to provide their users an opportunity to review potential violations before posting and to help users successfully appeal when their posts condemning hate speech were removed.[28] Even as platforms continue to enhance and perfect their processes over time, the difficulty of finding the right balance between automation and human review remains.

## II.    HB 18 violates basic legal principles developed to promote free exchange of ideas.

HB 18 flies in the face of key legal protections for online speech. The monitoring-and-filtering requirement is preempted by Section 230 because it imposes publisher liability on online platforms for third-party content, counter to

---

[27] *Content Moderation in a New Era for AI and Automation*, OVERSIGHT BD. 14-15 (Sept. 2024), https://www.oversightboard.com/wp-content/uploads/2024/09/Oversight-Board-Content-Moderation-in-a-New-Era-for-AI-and-Automation-September-2024.pdf.

[28] *Id.* at 13.

Section 230's text and purpose. HB 18 also violates the First and Fourteenth Amendments because of its overly vague, subjective standards, which force platforms to police speech without clear guidelines. The threat of legal liability will incentivize platforms to err on the side of severely curtailing user posts on any remotely controversial topic.

## A. Section 230 preempts liability for monitoring, screening, and deleting content in order to promote free discourse online.

Recognizing the challenges of moderating content, Section 230 establishes protections for content moderation that aim to promote safety and speech. Section 230 makes these concerns explicit, containing a Congressional finding that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" and that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens."[29] The law also explains Congress's intent "to promote the continued development of the Internet" and "preserve" the current "vibrant and

---

[29] 47 U.S.C. § 230(a).

competitive free market," while helping to "remove disincentives" for platforms to develop content moderation methods.[30]

As the Fourth Circuit explained in an early and influential Section 230 decision, Congress recognized the policy concerns associated with needing to moderate a "staggering" amount of information online.[31] "The specter of . . . liability in an area of such prolific speech would have an obvious chilling effect," because "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems." [32] In particular, "[f]aced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted."[33]

This Court has likewise observed how, without Section 230's strong protections, online platforms "would have a natural incentive to simply remove [content]" reported as harmful, regardless of whether this is true, and this system would have "a chilling effect on the freedom of Internet speech."[34]

---

[30] *Id.* § 230(b).

[31] *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)

[32] *Id.*

[33] *Id.*

[34] *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (quoting *Zeran*, 129 F.3d at 333).

Congress therefore chose to shield online platforms from liability for third-party content. Section 230 preempts state laws that treat interactive computer services "as the publisher or speaker of any information provided by another information content provider."[35] The federal statute thus overrides any state law imposing legal liability on platforms for "decisions relating to the monitoring, screening, and deletion of content" originating from third parties.[36] This immunity is essential to incentivize online platforms to permit user submissions on contentious topics, instead of removing any and all contributions with even the faintest hint of controversy.

### B. The First and Fourteenth Amendments forbid vague standards that chill speech.

Section 230 essentially codifies a principle long recognized by the Supreme Court in its First Amendment jurisprudence: that a productive exchange of ideas and debate cannot flourish in the face of an overarching threat of legal reprisal. This core tenet also underpins the doctrine of unconstitutional vagueness. Statutes that require parties to make "wholly subjective judgements without statutory definitions, narrowing context, or settled legal meanings" are too vague to pass constitutional

---

[35] 47 U.S.C. § 230(c)(1); *see also Diez v. Google, Inc.*, 831 F. App'x 723, 724 (5th Cir. 2020) ("By its plain text, § 230 creates federal immunity to any [law] that would make internet service providers liable for information originating with a third-party user of the service.").

[36] *See MySpace, Inc.*, 528 F.3d at 420 (quoting *Green*, 318 F.3d at 471).

muster under the First and Fourteenth Amendments.[37] All laws must provide

adequate notice of prohibited conduct, and the stakes are even higher "[w]hen speech

is involved" because of the risk that the ambiguity will lead to "arbitrary or

discriminatory" enforcement, which will inevitably "chill protected speech."[38] These

principles remain firm regardless of the government's aims. "[L]egislation aimed at

protecting children from allegedly harmful expression" needs to be "clearly drawn

and . . . reasonably precise so that those who are governed by the law and those that

administer it will understand its meaning and application."[39]

### C. The content-and-filtering requirement chills speech and squelches exchange of ideas.

HB 18's content-and-filtering requirement runs roughshod over this core

principle driving Section 230 and the constitutional guarantee of free speech by

setting the stage. This provision requires "a strategy to prevent or mitigate the known

minor's exposure to harmful material and other content that promotes, glorifies, or

facilitates" certain topics.[40] Harmful material is defined using Texas's obscenity

---

[37] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

[38] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

[39] *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968).

[40] Tex. Bus. & Com. Code § 509.053. Developing a strategy under requirement includes activities such as: "creating and maintaining a comprehensive list of harmful material or other content . . . to block from display to a known minor," "using filtering technology and other protocols to enforce the blocking of material

definition.[41] HB 18 lists topics for "other content" as: "(1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse."[42]

HB 18's content-and-filtering requirement is preempted by Section 230 because, as explained, Section 230 "specifically proscribes liability" for "decisions relating to the monitoring, screening, or deletion of content."[43] Simply put, liability may not be imposed on online platforms for "failure to implement measures" to prevent exposure to harmful third-party content.[44] But this is what the monitoring-and-filtering requirement would do, tasking online platforms with implementing measures to protect minors from seeing harmful and other content and imposing

---

or content," and "using hash-sharing technology and other protocols to identify recurring harmful material or other content." *Id.*

[41] "'Harmful material' means material whose dominant theme taken as a whole (A) appeals to the prurient interest of a minor, in sex, nudity, or excretion; (B) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) is utterly without redeeming social value for minors." Tex. Pen. Code § 43.24.

[42] Tex. Bus. & Com. Code § 509.053.

[43] *See MySpace, Inc.*, 528 F.3d at 420 (quoting *Green*, 318 F.3d at 471); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under Section 230.").

[44] *MySpace*, 528 F.3d at 420.

liability based on the adequacy of those measures.[45] In the face of this threat, platforms will err on the side of overzealously removing user content.

This same concern—overmoderation—drives the constitutional vagueness analysis. HB 18's monitoring-and-filtering requirement also fails to meet the "first essential of due process of law" because of its subjective, expansive terms.[46] The requirement combines vague, undefined verbs ("promotes," "glorifies," or "facilitates") with several open-ended, undefined categories of speech (for example, "substance abuse"), leaving platforms to guess as to whether content is allowed. Again, the potential for chilling speech is particularly acute in light of the challenges of content moderation and extensive penalties, encouraging platforms to over-enforce.

A survey of content that could be perceived as "promot[ing]," "glorif[ying]," or "facilitat[ing]" restricted speech quickly shows the difficult judgment calls and potential for severe overmoderation. For example, "suicide, self-harm, or eating disorders" could encompass posts honoring the actor Robin Williams, who died from suicide, or from musician Taylor Swift or Olympian Shawn Johnson discussing challenges with eating disorders. "Substance abuse" could encompass a discussion of struggles with substance abuse and recovery. The line between a heated political

---

[45] *See* Tex. Bus. & Com. Code § 509.053.

[46] *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

debate and "harassment" can be blurry—for example, calling someone a "lib" or "MAGAt." And "sexual exploitation or abuse" could cover survivors sharing their own experiences.

Indeed, many works of artistic and intellectual value could be swept in, such as Jacques-Louis David's painting *The Death of Socrates*, Shakespeare's *Hamlet*, *Macbeth*, or *Julius Caesar*, or James Taylor's *Fire and Rain*, which include depictions of suicide; F. Scott Fitzgerald's *The Great Gatsby* and Ernest Hemingway's *The Sun Also Rises* and popular songs by John Denver,[47] Johnny Cash,[48] or Eric Clapton,[49] which include depictions of substance abuse; movies such as *Rear Window*, which depicts stalking; and Alice Walker's *The Color Purple*, which depicts sexual abuse. HB 18 incentivizes platforms to err on the side of removing user content that features or discusses all these works.

### III. HB 18 would diminish online speech by censoring alternative viewpoints and limiting youth access to digital spaces.

HB 18's monitoring-and-filtering requirement would pressure platforms to change their content policies and features in ways that impair expression. For the complex choices inherent to content moderation, platforms would face the threat of

---

[47] *Rocky Mountain High* by John Denver.

[48] *Hurt* by Johnny Cash ("The needle tears a hole; the old familiar sting; try to kill it all away.").

[49] *Cocaine* by Eric Clapton (personifying addiction to cocaine as a woman.).

enforcement actions by the Texas Attorney General and steep penalties. Platforms are likely to over-enforce, which might stamp out discussions of socially valuable topics and silence perspectives outside the perceived mainstream. Moreover, given the liability risks, some platforms may seek to block minors outright, preventing youth from accessing important venues for lawful speech and social engagement.

## A. HB 18 could eliminate discussions of important issues and viewpoint diversity.

Over-enforcement by platforms threatens discussion of all kinds of important social issues. For example, standards against "grooming" could prevent discussion of dating strategies, romantic gift-giving, or how men can attract women. Standards against "suicide" and "self-harm" could curtail discussions about veterans' mental health, SSRIs, or acts that society considers heroic, such as by firefighters, police officers, or soldiers who sacrificed themselves to save others. Platforms might even be compelled to *forget* the Alamo, at the risk of "glorif[ying]" the 100 Texans who stood alone against certain defeat.

The examples of socially valuable topics that could become off-limits are endless, regardless of political viewpoint. Standards against "eating disorders" could erase discussions about popular diets, workouts, and general wellness trends that some may view as unhealthy—such as Mediterranean, Paleo, and carnivore diets, intermittent fasting, tips on exercises to build muscle, and products like protein powder, creatine, and colostrum—preventing Texans from freely talking

about their approaches to health and fitness. Standards against "substance abuse" could sweep up political debates about drug legalization, discussions of herbal supplements, campaigns to educate people on treating overdoses,[50] or even family photos from a winery or with cigars at a graduation.

Additionally, standards against "stalking" or "harassment" could impact content from undercover journalists, such as work by Mother Jones or Project Veritas, or from campaign trackers that follow political candidates to catch embarrassing gaffes. Insulting a celebrity's masculinity by commenting he has "beta" energy could be swept up in filters for "bullying" or harassment," as could videos of jeers at baseball games or even benign slogans like "Don't mess with Texas." These standards could even target posts featuring weapons or fighting, possibly removing content about martial arts, a Samurai sword, or a gun received for Christmas. At an extreme, platforms might even be compelled to censor any topic involving violence, such as hunting or UFC competitions.

Over-enforcement harms could especially undermine access to a diversity of viewpoints and resources across the political spectrum. Content policies, especially ones that are "imprecise and broad," often end up favoring certain groups over

---

[50] Alexander Lekhtman, *Social Media Bill Passed by Senate Threatens Harm Reduction and More*, FILTER (Aug. 6, 2024), https://filtermag.org/social-media-bill-harm-reduction.

others.[51] Research shows that automated detection tools that remove flagged content amplify the risk of collateral censorship of voices outside the mainstream.[52] As the Cato Institute has remarked, "freewheeling" online speech is made possible with protections that recognize the difficulties of content moderation: "[w]ant to blow the whistle on misconduct? Criticize someone powerful? Complain about mistreatment? Engage in vigorous, even rude debate? Section 230 lets you do it, because the companies that publish what you have to say don't need to fear getting dragged into a lawsuit."[53] It is these types of protections that facilitate speech from authentic speakers who challenge conventional thinking, from Joe Rogan to Howard Stern.

To illustrate, automated content moderation tools "disproportionately affect religious communities" by failing to distinguish between hate speech and community efforts in response to persecution,[54] and LGBTQ+ content is

---

[51] Ángel Díaz & Laura Hecht-Felella, *Double Standards in Social Media Content Moderation*, BRENNAN CENTER FOR JUSTICE at 3 (2021), https://bit.ly/497xuUH.

[52] *See* Note, *Section 230 as First Amendment Rule*, 131 HARV. L. REV. 2027, 2046–47 (2018) (citing research indicating that "marginalized communities" are "particularly vulnerable to the collateral censorship" that results from chilling an intermediary's speech).

[53] Thomas A. Berry & David Meyer-Lindenberg, *The Supreme Court Should Reject an Attempt to Undermine Section 230*, CATO AT LIBERTY (Jan. 23, 2023), https://www.cato.org/blog/supreme-court-should-reject-attempt-undermine-section-230.

[54] Kirsten Lavery, U.S. COMM'N ON PROTECTING RELIGIOUS FREEDOM, PROTECTING RELIGIOUS FREEDOM ONLINE 4-6 (2021),

disproportionately removed due to "overbroad content moderation algorithms and human reviewers."[55] Automated tools may also inadvertently dampen speech from racial minorities because it is deemed hate speech, harassment, or abuse.[56] One can also imagine scenarios in which tools make it difficult for women to discuss experiences with sexual harassment or impede men from responding to false accusations of committing sexual assault.

**B.** **Young people may be blocked outright from social media, walling off important speech venues.**

Online platforms provide important spaces for speech and connection for people of all ages, including to discover new ways of thinking and engage in the political process. The Supreme Court has noted that social media websites "for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge."[57] They "provide perhaps the most

---

https://www.uscirf.gov/sites/default/files/2021-12/2021%20Factsheet%20-%20Protecting%20Religious%20Freedom%20Online.pdf.

[55] Alexander Monea, The Digital Closet: How the Internet Became Straight 179 (2022).

[56] *See* Maarten Sap, et al., The Risk of Racial Bias in Hate Speech Detection, PROCEEDINGS OF THE 57TH ANNUAL MEETING OF THE ASSOCIATION FOR COMPUTATIONAL LINGUISTICS 1668, 1671 (2019), https://bit.ly/3ODPs8S.

[57] *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

powerful mechanisms available to a private citizen to make his or her voice heard."[58]

And access to online spaces is no less impactful for young people, whose speech interests do "not go on leave when social media are involved."[59]

Access to social media is therefore increasingly important for citizens to engage in public life. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."[60] It follows that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."[61]

Society is better off when young people can participate in this modern marketplace of ideas.[62] This is how the voices of a new generation are heard on issues from climate policy to school closures and mask mandates for COVID-19—and how they develop the knowledge and skills to participate in the American

---

[58] *Id.* at 107.

[59] *See Moody*, 144 S. Ct. at 2394.

[60] *Id.* at 104.

[61] *Id.*

[62] *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000) ("It is through speech that our convictions and beliefs are influenced, expressed, and tested. It is through speech that we bring those beliefs to bear on Government and on society. It is through speech that our personalities are formed and expressed. The citizen is entitled to seek out or reject certain ideas or influences without Government interference or control.").

political process. In recognition of social media's role in information dissemination, some federal agencies have recently eschewed press-release lists, instead choosing to post updates directly on platforms like X.[63] If teenagers were blocked from accessing social media, they would thus lose access to content that increases their knowledge of our government and helps them develop their civic identities.

Online platforms are a space for young people to learn and encounter new ideas. For example, online platforms can provide counterprograming to the viewpoints favored by teachers. They can also expose young people to new perspectives from voices not represented in their day-to-day interactions. For example, children of immigrants who do not hear their new community's perspective at the kitchen table can access these views through social media; by the same token, these children can stay connected to cultural traditions in their parents' home country via these same platforms. Indeed, online platforms furnish access to tremendous educational content like online tutoring, instructional videos, and TED talks—even

---

[63] Zoë Schiffer, *The Social Security Administration Is Gutting Regional Staff and Shifting All Public Communications to X*, WIRED (Apr. 11 2025), https://www.wired.com/story/social-security-administration-regional-office-elon-musk-x.

if a student's school lacks relevant classes, they can learn about public speaking,[64]

procrastination,[65] or differential equations.[66]

Online platforms are also a key aspect of how young people find community

and support. A survey by Pew Research Center found that, for a majority of teens,

social media was often more helpful than harmful.[67] For example, teenagers may

inform themselves about important decisions on online platforms, such as choosing

between colleges based on perspectives in the school's online communities or

considering career paths based on "day-in-the-life" social media accounts with

---

[64] Ted, *How to Speak So That People Want to Listen*, YOUTUBE (June 27, 2014), https://www.youtube.com/watch?v=eIho2S0ZahI.

[65] Ted-Ed, *Why you procrastinate even when it feels bad*, YOUTUBE (Oct. 27, 2022), https://www.youtube.com/watch?v=FWTNMzK9vG4.

[66] Khan Academy, *Differential Equations*, https://www.youtube.com/playlist?list=PL96AE8D9C68FEB902, YOUTUBE (visited July 7, 2025).

[67] Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022*, PEW RSCH. CTR. (Nov. 16, 2022), https://pewrsr.ch/3whSY2z ("Eight-in-ten teens say that what they see on social media makes them feel more connected to what's going on in their friends' lives[;] . . . 71% say it makes them feel like they have a place where they can show their creative side[;] . . . 67% say these platforms make them feel as if they have people who can support them through tough times[;] . . . a majority [] say the same for feeling more accepted. These positive sentiments are expressed by teens across demographic groups").

insights into jobs like agriculture,[68] petroleum engineering,[69] or entrepreneurship.[70] Additionally, through social media, young people can connect with old friends from a previous school or find support that is unavailable offline. For example, only 40% of LBGTQ+ youth reported living in affirming households, while 68% found online spaces supportive.[71] Young people can also use social media to bond over niche interests and experiences—on Reddit, users can bond over everything from a difficult cancer diagnosis[72] to a burgeoning passion for architecture,[73] from faith in a higher power[74] to faith in the Texas Longhorns.[75]

---

[68] Spencer Hillbert (@spencerhillbert_yt), TikTok, https://www.tiktok.com/@spencerhilbert_yt.

[69] Kobi McNutt (@K_nutt3), Instagram, https://www.instagram.com/k_nutt3.

[70] The Closet (@theclosetpgh), TikTok, https://www.tiktok.com/@theclosetpgh.

[71] 2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People, Trevor Project (last visited July 6, 2025), https://www.thetrevorproject.org/survey-2024/#intro.

[72] Apprehensive-Space94 (@Apprehensive-Space94), Reddit (r/cancer), *being a teenager with a rare and incurable type of cancer* (2023), https://www.reddit.com/r/cancer/comments/15k4rkc/being_a_teenager_with_a_rare_and_incurable_type.

[73] StudiosS (@StudiosS), Reddit (r/architecture), *How can I learn architecture?* (2022), https://www.reddit.com/r/architecture/comments/u6ebxu/how_can_i_learn_architecture.

[74] *r/Christian*, Reddit, https://www.reddit.com/r/Christian/ (last visited July 7, 2025).

[75] *r/LonghornNation*, Reddit, https://www.reddit.com/r/LonghornNation (last visited July 7, 2025).

* * *

These examples help to illustrate just some of the many ways that HB 18's content-and-filtering requirement would impair online speech. The law could erode discussion of any number of topics, push out alternative viewpoints, and deprive young people of access to all kinds of beneficial uses for online platforms.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Respectfully submitted,

/s/ Sean Marotta

<table>
<tr><td>Kathleen Farley*<br>Vice President of Litigation<br>CHAMBER OF PROGRESS<br>1390 Chain Bridge Rd. #A108<br>McLean, VA 22101<br>info@progresschamber.org<br>*admitted in New York</td><td>Sean Marotta<br>Mark W. Brennan<br>Thomas B. Veitch<br>Jordyn Johnson<br>HOGAN LOVELLS US LLP<br>555 Thirteenth Street NW<br>Washington, DC 20004<br>(202) 637-4881<br>sean.marotta@hoganlovells.com<br><br>*Counsel for Chamber of Progress*</td></tr>
</table>

July 10, 2025

**CERTIFICATE OF SERVICE**

I certify that on July 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sean Marotta
Sean Marotta

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,456 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ *Sean Marotta*

July 10, 2025                                  Sean Marotta