# United States Court of Appeals
# for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
AND NETCHOICE, L.L.C.,
*Plaintiffs-Appellees,*
v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND
THROUGH NEXT FRIEND, VANESSA FERNANDEZ;
AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,
*Plaintiffs-Appellees,*
*v.*
KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant.*

On Appeal from the United States District Court for the
Western District of Texas
Hon. Robert Pitman District Court Case Nos. 1:24-cv-
849 and 1:24-cv-945

---

## BRIEF OF *AMICUS CURIAE* SOFTWARE & INFORMATION INDUSTRY ASSOCIATION IN SUPPORT OF APPELLEES

---

Anne Voigts
Pillsbury Winthrop Shaw Pittman LLP
2550 Hanover Street
Palo Alto, California 94304-1115
T: 650.233.4500/F: 650.233.4545
E: anne.voigts@pillsburylaw.com

Jonathan T. Sink
Pillsbury Winthrop Shaw Pittman LLP
609 Main Street, Suite 2000
Houston, Texas 77002
T: 713.276.7600
E: Jonathan.sink@pillsburylaw.com

*Attorneys for Amicus Curiae Software*
*& Information Industry Association*

July 10, 2025

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to the persons and entities listed in Petitioners' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

### *Amicus Curiae:*

Software & Information Industry Association

### Counsel for *Amicus Curiae:*

Anne M. Voigts

Jonathan T. Sink


Dated:  July 10, 2025

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:  */s/  Anne Voigts*

2550 Hanover Street
Palo Alto, California 94304-1115
Telephone: 650.233.4500
Facsimile:  650.233.4545
Email: anne.voigts@pillsburylaw.com

*Attorneys for Amicus Curiae Software & Information Industry Association*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE* .............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT .................................................................................. 4

I.   THE FIRST AMENDMENT AND SECTION 230 PROTECT COMPLEMENTARY INTERESTS ............................................................. 4

    A.   The First Amendment Protects Digital Service Provider's Exercise Of Editorial Control In Publishing Third-Party Speech .................................. 5

    B.   Section 230 Also Protects the Act of Online Publication ......................... 7

    C.   Plaintiffs Can Raise Both First Amendment and Section 230 Claims At the Same Time ........................................................... 10

    D.   A Contrary Rule Would Stifle Online Speech and Impede Economic Development ............................................................ 12

II.  THE USE OF ALGORITHMS TO EXECUTE HUMAN EDITORIAL JUDGMENT IS PROTECTED UNDER THE FIRST AMENDMENT AND SECTION 230 .............................................................................. 14

    A.   The Use of Algorithms in Content Moderation Furthers Expressive Choices ................................................................. 15

    B.   The Use of Tools To Execute Expressive Choices Is Protected First Amendment Activity ....................................................... 18

    C.   The Use of Algorithms Does Not Dilute Section 230's Application ....... 19

III. *FREE SPEECH COALITION* REAFFIRMED THAT THE FIRST AMENDMENT (AND STRICT SCRUTINY) APPLY ................................. 21

CONCLUSION ............................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ........................................................................11

*Ben Ezra, Weinstein, & Co. v. Am. Online,*
206 F.3d 980 (10th Cir. 2000) ..........................................................................9

*Brown v. Entertainment Merchants Assn.,*
564 U.S. 786 (2011).....................................................................................5, 22

*Computer & Commc'ns Indus. Ass'n v. Paxton,*
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...................................................*passim*

*Cubby, Inc. v. CompuServe Inc.,*
776 F. Supp. 135 (S.D.N.Y. 1991) ...................................................................7

*Doe v. MySpace, Inc.,*
528 F.3d 413 (5th Cir. 2008) ...........................................................................9

*Dyroff v. Ultimate Software Grp.,*
934 F.3d 1093 (9th Cir. 2019) .....................................................................9, 19

*Erznoznik v. Jacksonville,*
422 U.S. 205 (1975).........................................................................................5

*Force v. Facebook,*
934 F.3d 53 (2d Cir. 2019) ...................................................................9, 20, 21

*Free Speech Coalition v. Paxton,*
606 U.S. __, No. 23-1122, 2025 WL 1773625 (June 27, 2025)................*passim*

*Google Inc. v. Hood,*
822 F.3d 212 (5th Cir. 2016) ..........................................................................11

*Gonzalez v. Google LLC,*
598 U.S. 617 (2023).........................................................................................1

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*
515 U.S. 557 (1995)................................................................6

*Hustler Magazine v. Falwell,*
485 U.S. 46 (1988)..............................................................14

*Johnson v. Arden*,
614 F.3d 785 (8th Cir. 2010) .............................................10

*Jones v. Dirty World Ent. Recordings LLC,*
755 F.3d 398 (6th Cir. 2014) ...............................................9

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ..............................................9

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014).............................................9

*La'Tiejira v. Facebook, Inc*.,
272 F. Supp. 3d 981 (S.D. Tex. 2017).....................................8

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)..............................................................6

*Monsarrat v. Newman*,
28 F.4th 314 (1st Cir. 2022)..................................................9

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)......................................................*passim*

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*
475 U.S. 1*,* 11, n.7 (1986)......................................................6

*Stratton-Oakmont v. Prodigy*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ..................7

*Students Engaged in Advancing Texas v. Paxton*,
765 F.Supp.3d 575 (W.D. Tex. 2025) ..........................2, 5, 22

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)..............................................................1

*Zeran v. Am. Online*,
129 F.3d 327 (4th Cir. 1997) ...............................................................9

## Statutes and Codes

United States Code
Title 47, Section 230 ................................................................*passim*


Texas Business & Commercial Code
Section 509.053(a) ...............................................................................2

## Other Authorities

Blazina & Stocking, *Key Facts About Parler*, Pew Research Center (Oct. 20,
2022), https://www.pewresearch.org/short-reads/2022/10/20/fast-facts-
about-parler-as-kanye-west-reportedly-plans-acquisition-of-site/ (visited
July 9, 2025) ......................................................................................15

Buckley & Schafer, *"Censorship-Free" Platforms: Evaluating Content
Moderation Policies and Practice of Alternative Social Media*, 4
For(e)Dialogue 7 (Feb. 3, 2022),
https://foredialogue.pubpub.org/pub/bsh5uhll/release/1 (visited July 9,
2025) ................................................................................................15

Congressional Record
Volume 141, H. 8471 (Aug. 4, 1995) ...........................................11, 12

Desjardins, *How Much Data Is Generated Each Day?*, World Economic
Forum https://www.weforum.org/agenda/2019/04/how-much-data-is-
generated-each-day-cf4bddf29f/ (visited July 10, 2025) ..............13, 14

Elliot Harmon, *No, Section 230 Does Not Require Platforms to Be
"Neutral"*, Electronic Frontier Foundation (April 12, 2018),
https://www.eff.org/deeplinks/2018/04/no-section-230-does-not-require-
platforms-be-neutral (visited July 9, 2025) .......................................11

Ethan Wham, *The Economic Case for Section 230, Disruptive Competition
Project*, Computer & Communications Industry Association (Sept. 6,
2019), https://www.project-disco.org/innovation/090619-an-economic-
case-for-section-230/ ..................................................................13, 14

Google, *Search Quality Rater Guidelines: An Overview*, Google,
https://services.google.com/fh/files/misc/hsw-sqrg.pdf (visited July 9,
2025) ................................................................................................................17

Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET
(2019). ..............................................................................................................8

*Key Facts About Parler*, Pew Research Center (Oct. 20, 2022),
https://www.pewresearch.org/short-reads/2022/10/20/fast-facts-about-
parler-as-kanye-west-reportedly-plans-acquisition-of-site/ (visited July
9, 2025) ............................................................................................................15

Merriam-Webster, *Algorithm*, https://www.merriam-
webster.com/dictionary/algorithm (visited July 9, 2025)..................................16

Senate Report No. 104-230 (1996) ..........................................................................7

Singhal et al., *SoK: Content Moderation in Social Media, from Guidelines to
Enforcement, and Research to Practice* (Mar. 2023),
https://arxiv.org/pdf/2206.14855.pdf (visited July 9, 2025)............................16

Troy Beamer, *402.74 Million Terabytes of Data Is Created Every Day*,
https://www.techbusinessnews.com.au/blog/402-74-million-terrabytes-
of-data-is-created-every-day/ (visited July 10, 2025) ........................................13

The Software and Information Industry Association ("SIIA") is the principal trade association for those in the business of information. SIIA's membership includes nearly 400 software companies, platforms, data and analytics firms, and digital publishers that serve nearly every segment of society, including business, education, government, healthcare, and consumers. It is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information. SIIA protects the rights of its members to use software as a tool for the dissemination of information.

SIIA and its members have a particular interest in the robust and predictable application of the First Amendment and 47 U.S.C. § 230. Indeed, SIIA has participated as *amicus* curiae in, among others, *Twitter, Inc. v. Taamneh,* 598 U.S. 471 (2023), *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *Gonzalez v. Google LLC,* 598 U.S. 617 (2023). Consistent application of those constitutional and statutory rules of the road promotes free speech and economic growth. Accordingly, SIIA submits this *amicus* brief to address: (1) Texas's incorrect assertion that Appellees' First Amendment claims cannot coexist with their Section 230 claims;

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

(2) why the First Amendment and Section 230 apply with undiluted force to HB 18's provisions even where they regulate, expressly or implicitly, the use of algorithms for content moderation and targeted advertising; and (3) why the Supreme Court's recent decision in *Free Speech Coalition v. Paxton* confirms that strict scrutiny applies here, where the regulations in question are plainly content-based and the speech they would curtail constitutionally protected.

## INTRODUCTION AND SUMMARY OF ARGUMENT

HB 18 requires covered digital service providers (DSPs) to "develop and implement a strategy to prevent [a] known minor's exposure to" broadly defined categories of speech, including content "that promotes, glorifies, or facilitates": (A) "suicide, self-harm, or eating disorders"; (B) "substance abuse"; (C) "stalking, bullying, or harassment"; and (D) "grooming, trafficking, child pornography, or other sexual exploitation or abuse." Tex. Bus. & Com. Code § 509.053(a). As the district court correctly recognized, most of that proscribed content, "even if highly distasteful," is nonetheless covered by the First Amendment, the statute proscribing it is plainly content-based, and its requirements more restrictive and less tailored than they need to be to survive that level of scrutiny. *Students Engaged in Advancing Tex. v. Paxton*, 765 F.Supp.3d 575, 597 n.13 (W.D. Tex. 2025) ("*S.E.A.T.*"); *see also Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036-1038 and n.13 (W.D. Tex. 2024) ("*CCIA*"). And, as the court also correctly recognized,

HB 18's attempt to regulate digital service providers' publication of third-party speech is preempted by Section 230, which "specifically proscribes liability" for "decisions relating to the monitoring, screening, and deletion of content." *CCIA*, 747 F. Supp. 3d at 1042. This Court should affirm.

At least three arguments support affirmance. First, the First Amendment and Section 230 are mutually reinforcing. In seeking to overturn the district court's decision on appeal, Texas argues that appellees cannot advance both First Amendment and Section 230 claims because those claims are mutually exclusive. They are not. The state's largely unprecedented position would strip companies of critical constitutional and statutory protections to which they are entitled, dilute First Amendment protections, and nullify Section 230. Nothing in Texas's brief argument, the constitutional or statutory text, or existing case law warrants such a result.

Second, this Court should reject any argument that HB 18's provisions regulating the use of algorithms survive First Amendment scrutiny or Section 230 preemption. When covered entities use algorithms, rather than human reviewers, to implement their editorial choices, their use of those algorithms to apply website rules and standards *at scale* does not displace human decision making. It certainly does not strip that decision making of its constitutional protections. Algorithms are simply tools created by humans to implement human decisions and apply human

values. Content-moderation actions using those tools simply reflect their human administrators' constitutionally protected, expressive choices. Their use can no more strip away First Amendment protections than does the use of a printing press instead of a feather pen.

Third, HB 18 fails strict scrutiny. The Supreme Court's recent decision in *Free Speech Coalition v. Paxton*, 606 U.S. __, No. 23-1122, 2025 WL 1773625 (June 27, 2025), confirms that strict scrutiny applies to content-based regulation of protected speech like HB 18—and that HB 18 fails that standard by a country mile. While the Court applied intermediate scrutiny to the age verification requirements there, it did so because those requirements were ancillary to speech, and the covered speech constitutionally unprotected as to minors. By contrast here, the explicit content-moderation requirements directly limit access to a broad swath of constitutionally protected speech. As the district court correctly concluded, that cannot be squared with the First Amendment.

## ARGUMENT

## I. THE FIRST AMENDMENT AND SECTION 230 PROTECT COMPLEMENTARY INTERESTS

Both the First Amendment and Section 230 protect social media companies' compilation and curation of third-party content. While the parameters for both may differ, neither can be squared with HB 18's sweeping regulations.

**A.     The First Amendment Protects Digital Service Provider's Exercise Of Editorial Control In Publishing Third-Party Speech**

The First Amendment unquestionably protects editorial choices. In concluding that Texas was not likely to succeed in enforcing another recent law that also sought to control social media companies' content moderation, the Supreme Court recently reaffirmed that "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles" of the First Amendment "do not vary." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790 (2011)).  Those principles protect against government interference with a private speaker's own editorial choices about the mix of speech it wants to convey. *Moody*, 603 U.S. at 734.  And, as the district court here recognized, those principles do not give way to government concerns that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription" should be "suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *S.E.A.T.,* 765 F. Supp. 3d at 596 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975)).

Those protections encompass expressive activity even where that activity involves presenting a curated compilation of speech originally created by others.

*Moody*, 603 U.S. at 728. That's because the First Amendment protects the "crucial process" of "exercise[ing] of editorial control and judgment" over the speech or expressions of others. *Miami Herald Publ'g Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974). In *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, the Court, applying strict scrutiny, confirmed that an interest in "offer[ing] the public a greater variety of views" could not justify compelling the utility to "alter its own message" by forcing it to include third-party material in its newsletter. 475 U.S. 1*,* 11, n.7, 12, 15 (1986). And in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, the Court held that the First Amendment prevented Massachusetts from compelling parade organizers to admit a particular group because doing so would "alter the expressive content of the[] parade*." * 515 U.S. 557, 572–574 (1995). Under the First Amendment, the organizers' decision to exclude the group's message could not be constitutionally second-guessed by the state.

While those cases dealt with the forced *inclusion* of particular speech, the same constitutional principles apply to forced *exclusion*. First, as the Supreme Court recognized in *Moody*, the First Amendment applies when an entity compiles and curates others' speech into an expressive product of its own. *Moody*, 603 U.S. at 709-10. Second, "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 710. Third, "the government cannot get its way just by asserting an interest in better balancing the marketplace of ideas"—that interest

is not a compelling one, and the statutory means for accomplishing it are not narrowly tailored. *Id.*

### B. Section 230 Also Protects the Act of Online Publication

Section 230 provides that "[n]o interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1); *CCIA*, 747 F. Supp. 3d at 1042. It was enacted to "promote the continued development of the Internet," and encourage the development of "forum[s] for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3), (b)(1). And it came partly in congressional response to cases holding that, so long as a website exercised "editorial control over the content of messages posted on its" site, it could be held liable for publishing third-party speech that the editor did *not* exclude. *See, e g., Stratton-Oakmont v. Prodigy*, 1995 WL 323710, at *2 (N.Y. Sup. Ct. May 24, 1995); S. Rep. No. 104-230, at 194 (1996); *cf. Cubby, Inc. v. CompuServe Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991). In enacting Section 230, Congress wanted to ensure that websites could remove some offensive third-party content without becoming liable as a common-law publisher for *all* third-party content.[2]

---

[2] Section 230 replaced what was effectively a notice and takedown regime under the common law. Under existing First Amendment law, once a publisher knew that an item was defamatory, for example, they could be liable for distributing it. *See*

Accordingly, as the district court recognized, Section 230 provides all DSPs "broad immunity" for "all claims stemming from their publication of information created by third parties." *CCIA*, 747 F. Supp. 3d at 1042. By preempting "inconsistent" laws, 47 U.S.C. § 230(e)(3), Congress "specifically proscribe[d] liability" for "decisions relating to the monitoring, screening, and deletion of content." *CCIA*, 747 F. Supp. 3d at 1042. (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008); citing *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017) ("Thus 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230'")). "That is the point of Section 230: to immunize websites for harm caused by unremoved speech." *CCIA*, 747 F. Supp. 3d at 1042. (cleaned up). That includes purported "failure[s] to implement basic safety measures to protect minors." *Id.*

Since its inception, Section 230 has consistently protected websites from liability for the "exercise of a publisher's traditional editorial functions—such as

---

*generally Smith v. People of the State of California*, 361 U.S. 147 (1959) (providing reasoning for scienter requirement). And if they removed some content (but not others), they could be liable for what they failed to remove. *See generally* Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET, 10 (2019). That discouraged content moderation efforts, to the detriment of everyone—website operators and users alike. *Id.* Section 230 was designed to encourage content moderation without fear of liability.

deciding whether to publish, withdraw, postpone or alter content." *See, e.g., Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997). It specifically provides that no website that relies on user-generated content "shall be treated as the publisher or speaker of any information provided by another information content provider," and it preempts claims that "treat" websites "as the publisher or speaker of any information provided by another information content provider," rather than the website itself. 47 U.S.C. § 230(c)(1). Section 230's protections thus turn on whether the allegedly injurious content is "creat[ed] or develop[ed]" by someone other than the website itself. 47 U.S.C. § 230(f)(3). If so, Section 230 precludes liability for posting, removing, arranging, and otherwise organizing that third-party content.[3]

---

[3] *See, e.g., Zeran*, 129 F.3d at 330; *see also Monsarrat v. Newman*, 28 F.4th 314, 319 (1st Cir. 2022) (Section 230 applied to and barred claim for "reposting … libelous information" created by a third party); *Force v. Facebook*, 934 F.3d 53, 65 (2d Cir. 2019) (Section 230 barred claim challenging use of "algorithms to suggest content to users"); *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (Section 230 barred challenge to decision to "publish[] information created or developed by third parties," including by using "algorithms" to "recommend[]" content); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (Section 230 barred challenge to website's "exercise of a publisher's traditional editorial functions"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) (Section 230 bars challenge to "decision whether to print or retract a given piece of content"); *Johnson v. Arden*, 614 F.3d 785, 791-92 (8th Cir. 2010) (same); *Doe v. MySpace*, 528 F.3d 413, 420 (5th Cir. 2008) (Section 230 barred challenge to "decisions relating to the monitoring, screening, and deletion of content"); *Ben Ezra, Weinstein, & Co. v. Am. Online*, 206 F.3d 980, 986 (10th Cir. 2000) ("Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions"); *cf. Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265-66 (9th Cir. 2016) (Section 230(c)(1) barred challenge to Yelp!'s display of negative reviews).

## C.  Plaintiffs Can Raise Both First Amendment and Section 230 Claims At the Same Time

Thus, Section 230 and First Amendment protections are not an either/or proposition. Websites that disseminate third-party content both exercise First-Amendment-protected editorial control *and* enjoy Section 230 protection from publisher liability. As a matter of black-letter law, Section 230's statutory protections cannot erode the First Amendment's constitutional ones. U.S. CONST., Art. VI, Cl. 2. But neither does the application of the First Amendment preclude the application of Section 230. Indeed, applying the rule that Texas proposes would nullify the protection for third-party speech in Section 230(c)(1). Section 230 protection is necessary precisely because when websites engage in content moderation of third-party material, they exercise the kind of First-Amendment-protected editorial discretion that would have given rise to publisher liability under the common law.

In the face of this precedent, Texas argues incorrectly that appellees cannot "invoke § 230 preemption while simultaneously claiming HB 18 violates their own First Amendment rights." Paxton Br. at 49. More specifically, it contends, Appellees cannot assert both that (1) HB 18 is unconstitutional because it infringes DSPs' speech rights and (2) Section 230 preempts HB 18 because it imposes liability for other people's speech. *Id.* Accordingly, Texas argues, appellees must pick a horse. Going even further, it implies, because appellees purportedly cannot have

both, they are entitled to neither. That does not work, either as a matter of law, or as a matter of math.

The First Amendment and Section 230 are not mutually exclusive—far from it. True, they are not coterminous: in some circumstances, one may protect more than the other. Thus, Section 230 may apply where the First Amendment does not (to some dissemination of user-created defamation, for example), and the First Amendment may apply where Section 230 does not (to websites' own speech, for example). But the fact that sometimes they overlap and sometimes they don't does not mean that when they *do* overlap, a plaintiff can't invoke both. Websites "are within their First Amendment rights to moderate their online platforms however they like, and they're additionally shielded by Section 230 for many types of liability for their users' speech. It's not one or the other: It's both." Elliot Harmon, *No, Section 230 Does Not Require Platforms to Be "Neutral"*, Electronic Frontier Foundation (April 12, 2018), https://www.eff.org/deeplinks/2018/04/no-section-230-does-not-require-platforms-be-neutral.

That makes good legal sense. As courts (including this one) and Congress have recognized, Section 230 is animated by core First Amendment values. *See Google Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values … drive" Section 230); *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003) (Section 230 "sought to further First Amendment … interests on the Internet"); 141 Cong.

Rec. H. 8471 (Aug. 4, 1995) (statement of Rep. Zoe Lofgren) (Section 230 "preserve[s] the First Amendment … on the Net").  Texas's position serves none of those values and should be rejected.

### D. A Contrary Rule Would Stifle Online Speech and Impede Economic Development

Texas's position is wrong.

The easiest way to demonstrate the flaws in Texas's view is to assume *arguendo* that it is correct.  In the current state of the internet, websites compete through the kinds of communities they create and the ideas that they allow to be promoted.  Some will intentionally exclude political discussions.  Others will exclude ad hominem attacks.  Others will allow their users to post exactly what the law allows.  That editorial selection creates paradigmatic competition in the marketplace of ideas, and it has enabled the United States' information businesses to be the envy of the world.

But suppose, for example, that Texas' position were correct and that a website became aware of a third-party defamatory statement and had to choose between Section 230's protection and First Amendment protection.  If the state were correct, the website's choice would have two bad outcomes: either adopt the risk of third-party content and stand on the First Amendment, or eschew content moderation and act as a pure intermediary in reliance on Section 230.  In one case, there is free speech with risk of massive liability; in the other case, there is no speech with the shield for

liability. No court has ever forced a website to make such a choice. And even putting aside the lack of supporting authority, a number of practical harms would ensue.

First, narrowing Section 230 immunity would exacerbate the problems of content moderation at scale, and make it more difficult for smaller companies to enter the market, let alone survive. Roughly 500 million tweets are sent, 95 million photos and videos shared on Instagram, and 4 petabytes of data created on Facebook in a single day. Desjardins, *How Much Data Is Generated Each Day?*, World Economic Forum https://www.weforum.org/agenda/2019/04/how-much-data-is-generated-each-day-cf4bddf29f/ (visited July 10, 2025); *see also* Troy Beamer, *402.74 Million Terabytes of Data Is Created Every Day*, https://www.techbusinessnews.com.au/blog/402-74-million-terrabytes-of-data-is-created-every-day/ (visited July 10, 2025) (approximately 5.35 billion internet users worldwide). The sheer quantity of content generated on a daily basis by the billions of internet users makes content moderation an imperfect and extraordinarily difficult process for even the largest companies. For smaller ones, it can be an existential challenge. That challenge presents a potentially insuperable barrier to market entry, because new companies would be unable to attract investments or get off the ground if faced with potentially massive legal exposure. Ethan Wham, *The Economic Case for Section 230, Disruptive Competition Project*, Computer & Communications

Industry Association (Sept. 6, 2019), https://www.project-disco.org/innovation/090619-an-economic-case-for-section-230/.

Second, Texas's view, if adopted, would throttle "the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-52 (1988). And the impact of such a decision is likely to fall most heavily on heterodox views, as opposed to mainstream ones, trimming the marketplace of ideas to ideas that are already generally accepted. Faced with the risk of liability for non-mainstream content, many services may choose to prohibit and exclude it all together. None of Texas's arguments, which ignore the practical reality of how algorithms and content moderation policies actually operate, warrant incurring those constitutional and societal costs.

## II. THE USE OF ALGORITHMS TO EXECUTE HUMAN EDITORIAL JUDGMENT IS PROTECTED UNDER THE FIRST AMENDMENT AND SECTION 230

The sheer amount of user-generated content online requires websites to filter, organize, and sort content to make it useful and accessible to users. *See* Desjardins, *How Much Data Is Generated Each Day?*, World Economic Forum https://www.weforum.org/agenda/2019/04/how-much-data-is-generated-each-day-cf4bddf29f/ (visited July 10, 2025) (estimating that by 2025, 463 exabytes of data will be created each day globally, the equivalent of 212,765,957 DVDs per day). The algorithmic tools that websites use to select, coordinate, and arrange this

material are protected by both the First Amendment and Section 230. HB 18 conflicts with the former and is preempted by the latter.

### A. The Use of Algorithms in Content Moderation Furthers Expressive Choices

As an initial matter, algorithms play a critical role in content moderation. They are a product of and reflect their human creators' expressive choices, which vary from site to site. Humans design them, deploy them, supervise them, and, as necessary, revise them.

While content moderation policies share some commonalities, they reflect the individual expressive choices of particular websites. Those websites in turn represent a range of diverse communities and different editorial priorities. Each website establishes its own content policies and priorities to guide the dissemination of speech. And, as mentioned above, some websites' content policies tolerate significantly more content than others. Blazina & Stocking, *Key Facts About Parler*, Pew Research Center (Oct. 20, 2022), https://www.pewresearch.org/short-reads/2022/10/20/fast-facts-about-parler-as-kanye-west-reportedly-plans-acquisition-of-site/ (visited July 9, 2025). For example, websites like Parler, BitChute, Gab, and Gettr "have attempted to market themselves as unfettered, unmoderated areas which prioriti[z]e unlimited free speech." Buckley & Schafer, *"Censorship-Free" Platforms: Evaluating Content Moderation Policies and*

*Practice of Alternative Social Media*, 4 For(e)Dialogue 7 (Feb. 3, 2022), https://foredialogue.pubpub.org/pub/bsh5uhll/release/1 (visited July 9, 2025).

These policies and priorities often evolve as the websites do. In developing those policies and priorities, websites can find themselves caught between a rock and a hard place. Websites may be accused of censorship for allegedly moderating too much, but criticized as unduly laissez-faire for moderating too little. And, of course, what constitutes too much (or too little) is very much in the (subjective) eye of the beholder—and the essence of protected editorial discretion.

Further, websites use tools to implement those content-related policies and priorities. Algorithms are a means to those idiosyncratic, expressive ends. In the simplest of terms, an algorithm is a "step-by-step procedure for solving a problem or accomplishing some end." Merriam-Webster, *Algorithm*, https://www.merriam-webster.com/dictionary/algorithm (visited July 9, 2025). Coded algorithms tell computers what to do, in what order, in response to specifically defined inputs. More specifically, software developers have a range of tools for pre-programmed methods of moderation and curation, including "automated algorithms, which include heuristic-based and rule-based techniques as well as sophisticated machine learning-based models." Singhal et al., *SoK: Content Moderation in Social Media, from Guidelines to Enforcement, and Research to Practice*, 2 (Mar. 2023), https://arxiv.org/pdf/2206.14855.pdf (visited July 9, 2025).

All of those tools, however, implement human choices regarding what content should be distributed, what should not, and how that content should be displayed. To enable content moderation at scale, those decisions are made in advance and applied automatically as new content is created and shared, but the principles and processes underlying those decisions are still human. Humans control those tools to achieve the website's specific expressive goals, select the datasets on which they are trained, determine when to deploy them, pair them with human moderation when appropriate, and create guardrails around their use.

Nor is that human involvement simply at the front end. These tools are subject to on-going human oversight. While every action that is taken by a computer, including every response to any input that is provided, is built into the computer's code during programming and is a function of the instructions that are embodied in that code by the human coders, that process requires significant iteration and improvement. Websites continually finetune the coding of those tools to ensure they effectively serve their purpose and accurately reflect the websites' expressive choices.

For example, Google uses humans to test its search algorithms. To do so, it uses human Search Quality Raters, who "collectively perform millions of sample searches and rate the quality of the results." Google, *Search Quality Rater Guidelines: An Overview*, 11, Google, https://services.google.com/fh/files/misc/

hsw-sqrg.pdf (visited July 9, 2025). It does so because algorithms often fall short in characterizing content and therefore make mistakes humans might not.

The need for continuous iteration and human involvement also reflects changing user behavior and conditions. Specifically, bad actors often actively work to overcome and elude moderation systems.[4] As a result, these are not set-it-and-forget-it tools to be developed, deployed, and then ignored. Rather, to be effective, content-moderation algorithms must (and do) evolve with human oversight and human involvement.

## B. The Use of Tools To Execute Expressive Choices Is Protected First Amendment Activity

The use of tools (and in particular, artificial intelligence and machine learning) to implement editorial decisions is protected by the First Amendment. Those tools reflect differing, deeply subjective value judgments about (1) which inputs or signals should factor into their algorithms, (2) how much weight should be given to each input or signal, and (3) how the algorithm should guide and organize what content is displayed, as well as where, how, and to whom that content is displayed. Humans make those judgments, the tools simply implement them.

---

[4] As a result, websites cannot always be transparent about how their algorithms work. The need to prevent bad actors from gaming the system is one reason why most websites do not publicly share the details of the algorithmic tools that they use to detect misinformation or offensive content.

As the Supreme Court recognized in *Moody,* platforms write algorithms to implement their expressive choices and content-moderation standards. 603 U.S. at 735. "If they create an algorithm to help them identify and delete [particular content], the First Amendment protects their exercise of editorial judgment—even if the algorithm does most of the deleting without a person in the loop. In that event, the algorithm would simply implement human beings' inherently expressive choice to exclude a message they did not like from their speech compilation." *Id*. at 745–46 (Barrett, J., concurring) (cleaned up). And while Justice Barrett speculated that in some instances, "technology may attenuate the connection between content-moderation *actions* (*e.g.*, removing posts) and human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence,'" *id.* (cleaned up) (emphasis in original), people set the principles that govern those actions. Because human choices govern how the tools operate, the use of those tools does not dilute the First Amendment's application.

### C.    The Use of Algorithms Does Not Dilute Section 230's Application

Section 230 also applies whether or not a website uses algorithms or other tools to execute content moderation decisions. Simply put, recommendations made by algorithms "are tools meant to facilitate the communication and content of others," " not content in and of themselves." *Dyroff v. Ultimate Software Group,*

*Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). Indeed, the relevant statutory definitions expressly incorporate the use of such tools. 47 U.S.C. § 230(f)(2), (4). Accordingly, courts have similarly refused to cabin the statute's sweep based on the use of such tools.

Take *Force v. Facebook*. There, the plaintiffs argued that "Facebook's algorithms make … content more 'visible,' 'available,' and 'usable,'" that "Facebook's algorithms suggest third-party content to users 'based on what Facebook believes will cause the user to use Facebook as much as possible,'" and that "Facebook intends to 'influence' consumers' responses to that content." 934 F.3d at 70 (quotations omitted). From this, they argued, algorithms were a distinct form of speech, that the speech at issue was thus the platform's, and that, as a result, it fell outside the scope of Section 230. *Id.*

The Second Circuit rejected that proposition. *Id.* at 67. It held that "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity *regardless of the specific editorial or selection proce*ss." *Id.* (cleaned up) (emphasis added). Nothing in the text of Section 230, it concluded, supports the proposition that a website "is not the 'publisher' of third-party information when it uses tools such as algorithms that are designed to match that information with a consumer's interests." *Id.* at 66. Using such tools promotes the congressional policies behind Section 230, which was intended to (and

has) played a critical role in promoting "the continued development of the Internet." *Id.* (quoting 47 U.S.C. § 230(b)(1)).

Under Section 230, the Court concluded, third-party content is also first-party content only when the website "directly and materially contributed to what made the content itself unlawful." 934 F.3d at 68 (cleaned up). In other words, presenting unlawful content is protected, creating it is not. *Id.* Because HB 18 regulates presentation, not creation, Section 230 preempts it.

## III. *FREE SPEECH COALITION* REAFFIRMED THAT THE FIRST AMENDMENT (AND STRICT SCRUTINY) APPLY

*Free Speech Coalition, Inc. v. Paxton*, confirms that the First Amendment (and strict scrutiny) applies here. 606 U.S. __, No. 23-1122, 2025 WL 1773625 (June 27, 2025). *Free Speech Coalition* held that "[t]o determine whether a law that regulates speech violates the First Amendment, a court must consider both the nature of the burden imposed by the law and the nature of the speech at issue." *Id.* at *5. In so doing, it confirmed that "[t]he basic principles of freedom of speech do not vary when a new and different medium for communication appears." *Id.* at *10 (cleaned up). And it reaffirmed that "[c]ontent-based laws, which target speech based on its communicative content, *are presumptively unconstitutional under the First Amendment* and may be justified only if they satisfy strict scrutiny." *Id.* (cleaned up).

In concluding that intermediate scrutiny nonetheless applied to the age-verification requirements at issue in *Free Speech Coalition*, the Court conditioned its holding on three critical points. First, with respect to the nature of the burden, the age verification requirement did not directly regulate protected speech of adults. *Id.* at *11. Second, with respect to the nature of the speech, minors had no right to access speech that was obscene as to minors. *Id.* at *8. And, third, while adults did have a right of access to such speech, they had no right to access without first undergoing age verification. *Id*. at *8-11.

By contrast here, HB 18 *directly* regulates protected speech on the basis of content. As the district court correctly concluded, "[t]he monitoring-and-filtering requirements explicitly identify discrete categories of speech and single them out to be filtered and blocked. That is as content based as it gets." *CCIA*, 747 F. Supp. 3d at 1036. And while the law targets minors, as the district court also correctly recognized, "the large majority of the proscribed content, such as speech promoting eating disorders, harassment, and bullying," "even if highly distasteful," is nonetheless covered by the First Amendment. *S.E.A.T.*, 765 F.Supp.3d at 597, n.13 (citing *Brown*, 564 U.S. at 794). That is true whether the listener is 70 or 17. Accordingly, this Court should apply strict scrutiny to HB 18—and conclude that HB 18 fails it.

**CONCLUSION**

For these reasons, amicus respectfully requests that this Court affirm the decision of the district court.

Dated: July 10, 2025

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Anne Voigts*
    Anne Voigts

2550 Hanover Street
Palo Alto, California 94304-1115
Telephone: 650.233.4500
Facsimile: 650.233.4545
Email: anne.voigts@pillsburylaw.com

Jonathan T. Sink
Pillsbury Winthrop Shaw Pittman LLP
609 Main Street, Suite 2000
Houston, Texas 77002
Telephone: 713.276.7600
Email: Jonathan.sink@pillsburylaw.com

*Attorneys for Amicus Curiae Software & Information Industry Association*

**CERTIFICATE OF SERVICE**

Counsel hereby certifies that on July 10, 2025, they electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Counsel certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:  July 10, 2025

*/s/  Anne Voigts*
Anne Voigts

2550 Hanover Street
Palo Alto, California 94304-1115
Telephone: 650.233.4500
Facsimile:  650.233.4545
Email: anne.voigts@pillsburylaw.com

*Counsel for Amicus Curiae Software &*
*Information Industry Association*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 5,123 words, excluding the parts of exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).


Dated:  July 10, 2025                            */s/  Anne Voigts*
                                                      Anne Voigts

                                                    2550 Hanover Street
                                                    Palo Alto, California 94304-1115
                                                    Telephone: 650.233.4500
                                                    Facsimile:  650.233.4545
                                                    Email: anne.voigts@pillsburylaw.com

                                                    *Counsel for Amicus Curiae Software &*
                                                    *Information Industry Association*