**Nos. 24-50721 & 25-50096**

# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,

*Plaintiffs–Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant–Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS;
M.F., by and through next friend, VANESSA FERNANDEZ;
AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs–Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

**PETITION FOR REHEARING EN BANC IN NO. 24-50721**

***(Counsel Listed on Inside Cover)***

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

Benjamin W. Mendelson
Deputy Solicitor General
Ben.Mendelson@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

*Counsel for Defendant–Appellant*

# Certificate of Interested Persons

Nos. 24-50721 & 25-50096

Computer & Communications Industry Association;
NetChoice, L.L.C.,

*Plaintiffs–Appellees*,

*v.*

Ken Paxton, Attorney General, State of Texas,

*Defendant–Appellant.*

*consolidated with*

Students Engaged in Advancing Texas;
M.F., by and through next friend, Vanessa Fernandez;
Ampersand Group, L.L.C.; Brandon Closson,

*Plaintiffs–Appellees,*

*v.*

Ken Paxton, Attorney General, State of Texas,

*Defendant–Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Benjamin W. Mendelson
Benjamin W. Mendelson
*Counsel of Record for*
*Defendant–Appellant*

# Table of Contents

Certificate of Interested Persons ........ ii
Table of Authorities ........ iv
Introduction and Rule 40(b) Statement ........ 1
Issue Meriting En Banc Consideration ........ 3
Statement of the Case ........ 3
Statement of Facts ........ 5
Argument ........ 6
I. This Court's Section 230 Jurisprudence Warrants Reconsideration in Light of *Moody*. ........ 7
II. The Panel's Decision Conflicts with the Third Circuit's Post-*Moody* Section 230 Precedent. ........ 10
III. The Scope of Section 230 Preemption Is an Important Issue. ........ 11
Conclusion ........ 13
Certificate of Compliance ........ 14

# Table of Authorities

Page(s)

**Cases:**

*A.B. v. Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024) ........ 4, 6, 8, 9, 11

*Anderson v. TikTok, Inc.*,
116 F.4th 180 (3d Cir. 2024) ........ 1, 4, 5, 9, 10, 11

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ........ 8

*Doe ex rel. Roe v. Snap, Inc.*,
144 S. Ct. 2493 (2024) ........ 10

*Doe ex rel. Roe v. Snap, Inc.*,
88 F.4th 1069 (5th Cir. 2023) ........ 6

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ........ 8

*Est. of Bride by ex rel. Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) ........ 6

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ........ 7

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ........ 8, 9

*Ginsberg v. New York*,
390 U.S. 629 (1968) ........ 7

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 1, 2, 3, 4, 6, 7, 8, 9, 10

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ........ 9

**Statutes and Rules:**

47 U.S.C.
§ 230 ........ *passim*
§ 230(b)(4) ........ 12
§ 230(c)(1) ........ 1, 3, 4, 6, 7

Tex. Bus. & Com. Code
§ 509.001(3) ........ 3
§ 509.053(a) ........ 3

Tex. Penal Code § 43.24(a)(2) ........ 3
Fed. R. App. P.
40(b)(2)(A) ........ 2
40(b)(2)(C) ........ 2, 11
40(b)(2)(D) ........ 1, 2
5th Cir. R. 40.2.2.6 ........ 5

## Introduction and Rule 40(b) Statement

This case presents a novel question of exceptional importance: whether Section 230 of the Communications Decency Act, which shields social-media companies from liability for third-party speech on their platforms, preempts state laws that impose liability on the companies' own editorial decisions about content filtering. Fed. R. App. P. 40(b)(2)(D). In *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024), the same trade associations representing the same social-media companies now before this Court persuaded the Supreme Court that the companies' content moderation decisions constitute their own speech protected by the First Amendment. Having done so, Section 230 should not stand as a barrier to their being held responsible for their own expressive choices.

Texas House Bill 18 (HB18) requires social-media companies to filter from the view of known minors content that promotes, among other things, suicide, self-harm, eating disorders, child pornography, and sexual exploitation. With respect to the claims brought by Computer & Communications Industry Association (CCIA) and NetChoice, L.L.C. in No. 24-50721, a divided panel of this Court held that Section 230(c)(1)—which prohibits treating the provider of an interactive computer service "as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1)—preempts this state law.

The panel's holding conflicts with the Third Circuit's decision in *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), which "charts a new course in Section 230 law" in light of *Moody*. App.30-31 & n.15. Judge Ho dissented, acknowledging the circuit split and concluding that because HB18 "regulates curation, not

publication—first-party speech, not third-party speech," Section 230 does not preempt it. App.39. En banc review is therefore warranted. Fed. R. App. P. 40(b)(2)(C).

Beyond addressing the conflict of authority, this Court should grant rehearing en banc in appeal No. 24-50721 to address the important issue of the scope of Section 230 preemption in light of *Moody*, which significantly altered the legal landscape governing this Court's Section 230 precedent. *See* Fed. R. App. P. 40(b)(2)(A), (D).

With respect to appeal No. 25-50096, the panel unanimously and correctly held that the plaintiffs—Students Engaged in Advancing Texas, M.F., by and through next friend, Vanessa Fernandez, Ampersand Group, L.L.C., and Brandon Closson—lack standing and that a separate claim made by these Plaintiffs is foreclosed. Because those determinations do not warrant rehearing en banc and to limit the issues before the en banc Court, Appellant respectfully suggests that this Court undo the consolidation of the appeals by granting rehearing only in appeal No. 24-50721. If this Court does so, the panel should modify its opinion in appeal No. 25-50096 to address only the issues concerning the SEAT Plaintiffs. Appellant concurrently and conditionally seeks panel rehearing in No. 25-50096 out of an abundance of caution to request this modification of the opinion. For these reasons, the statement of the case and argument below discuss only the parties and issues in appeal No. 24-50721.

## Issue Meriting En Banc Consideration

Whether Section 230, which prohibits imposing liability on a platform for the speech of a third party, 47 U.S.C. § 230(c)(1), preempts a state law that regulates the platform's own speech under the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

## Statement of the Case

**1.** HB18 protects minors on social media. Its monitoring-and-filtering provision requires covered digital service providers (DSPs) to "develop and implement a strategy to prevent" minors' exposure to "harmful material" (defined as material obscene as to minors under the Texas Penal Code) and content that "promotes, glorifies, or facilitates" suicide, self-harm, eating disorders, substance abuse, stalking, bullying, harassment, grooming, trafficking, child pornography, or other sexual exploitation or abuse. Tex. Bus. & Com. Code § 509.053(a); *id.* § 509.001(3); Tex. Penal Code § 43.24(a)(2).

Appellees CCIA and NetChoice, L.L.C., trade associations whose members include the world's largest social-media companies, sued the Texas Attorney General and moved to preliminarily enjoin HB18 before it took effect. ROA.75-102.

The district court entered a preliminary injunction blocking enforcement of the monitoring and filtering provisions, holding them preempted by Section 230 because liability under it "stems from the content" a platform hosts. ROA.428. According to the district court, a contrary rule would allow States to nullify Section 230. ROA.428.

**2.** The Attorney General appealed, and a divided panel of this Court affirmed. App.33. The panel majority held that enforcement actions under the monitoring and filtering provisions "are claims stemming from DSPs' actions as publishers, that is, from their monitoring, screening, and deletion of content." App.28. Applying *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 795 (5th Cir. 2024), the majority concluded that the provision imposes a duty that "would necessarily require an internet company to monitor[, alter, or remove] third-party content." App.29 (alterations in original).

The panel majority acknowledged the Attorney General's argument that Section 230 "does not apply to claims that simply seek to hold social-media companies liable for their own speech, such as the methods they use to curate content." App.30. It rejected that argument, however, "hesitat[ing] to read *Moody* to render Section 230 so easily avoidable," and concluding that First Amendment and Section 230 protections coexist: "[T]he argument that we must choose between them presents a false choice." App.31, 33.

The majority "candidly acknowledge[d]" that its holding "may raise the specter that Section 230 too often functions as a 'get-out-of-jail free card' immunizing social-media companies from all but the most egregious consequences of their products' functioning." App.30. But, the majority held, an alternative holding would "conflict with the text of § 230(c)(1)." App.31-32.

In a footnote, the majority addressed the Third Circuit's decision in *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), first noting that it is potentially distinguishable "because products liability and negligence-based claims could conceivably yield a different analysis," before describing the Third Circuit's

reasoning as based on a "flawed premise": "In any case, *Anderson* self-consciously charts a new course in Section 230 law, and is based on the flawed premise that First Amendment protections for first-party speech and Section 230 protection for internet companies that curate the speech of others cannot coexist." App.30-31 n.15.

Judge Ho dissented from this holding. In his view, Section 230 "is triggered only when a provider is treated as the 'publisher' or 'speaker' of content provided by 'another,'" and so it "does not apply when a provider is held liable for its own content—including its curation of third-party content." App.34-35. Because HB18 "regulates curation, not publication," Judge Ho would have held it not preempted. App.39.

## Statement of Facts

The Attorney General does not believe that any additional facts are necessary to understand the arguments and issues presented. *See* 5th Cir. R. 40.2.2.6.

## ARGUMENT

Section 230 prohibits treating an interactive computer service provider as "the publisher or speaker of any information provided by another." 47 U.S.C. § 230(c)(1). Rather than providing blanket immunity for all claims against providers, this text prohibits only imposing liability on social-media companies by treating them as the publisher or speaker of the speech of third parties.

Before *Moody*, it was, perhaps, appropriate to treat any claim against social-media companies relating to "the defendant's status or conduct as a 'publisher or speaker'" as imposing liability prohibited by Section 230. *See Salesforce*, 123 F.4th at 797 (quoting *Est. of Bride by ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 (9th Cir. 2024)).[1] *But see Doe ex rel. Roe v. Snap, Inc.*, 88 F.4th 1069, 1070 (5th Cir. 2023) (Elrod, J., dissenting from the denial of rehearing en banc) (arguing that this Court's "atextual interpretation" of Section 230 has provided "sweeping immunity for social-media companies that the text cannot possibly bear").

But in *Moody*, the Supreme Court rejected Texas's argument that social-media companies are merely common carriers that passively convey the speech of third parties. Instead, social-media companies "engag[e] in expressive activity" by "compiling and curating others' speech." 603 U.S. at 731. They "engag[e] in speech activity" and provide a "distinctive expressive product." *Id.* (internal quotation marks omitted). As the Third Circuit correctly recognized, *Moody* warrants reconsideration of Section 230 jurisprudence.

---

[1] Although *Salesforce* and *Yolo* were released after the Supreme Court's decision in *Moody*, neither case addresses *Moody*.

HB18 does not impose liability on social-media companies for the speech of third parties. Instead, it regulates social-media companies' own speech and expressive products. Such liability thus does not involve treating them as "the publisher or speaker of any information provided by another." 47 U.S.C. § 230(c)(1).

The State does not argue that Congress *could not* have provided Section 230 protection for platforms' activities protected by the First Amendment. *See* App.33 (suggesting that there is a "false choice" between First Amendment protection and Section 230 protection). The point is that Congress *did not* do so in Section 230, choosing instead to provide only limited immunity to liability for the speech of third parties.

The issue is recurring and important, and the en banc Court should evaluate the effect of *Moody* on this Court's interpretation of Section 230.

## I. This Court's Section 230 Jurisprudence Warrants Reconsideration in Light of *Moody*.

The panel majority held that Section 230 preempts a state law governing the expressive product that social-media companies provide by requiring that they monitor and filter certain content for minors. App.28-29. Under the panel's holding, Section 230 preempts every content-moderation duty a State might impose on any platform, including laws limited to material that is obscene as to minors (and therefore unprotected by the First Amendment as to minors). *See Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025). The authority of States in this Circuit to protect children from harmful online material depends on resolution of this crucial question.

The panel majority relied primarily on three previous decisions from this Court: *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008); *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *A.B. v. Salesforce, Inc.*, 123 F.4th 788 (5th Cir. 2024). The first two were issued before the Supreme Court's decision in *Moody*, and although *Salesforce* was issued five months after *Moody*, it does not cite *Moody*.[2] The panel majority's decision in this appeal is the first decision of this Court to address whether and how *Moody*'s holding that social-media companies engage in their own speech when making content-moderation choices alters the reach of Section 230.

The decisions on which the panel majority relied warrant reconsideration in light of *Moody*. *Doe*, for example, approvingly quoted the Ninth Circuit's holding that "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Doe*, 528 F.3d at 419 (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003)). But *Doe* did not "conside[r] the Does' content-creation argument," *i.e.*, that MySpace "was partially responsible for creating information exchanged," because the argument was not presented to the district court. *Id.* at 422.

---

[2] The reply brief in *Salesforce* was filed on July 2, 2024, the day after issuance of *Moody*. Reply Brief of Appellant, *A.B. v. Salesforce, Inc.*, No. 23-20604 (5th Cir. July 2, 2024), ECF No. 54. The reply brief does not cite *Moody*, *id.*, and neither party raised the decision in a letter under Rule 28(j).

In *Free Speech Coalition*, this Court analogized interactive computer services providers to "cellphone service providers" for purposes of protection under Section 230: "Like cellphone service providers, interactive computer service providers cannot be held liable for harmful communications that they fail to remove." 95 F.4th at 285. But *Moody* held that by filtering content, social-media companies "engag[e] in speech activity" and provide a "distinctive expressive product." 603 U.S. at 731 (internal quotation marks omitted). They are thus unlike cellphone service providers.

In *Salesforce*, the Court held that "[t]o determine whether a claim treats a defendant as a publisher or speaker, . . . courts look to the nature of the claim and the duties the plaintiff seeks to impose on the defendant." 123 F.4th at 794-95. If a claim "seeks to hold the defendant liable for deciding whether to publish, withdraw, postpone or alter content, the claim treats the defendant as a publisher or speaker and is barred by section 230." *Id.* at 795 (internal quotation marks omitted). But the decision reiterated that "providers of interactive computer services may be held liable for speech or conduct 'that is properly attributable to them[,]' even if third-party speech exists somewhere upstream." *Id.* (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009)); *see also id.* at 796 (approvingly citing *Anderson*, 116 F.4th at 184). *Moody* held that content-curation decisions are attributable to them as their own speech.

Justice Thomas recently noted the asymmetry of social-media companies' arguments:

> Because platforms organize users' content into newsfeeds or other compilations, the argument goes, platforms engage in constitutionally protected speech. When it comes time for platforms to be held accountable for their websites, however, they argue the opposite. Platforms claim that since they are *not* speakers under § 230, they cannot be subject to any suit implicating users' content, even if the suit revolves around the platform's alleged misconduct.

*Doe ex rel. Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2494 (2024) (Thomas, J., dissenting from the denial of certiorari) (internal citations omitted). This Court should hold that, having persuaded the Supreme Court that they are engaged in their own speech and the exercise of their own First Amendment rights, social-media companies can be held liable for their own expressive conduct.

## II. The Panel's Decision Conflicts with the Third Circuit's Post-*Moody* Section 230 Precedent.

In *Anderson*, the Third Circuit correctly held that Section 230 did not preempt claims arising from TikTok's algorithmic curation of its "For You Page," which recommended a "Blackout Challenge" video to a ten-year-old girl who died imitating it. 116 F.4th at 181-84. The court's holding followed from *Moody*: "Given the Supreme Court's observations that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms, it follows that doing so amounts to first-party speech under § 230, too." *Id.* at 184 (citation omitted). Because "the information that forms the basis of Anderson's lawsuit—*i.e.*, TikTok's recommendations via its

FYP algorithm—is TikTok's own expressive activity, § 230 does not bar Anderson's claims." *Id.*

Although this Court approvingly cited *Anderson* in *Salesforce*, 123 F.4th at 796, the panel majority here concluded that *Anderson* rests on "the flawed premise that First Amendment protections for first-party speech and Section 230 protection for internet companies that curate the speech of others cannot coexist." App.30 n.15. The panel majority's suggestion that "products liability and negligence-based claims could conceivably yield a different analysis," App.30 n.15, is inconsistent with this Court's precedent, which focuses on the duty and not the claim: "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Salesforce*, 123 F.4th at 795.

If *Anderson* is correct that social-media companies' editorial selection of content to provide to minors constitutes the platforms' own expressive activity not covered by Section 230, then HB18, which regulates the same expressive activity, is not preempted. As Judge Ho explained in dissent, Section 230 "does not apply when a provider is held liable for its *own* content—including its curation of third-party content." App.35 The panel majority's decision conflicts with the Third Circuit's holding in *Anderson* and warrants rehearing by the en banc Court. *See* Fed. R. App. P. 40(b)(2)(C).

### III. The Scope of Section 230 Preemption Is an Important Issue.

Under the panel majority's rule, a State may not impose any content-moderation duty on any online platform, no matter how harmful the material or how young the audience. The answer to this important question will determine whether the State

may require platforms to shield children from the worst online content imaginable, including content unprotected by the First Amendment at all.

The panel majority's decision is particularly important given Section 230's own stated policy "to *remove disincentives* for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4) (emphasis added). HB18 requires precisely those technologies: filtering that shields children from harmful material, subject to parental control. On the panel majority's reading, however, a statute Congress enacted to encourage the filtering of harmful material from children's view now forbids the States from requiring that very thing.

The panel majority itself acknowledged that its holding "may raise the specter that Section 230 too often functions as a 'get-out-of-jail free card' immunizing social-media companies from all but the most egregious consequences of their products' functioning." App.30. Whether Section 230's text compels this result is an important issue that warrants the full Court's attention.

## Conclusion

The Court should grant rehearing en banc in No. 24-50721. If the Court does so, then the panel's decision in No. 25-50096 should be modified to address only the issues concerning the SEAT Plaintiffs.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

/s/ Benjamin W. Mendelson
Benjamin W. Mendelson
Deputy Solicitor General
Ben.Mendelson@oag.texas.gov

*Counsel for Defendant–Appellant*

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 2,784 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Benjamin W. Mendelson
Benjamin W. Mendelson

**No. 24-50721 & 25-50096**

# In the United States Court of Appeals For the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE, L.L.C.,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

*consolidated with*

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Case Nos. 1:24-cv-849 & 1:24-cv-945

## APPENDIX

Tab

Panel Opinion (Filed July 24, 2026) ........................................................ 1

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2026

Lyle W. Cayce
Clerk

---

No. 24-50721

---

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, *Attorney General, State of Texas*,

*Defendant—Appellant*,

CONSOLIDATED WITH

---

No. 25-50096

---

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY and THROUGH NEXT FRIEND, VANESSA FERNANDEZ; AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, *Attorney General, State of Texas*,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:24-CV-849, 1:24-CV-945

---

Before Higginbotham, Ho, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

This case concerns two pre-enforcement challenges to Texas House Bill 18 ("H.B. 18"), "The Securing Children Online through Parental Empowerment Act," which regulates social media websites.

First, the nonprofit organizations Computer & Communications Industry Association ("CCIA") and NetChoice, L.L.C. ("NetChoice") (collectively, "the CCIA plaintiffs") challenged all of H.B. 18 as a content-based law. They focused their challenge on the law's requirement that certain social media-based "digital service providers" ("DSPs") monitor and filter content accessible to known minors to prevent exposure to several categories of potentially harmful speech ("the monitoring and filtering requirement").

Second, nonprofit organization Students Engaged in Advancing Texas ("SEAT"), two individual Texans, and advertising firm The Ampersand Group ("Ampersand") (collectively, "the SEAT plaintiffs") challenged the same monitoring and filtering requirement. They also challenged H.B. 18's language that mandates covered DSPs to make users register their ages before creating accounts ("the age-registration requirement"), to not display targeted advertisements to known minors ("the targeted ads requirement"), and to make a commercially reasonable effort to prevent advertisers from targeting known minors with advertisements facilitating, promoting, or offering unlawful products, services, or activities ("the unlawful ads requirement"), and that mandates all DSPs to monitor their content and, if more than one-third of it is obscene

for adults or minors under Texas law, verify that users accessing their digital service are 18 or older ("the age-verification requirement").

In both cases, the plaintiffs moved for a preliminary injunction. The district court granted the motions except as to the age-registration requirement and the other provisions not specifically challenged. Texas Attorney General Paxton appealed the preliminary injunction orders, and we consolidated the cases for appeal.

We hold that the SEAT plaintiffs do not have standing to challenge the monitoring and filtering, targeted ads, and unlawful ads requirements, and that their challenge to the age-verification requirement is now foreclosed by precedent. The monitoring and filtering requirement challenged by the CCIA plaintiffs, however, is preempted by Section 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230(c)(1). We therefore VACATE and REMAND in part, and AFFIRM in part.

# I

## A

H.B. 18, which took effect on September 1, 2024, imposes requirements on DSPs. TEX. BUS. & COM. CODE §§ 509.001–.152; *see Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (enjoining certain provisions of H.B. 18 before it took effect). It defines DSPs as persons who "own[ ] or operate[ ] a digital service" and determine the purpose and means of collecting and processing personal identifying information of users of the digital service. TEX. BUS. & COM. CODE § 509.001(2). With the exception of its age-verification requirement, H.B. 18 applies only to DSPs whose digital service "connects users in a manner that allows users to socially interact with other users on the digital service," "allows a user to create a public or semi-public profile for purposes of signing into and using the digital service," and "allows a user to create or

post content that can be viewed by other users of the digital service," including via a message board, chat room, or other "landing page, video channel, or main feed that presents to a user content created and posted by other users." *Id.* § 509.002.[1]

H.B. 18's monitoring and filtering requirement mandates covered DSPs to develop and implement a strategy to prevent known minors' exposure to "harmful material" and other content "that promotes, glorifies, or facilitates" "suicide, self-harm, or eating disorders"; "substance abuse"; "stalking, bullying, or harassment"; and "grooming, trafficking, child pornography, or other sexual exploitation or abuse." *Id.* § 509.053. "Harmful material" is defined with reference to its definition in the Texas Penal Code. *Id.* § 509.001(3); TEX. PENAL CODE § 43.24(a)(2).

H.B. 18's targeted ads requirement forbids covered DSPs from using a digital service to display "targeted advertising" to a minor without the consent of a verified parent. TEX. BUS. & COM. CODE § 509.052(2)(D).

H.B. 18's unlawful ads requirement mandates covered DSPs to make a commercially reasonable effort to prevent advertisers from targeting known minors with advertisements "that facilitate, promote, or offer a

---

[1] H.B. 18 exempts from its coverage state and local government websites, financial institutions, medical websites, small businesses, higher education websites, employee management software, school education software, and e-mail and direct messaging services that provide only those services. TEX. BUS. & COM. CODE § 509.002(b). H.B. 18 also exempts digital services that "primarily function[ ] to provide a user with access to news, sports, commerce, or content primarily generated or selected by the [DSP]" and provide only incidental social functions. *Id.* § 509.002(b)(10).

product, service, or activity that is unlawful for a minor in [Texas] to use or engage in." *Id.* § 509.055.

H.B. 18's age-verification requirement mandates every DSP to monitor its content and, if it determines that it publishes or distributes material more than one-third of which is "harmful material or obscene" as defined by Texas law, use a commercially reasonable method to verify the age of any person seeking to access content through its digital service to confirm that they are 18 years of age or older, and deny access to those who are not. *Id.* § 509.057.

H.B. 18 may be enforced by means of (1) a deceptive trade practice action brought by the Consumer Protection Division of the Texas Attorney General's Office, or (2) an action for a declaratory judgment or injunction brought by the parent or guardian of a known minor "affected by" a violation. *Id.* §§ 509.151–.152.

B

CCIA is a nonprofit organization that promotes open markets, systems, and networks. Its members include technology and social media companies such as Google (including YouTube), Meta (including Facebook, Instagram, and Threads), and X. NetChoice is a nonprofit trade association that includes these same members, in addition to the companies that own Nextdoor, Snapchat, and Pinterest.

SEAT is a coalition of Texas students from middle school to college-age who "seek to increase youth visibility and participation in policymaking, including via social media." SEAT is concerned that its members will lose access to constitutionally protected speech due to the monitoring and filtering, age-verification, and targeted ads requirements. In support of its motion for a preliminary injunction, SEAT pointed to specific social media posts and categories of content it believes minors will not be able to view

when H.B. 18 goes into effect. It also asserted that it wishes to use targeted digital advertising to mobilize students, grow local organizing bases on school campuses, and advocate for the repeal of laws in a way that it believes might be blocked by the targeted ads and unlawful ads requirements.

M.F. is a 16-year-old high school student who "uses social media to learn about current events and opportunities, follow the news, discover music, and conduct research for his debate team and other school activities." M.F. believes that H.B. 18 may block him from viewing content pertaining to important topics like bullying and substance abuse for research and other purposes, from viewing art or music that he finds stimulating and comforting, from sharing resources with peers struggling with issues like self-harm, and from accessing targeted ads that might be useful.

Ampersand is an Austin, Texas-based advertising agency that "publishes social-good and public service advertisements on YouTube, Instagram, Facebook, and gaming platforms." Ampersand's advertising does not target minors directly by age, but "for certain [advertising] campaigns, it purposefully seeks to reach teens through other means, such as by targeting ad placements on content or topics already frequented by teens." Ampersand believes that the targeted ads requirement will chill it from advertising certain educational content in places accessible to teens or even to all ages, including content raising awareness regarding such issues as sex trafficking and substance abuse. It also believes that the unlawful ads requirement might prevent it from distributing ads about campaigns to decriminalize or oppose prohibition of certain activity, such as campaigns regarding the distribution of banned books or sex-education materials. Since H.B. 18 took effect, it has ceased pursuing grants for projects specifically involving youth outreach, and declined to pursue a specific grant related to protecting children from gun violence out of fear that these ads would be blocked by the targeted ads requirement.

Case: 24-50721 Document: 216-1 Page: 27 Date Filed: 09/24/2025



Brandon Closson is an adult Texas resident who shares content about bipolar disorder via Instagram and other social media websites. Closson believes that H.B. 18 may prevent him from sharing his content with his minor audience, which he intends to educate and encourage to seek professional medical help when needed, citing specific posts and categories of content he believes would be filtered. He also contends that H.B. 18 may prevent that audience from receiving mental health-related targeted ads, and that the age-verification requirement may encourage users to refrain from accessing helpful content due to privacy concerns.

Attorney General Paxton is sued in his official capacity. The Attorney General and the Consumer Protection Division of the Attorney General's Office have authority to enforce H.B. 18. Tex. Bus. & Com. Code § 509.151.

## II

### A

CCIA and NetChoice sued Attorney General Paxton in the Western District of Texas on July 30, 2024. On the same day, they moved for a preliminary injunction and, in the alternative, a restraining order. CCIA and NetChoice argued that all of H.B. 18 failed strict scrutiny and was unconstitutionally vague. They also challenged H.B. 18's monitoring and filtering requirement as a content-based and viewpoint-based law and prior restraint. They further argued that this requirement was unconstitutionally vague and preempted by the Communications Decency Act, 47 U.S.C. § 230. They brought both facial and as-applied challenges.

In an August 30, 2024 Order, after determining that CCIA and NetChoice had associational standing to bring their pre-enforcement challenge, the district court granted the motion for a preliminary injunction only as to the monitoring and filtering requirement. The court held that the

monitoring and filtering requirement failed strict scrutiny because it was overbroad, overly restrictive, and underinclusive on its face, and thus was facially unconstitutional. The court further held that the monitoring and filtering requirement was also unconstitutionally vague on its face and preempted by the CDA. The district court denied the motion with respect to the CCIA plaintiffs' challenge to H.B. 18 as a whole because they had not shown that a substantial number of H.B. 18's total applications were unconstitutional in relation to its plainly legitimate sweepThe district court also determined that H.B. 18's definition of covered DSPs was not unconstitutionally vague.

The Attorney General timely filed a notice of appeal on September 5, 2024.

B

The SEAT plaintiffs sued Attorney General Paxton in the Western District of Texas on August 16, 2024. On August 24, 2024, they moved for a preliminary injunction. The SEAT plaintiffs challenged H.B. 18's age-registration, monitoring and filtering, targeted ads, unlawful ads, and age-verification requirements, in addition to other provisions not before us on appeal, arguing that these requirements created a system of unconstitutional prior restraints, failed strict or intermediate scrutiny under the First Amendment, and were also unconstitutionally vague. They brought both facial and as-applied challenges.

In a February 7, 2025 Order, after determining that the plaintiffs had standing based on the indirect chill to their speech and listening rights, the district court granted the motion for a preliminary injunction as to the monitoring and filtering, targeted ads, unlawful ads, and age-verification requirements. The court held that these provisions failed strict scrutiny and thus were facially unconstitutional. The court also held that the monitoring

and filtering and unlawful ads requirements were unconstitutionally vague on their face. The district court denied the motion as to the remaining challenged provisions, including the age-registration requirement, which it held the plaintiffs had not shown independently prohibited speech.

The Attorney General timely filed a notice of appeal on February 7, 2025. He moved to consolidate these appeals on February 14, 2025. We granted the motion on February 21, 2025.

## III

We have jurisdiction to hear interlocutory appeals from preliminary injunctions pursuant to 28 U.S.C. § 1292(a)(1). *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 395 (5th Cir. 2025). "A grant of a preliminary injunction is reviewed for abuse of discretion. Factual determinations within the preliminary injunction analysis are reviewed for clear error, and legal conclusions within the analysis are reviewed de novo." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018 (citations omitted)).

To demonstrate that it is entitled to a preliminary injunction, the moving party must show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury outweighs any harm from granting the injunction, and (4) that the public interest favors granting the injunction. *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023). Under the circumstances, the preliminary injunction factors in effect collapse with the merits. "[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm," *Restaurant L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023), and "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs," *Book People, Inc. v. Wong*, 91 F.4th 318,

341 (5th Cir. 2024) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (Fed. Cir. 2016)). Likewise, "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Where the State is appealing an injunction, its interest and harm merge with the public interest," but "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law." *Book People*, 91 F.4th at 341 (alteration in original) (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024)). This leaves what is "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023).

Our analysis proceeds in three parts: (A) we hold that the SEAT plaintiffs do not have standing to challenge the monitoring and filtering, targeted ads, and unlawful ads requirements, and that their challenge to the age-verification requirement is foreclosed; (B) we hold that the monitoring and filtering requirement challenged by the CCIA plaintiffs is preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1); and (C) we decline to reach the constitutional issues presented.

A

The Attorney General argues that none of the SEAT plaintiffs have standing to challenge the monitoring and filtering, targeted ads, unlawful ads, and age-verification requirements because as non-DSPs, they are not directly regulated by H.B. 18 and do not face a credible threat of enforcement.

Standing requires (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct and (3) likely to be redressed by a favorable judicial decision. *Book People*, 91 F.4th at 328. Plaintiffs "bear[ ] the burden of establishing the three familiar elements of standing." *Id.* (alteration in

original) (quoting *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)). "[S]tanding is not dispensed in gross," but rather, "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

In the typical pre-enforcement challenge, plaintiffs can establish an injury in fact by showing "(1) [they] ha[ve] an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) [their] intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Book People*, 91 F.4th at 329 (alterations in original) (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)). Where the alleged injury in fact is a law's chilling effect on the plaintiff's speech, "[t]he chilling effect must have an objective basis; '[a]llegations of a subjective "chill" are not an adequate substitute.'" *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) (second alteration in original) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

Where the law the plaintiffs challenge directly regulates a third party rather than the plaintiffs themselves, plaintiffs face an additional hurdle. Because a future injury may constitute a sufficiently "imminent" injury in fact only where it is "certainly impending" or there is a "substantial risk that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified), plaintiffs must show that regulated third parties "will likely react in predictable ways" to the challenged law, *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). "In cases of alleged future injuries to unregulated parties from government regulation," therefore, the question becomes: "Is it *likely* that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the

unregulated plaintiff?" *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 385 n.2 (2024) (emphasis added).

"At th[e preliminary injunction] stage, Plaintiffs 'must clearly show only that each element of standing is likely to obtain in the case at hand.'" *Book People*, 91 F.4th at 329 (quoting *Missouri v. Biden*, 83 F.4th 350, 366–67 (5th Cir. 2023), *rev'd on other grounds sub nom. Murthy v. Missouri*, 603 U.S. 43 (2024)).

The district court held that the SEAT plaintiffs had standing because H.B. 18 "produces a 'determinative or coercive effect' on [DSPs], which results in preventing speech and produces Plaintiffs' injuries." *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 587–91 (W.D. Tex. 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). The district court based its ruling on each plaintiff's statements regarding intended social media posts and desired access to content, relying primarily on *Book People, Inc. v. Wong* and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) to hold that the law's potential coercive effect on DSPs produced a concrete injury in fact that was traceable to the challenged law and redressable by injunction. *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 588–91.[2]

Somewhat beyond what the district court acknowledged, the SEAT plaintiffs' standing theory is importantly novel. "A threatened future injury must be 'certainly impending' to constitute an injury in fact, and a 'theory of

[2] For example, as to the monitoring and filtering requirement, the district court credited that SEAT reasonably understood H.B. 18 to require filtering of its "previous and planned educational Instagram posts concern[ing] bullying, sexual assault, and suicide," Closson's fear that H.B. 18 "will lead social media companies to prevent him from posting about bipolar disorder, eating disorders, substance abuse, and his identity as a member of the LGBTQ+ community," and M.F.'s concern that he would be unable to listen to songs featuring "references to suicide." *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 588.

standing[ ] which relies on a highly attenuated chain of possibilities[ ] does not satisfy the [certainly-impending] requirement.'" *Louisiana v. Haaland*, 86 F.4th 663, 666 (5th Cir. 2023) (alterations in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). The SEAT plaintiffs allege that their speech would be censored, or that they are self-censoring, in response to a law that does not apply directly to them and that, as of the complaint's filing, had not yet been enforced against the third-party DSPs who would presumably otherwise host their content.[3] Alternatively, some plaintiffs allege that they will lose their right to listen to or otherwise receive desired content if and when the DSPs respond in predictable ways to H.B. 18's requirements. In other words, the SEAT plaintiffs claim an injury in fact based on predicted censorship or a present chill, arising from someone else's predictable response to the challenged law.

The indirect nature of the SEAT plaintiffs' challenge poses a problem for our pre-enforcement standing analysis. Typically, we ask only whether the challenged law "arguably proscribe[s]" the conduct plaintiffs intend to engage in. *Book People*, 91 F.4th at 329 (citation modified). This makes sense with respect to direct regulation, because a reasonably perceived threat of bad consequences for constitutionally protected conduct might chill a reasonable person from engaging in that conduct, even if the threat might not materialize. *See Pool v. City of Houston*, 978 F.3d 307, 311 (5th Cir. 2020) ("Th[e] special [chill-based] standing rule for First Amendment cases recognizes that people should not have to expose themselves to actual arrest or prosecution in order to challenge a law that infringes on speech." (citation modified)). Strictly speaking, however, H.B. 18 proscribes none of the

---

[3] The Attorney General has initiated an H.B. 18 enforcement action against TikTok, but the action does not involve the challenged requirements, and the SEAT plaintiffs do not allege that they use or fear censorship on TikTok.

speech the SEAT plaintiffs wish to share as to the plaintiffs themselves. Rather, it requires DSPs to filter categories of content that may or may not include this speech. Although "injury produced by determinative or coercive effect upon the action of someone else" may amount to an injury in fact, generally speaking "an injury cannot be the result of the independent action of some third party not before the court." *Book People*, 91 F.4th at 331 (citation modified). At the preliminary injunction stage, therefore, in order to satisfy the imminent injury requirement, the SEAT plaintiffs must make a clear showing that the directly regulated third-party DSPs "will likely react in predictable ways" to the challenged law, *Dep't of Com.*, 588 U.S. at 768, and that this likely reaction will in turn pose at least a substantial risk that a "platform [will] then suppress [a plaintiff or specific speaker's] post," "at least partly in response to [H.B. 18], rather than in keeping with its own content-moderation policy," *Murthy*, 603 U.S. at 70.[4]

On close examination, the SEAT plaintiffs do not make a clear showing that the DSPs' likely response to the challenged requirements poses a substantial risk of censoring their speech. For the same reason, their self-censorship harm amounts to a "subjective" chill of the kind we have excluded from this exceptional form of standing. *Tex. State LULAC*, 52 F.4th at 256; *see also Pool*, 978 F.3d at 311 ("Not just anyone has standing to bring such a [First Amendment chill-based] suit. Plaintiffs . . . must show that they are seriously interested in disobeying, and the defendant seriously

---

[4] The district court sometimes framed its analysis in this way, but did not consistently apply these requirements. *See Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 591 ("HB 18 would *likely* prevent the[ plaintiffs] from viewing those forms of content on social media." (emphasis added)). In general, the district court applied the ordinary pre-enforcement requirement that constitutionally protected conduct must be only "arguably proscribed" to constitute an injury in fact, while noting that censorship from the DSPs was broadly predictable. *Id.* at 588–90.

intent on enforcing, the challenged measure." (citation modified)). Similarly, the SEAT plaintiffs do not allege a concrete, specific connection between speaker and listener of the kind that the most analogous listening-based cases require, and in any case do not clearly show a likelihood that a substantial risk of harm to their listening rights is imminent.

1

First, the authorities relied on for both plaintiffs' speech-based and listening-based theories are distinguishable. Regarding the SEAT plaintiffs' speech-based theory, *Bantam Books* did not address a pre-enforcement challenge to a potentially harmful statute but rather an already harmful, targeted campaign of government threats made to book distributors, which had then ceased circulating certain of the plaintiff book publishers' books to retailers. *Bantam Books*, 372 U.S. at 60–64. Likewise, although its enforcement mechanism was indirect, the law challenged in *Book People*, unlike H.B. 18, directly proscribed the plaintiffs' own conduct: the plaintiff booksellers could not sell library materials to Texas public schools without first issuing sexual-content ratings for and flagging sexual content in those materials, and, without those sales, would have foregone a significant revenue stream. *Book People*, 91 F.4th at 324, 331–32. In both cases, then, the reviewing court had a more concrete injury in fact to analyze: an already-begun pressure campaign censoring specific speech, and a law directly compelling the plaintiffs to speak or lose significant revenue.[5] *See Bantam*

[5] Similarly, in *Virginia v. American Booksellers Ass'n*, where the Supreme Court held that booksellers had standing to bring a pre-enforcement challenge to a law restricting their display of sexually explicit material to juveniles based on the First Amendment rights of potential book buyers, the bookseller plaintiffs themselves faced a choice between costly compliance measures and criminal prosecution under the challenged law. 484 U.S. 383, 392–93 (1988). Like the DSPs here, then, the plaintiffs themselves were directly injured by the law's potential enforcement.

*Books*, 372 U.S. at 64 n.6 (describing the "palpable injury" suffered by plaintiff book publishers in terms of already "impaired sales"); *Book People*, 91 F.4th at 331–33 (describing the "injurious dilemma" posed by the requirement to engage in compelled speech or else lose significant revenue). Here, the SEAT plaintiffs asked the district court to assume (1) that the DSPs will respond in predictable ways to H.B. 18 as it is interpreted by them and through the Attorney General's enforcement of it, and (2) that their speech will be predictably censored, or is already objectively chilled, by that third-party response. The SEAT plaintiffs have not pointed to a case where a court found standing for a pre-enforcement, chill-based challenge to a law that did not directly apply to the plaintiffs.

In a similar way, the listening-based case law on which the SEAT plaintiffs rely has been applied "only where the listener has a concrete, specific connection to the speaker." *Murthy*, 603 U.S. at 75. This cuts against the district court's reasoning that it could "logically deduce that the threat of penalties on covered entities would result in changes to their practices," and thus assume a cognizable right-to-listen injury downstream from the regulated parties. *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 590 n.8. The SEAT plaintiffs' best listening-based case is *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, where the Supreme Court held that prescription drug consumers had standing to challenge Virginia's ban on pharmacists' advertisement of prescription drug prices. 425 U.S. 748, 749–50, 756–57 (1976). There is a surface similarity between this case and, at least, the SEAT plaintiffs' challenge to the targeted ads requirement: Ampersand and SEAT state that they wish to run ad campaigns that they would run but for H.B. 18's requirement that DSPs restrict minors' access to targeted ads, and M.F. says he wishes to receive potentially helpful targeted advertising, so the precise category of speech these plaintiffs wish to send or receive may be proscribed by this requirement.

Even so, the SEAT plaintiffs allege no concrete, specific connection to a speaker whose speech will be affected by this or any other requirement, but only a more general concern that they will lose access to broad categories of speech. This is only a little more specific than the "startlingly broad" theory the Supreme Court rejected in *Murthy v. Missouri*, which would have granted "all social-media users the right to sue over *someone else's* censorship," based on a general interest in "hearing unfettered speech on social media" and professional needs. 603 U.S. at 75. The SEAT plaintiffs' analogy to *Virginia State Board of Pharmacy* is therefore also imprecise.

2

Of course, that none of the SEAT plaintiffs' cited cases is precisely analogous to the facts at issue here does not necessarily defeat their standing argument. This is particularly the case given the novelty of the technology involved, and of social media laws like H.B. 18. Turning to the specifics of their attempted showing, and applying the Supreme Court's test from *Murthy*, we ask simply whether the SEAT plaintiffs have clearly shown they are likely to establish there is "a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to [the challenged law.]" 603 U.S. at 58. We conclude that they have not.

First, SEAT points to the potential censorship of "important topics such as bullying and resulting suicides, sex education, and other issues that the State of Texas may wrongly interpret as pornographic or promoting 'grooming'" under the monitoring and filtering requirement. It also cites two of its specific previous posts in favor of anti-bullying and anti-book ban laws, whose explicit mentions of bullying, LGBTQ mental health and suicide, human trafficking, and other statutory terms it believes would trigger this requirement. SEAT also argues that the unlawful ads requirement could prevent SEAT members "from receiving advertisements over social media

about campaigns to decriminalize certain activity that [it does] not believe should be criminalized—such as reading banned books or participating in a drag queen read-aloud in a school library."[6]

The minor plaintiff M.F. cites specific topics such as marijuana legalization that he believes H.B. 18 would bar him from researching, and songs that he believes he would be prevented from listening to because they deal with covered subjects like substance abuse and self-harm. He also states the he would be prevented from sharing resources regarding substance abuse, eating disorders, or self-harm with his peers, and expresses a more general concern that H.B. 18 will place Texas minors at a disadvantage in college, when preparing to vote, and when faced with issues such as whether to use vapes and other regulated substances later in life, including how to use social

[6] SEAT also stated via supplemental declaration that it wishes to use "targeted digital advertising" to mobilize students and local organizing bases on school campuses around issues before the Texas Legislature. It specified that because it wishes to promote discussion of potential repeals of laws restricting "students' access to library books" and "gender-affirming healthcare for minors," this advertising "could arguably fall under" the unlawful ads requirement as well, as promoting conduct currently deemed unlawful for minors. These statements are unsupported by allegations in the complaint, where SEAT alleged only generally that it "uses social media accounts on Instagram, X, Facebook, and LinkedIn to share opportunities, news, and calls to action with Texas students," and that it "uses Instagram to educate students about local legislative attempts to ban books and their rights under the First Amendment." Unlike the other SEAT plaintiffs, no specific allegations regarding SEAT itself were made in the section of the complaint dealing specifically with the targeted advertising and unlawful ads requirements. District courts in this circuit have followed the sensible rule "that a request for a preliminary injunction must also be based on allegations related to the claims in the complaint." *Bucklew v. St. Clair*, No. 3:18-CV-2117-N, 2019 WL 2251109, at *2 (N.D. Tex. May 15, 2019), *report and recommendation adopted*, No. 3:18-CV-2117-N, 2019 WL 2249719 (N.D. Tex. May 24, 2019). We do the same here. Failing support from the allegations in the complaint, SEAT's late-breaking statement that it wishes to engage in targeted advertising does not amount to a clear showing that there is a substantial risk its speech will be censored under the targeted ads or unlawful ads requirements.

media safely. He further states that he has benefited from "receiving some targeted advertising that has provided [him] with direct access to items that [he] would like to purchase or information about events," such as targeted ads for "a particular kind of pants that [he] had been looking for."

Ampersand's Chief Operating Officer states that Ampersand has previously worked on, or plans in the future to work on, advertising campaigns raising awareness regarding categories like "sex trafficking, substance abuse, eating disorders, bullying, and harassment." More specifically, Ampersand has worked on a campaign to help teens and young adults recognize "the warning signs of sex trafficking" and "learn how to seek assistance when needed," and "seeks to take on more social media public health campaigns related to preventing substance abuse." Ampersand worries that H.B. 18 "may even apply to block some of The Ampersand Group's advertisements, such as its prior work for sex-positive parenting groups who want to teach their children about sexual education in a healthy manner." Ampersand also fears that, because H.B. 18 does not define targeted advertising, even indirect targeted advertising such as Ampersand's campaigns "focusing ad placements on content or topics already frequented by teens" could be filtered, and that this would impact not just minors but people of all ages because Ampersand would simply cease advertising such content. Consequently, it states that H.B. 18 "would prevent [Ampersand] from reaching Texas teens with advertisements about health services, education, and resources for disadvantaged and marginalized youths." Ampersand also states that the unlawful ads requirement "could prevent [it] from distributing advertisements about campaigns to decriminalize certain activity that [its] clients do not believe should be criminalized," such as campaigns "promoting banned books or opposing laws that limit access to diverse and inclusive sex-education materials." Ampersand has specified that "since [H.B. 18] took effect on September 1 2024, [Ampersand has]

ceased pursuing grants for projects that would specifically involve outreach to youth or teen audiences," including one grant to conduct advertisement for the nonprofit school safety organization Sandy Hook Promise, in part due to the Attorney General's announcement that he would take steps to enforce the law including by investigating platforms like Instagram.

Finally, Closson states that, under H.B. 18, his social media content providing information about living with bipolar disorder and other mental health diagnoses "may not reach minor audiences who would benefit from viewing it." He describes "certain categories of content," including topics "like substance abuse and eating disorders," that he addresses with his large social media audience, and that H.B. 18 may require social media companies to filter. Like SEAT, Closson also points to specific posts he believes Texas minors would no longer be able to view, including a post discussing the comorbidity rate between bipolar disorder and "disordered eating," and a "humorous video of a gorilla drinking a beer to illustrate the experience of a bipolar person mistakenly going on a final 'bender' before turning sober," which describes his own experience coping with bipolar disorder via alcohol and warns against doing the same. Closson also expresses a concern that the vague term "grooming" might be applied to filter some his content that "discusses the intersectionality of being gay and bipolar," including "some of the sexual symptoms of bipolar disorder," and a more general concern that humorous posts will be swept up in the required filtering due to the broad sweep of the terms "promot[ing]," "glorif[ying]," and "facilitat[ing]." Finally, Closson worries that his minor audience will be barred from viewing potentially helpful mental health-related targeted advertising, including ads for clinical trials and studies.

Under these third-party circumstances, none of this evidence is enough to show a likelihood that the SEAT plaintiffs face a substantial risk of censorship.

Beginning with SEAT, SEAT's general concern about content involving broad topics like bullying and suicide is not specific enough to support a clear showing that there is a substantial risk that any particular content will be filtered. SEAT's more specific reference to two posts including terms used in H.B. 18 asks us to assume, in effect, that DSPs will filter all posts mentioning statutory terms like "bullying," but nothing in the record demonstrates that it is *likely* the DSPs will react in this way. The best record evidence supporting the proposition that DSPs will broadly over-filter in response to H.B. 18 is one YouTube executive's statement that "[t]o ensure compliance with [the monitoring and filtering requirement], YouTube may need to alter its policies and enforcement to take an overinclusive approach to content moderation," because "YouTube runs the risk of liability every time a minor sees any content that even references self-harm" such that "the only way to avoid [H.B. 18's] large penalties is to decline to disseminate all content mentioning self-harm to known minors."[7] This statement about what YouTube "may" do says little about what YouTube will likely do, and itself relies on conjecture about how Texas will enforce H.B. 18. Finally, SEAT's listening-based concern that the targeted and unlawful ads requirements will prevent its members from receiving

[7] This statement comes from a declaration introduced in the CCIA plaintiffs' case that the SEAT plaintiffs cite in their motion for a preliminary injunction and in their brief on appeal. The SEAT plaintiffs also cite more speculative statements from CCIA and NetChoice officials suggesting that member social media companies may respond to H.B. 18 by generally over-filtering.

targeted ads and ads about decriminalizing activities now unlawful for minors fails for the reasons set out above with respect to *Virginia State Board of Pharmacy*: it alleges no concrete, specific connection between listeners and would-be speakers.[8]

The remaining SEAT plaintiffs do not meaningfully change the standing analysis.

First, also as analyzed above, M.F. points to mostly listening-based harms without the required concrete, specific connection with any would-be speakers. This is true even of M.F.'s desire to receive targeted advertising, although it identifies a broad category of speech that H.B. 18 unambiguously requires DSPs to filter, because he fails to identify "specific speakers or topics that [he will be] unable to hear or follow." *Murthy*, 603 U.S. at 75.[9]

---

[8] To the extent that SEAT members' relationship with the digital services they use could be considered specific enough to ground a listening-based claim, SEAT does at least identify specific topics its members may wish to hear about: "campaigns to decriminalize" certain activities like "reading banned books or participating in a drag queen read-aloud in a school library." However, SEAT does not make a clear showing that it is likely the DSPs will interpret the unlawful ads requirement to require the filtering of such political advocacy, as opposed to content that more straightforwardly facilitates, promotes, or offers unlawful products, services, or activities.

[9] Like SEAT, with respect to the unlawful ads requirement M.F. does identify topics "such as whether marijuana use should be legal" that he would like to hear about, but again, even assuming his connection to the digital services themselves were enough to ground a listening-based claim, M.F. does not clearly show that the DSPs will likely react to H.B. 18's monitoring and filtering or unlawful ads requirements by filtering political advocacy, as opposed to content that more straightforwardly promotes substance abuse or any of the other categories of speech he identifies. Likewise, his fear that he will be unable to share resources with peers struggling with issues related to substance abuse and other topics is unaccompanied by a clear showing that DSPs will likely view this content as falling within a category that must be filtered. *See Murthy*, 603 U.S. at 72 (noting plaintiff's failure to show that her content "has fallen, or is *likely to fall*, in th[e]category [to be censored]" (emphasis added)).

Second, like SEAT's fears regarding posts that merely mention topics addressed by H.B. 18, Ampersand's fear that its previous ads identifying warning signs of sex trafficking and advocating for healthy sex education may be filtered does little to show that this is likely how the DSPs will react. As for the targeted ads requirement, Ampersand specifically states that it "does not target minors directly by age, as most digital service providers do not allow such targeting"; rather, it aims "to reach teens through other means, such as by focusing ad placement on content or topics already frequented by teens." Ampersand attempts no showing that DSPs will likely interpret the targeted ads requirement to forbid such general targeting, except to say that H.B. 18 does not define the term, and the requirement's statutory context weighs against this interpretation.[10] Likewise, Ampersand's general statement that the unlawful ads requirement "could prevent [it] from distributing advertisements about campaigns to decriminalize certain activity that [its] clients do not believe should be criminalized" does not show that any such advertisement from Ampersand is imminent, much less that there is a substantial risk that such an ad will be censored. Finally, Ampersand's statement that it has ceased pursuing grants related to youth audiences, including one school safety-related grant from

---

[10] Texas law defines "targeted advertising" as advertising that is targeted based on a platform user's personal data obtained from a consumer's activities over time and across other platforms. TEX. BUS. & COM. CODE § 541.001(31). This definition fits with the context of the targeted ads requirement in a list of restrictions on DSPs' collecting and using minors' personal information, allowing minors to make financial transactions, sharing minors' personal information, and collecting minors' geolocation data. *Id.* § 509.052; *see Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *In re Soza*, 542 F.3d 1060, 1065–66 (5th Cir. 2008) (looking to state law "sister statutes" to interpret unclear statutory terms). Ampersand does not allege that it intends to engage in cross-platform, personal information-based targeted advertising of the kind the statute apparently contemplates as defined under Texas law.

Sandy Hook Promise, is also, without a clear showing that the targeted ads requirement would likely be understood to apply to ads touching on minor-related topics in general, not enough to show a substantial risk that these advertisements would be filtered, and thus not enough to show that this self-censorship is any more than self-inflicted harm. *See Murthy*, 603 U.S. at 73 ("[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (quoting *Clapper*, 568 U.S. at 416)).

Third, as with SEAT and Ampersand, Closson's fears about general categories of content related to substance abuse and eating disorders do not clearly show that DSPs will likely interpret the monitoring and filtering requirement's reference to content promoting, glorifying, or facilitating substance use and eating disorders to encompass virtually all content referring to these topics whatsoever. The specific posts Closson points to plainly seek to offer helpful advice in dealing with mental health, substance abuse, and eating disorders. The same reasoning applies to Closson's concern that the term "grooming" will be understood to require filtering broad swaths of LGBTQ+-related content, and his more general concern about potentially misunderstood humorous posts. Finally, Closson's concern for his minor audiences' listening rights is yet another step removed from even the third-party claims at issue here.

4

In sum, it is inherently speculative whether any content the SEAT plaintiffs allege they wish to share or receive will trigger enforcement against the DSPs, or whether the DSPs will filter that specific content. Likewise, to the extent that they may be more specific, the SEAT plaintiffs' listening-based harms are not sufficiently anchored in a concrete, specific connection with a speaker. Under these third-party, pre-enforcement circumstances,

their alleged chill is thus too subjective to amount to an injury in fact, and they have not clearly shown that the DSPs' predicted censorship amounts to a substantial risk of imminent harm.

Having determined that the SEAT plaintiffs do not have standing to challenge the monitoring and filtering, unlawful ads, or targeted ads requirements, we do not reach the merits of their challenges to these requirements.[11] We turn to the CCIA plaintiffs' challenge to the monitoring and filtering requirement.

B

We begin with preemption. "While federal pre-emption of state statutes is, of course, ultimately a question under the Supremacy Clause, analysis of pre-emption issues depends primarily on statutory and not constitutional interpretation," so "it is appropriate that the federal pre-emption issue be resolved before the constitutional issue . . . is addressed." *City of Philadelphia v. New Jersey*, 430 U.S. 141, 142 (1977) (per curiam); *see also Sojourner T v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) (observing, with respect to a preemption claim, that "it is usually true that if a case can be

[11] Because the SEAT plaintiffs' challenge to the age-verification requirement is now foreclosed by Supreme Court precedent, whether they have standing to challenge this requirement is not addressed here, and the district court's order enjoining this requirement must be VACATED. *See Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935, 941 n.3 (5th Cir. 1982) ("Because the plaintiffs lose either because their claims lack merit or because they lack standing, we stress that the assumption of standing, arguendo, does not imply its recognition."). The district court held that this requirement compelled speech by requiring users to submit personal information in order to verify their age, thus injuring them directly. *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 588. The Supreme Court subsequently held in *Free Speech Coalition v. Paxton* that a materially similar requirement pertaining to pornographic websites was constitutional because it survived intermediate scrutiny as only incidentally burdening protected speech. 606 U.S. 461 (2025). The appellees acknowledge this, and therefore do not oppose the appellants' arguments on this issue.

decided either on statutory or constitutional law, we should address the statutory issue first" (citation omitted)). The district court held that H.B. 18's monitoring and filtering requirement is preempted by Section 230 of the CDA, falling afoul of its rule that "'[n]o interactive computer service shall be treated as the publisher or speaker of any information provided by' someone else." *Computer & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1042–43 (quoting 47 U.S.C. § 230(c)(1)).

Consistent with other courts of appeal, we have interpreted Section 230 to provide DSPs with "broad immunity" from "all claims stemming from their publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418–20 (5th Cir. 2008); *see Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) (collecting cases). Our recent discussion in *Free Speech Coalition, Inc. v. Paxton* provides the initial guardrails for this analysis. 95 F.4th 263, 284–86 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025). Building on *Doe v. MySpace, Inc.*, where we had previously held that Section 230 "shielded MySpace from negligence liability for publishing communications between a minor and an adult who later sexually assaulted her," in *Free Speech Coalition* we held that an age-verification requirement for pornographic websites was different, and not preempted, because it did not pertain to "immuniz[ing] web service providers from harm caused by unremoved speech on their website," which is "the point of Section 230." *Id.* at 285. We distinguished between liability "reliant on the harm done by third-party content," which is preempted by Section 230, and "liability purely based on whether plaintiffs comply with the statute," which is not. *Id.* at 285. "[T]he nature of Section 230's protections," we observed, is "to protect a provider from speaker-liability stemming from the speech it hosts." *Id.*

The Attorney General argues that the monitoring and filtering requirement does no more than require DSPs to comply with the statute,

imposing no liability for harms from the content they host. This is similar to the argument we rejected in *MySpace*. There, plaintiffs argued that their negligence claims were "predicated solely on MySpace's failure to implement basic safety measures to protect minors." *MySpace*, 528 F.3d at 419. Here, the Attorney General argues that the state has created new affirmative duties by statute, so H.B. 18's requirement that covered DSPs "implement a strategy" to prevent known minors' exposure to several categories of potentially harmful content presumably may be violated even when no one has yet been harmed. Tex. Bus. & Com. Code § 509.053. In other words, the argument goes, Section 230 cannot "immunize web service providers for harm caused by unremoved speech on their website" with respect to claims that do not even allege specific harms. *Free Speech Coal.*, 95 F.4th at 285.

Although *Free Speech Coalition* distinguished between claims based on harms from third-party speech and claims based on violations of statutory obligations, it also reiterated our distinction between "claims stemming from [DSPs'] *publication of information created by third parties*," that is, from "[a]ctions quintessentially related to a publisher's role," like the "monitoring, screening, and deletion of content," and claims that do not. *Free Speech Coal.*, 95 F.4th at 286 (quoting *MySpace*, 528 F.3d at 418, 420). As we have since clarified, in determining whether a claim "treats a defendant as a publisher or speaker," and is therefore barred by Section 230, "[a] court may 'look . . . to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor[, alter, or remove] third-party content.'" *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794–95 (5th Cir. 2024) (second alteration in original) (quoting *Force*, 934 F.3d at 83 (Katzmann, C.J., concurring in part and dissenting in part)). "If it would, then the claim is barred by section 230." *Id.*

As set out above, the monitoring and filtering requirement requires covered DSPs to "implement a strategy" to prevent known minors' exposure to "harmful material"—that is, material obscene to minors as it is defined by Texas law—and other content "that promotes, glorifies, or facilitates" "suicide, self-harm, or eating disorders"; "substance abuse"; "stalking, bullying, or harassment"; and "grooming, trafficking, child pornography, or other sexual exploitation or abuse." Tex. Bus. & Com. Code § 509.053; *id.* § 509.001(3) (defining "[h]armful material" in terms of "the meaning assigned by Section 43.24, Penal Code"); Tex. Penal Code § 43.24(a)(2). It provides for enforcement for "violation[s]" by the Consumer Protection Division of the Attorney General's Office or by actions for a declaratory judgment or an injunction brought by the parent of a "known minor affected by" a violation. Tex. Bus. & Com. Code §§ 509.151–.152.

Actions to enforce the monitoring and filtering requirement are claims stemming from DSPs' actions as publishers, that is, from their monitoring, screening, and deletion of content, and are thus squarely preempted by Section 230. Although H.B. 18's monitoring and filtering requirement is framed as a matter of affirmative obligations rather than direct penalties for published content, this is not conclusive under our precedent. "[I]f the claim seeks to hold the defendant liable for 'deciding whether to publish, withdraw, postpone, or alter content[,]' the claim treats the defendant as a publisher or speaker and is barred by section 230." *Salesforce*, 123 F.4th at 795 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). The requirement would hold DSPs liable for their failure to adhere to state-set publication standards, not only "treat[ing] [them] as . . . publisher[s] or speaker[s]," but treating them as publishers subject to sweeping state controls. *Id.* at 794; *see* Tex. Bus. & Com. Code § 509.053(b) (detailing the methods DSPs must or may implement to avoid liability for inadequately

filtering the broad categories of speech identified in § 509.053(a)). Enforcement is triggered by failures to adequately filter according to a complex array of prescribed practices, as ascertained by the Texas Attorney General's Office and by the parents of minors "affected"—in other words, harmed—by these failures.[12] Tex. Bus. & Com. Code § 509.152. The monitoring and filtering requirement thus imposes a "duty" that "'would necessarily require an internet company to monitor[, alter, or remove] third-party content.'" *Salesforce*, 123 F.4th at 795 (alteration in original) (quoting *Force*, 934 F.3d at 83 (Katzmann, C.J., concurring in part and dissenting in part)).[13] As we observed in *Free Speech Coalition*, "publishers do not filter audiences; they filter content." 95 F.4th at 286. Unlike the age-verification

[12] The monitoring and filtering requirement is also described by its title in terms of a "Digital Service Provider Duty to Prevent Harm to Known Minors." Tex. Bus. & Com. Code § 509.053. This cuts against any argument that liability for violations of H.B. 18 is "*purely* based on whether plaintiffs comply with the statute, *independently* of whether the third-party speech that plaintiffs host harms anybody," as opposed to liability "*reliant on* the harm done by third-party content." *Free Speech Coal.*, 95 F.4th at 285 (emphasis added). Our statement in *Free Speech Coalition* that "interactive computer service providers cannot be held liable for harmful communications that they fail to remove," combined with our duty-based analysis in *Salesforce*, yields the inference that providers also cannot be held liable for *potentially* harmful communications that they fail to remove. *Id.* Furthermore, H.B. 18's provision for suits brought by parents of minors "affected by" violations shows that at least some suits brought pursuant to it will be based on specific harms from unremoved communications. Tex. Bus. & Com. Code § 509.152(b).

[13] Tellingly, on the Attorney General's reading, states could simply re-encode the tort law otherwise preempted by Section 230 in the form of statutory obligations, accomplishing exactly the same effect as if Section 230 had no preemptive effect at all. This is a good sign that we are not confronted here with a mere "but-for" theory of Section 230 preemption of the kind we have rejected elsewhere—that is, a theory applying preemption whenever "third-party speech lies anywhere in the chain of causation leading to the alleged harm"; rather, like an ordinary negligence or defamation suit for harmful publication, the claims at issue would "treat a defendant as a publisher or speaker." *Salesforce*, 123 F.4th at 794. Of course, that H.B. 18 may be enforced even when no one has been harmed only broadens the scope of the state controls to which it subjects covered DSPs.

requirement we addressed in that case, H.B. 18's monitoring and filtering requirement is all about filtering content, and is thus preempted.[14]

We candidly acknowledge that this holding, although it does no more than straightforwardly apply our court's precedents, may raise the specter that Section 230 too often functions as a "get-out-of-jail free card" immunizing social media companies from all but the most egregious consequences of their products' functioning. *Doe ex rel. Roe v. Snap, Inc.*, --- U.S. ----, 144 S. Ct. 2493, 2493 (2024) (mem.) (Thomas, J., dissenting from denial of certiorari). The Attorney General contends that the Supreme Court's recent recognition of the DSPs' own free speech interest in curating the content they display in *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024) means that Section 230's broadly-interpreted rule against "treat[ing]" the DSPs "as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), does not apply to claims that simply seek to hold social media platforms liable for their own speech, such as the methods they use to curate content.[15] We

---

[14] This holding also applies to H.B. 18's additional requirement that covered DSPs that use algorithms to automate the provision of information to known minors "make a commercially reasonable effort to ensure that the algorithm does not interfere with the digital service provider's duties under Section 509.053," Tex. Bus. & Com. Code § 509.056(1), which the district court also enjoined as part of what it called the "monitoring-and-filtering requirements," *Computer & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1044.

[15] *See Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024) (holding that Section 230 does not preempt strict product liability and negligence claims that TikTok promoted harmful videos via its For You Page algorithm because, under *Moody,* this algorithm is TikTok's "first-party speech"). *Anderson* acknowledges it "may" conflict with our court's Section 230 precedent. *Id.* at 184 n.13. It is not clear, however, that it is unreconcilable with our broad view of Section 230 preemption in the respects relevant here, because products liability and negligence-based claims could conceivably yield a different analysis. *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) (holding that negligent design claim based on Snapchat's "speed filter" predictably leading to high-speed travel while using the app was not preempted by Section 230 because the claim

hesitate to read *Moody* to render Section 230 so easily avoidable, as if speech could not be both protected by the First Amendment and subject to preemption on the grounds that the speaker may not be treated as a publisher. Such a narrow view of Section 230 preemption would conflict with the statute's purpose "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." *Force*, 934 F.3d at 63 (quoting *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015)).[16] It would also conflict with the text of

---

focused on a specific product defect, not harm from content provided by another); *Force*, 934 F.3d at 80–84 (Katzmann, C.J., concurring in part and dissenting in part) (arguing that Section 230 does not bar suit based on harm from Facebook's active promotion of certain content via algorithms, at least with respect to the non-traditional editorial function of facilitating users' social networks) *see also Salesforce*, 123 F.4th at 790–93 (allowing claim that defendant "knowingly benefit[ed] from participation in a sex-trafficking venture" by providing software tools and support services to online forum where advertisements facilitating trafficking were posted to go forward over Section 230 challenge). In any case, *Anderson* self-consciously charts a new course in Section 230 law, and is based on the flawed premise that First Amendment protections for first-party speech and Section 230 protection for internet companies that curate the speech of others cannot coexist. 116 F.4th at 184 n.13 (acknowledging that the court's decision may conflict with the Third Circuit's own precedent); *id.* at 184 (stating that first-party speech for First Amendment purposes must be "first-party speech under § 230, too").

[16] *See Zeran*, 129 F.3d at 330 (collecting Section 230's statutory findings recognizing the importance of preserving the Internet as a forum for speech and as a free market subject to a minimum of state regulation); *id.* at 331 ("The amount of information communicated via interactive computer services is . . . staggering. The specter of . . . liability in an area of such prolific speech would have an obvious chilling effect. . . . Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect."); *Force*, 934 F.3d at 77–80 (Katzmann, C.J., concurring in part and dissenting in part) (documenting the legislative history of Section 230 and collecting cases). Consistent with this congressional purpose, amicus curiae Software & Information Industry Association points out that the financial consequences of requiring such filtering, including significant legal exposure for inadequate filtering, would pose obvious problems for newer and smaller businesses in particular.

§ 230(c)(1), which, in spite of its often-discussed connection with specific instigating judicial decisions, "cannot be ignored": "Congress grabbed a bazooka to swat [a] fly." *Id.* at 80 (Katzmann, C.J., concurring in part and dissenting in part).

Given that "First Amendment values . . . drive the CDA," it should be no surprise if the two protections overlap. *Google, Inc. v. Hood*, 922 F.3d 212, 220 (5th Cir. 2016) (quoting *Doe v. Backpage.com, LLC*, 817 F.3d 12, (1st Cir. 2016)). As we recognized in *MySpace*, drawing on the Fourth Circuit's influential *Zeran* decision, "[digital] service providers . . . subject to liability only for the publication of information, and not for its removal . . . would have a natural incentive simply to remove messages upon notification [of a possible harm,] whether the contents were [actually harmful] or not." 528 F.3d at 418 (quoting *Zeran*, 129 F.3d at 333). This would have an obvious "chilling effect on the freedom of Internet speech," implicating basic First Amendment freedoms as well as Section 230's more specific protections for internet speech. *Id.* (quoting *Zeran*, 129 F.3d at 333).[17] Viewing our Section 230 precedent together with *Moody*, the First Amendment protects the

---

[17] The Attorney General also invokes the strong presumption against preemption that applies in areas of traditional state authority such as the protection of children. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "[I]n more recent years," however, "the Supreme Court has declined to apply such a presumption in express-preemption cases." *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023 (10th Cir. 2022) (collecting cases). In any case, "that presumption can be overcome where . . . Congress has made clear its desire for pre-emption," *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001), and it "is not triggered when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000). Because we conclude that the monitoring and filtering requirement is preempted based on "Congress' intent" as "primarily . . . discerned from the language of the pre-emption statute and the statutory framework surrounding it," in addition to the "structure and purpose of the statute as a whole," consistent with our precedent interpreting federal regulation of the Internet virtually from its inception, this presumption is overcome to the extent that it applies. *Medtronic*, 518 U.S. at 485–86 (citation modified).

DSPs' editorial discretion from unconstitutional government regulation, and Section 230 protects those same decisions from civil liability based on third-party content. The argument that we must choose between them presents a false choice.

### C

Because we hold that the monitoring and filtering requirement is preempted by Section 230 of the CDA, we do not reach the constitutional issues presented here.[18] CCIA and NetChoice have shown a likelihood of success on the merits of their preemption claim, which is enough to support the district court's granting of a preliminary injunction in their favor.

## IV

On this record, the SEAT plaintiffs' fears of censorship based on indirect regulation are insufficient to support standing for a pre-enforcement challenge, and their challenge to the age-verification requirement is now foreclosed. The monitoring and filtering requirement separately challenged by CCIA and NetChoice, however, is preempted by Section 230 of the CDA. We therefore AFFIRM the order of the district court as to CCIA and NetChoice, but VACATE the order of the district court as to the SEAT plaintiffs and REMAND for proceedings consistent with this opinion.[19]

---

[18] "[W]e do not decide questions of a constitutional nature 'unless absolutely necessary to decide the case[.]'" *A.A. ex. rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 273 (5th Cir. 2010) (quoting *United States v. Lipscomb*, 299 F.3d 303, 359 (5th Cir. 2002)).

[19] "[A]n inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see Murthy*, 603 U.S. at 76 (remanding for further proceedings where plaintiffs' showing with respect to standing was insufficient at the preliminary injunction phase). Based on our standing analysis, it is not clear that the SEAT plaintiffs' showing with respect to standing cannot be cured.

James C. Ho, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

The Securing Children Online through Parental Empowerment Act (SCOPE Act) does what its title suggests: It protects children from the dangers of social media. It does so by requiring digital service providers to implement measures to prevent children from being exposed to "harmful material"—namely, content that promotes suicide, self-harm, eating disorders, substance abuse, stalking, bullying, harassment, grooming, trafficking, child pornography, and other sexual exploitation or abuse. Tex. Bus. & Com. Code § 509.053(a).

Notably, the Act does not hold providers strictly liable just because such content inadvertently appears on their platforms. It merely requires digital service providers to take reasonable steps to minimize the potential display of such content to children. *See* Tex. Bus. & Com. Code § 509.053(b). And if a platform fails to take such steps, parents may seek declaratory or injunctive relief against the provider. *See* Tex. Bus. & Com. Code § 509.152(b).

The district court entered a broad preliminary injunction against the enforcement of the SCOPE Act. The panel majority today vacates that injunction in part. I concur in that partial vacatur. But I would go further and vacate the injunction in its entirety.

* * *

The panel majority enjoins certain provisions of the SCOPE Act on the ground that they're preempted by section 230 of the Communications Decency Act. But that misreads section 230. *See* 47 U.S.C. § 230(c)(1). Section 230 is triggered only when a provider is treated as the "publisher" or "speaker" of content provided by "another" information content

provider. *Id.* So it does not apply when a provider is held liable for its *own* content—including its curation of third-party content.

That's what Justice Thomas intimated in *Doe ex rel. Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2494 (2024) (Thomas, J., dissenting from denial of certiorari). It's what the Third Circuit held in *Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3rd Cir. 2024). And it's the approach we adopted in *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 795–96 (5th Cir. 2024) (citing, *inter alia*, *Anderson*). Because curation of third-party content is fundamentally different from publication of third-party content. A digital service provider may choose to publish content created by third parties. But the providers engage in their own speech when they curate that content. The Supreme Court has so held. *See Moody v. NetChoice*, 603 U.S. 707, 738 (2024). So have we. *See Little v. Llano County*, 138 F.4th 834, 852 (5th Cir. 2025).

And it's that distinction between curation and publication—that is, between first-party speech and third-party speech—that explains why section 230 doesn't preempt the SCOPE Act. Because the Act does not hold digital service providers liable as the publisher or speaker of third-party content. It simply holds digital service providers liable for their own efforts to curate that content.

So I would adhere to *Moody*, *Little*, *Anderson*, and *A.B.*, and vacate the injunction in its entirety. Because the majority declines to do so, I respectfully dissent.

## I.

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). We have construed this provision to insulate social media companies from liability for "all claims stemming from their *publication of*

*information created by third parties*." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)) (emphasis in original). Any state law that holds social media companies liable for content posted by their users is accordingly preempted by federal law.

But although section 230 preempts a state law that treats a provider as the publisher or speaker of content "provided by *another* information content provider," 47 U.S.C. § 230(c)(1) (emphasis added), it has no impact on state laws that hold social media companies accountable for their *own* speech.

The distinction between first-party and third-party speech plays a critical role here, because section 230 applies only to third-party speech—whereas curation, by contrast, is first-party speech.

Recent Supreme Court and circuit precedent confirm as much. In *Moody*, the Supreme Court applied the First Amendment to social media platforms when they exercise editorial control over the content on their platforms. *See* 603 U.S. at 738. As the Court explained, "[t]he individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint." *Id.* "Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality." *Id.*

We recently invoked *Moody* and its treatment of curation as first-party speech in the public library context. In *Little*, we noted that "a library expresses itself by deciding how to shape its collection." 138 F.4th at 837. And of course, "a library does *not* speak through the words of the books themselves." *Id.* (emphasis added). Indeed, we noted the absurdity of treating the library as if it were endorsing every word of every book in its

collection. As we explained: "Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message." *Id.* (quotations omitted). "The [public] library is not babbling incoherently in the voices of Captain Ahab, Hester Prynne, Odysseus, Raskolnikov, and Ignatius J. Reilly." *Id.* "Rather, the library speaks by selecting some books over others and presenting that collection to the public—just as a museum does when it curates a collection of various schools of art. No one thinks the museum is contradicting itself by featuring both Rembrandt and Andy Warhol." *Id.*

So curation is speech. And it is speech that is distinct from the underlying content. Posts that appear on a child's social media feed are the speech of third parties. But the algorithm that social media companies design to curate that feed constitute the first-party speech of the companies.

Justice Thomas has noted how this distinction between curation and third-party content may have direct implications for cases involving section 230. And he has suggested that social-media platforms are deploying the distinction between curation and third-party content inconsistently—and self-servingly—in an effort to turn § 230 into "a get-out-of-jail free card." *Doe*, 144 S. Ct. at 2494 (Thomas, J., dissenting from denial of certiorari).

As he points out, when "platforms organize users' content into newsfeeds or other compilations," they claim that they are "engage[d] in constitutionally protected speech." *Id.* Yet "[w]hen it comes time for platforms to be held accountable for their websites, however, they argue the opposite." *Id.* "In the platforms' world, they are fully responsible for their websites when it results in constitutional protections, but the moment that responsibility could lead to liability, they can disclaim any obligations and enjoy greater protections from suit than nearly any other industry." *Id.*

"The Court should consider if this state of affairs is what § 230 demands." *Id.*

Consistent with Justice Thomas's observations, the Third Circuit has recognized that section 230 applies only to the publication of third-party content, and not to the curation of such content. In *Anderson*, the court noted that, "[g]iven the Supreme Court's observations [in *Moody*] that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms, it follows that doing so amounts to first-party speech under § 230, too." 116 F.4th at 184 (cleaned up).

We have followed the Third Circuit's limited approach to section 230 in this circuit as well. In *A.B.*, we concluded that "section 230 does not provide a general immunity against all claims derived from third-party content." 123 F.4th at 795 (quotations omitted). To the contrary, "providers of interactive computer services may be held liable for speech or conduct that is properly attributable to them, even if third-party speech exists somewhere upstream." *Id.* at 795–96 (citing, *inter alia*, *Anderson*).

**II.**

The SCOPE Act concerns curation. So it's not preempted by section 230.

That's because the Act simply imposes a duty on social media companies to meet certain standards for curation—that is, for their *own* speech. It imposes no penalty based on the publication of third-party speech.

So if third-party content leads to harm to children, the SCOPE Act does not hold social media companies liable, so long as they have met its standards for curation. To use an analogy, when a child misbehaves, that does not (necessarily) mean that the parent has failed. Whether the parent

has been negligent is a separate question entirely. And so too here: the SCOPE Act considers the curation decisions made by social media companies—not the harm caused by the third-party content itself.

**III.**

As for the First Amendment challenge to the SCOPE Act not reached by the panel majority: "States have a profound interest in protecting the innocence of children," and "[n]othing in the First Amendment prevents states from taking steps to shield children" from harmful content. *Book People, Inc. v. Wong*, 98 F.4th 657, 659 (5th Cir. 2024) (Ho, J., dissenting from denial of rehearing en banc). I would have simply certified the questions regarding the proper interpretation of the SCOPE Act to allow the Supreme Court of Texas to clarify the meaning of state law.

* * *

The SCOPE Act isn't preempted by section 230 for one simple reason: Because it regulates curation, not publication—first-party speech, not third-party speech.

So I would vacate the injunction in its entirety. Because the panel majority vacates the injunction only in part, I concur in the judgment in part and dissent in part.