Nos. 24-50721 & 25-50096

# In the United States Court of Appeals for the Fifth Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,
*Plaintiffs-Appellees*,
*v.*
KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant*.

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ;
AMPERSAND GROUP, L.L.C.; BRANDON CLOSSON,
*Plaintiffs-Appellees*,
*v.*
KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant*.

On Appeals from the United States District Court
for the Western District of Texas, Austin Division
Nos. 1:24-cv-849 & 1:24-cv-945

## OPPOSITION TO PETITION FOR REHEARING EN BANC

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001

*Counsel for Plaintiffs-Appellees CCIA and NetChoice*

# CERTIFICATE OF INTERESTED PERSONS

24-50721

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION;
NETCHOICE, L.L.C.,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiffs-Appellees CCIA and NetChoice have no parent corporations and no publicly held corporation owns 10% or more of their respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA; and NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice.

**Counsel for Plaintiffs-Appellees CCIA and NetChoice:**
Steven P. Lehotsky (lead counsel)
Jeremy Evan Maltz
Scott A. Keller (former)

**Defendant-Appellant:**
Ken Paxton, in his official capacity as Attorney General of Texas

**Counsel for Defendant-Appellant:**
Ken Paxton
Brent Webster
William R. Peterson
William F. Cole
Benjamin W. Mendelson
Todd A. Dickerson
Cameron Fraser (former)
Eric Scott Abels (former)
OFFICE OF THE ATTORNEY GENERAL

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky
*Counsel of Record for*
*Plaintiffs-Appellees* CCIA *and NetChoice*

# TABLE OF CONTENTS

Page

Table of Authorities ........ iv

Introduction ........ 1

Background ........ 2

Standard of Review ........ 4

Argument ........ 4

I. The panel majority correctly concluded that 47 U.S.C. § 230 preempts Texas HB18's content-moderation requirements, and Defendant's contrary arguments would unravel § 230's most fundamental protections........ 4

A. Section 230's plain text protects websites from publisher liability for third-party speech, which includes a range of editorial activities, such as monitoring for and blocking particular speech. ........ 4

B. The panel majority correctly applied this Court's precedent to hold that § 230 preempts HB18's content-moderation requirements. ........ 8

C. Defendant's and the panel dissent's interpretation of § 230 would recreate precisely the problem that Congress solved when enacting § 230, with adverse consequences for all manner of online speech. ........ 10

II. This Court should not revisit its § 230 precedent, which accords with the consensus view among federal courts of appeals—and which both Congress and the Supreme Court have left undisturbed, both pre- and post-*Moody*. ........ 14

Conclusion ........ 18

Certificate of Service ........ 19

Certificate of Compliance ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.B. v. Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024)....................4, 6, 8, 9, 10

*Anderson v. TikTok, Inc.*,
116 F.4th 180 (3d Cir. 2024)....................9, 15, 16

*Ben Ezra, Weinstein, & Co. v. Am. Online*,
206 F.3d 980 (10th Cir. 2000)....................15

*Estate of Bride by & through Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024)....................17

*Doe Through Roe v. Snap, Inc.*,
2023 WL 4174061 (5th Cir. June 26, 2023)....................17

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025)....................15, 17

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008)....................9, 10

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019)....................17

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021)....................16, 17

*Force v. Facebook*,
934 F.3d 53 (2d Cir. 2019)....................14, 17

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024)....................10

*Gonzalez v. Google LLC*,
598 U.S. 617 (2023) (per curiam) ....................................................................17

*Gonzalez v. S. Pac. Transp. Co.*,
773 F.2d 637 (5th Cir. 1985)...............................................................................4

*Jones v. Dirty World Ent. Recordings LLC*,
755 F.3d 398 (6th Cir. 2014)...............................................................................14

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014)....................................................................15, 17

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025)........................................................................14, 17

*Monsarrat v. Newman*,
28 F.4th 314 (1st Cir. 2022) .............................................................................14

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...........................................................................1, 2, 7, 17

*Planet Green Cartridges, Inc. v. Amazon.com, Inc.*,
2025 WL 869209 (9th Cir. Mar. 20, 2025).......................................................17

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ......................................11, 12

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)...........................................................................................16

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997)...................................................................5, 11, 14

**Statutes**

47 U.S.C. § 230 .......... 1, 2, 4-18

Protection of Lawful Commerce in Arms Act of 2005, Pub. L. No. 109-92, 119 Stat. 2095 (Oct. 26, 2005) .......... 7

Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488 (Nov. 16, 1993) .......... 7

Tex. Bus. & Com. Code § 509.053 .......... 1, 2, 3, 10

**Other Authorities**

5th Cir. I.O.P. .......... 4, 9

Appellant Br., *Free Speech Coal., Inc. v. Paxton*, 2023 WL 6465441 (5th Cir. Sept. 25, 2023) .......... 8, 10

Melissa Pittaoulis, *Hate Speech & Digital Ads: The Impact of Harmful Content on Brands*, CCIA Research Center (Sept. 5, 2023), https://perma.cc/2CM9-2KLD .......... 13

Prosser & Keeton on the Law of Torts § 113 (5th ed. 1984) .......... 5

## INTRODUCTION

Defendant asks this Court to go en banc to abandon the Circuit's wholly correct precedent, inviting the Court to switch sides to the short—and wrong—side of a lopsided circuit split. The Court should decline that invitation.

Congress enacted 47 U.S.C. § 230 to preempt causes of action and liability for online services' choices about whether and how to display third-party speech. Confirming the statute's plain text, courts have overwhelmingly held as much. And this Court is no different. *See* Op.26-27 (citing *A.B. v. Salesforce, Inc.*, 123 F.4th 788 (5th Cir. 2024); *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008)). So the district court and panel majority correctly concluded that § 230 preempts Texas House Bill 18's (2023) requirements for certain online services to monitor and block specific categories of user-generated content on minors' accounts. § 509.053(a).[1]

Defendant's contrary arguments fail to grapple with § 230's plain text. And they rely on a fundamental misunderstanding of the Supreme Court's ruling in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Worse, Defendant's interpretation would recreate the problem that Congress enacted § 230 to address—when Congress expressly rejected a state court decision that imposed precisely the rule Defendant advocates here. On Defendant's view, even the

[1] Statutory citations in this brief refer to the Texas Business & Commerce Code, unless otherwise specified.

most basic act of content moderation deprives online services of § 230's protections. No court in the country has ever held as much, and this Court should not be the first.

This Court should deny the Petition.

## BACKGROUND

*Factual background.* CCIA's and NetChoice's covered members craft and enforce "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, ROA.128-29 ¶¶ 8-10; ROA.146 ¶¶ 10-17; ROA.167-75 ¶¶ 17-28; ROA.184-86 ¶¶ 10-14. They have defended those policies against Texas's attempts to severely curtail members' content moderation. *See Moody*, 603 U.S. at 717.

Particularly relevant here, the record shows that CCIA's and NetChoice's members have policies disallowing broad categories of objectionable speech, including content regulated by the Act. ROA.147-53 ¶¶ 12-17; ROA.168-70 ¶ 19; ROA.185 ¶ 13.

*Legal background.* HB18 directs covered websites' content moderation. Defendant himself has said that HB18 requires "filtering" or "blocking" user-generated content. *E.g.*, Def.Merits.Br.2, 5-6, 10, 36, 48. Thus, HB18 does not regulate all of covered websites' content moderation or content curation. *Cf.* Diss.Op.39. Instead, HB18 directs websites to monitor for particular content—and then filter that content on minors' accounts. § 509.053(a) ("develop

and implement a strategy to prevent [a] known minor's exposure to" categories of speech).

Underscoring HB18's regulatory scope, websites' strategies "must include" mechanisms that would, among other things, "block from display" prohibited content, including by:

> (A) creating and maintaining a comprehensive list of harmful material or other content described by Subsection (a) to block from display to a known minor;
>
> (B) using filtering technology and other protocols to enforce the blocking of material or content on the list under Paragraph (A);
>
> (C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described by Subsection (a);
>
> (D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;

§ 509.053(b)(1).

## STANDARD OF REVIEW

This Court has explained that "petitions for rehearing en banc are the most abused prerogative of appellate advocates in the Fifth Circuit." 5th Cir. I.O.P. at 36. Accordingly, this "extraordinary procedure" is warranted only where (1) the panel committed "an error of exceptional public importance"; or (2) the opinion "directly conflicts with prior Supreme Court, Fifth Circuit or state law precedent." *Id.*; *see Gonzalez v. S. Pac. Transp. Co.*, 773 F.2d 637, 641 (5th Cir. 1985). Defendant's petition meets neither condition here.

## ARGUMENT

### I. The panel majority correctly concluded that 47 U.S.C. § 230 preempts Texas HB18's content-moderation requirements, and Defendant's contrary arguments would unravel § 230's most fundamental protections.

There is no error here. The panel majority correctly applied this Court's § 230 precedent, which itself faithfully reflects § 230's plain meaning. Defendant's contrary and atextual interpretation would recreate the problem that Congress solved through § 230: the tradeoff between exercise of editorial discretion and liability for third-party content.

#### A. Section 230's plain text protects websites from publisher liability for third-party speech, which includes a range of editorial activities, such as monitoring for and blocking particular speech.

1. "[W]e start with the text." *Salesforce*, 123 F.4th at 793. Under § 230, "No provider or user of an interactive computer service shall be treated as the

publisher or speaker of any information provided by another information content provider," *e.g.*, a user or advertiser. 47 U.S.C. § 230(c)(1). Congress expressly preempted "inconsistent" state laws, protecting websites from "cause[s] of action" and "liability." *Id.* § 230(e)(3).

By using the term "publisher," Congress codified the pre-existing—and broad—understanding of what publishers do. A "publisher" includes all those "who take[] part in the publication" of speech both upstream and downstream—including "*editor*[*s*]" and "printer[s]," and "vendor[s]." Prosser & Keeton on the Law of Torts § 113 (5th ed. 1984) (emphasis added); *see Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997) ("[p]ublication," among other things, "describe[s] the choice by an author to include certain information" (collecting authorities)). After all, publication is a multi-faceted and multi-stage process where public dissemination of material is only the end of the process. *Contra* Diss.Op.35-38 (suggesting that to "be treated as publisher" is limited to end act of publication). Among the steps in that process, publishers choose both *whether* and *how* to publish content.

And this Court need not rely on the word "publisher" in Section 230(c)(1) alone. Section 230's other provisions make clear that its protections extend to various editorial functions. In defining the kinds of online services that receive § 230's protections, Congress underscored that "filter[ing]," "screen[ing]," or "disallow[ing]" content does not remove § 230's protections. 47 U.S.C. § 230(c), (f)(4). These inclusions also make clear that Congress

did not intend to discourage or exclude online services that moderate content.

Accordingly, a "publisher's role" under § 230 "quintessentially" includes "decisions relating to the monitoring, screening, and deletion of content." *Salesforce*, 123 F.4th at 793 (quoting *MySpace*, 528 F.3d at 420); *see infra* pp.14-15 (collecting holdings from federal courts of appeals). Those protections are technology agnostic "to promote the continued development of the Internet": As the technical means of exercising editorial control evolve, § 230's protections remain the same. 47 U.S.C. § 230(b)(1).

Defendant largely ignores these textual requirements. In place of discussing what § 230 actually says, Defendant asserts that § 230 creates a dichotomy between "first-party" speech and "third-party" speech. *See* PFR.2, 5, 10-11; Diss.Op.35-39. But neither of those terms appears in the statute. Rather, § 230 asks whether a cause of action or liability would "treat[]" a website "as the publisher or speaker" (who have their own bevy of First Amendment rights) of "information" provided by a third party. 47 U.S.C. § 230(c)(1).

2. Because myriad "publisher" functions receive First Amendment protections, it should be unsurprising that there is overlap between § 230's statutory protections and the First Amendment's constitutional protections. *See*

Op.31-33.[2] And that is why websites' First Amendment rights do not somehow negate § 230's statutory protections.

Section 230 does not create a dichotomy where expressive conduct can either be protected by § 230 or the First Amendment—but not both. The protections are complementary, not mutually exclusive. True, the protections are not coterminous. For instance, § 230 can protect more than the First Amendment, such as websites' disseminating user-created defamation. Likewise, some actions are protected by the First Amendment, which applies beyond websites' disseminating speech created by others. Nevertheless, a variety of actions receive both statutory and constitutional protections.

*Moody* changed *nothing* about § 230's scope—nor could it have. *Contra* PFR.10-11; Diss.Op.36-38. Almost needless to say, the *Moody* majority opinion said nothing about § 230. Relevant here, *Moody* reiterated that publishers' "choices" about what speech to "include and exclude" have long been protected by the First Amendment. 603 U.S. at 716; *id.* at 731 ("[T]he First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to

[2] Congress often creates statutory protections that partially overlap with freedoms secured by the Constitution—whether to fill gaps in existing constitutional precedent or to create additional avenues for litigants to assert their rights. *See* Protection of Lawful Commerce in Arms Act of 2005, Pub. L. No. 109-92, 119 Stat. 2095 (Oct. 26, 2005); The Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488 (Nov. 16, 1993).

accommodate messages it would prefer to exclude."). That is, choices about what to exclude are "functions traditionally associated with publication." *Salesforce*, 123 F.4th at 793. Those constitutional protections have always co-existed with § 230's protections. In turn, § 230 says that websites are not liable for removing or not removing speech "provided by another [user]." 47 U.S.C. § 230(c)(1). Put otherwise, § 230 protection applies to protect a website's decisions as to user-generated speech, even though websites simultaneously engage in First-Amendment-protected activity.[3]

### B. The panel majority correctly applied this Court's precedent to hold that § 230 preempts HB18's content-moderation requirements.

The panel majority correctly held that "[a]ctions to enforce [HB18's] monitoring and filtering requirement are claims stemming from [websites'] actions as publishers, that is, from their monitoring, screening, and deletion of content, and are thus squarely preempted by Section 230." Op.28. This conclusion follows directly from Section 230's text, this Court's precedent, and Defendant's own concession that States cannot "require the *monitoring or deletion* of third-party content" on online services. Appellant Br.31, *Free Speech Coal., Inc. v. Paxton*, 2023 WL 6465441 (5th Cir. Sept. 25, 2023)

[3] In other litigation, Defendant disputes that CCIA's and NetChoice's members engage in editorial conduct protected by the First Amendment. If there is any "asymmetry" or "inconsisten[cy]" in the positions of the parties, they belong to Defendant's arguments. *Contra* PFR.10; Diss.Op.37.

(emphasis added) ("*FSC* Br."). So Defendant cannot seriously contend that the panel committed "an error of" any kind. 5th Cir. I.O.P. at 36.

This Court has established a straightforward test to determine whether § 230 applies: "[I]f the [law] would not require the defendant to *exercise some kind of publication or editorial function*, then section 230 does not preclude liability." *Salesforce*, 123 F.4th at 797.[4] In other words, this Court must ask whether HB18 would "require [websites] to exercise publication or editorial functions to avoid liability." *Id.* Such functions include: (1) "screening, monitoring, or filtering content"; (2) "reviewing or analyzing third-party content"; (3) "transmitting or hosting third-party content"; (4) "editing or altering third-party content"; (5) "developing or enforcing content-moderation policies"; or (6) "deciding how third-party content was organized or displayed." *Id.* at 799.

Defendant concedes many factors justifying § 230 preemption, each of which is plain on the face of the law and would be sufficient to declare HB18's monitoring-and-censorship requirements preempted. For example, under HB18, covered websites must "filter[] content" and HB18 would penalize websites for "deciding how third-party content was organized or displayed." *Salesforce*, 123 F.4th at 799. This Court has long recognized that—at

---

[4] Accordingly, *Salesforce* did not "cite[] [the Third Circuit's decision in] *Anderson*" "approvingly" for the proposition that § 230 does not protect the exercise of traditional editorial functions—which this court has held since *MySpace*. *Contra* PFR.11.

its core—§ 230 provides that websites "cannot be held liable for harmful communications that they fail to remove." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd on other grounds*, 606 U.S. 461 (2025); *see MySpace*, 528 F.3d at 418-19 ("failure[s] to implement basic safety measures to protect minors"); *but see* 47 U.S.C. § 230(e)(1) (providing inapplicable and limited exceptions for websites' violations of federal criminal law). Perhaps for that reason, "requir[ing] the monitoring or deletion of third-party content" is also precisely what Defendant has said § 230 preempts. *FSC* Br.30. And Defendant concedes here that HB18 generally requires "filtering" or "blocking" content. *E.g.*, Def.Merits.Br.2, 5-6, 10, 36, 48.

Likewise, covered websites must engage in the protected "publication" and "editorial" functions of "screening" and "monitoring content." *Salesforce*, 123 F.4th at 799; *id.* ("reviewing or analyzing third-party content"). The statutory text says as much, requiring websites to, *e.g.*, "identify recurring harmful material or other content." § 509.053(b)(1)(C). Defendant concedes this as well. Def.Merits.Br.2, 10, 48.

### C. Defendant's and the panel dissent's interpretation of § 230 would recreate precisely the problem that Congress solved when enacting § 230, with adverse consequences for all manner of online speech.

1. Defendant asks this Court to abandon this Circuit's correct precedent. But under Defendant's preferred view of the law, § 230 would not protect websites from exactly the kind of liability Congress sought to preempt.

Fundamentally, § 230 eliminated any trade-off between wielding editorial control (protected by the First Amendment) and risking liability for disseminating others' speech. Accordingly, Defendant's petition fundamentally misunderstands how § 230's protections encourage content moderation—and what Defendant's preferred rule would produce. PFR.12.

Congress enacted Section 230 to correct for a state-court decision that imposed liability on a website because it disseminated allegedly defamatory user-created speech, while simultaneously exercising editorial discretion to remove certain speech it considered objectionable. *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *2-5 (N.Y. Sup. Ct. May 24, 1995). The website in *Stratton Oakmont* engaged in (1) "promulgation of 'content guidelines'" about acceptable speech on the service; and (2) "use of a software screening program which automatically prescreens" content. *Id.* at *2. In other words, the website in that case exercised "editorial control" to determine whether and how to disseminate and display content created by others. *Id. Stratton Oakmont* essentially penalized those editorial activities by concluding they rendered the website liable as a "publisher" of speech created by others. If adopted by other courts, that reasoning would have made it practically impossible for websites to disseminate speech created by others while still retaining editorial discretion over their own websites. Congress therefore acted swiftly, by passing § 230, to "remove disincentives for the development and utilization of blocking and filtering technologies" implemented by websites. 47 U.S.C. § 230(b)(4); *see Zeran*, 129 F.3d at 331

("Congress enacted § 230 to remove the disincentives to selfregulation created by the *Stratton Oakmont* decision.").

But Defendant and the panel dissent would have this Court hold that States can unabashedly impose "content-moderation dut[ies]" without § 230 offering any protection. PFR.11-12. Defendant's view of the law mirrors *Stratton Oakmont*, where only websites with *no* content moderation would receive protection from liability. That would create perverse results that are contrary to both websites' and the State's professed interests. Websites replete with hate speech, sexual content, pro-terrorist propaganda, depictions of graphic violence, and all manner of objectionable speech would enjoy § 230's liability protections—and ostensibly would therefore not need to comply with HB18, under even Defendant's cramped view. That would make the internet less safe for all, especially minors. *Contra* PFR.12 (arguing that its view advances minor safety). But the second that such websites endeavor to *voluntarily* remove potentially harmful content, they would lose § 230's protections. Congress enacted § 230 to remove that tradeoff.

In so doing, § 230 has enabled online services to engage in *better* content moderation. Websites can moderate content to address potentially harmful content without fear of liability for the content on their services. And through these voluntary efforts, online services have been able to create safer experiences for all their users.

At bottom, Defendant would have this Court take the Internet back to the mid-1990s and would make websites liable in the precise circumstance—

websites deciding whether to remove content—that Congress enacted § 230 to protect.

2. Defendant's preferred interpretation would also create substantial uncertainty for every website on the Internet that disseminates user-created speech. According to Defendant, the very same editorial decisions that make websites' services useful may be a potential source of liability.

That will lead some websites to either stop disseminating user-created content altogether or stop moderating content—the result Congress intended to forestall by enacting § 230. *See* 47 U.S.C. § 230(b)(3)-(4). Either way, this will fundamentally change these websites and how users can speak online. When websites are overrun with hate speech and abuse, they are obviously less hospitable places for users. Melissa Pittaoulis, *Hate Speech & Digital Ads: The Impact of Harmful Content on Brands*, CCIA Research Center (Sept. 5, 2023), https://perma.cc/2CM9-2KLD. Various websites may decide that comments sections, for example, are more trouble than they are worth and remove them entirely.

Whatever the path, the predictable response to Defendant's preferred interpretation leads to the same place: an Internet with much less user-created speech and much less voluntary policing. Section 230 does not require that outcome. Even if the Court could disregard Congress's plain instructions, that outcome is unnecessary given NetChoice's and CCIA's members' extensive *voluntary* content. *See supra* p.2.

## II. This Court should not revisit its § 230 precedent, which accords with the consensus view among federal courts of appeals—and which both Congress and the Supreme Court have left undisturbed, both pre- and post-*Moody*.

This Court's § 230 precedent is consistent with precedent nationwide from other courts of appeals. Given multiple opportunities to "correct" that precedent in ways that Defendant advocates here, both Congress and the Supreme Court have declined. This Court should too.

A. This Court should not deviate from its precedent to join the short—and incorrect—side of a lopsided circuit split.

Every other circuit to consider the issue (save one) has held that § 230(c)(1) bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330; *see* Op.26 (noticing panel majority's consistency "with other courts of appeal"); *Monsarrat v. Newman*, 28 F.4th 314, 320 (1st Cir. 2022) ("one of the described 'traditional editorial functions' is determining whether to 'publish' certain information" (citation omitted)); *Force v. Facebook*, 934 F.3d 53, 65-66 (2d Cir. 2019) ("us[ing] algorithms to suggest content to users"); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("Decisions about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task."); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("exercise

of a publisher's traditional editorial functions"); *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) ("editing, monitoring, or removing of the content that its users generate through the app" (citation modified)); *Ben Ezra, Weinstein, & Co. v. Am. Online*, 206 F.3d 980, 986 (10th Cir. 2000) ("Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("decision whether to print or retract a given piece of content").

Ignoring that overwhelming weight of authority, Defendant instead points (PFR.10-11) to the Third Circuit's outlier decision in *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024); *see id.* at 184 n.13 (noting deviation from federal court of appeals precedent, including its own). Here, the panel majority correctly rejected *Anderson*'s rationale, for all the reasons explained above at pp.8-10; *see* Op.30-31 n.15. *Anderson*'s identification of "recommendations" as the platform's own speech outside of § 230's protections has no limiting principle. The fundamental decision to disseminate user-generated speech is itself an expressive act, and thus could be deemed "first-party" speech under *Anderson*'s rationale. 116 F.4th at 183. That would have the absurd result that the threshold requirement for § 230's protections (deciding to disseminate "information provided by" a third party) is what strips the service of § 230's protections. 47 U.S.C. § 230(c)(1).

But even if *Anderson* were correct on its own narrow terms, adopting it here would *not* change the outcome in this case. Not even *Anderson*

concluded that States may direct websites to monitor and block user-generated speech. Indeed, if § 230 does not protect decisions about removing—or not removing—content under the theory that such decisions are "the platform's own speech," then § 230 risks being a dead letter. PFR.3. In any event, *Anderson* was self-consciously limited to algorithmic "recommendations," and such recommendations are not at issue here. 116 F.4th at 184 nn.12-14; *see* PFR.10 (noting *Anderson* was based on "recommendations"). So even if this Court thinks that some aspects of content curation raise difficult questions under the consensus view among the federal courts, this is not such a case.

B. Congress has "ratified" the federal courts' consensus interpretation multiple times when amending § 230. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). "Congress, with knowledge of the prevailing judicial understanding of section 230, has twice *expanded* its scope." *In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021) (discussing legislative expansions of § 230 protections in 2002 and 2010). Similarly, Congress's 2018 limitations of § 230 protections for certain claims led to the "conclusion . . . that the . . . amendments were deemed necessary because Congress presupposed" § 230 protects liability for traditional editorial functions. *Inclusive Cmtys.*, 576 U.S. at 537. Thus, in the multiple times that Congress has "amend[ed]" § 230's scope, it has declined to upset the consensus interpretation that § 230 protects the exercise of editorial functions. *Id.* This

"is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals." *Id.* at 536.

C. Similarly, the U.S. Supreme Court has also left this lower-court consensus interpretation in place. It is implausible to think that the Supreme Court, after consciously declining to override the lower courts' consensus § 230 interpretation in *Gonzalez v. Google LLC*, 598 U.S. 617 (2023) (per curiam), silently and indirectly rewrote § 230 to reach that very conclusion over a year later in a case (*Moody*) that did not even present a § 230 question.

Indeed, both before and after 2024's *Moody* decision, the Supreme Court has *repeatedly* declined opportunities to alter the prevailing consensus interpretation of § 230. *E.g.*, *Planet Green Cartridges, Inc. v. Amazon.com, Inc.*, 2025 WL 869209 (9th Cir. Mar. 20, 2025), *cert. denied*, 146 S. Ct. 605 (2025); *Grindr*, 128 F.4th 1148, *cert. denied*, 146 S. Ct. 319 (2025); *Pinckney*, 127 F.4th 516, *cert. denied sub nom. M.P. by & through Pinckney v. Meta Platforms Inc.*, 146 S. Ct. 287 (2025); *Estate of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168 (9th Cir. 2024), *cert. denied sub nom. Estate of Bride v. Yolo Techs., Inc.*, 145 S. Ct. 1435 (2025); *Doe Through Roe v. Snap, Inc.*, 2023 WL 4174061 (5th Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 2493 (2024); *Facebook*, 625 S.W.3d 80, *cert. denied sub nom. Doe v. Facebook, Inc.*, 142 S. Ct. 1087 (2022); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019), *cert. denied*, 590 U.S. 942 (2020); *Force*, 934 F.3d 53, *cert. denied*, 590 U.S. 942 (2020); *Klayman*, 753 F.3d 1354, *cert. denied*, 574 U.S. 1012 (2014).

That too is convincing evidence that the lower courts have reached the right outcome.

* * *

The district court and panel majority got it right because this Court's precedent has it right. Section 230 protects online services' exercise of functions "quintessentially related to a publisher's role." Op.27 (citation omitted). This Court should therefore decline Defendant's invitation to deviate from § 230's text and the overwhelming judicial consensus interpretation—which both Congress and the Supreme Court have left in place. This case gives the Court no reason to join the short and wrong side of a circuit split.

## CONCLUSION

This Court should deny the Petition.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com

*Counsel for Plaintiffs-Appellees CCIA and NetChoice*

## CERTIFICATE OF SERVICE

I certify that on September 24, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. No paper copies were filed in accordance with the changes ordered in General Docket No. 2020-3.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

## CERTIFICATE OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3) and Fifth Circuit Rule 40.2.5 because it contains 3894 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky